# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 24-3006

KAREN CORNISH-ADEBIYI; LUIS SANTIAGO; MONICA BLAIR-SMITH,
individually and on behalf of all others similarly situated,

*Appellants,*

— v. —

CAESARS ENTERTAINMENT, INC.; BOARDWALK REGENCY LLC,
d/b/a Caesars Atlantic City Hotel & Casino; HARRAHS ATLANTIC CITY
OPERATING COMPANY, LLC, d/b/a Harrahs Resort Atlantic City Hotel &
Casino; TROPICANA ATLANTIC CITY CORPORATION, d/b/a Tropicana
Casino and Resort Atlantic City; MGM RESORTS INTERNATIONAL;
MARINA DISTRICT DEVELOPMENT COMPANY, LLC, d/b/a Borgata Hotel
Casino & Spa; HARD ROCK INTERNATIONAL INC.; SEMINOLE HARD
ROCK SUPPORT SERVICES, LLC; BOARDWALK 1000, LLC, d/b/a Hard
Rock Hotel & Casino Atlantic City; CENDYN GROUP, LLC.

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY IN
NO. 1-23-CV-02536, HONORABLE KAREN M. WILLIAMS, DISTRICT JUDGE

## BRIEF AND APPENDIX FOR PLAINTIFFS-APPELLANTS
### Volume 1 of 3 (Pages A-1 to A-18)

ZACH FIELDS
SUSMAN GODFREY LLP
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
(212) 336-8330

SHAWN RAYMOND
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 653-7817

CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
(202) 577-3977

MINDEE J. REUBEN
LITE DEPALMA GREENBERG
    & AFANADOR, LLC
1515 Market Street, Suite 1200
Philadelphia, Pennsylvania 19102
(215) 854-4060

*Attorney for Plaintiffs-Appellants*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (335804)

WILLIAM G. CALDES
ICEE N. ETHERIDGE
JEFFREY L. SPECTOR
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
(215) 496-0300

STANLEY O. KING
KING & KING
231 South Broad Street
Woodbury, New Jersey 08096
(856) 845-3001

*Attorney for Plaintiff-Appellant
Monica Blair-Smith, individually
and on behalf of all others similarly
situated*

JOSEPH J. DEPALMA
CATHERINE B. DERENZE
LITE DEPALMA GREENBERG
& AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iii

Jurisdictional Statement ............................................................ 1

Issues Presented ...................................................................... 2

Introduction ............................................................................ 3

Statement of Facts .................................................................. 15

Procedural History .................................................................. 20

Legal Standard ....................................................................... 24

Summary of Argument ............................................................. 25

Argument ............................................................................... 27

    I.    Plaintiffs Plausibly Allege a Horizontal Price Fixing
        Scheme ....................................................................... 27

        A.    Plaintiffs Plausibly Allege an Anticompetitive
            Agreement ......................................................... 28

            1.    The district court erred by relying on one
                flawed out-of-Circuit decision while
                discounting binding precedent ........................... 32

            2.    The CAC's allegations plausibly support
                the inference of an anti-competitive
                agreement under settled precedent .................... 42

                a.    Parallel Conduct ........................................ 42

                b.    Plus Factors ............................................... 46

        B.    Plaintiffs Plausibly Allege an Unreasonable
            Restraint on Trade ............................................. 52

            1.    The alleged conspiracy is *per se* illegal ............... 54

            2.    The alleged conspiracy unreasonably
                 restrains trade under the rule of reason ........... 57

II.    The District Court Improperly Denied Leave to Amend.................................................................59

Conclusion.................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott v. Latshaw*,
164 F.3d 141 (3d Cir. 1998) ................................................................ 61

*Alston v. Parker*,
363 F.3d 229 (3d Cir. 2004) ............................................................ 5, 60

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010) ..................................................... 14, 33, 34, 36

*Arizona v. Maricopa Cnty. Med. Soc.*,
457 U.S. 332 (1982) ............................................................................ 54

*Brader v. Allegheny Gen. Hosp.*,
64 F.3d 869 (3d Cir. 1995) ................................................................ 53

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) ........................................................ 38, 39

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988) ............................................................................ 67

*Citizen Publ'g Co. v. United States*,
394 U.S. 131 (1969) .................................................................... 33, 54

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ............................................................. 13, 29, 34

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) .............................................................................. 53

*Duffy v. Yardi Systems, Inc.*,
2:23-cv-01391 (RSL), --- F. Supp. 3d ---, 2024 WL 4980771
(W.D. Wash. Dec. 4, 2024) ...................................................... *passim*

*Fed. Trade Comm'n v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020) ........................................................ 58, 59

*Fed. Trade Comm'n v. Cement Inst.*,
   333 U.S. 683 (1948) ............................................................... 29

*Foman v. Davis*,
   371 U.S. 178 (1962) ............................................................... 61

*Gibson v. Cendyn Group, LLC*,
   No. 2:23-cv-00140, 2024 WL 2060260
   (D. Nev. May 8, 2024) ..................................................... *passim*

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773 (1975) ............................................................... 66

*Grayson v. Mayview State Hosp.*,
   293 F.3d 103 (3d Cir. 2002) ................................................. 62

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l*,
   602 F.3d 237 (3d Cir. 2010) ................................................. 32

*In re Domestic Airline Travel Antitrust Litig.*,
   2023 WL 5930973 (D.D.C. Sept. 12, 2023) ........................ 37

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) .............................. 27, 46, 55, 66

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................. 49

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) .......................................... *passim*

*In re NAHC, Inc. Securities Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ............................................... 61

*In re New Jersey Title Ins. Litig.*,
   2009 WL 3233529 (D.N.J. Oct. 5, 2009) ............................ 61

*In re Party City Securities Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) ..................................... 61

*In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 565101
   (E.D. Pa. Oct. 31, 2019) ....................................................... 37

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II),*
709 F. Supp. 3d 478 (M.D. Tenn. Dec. 28, 2023).........................*passim*

*Interstate Circuit, Inc. v. United States,*
306 U.S. 208 (1939) .......................................................*passim*

*Int'l Constr. Prods. LLC v. Caterpillar Inc.,*
419 F. Supp. 3d 791 (D. Del. 2019) ......................................53

*Krantz v. Prudential Invs. Fund Mgmt., LLC,*
305 F.3d 140 (3d Cir. 2002)..............................................62

*Lifewatch Servs. Inc. v. Highmark Inc.,*
902 F.3d 323 (3d Cir. 2018).................................47, 57, 58

*Long v. Wilson,*
393 F.3d 390 (3d Cir. 2004)..............................................60

*McTernan v. City of York,*
577 F.3d 521 (3d Cir. 2009)..............................................25

*Meyer v. Kalanick,*
174 F. Supp. 3d 817 (S.D.N.Y. 2016) ....................................54

*Ohio v. Am. Express Co.,*
585 US 529 (2018) .............................................52, 54, 57, 67

*Phillips v. Cnty. of Allegheny,*
515 F.3d 224 (3d Cir. 2008)...............................60, 61, 62

*Poller v. Columbia Broad. Sys., Inc.,*
368 U.S. 464 (1962) ......................................................29

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
124 F.3d 430 (3d Cir. 1997)..............................................47

*Salud Servs., Inc. v. Caterpillar, Inc.,*
67 F. Supp. 3d 663 (D.N.J. 2014).........................................61

*Shane v. Fauver,*
213 F.3d 113 (3d Cir. 2000)...................................5, 59, 61

*Sheldon Pontiac v. Pontiac Motor Div., Gen. Motors Corp.,*
  418 F. Supp. 1024 (D.N.J. 1976), *aff'd,* 566 F.2d 1170
  (3d Cir. 1977) ............................................... 43

*United States v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940) ................................... *passim*

*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.,*
  967 F.3d 295 (3d Cir. 2020) ......................... 24, 25

*Standard Oil Co. of New Jersey v. United States,*
  221 U.S. 1 (1911) ........................................ 52

*Synthes, Inc. v. Marotta,*
  281 F.R.D. 217 (E.D. Pa. 2012) ........................ 67

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001) ........................... 67

*Triangle Conduit & Cable Co. v. Fed. Trade Comm'n,*
  168 F.2d 175 (7th Cir. 1948), *aff'd sub nom. Clayton Mark*
  *& Co. v. Fed. Trade Comm'n,* 336 U.S. 956 (1949) ......... 29-30

*Bell Atlantic Corp. v. Twombly,*
  50 U.S. 544 (2007) .................................... 25, 42

*United States v. Apple, Inc.,*
  791 F.3d 290 (2d Cir. 2015) ........................... 55

*United States v. Gen. Motors Corp.,*
  384 U.S. 127 (1966) ................................... 43

*United States v. Masonite Corp.,*
  316 U.S. 265 (1942) ................................. *passim*

*United States v. MMR Corp. (LA),*
  907 F.2d 489 (5th Cir. 1990) .......................... 55

*United States v. Union Pac. R. Co.,*
  226 U.S. 61 (1912) .................................... 14

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.,*
  873 F.3d 185 (3d Cir. 2017) ....................... 13, 27, 28

*Viking Theatre Corp. v. Paramount Film Distrib. Corp.,*
320 F.2d 285 (3d Cir. 1963) ....................................................43

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
627 F.3d 85 (3d Cir. 2010) ....................................25, 54, 58

*William Goldman Theaters v. Loew's, Inc.,*
150 F.2d 738 (3d Cir. 1945) ...............................................37

**Statutes and Other Authorities:**

15 U.S.C. § 1 ......................................................1, 4, 10, 27

28 U.S.C. § 1291.......................................................................1

28 U.S.C. § 1331.......................................................................1

Fed. R. Civ. P. 12(b)(6) ...................................................24, 60

Fed. R. Civ. P. 15(a).................................................27, 60, 63

6 Wright, Miller & Kane, *Federal Practice & Procedure* § 1487
(2d ed. 1990).......................................................................60

Ariel Ezrachi & Maurice E. Stucke, *Artificial Intelligence
& Collusion: When Computers Inhibit Competition*,
2017 U. ILL. L. REV. 1775 (2017) .........................................11

Br. of United States, *Gibson v. Cendyn Grp. LLC*, No. 24-3576
(9th Cir. Oct. 24, 2024) ........................................................34

Brendon Ballou, *The "No Collusion" Rule*, 32 STAN. L. & POL'Y
REV. 213 (2021) ...................................................................11

Christopher R. Leslie, *Predatory Pricing Algorithms*,
98 N.Y.U. L. Rev. 49 (2023) ................................................12

Hannah Garden-Monheit & Ken Merber, *Price fixing by algorithm
is still price fixing*, Fed. Trade Comm'n (March 1, 2024) ...................11

Lina Khan (@LinaKhanFTC), Twitter (Mar. 1, 2024) ...........................11

Maureen K. Ohlhausen, *Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, Fed. Trade Comm'n (May 23, 2017) .............................................................. 10, 11

Michal S. Gal, *Algorithms as Illegal Agreements*, 34 BERKELEY TECH. L.J. 67 (2019).................................................. 11

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 305 (5th ed. Supp. 2022)............................................. 53

*Revenue Management a Good bet for Caesars Entertainment*, Supply & Demand Chain Executive (Aug. 3, 2004) ............................ 40

Salil K. Mehra, *Antitrust and the Robo-Seller: Competition in the Time of Algorithms*, 100 MINN. L. REV. 1323 (2019) ........................... 11

## Jurisdictional Statement

The district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' antitrust claims arise under the Sherman Act, 15 U.S.C. § 1.

The court granted Defendants' motion to dismiss and entered final judgment on September 30, 2024. AR 1–14 (opinion); AR 15 (order). Plaintiffs filed a timely notice of appeal on October 25, 2024. AR 17. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

<u>Issues Presented</u>

I.     Whether the district court committed legal error by holding that Plaintiffs did not plead concerted action under Section One of the Sherman Act, when they plausibly alleged Casino-Hotel Defendants knowingly delegated their previously independent pricing strategies and decisions to the same third-party pricing algorithm products, which analyzed their pooled confidential data using proprietary artificial intelligence to generate prices they overwhelmingly adopted, while knowing one another were doing the same.

II.     Whether the district court abused its discretion by dismissing the operative complaint with prejudice and denying Plaintiffs' request to amend without previously identifying the complaint's purported deficiencies or ruling that an amendment to cure those deficiencies would be futile or inequitable.

## Introduction

The district court erred in dismissing this case because Plaintiffs-Appellants ("Plaintiffs") plausibly allege that competitors, facilitated by a shared agent, followed a common plan to artificially inflate the prices of guest rooms at Atlantic City casino-hotels. Throughout its 126 pages, the Consolidated Amended Complaint ("CAC")[1] details how Casino-Hotel Defendants[2] knowingly have used the same Rainmaker pricing algorithm platform as a coordinated pricing machine—delegating their formerly independent pricing strategies and decisions to a shared "brain." Although the artificial intelligence ("AI") powering the platform is complex and certain of its details (for now) unknown, the basic scheme that Defendants have employed is not.

---

[1] The CAC, *see* AR 207–339, consolidated three class actions filed in the same district alleging substantially similar conduct. Thus, although the CAC is technically an "amended" pleading, Plaintiffs did not amend substantively to cure any deficiencies identified by a prior dismissal.

[2] "Casino-Hotel Defendants" refers to the corporate parent Defendants and affiliates Caesars Entertainment, MGM Resorts, Hard Rock International, and Seminole Hard Rock Support Services, and their respective Atlantic City casino-hotels: Caesars Atlantic City, Harrah's Atlantic City, Tropicana Atlantic City, Bally's Atlantic City, Borgata, and Hard Rock Atlantic City ("HRAC"). "Rainmaker" refers to both Cendyn Group and its predecessor The Rainmaker Group. AR 210 n.2.

From the earliest days of antitrust enforcement, courts have recognized that this kind of collaboration violates Section One of the Sherman Act. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221–27, 232 (1939); *United Sates v. Masonite Corp.*, 316 U.S. 265, 274–75 (1942). In alleging facts plausibly demonstrating the collective delegation of price-setting authority to a common agent, the CAC pleads a "hub-and-spoke" conspiracy that constitutes an "illegal" "contract, combination, . . . or conspiracy in restraint of trade[.]" 15 U.S.C. § 1.

But in extensively relying on an out-of-Circuit court's flawed analysis in *Gibson v. Cendyn Group, LLC*, No. 2:23-cv-00140, 2024 WL 2060260 (D. Nev. May 8, 2024) ("*Gibson II*"), now on appeal, the court below made critical legal errors in disregard of established antitrust precedent*, see* AR 8–13, that warrant reversal. *Accord* No. 24-3576 (9th Cir.), Dkt. 28, Br. of United States (Department of Justice explaining *Gibson II* wrongly decided on the law as amicus curiae in support of plaintiffs-appellants). *See* Arg. § I.A.1, *infra*.

The district court further erred by basing its ruling on the faulty belief that the CAC contained "the same factual deficiencies" as *Gibson II*. AR 8. But here—anchored to Defendants' publicly-available

admissions about the relevant Rainmaker pricing algorithm products—Plaintiffs have alleged key non-conclusory facts about these products' functionality and use not found in *Gibson II*. Viewed properly, the facts Plaintiffs actually allege state a plausible antitrust claim that should proceed to discovery. *See* Arg. §§ I.A.1 & I.A.2, *infra*.

At a minimum, even if this Court does not reverse the district court's ruling outright, it should remand with instructions that Plaintiffs receive leave to amend. In denying Plaintiff's request for leave to amend in an unreasoned, two-sentence footnote without finding amendment would be "futile" or "inequitable," *see* AR 14 n.6, the district court abused its discretion under binding precedent. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (Alito, J.); *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004). Indeed, Plaintiffs are prepared to allege additional facts further substantiating the plausibility of Defendants' scheme and to plead additional causes of action for an unlawful information exchange and anticompetitive vertical agreements. These facts and claims—none of which the district court could have considered—show why amendment, if necessary, would not be "futile," and should be granted following the

lower court's first identification of its concerns on a first dismissal, *See* Arg. § II, *infra.*

* * *

At a basic level, Defendants' anticompetitive scheme works as follows. Casino-Hotel Defendants (the spokes) feed confidential, real-time price and occupancy data directly into Defendant Rainmaker's pricing algorithm platform (the hub). AR 207–339 (CAC ¶¶ 6, 22, 147, 185, 224, 358, 402). The Rainmaker platform then "processes and analyzes this non-public, real-time information, along with the same type of non-public, real-time data the [] competitors also submit to the platform, and other relevant supply and demand-related data." *Id.* ¶ 6; *see also id.* ¶¶ 22, 147, 185, 224, 358, 402. Powered by powerful, proprietary AI, the platform "ultimately uses this information to generate 'optimal' room rates, updated multiple times per day, for each [Casino-Hotel Defendant (the other spokes along the rim)] to charge guests." *Id.* ¶ 6.

Casino-Hotel Defendants each agreed to use and continue to use the Rainmaker platform while knowing the others were doing the same. *Id.* ¶¶ 13, 17, 204, 221, 223–24, 226–27, 229, 402. They accept

Rainmaker's recommended prices the vast majority of the time, with Rainmaker itself publicly boasting a 90% acceptance rate among clients like Casino-Hotel Defendants. *Id.* ¶¶ 15, 142, 174. Moreover, Rainmaker discourages Casino-Hotel Defendants from not adopting in full any given recommended price via manual override that a select few managers are allowed to make in "extreme circumstances." *Id.* ¶¶ 138–39. And Rainmaker "scores" Casino-Hotel Defendants on their acceptance rate as documented in regularly circulated reports, further ensuring compliance with its room price recommendations and enforcing adherence to its overarching pricing strategy. *Id.* ¶ 139.

Why would Casino-Hotel Defendants each delegate their previously independent pricing strategies (while handing over their confidential business data) to Rainmaker? For one, they knew their competitors (the other spokes) were doing the same thing and for the same reason. *Id.* ¶¶ 12–13, 17, 204, 206, 223–28, 306–09. They "adopted and have continued to use the products *because* the other [Casino-Hotel Defendants] were doing the same." *Id.* ¶ 204 (emphasis in original). For another, the key structural features and historical performance of the market they jointly dominate removed the risk they otherwise would have faced by charging

inflated prices. *See id.* ¶¶ 3, 11, 98 (market share between 72% and 80% during class period), 283–304 (structural features enabling collusion).

The allure of Defendants' scheme—which would have been unfeasible before the technological innovations fueling the Rainmaker platform—is that Casino-Hotel Defendants never have to directly coordinate, let alone agree, with one another on any given room rate. They do not need to strike secret deals in smoke-filled rooms like the cartelists of old. Rainmaker's pricing engine does the hard work for them. Indeed, Rainmaker boasts that its flagship GuestREV product, powered by "artificial intelligence (AI) and machine learning," enables Casino-Hotel Defendants to put "pricing optimization" on "autopilot" by adopting its "recommend[ed] selling strategies and overbooking levels to maximize yield with an unprecedented degree of accuracy, and with little need for human judgment, which is often erroneous." *Id.* ¶ 150. Confident their competitors would also delegate their pricing decisions to the same agent, who promised them revenue increases of "up to 15%" following adoption of the platform, *id.* ¶ 15, Casino-Hotel Defendants have ridden the "optimal" pricing wave without facing the destabilizing competition that otherwise would occur. *Id.*, *e.g.*, ¶¶ 235–53 (detailing New Jersey Division

of Gaming Enforcement reporting data demonstrating parallel pricing and occupancy rates).

Courts, regulators, and scholars all have concluded that this type of conduct harms competition and consumers. One court found that similar allegations of horizontal conspiracy in the apartment rental market, based on the use of a pricing algorithm platform featuring a product Rainmaker itself developed, were sufficient to survive dismissal. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 503–13 (M.D. Tenn. Dec. 28, 2023). The Department of Justice's Antitrust Division ("DOJ"), alongside multiple state attorneys general, filed an amended multi-count complaint against the platform provider and half a dozen landlords. *See United States v. RealPage, Inc.*, 24-cv-710 (LCB), Am. Compl., Dkt. 47 (M.D.N.C. Jan. 7, 2025). Another court held that similar allegations suggestive of defendants' decision to "entrust [a third-party system] with their sensitive commercial information in order to obtain and implement [] supracompetitive rental rates generated by [its] algorithm" pleaded a *per se* unlawful horizontal conspiracy. *Duffy v. Yardi Systems, Inc.*, 2:23-cv-01391 (RSL), --- F. Supp. 3d ---, 2024 WL 4980771, at *6–*8 (W.D. Wash. Dec. 4, 2024).

And here, the DOJ and the Federal Trade Commission ("FTC") filed a joint statement of interest supporting Plaintiffs. In the filing, which addressed multiple errors of law pervading Defendants' motion to dismiss, the regulators emphasized, as they did in *RealPage*, *Yardi*, and *Gibson*, that "algorithmic price fixing is a per se violation of Section 1." AR 554, Br. of United States.

FTC Commissioners from across the ideological spectrum agree. One former chair offered a simple analogy to help understand the fundamental issue underlying these cases:

> Everywhere the word 'algorithm' appears, please just insert the words 'a guy named Bob.' Is it okay for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price?

Maureen K. Ohlhausen, *Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, Fed. Trade Comm'n (May 23, 2017). Such conduct, she explained, is "fairly familiar territory for antitrust lawyers" and amounts to a "hub-and-spoke conspiracy." *Id.* at 10. As she aptly put

it: "If it isn't ok for a guy named Bob to do it, then it probably isn't okay for an algorithm to do it either." *Id.*[3]

That view accords with a growing body of scholarship on this increasingly important subject. In one seminal article, for example, two law professors wrote that "use of a single algorithm" by numerous competitors, demonstrated by "a cluster of similar vertical agreements," "may give rise to a classic hub-and-spoke conspiracy, whereby the developer (as the hub) helps orchestrate industry-wide collusion, leading to higher prices." Ariel Ezrachi & Maurice E. Stucke, *Artificial Intelligence & Collusion: When Computers Inhibit Competition*, 2017 U. ILL. L. REV. 1775, 1782–84, 1787–89 (2017).[4]

---

[3] This is because "price fixing through an algorithm is still price fixing." Hannah Garden-Monheit & Ken Merber, *Price fixing by algorithm is still price fixing*, Fed. Trade Comm'n (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing; *see* Lina Khan (@LinaKhanFTC), Twitter (Mar. 1, 2024), ("[T]here is no AI exemption from the antitrust laws."), https://www.twitter.com/linakhanFTC/status/176336763273627.

[4] *See also, e.g.,* Brendon Ballou, *The "No Collusion" Rule*, 32 STAN. L. & POL'Y REV. 213, 222 (2021) (firms may "use pricing algorithms to coordinate with one another, essentially automating collusive decisions that might otherwise be made by people"); Michal S. Gal, *Algorithms as Illegal Agreements*, 34 BERKELEY TECH. L.J. 67 (2019); Salil K. Mehra, *Antitrust and the Robo-Seller: Competition in the Time of Algorithms*, 100 MINN. L. REV. 1323, 1356 (2019) (observing traditional deterrents against

Were this Court to adopt the reasoning of the decision below, antitrust plaintiffs in this Circuit would be required—*at the pleading stage*—to somehow look under the proverbial (and proprietary) hood of a pricing algorithm engine to *prove* exactly how it uses information, including data provided by its co-conspirator customers, to generate the prices they overwhelmingly adopt. This is not how Section One claims are analyzed under well-established antitrust jurisprudence. For good reason. Conditioning liability on whether (or how) competitors exchange information through an algorithm would brush aside the key inquiry: whether independent pricing decisions have been ceded to a common third-party to produce anticompetitive effects. A plaintiff need not allege exactly *how* Bob does the math to arrive at the prices he sets for his co-conspirators to plead that Bob and his co-conspirators agreed to fix prices. And the fact that Rainmaker's algorithm is powered by modern AI doesn't immunize Defendants from the Sherman Act's reach.

Yet this is essentially what the district court required of Plaintiffs. While contesting the facts—about each product's specific operation, for

_____

price-fixing are "likely to prove less effective in a world of robo-sellers"); Christopher R. Leslie, *Predatory Pricing Algorithms*, 98 N.Y.U. L. Rev. 49 (2023) (algorithms facilitate monopolization).

instance—may be fair game at summary judgment, it is not at the pleadings stage. Plaintiffs must be given "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962); *accord Yardi*, 2024 WL 4980771, at *3 & n.1 ("Defendants cannot obtain a dismissal at the pleading stage by ignoring or challenging the facts alleged."). When the CAC's well-pleaded allegations, many of which are based on Defendants' public statements, are properly considered, they give rise to a reasonable inference of anticompetitive behavior. *See* CAC ¶¶ 113–220.

At bottom, Plaintiffs plead a coordinated scheme that is a "threat to the central nervous system of the economy." *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017). Plaintiffs plausibly allege that Defendants took "concerted action," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010), by knowingly delegating pricing authority to the same Rainmaker platform to "optimize" their collective revenues. This constitutes a common plan or course of conduct that violates Section One of the Sherman Act. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 188 (2010) (key issue is "whether the

conduct in question deprives the marketplace of the independent sources of economic control that competition assumes"). While this conduct, if proven, should be deemed *per se* unlawful, it should be held unlawful under the "rule of reason" standard at the very least.

The Sherman Act "embraces all forms of combination, old and new," *Am. Needle*, 560 U.S. at 193, and "[t]he advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind," *United States v. Union Pac. R. Co.*, 226 U.S. 61, 85–86 (1912). With the rise of modern technology making collusion possible to an extent never before possible, federal courts stand in the breach. Holding Plaintiffs' plausible allegations about this novel technology to time-tested antitrust standards, the Court should reverse the decision below.

## Statement of Facts

Casino-hotels in Atlantic City historically offered room rates low enough to fill their rooms with guests who would, in turn, gamble on their casino floors and increase the casino-hotel's total profit. CAC ¶ 4. Because casino-hotels derive the vast majority (some 80%) of revenues from casino operations rather than room sales, "in a normally functioning market

[they] have even more incentive than [traditional] hotels to fill their hotel to capacity," resulting in lower rates. *Id*. ¶ 308. This "heads in beds" strategy, coupled with casino-hotels setting room rates independently from one another, traditionally resulted in downward market pressure on the room rates charged by Casino-Hotel Defendants here. *Id*.

The Rainmaker Group was founded in the 1990s to offer "profit optimization solutions for the Gaming & Hospitality and Multifamily Housing industries." *Id*. ¶ 113. In the gaming and hospitality industry, it developed and sold licenses to use a pricing algorithm platform for room rates to be sued by casino-hotels; Cendyn acquired that platform in 2019. *Id*. ¶¶ 120-26.

The Rainmaker pricing algorithm platform consists of two core products relevant to this case: GuestREV and GroupREV.

GuestREV, the flagship product of Rainmaker's (now Cendyn's) current generation platform, generates rate recommendations for individual guest rooms. *Id*. ¶ 134. It uses AI to continuously process and analyze real-time, non-public data collected using Rainmaker software installed directly into clients' property management systems, along with other types of relevant market information, to forecast demand and

recommend the "optimal" rates for individual rooms on a per-guest, per-day basis. *Id*. ¶¶ 134, 136, 150.

Because GuestREV plugs directly into a casino-hotel's property management system, the "pricing recommendations generated by the GuestREV algorithm," touted as generating revenues "up to 12%" higher, "are directly and automatically uploaded into the casino-hotel's system" and can run "largely on autopilot." *Id*. ¶¶ 137, 141, 150. In effect, this is functionally equivalent to Rainmaker walking through the front door of Casino-Hotel Defendants' properties, running a cable into their computer systems that continuously extracts data, and analyzing this (and other sets of non-proprietary) data to generate price outputs for the Casino-Hotel Defendants to charge. As Borgata's former Vice President of Information Technology put it, "[e]very minute of every day, relevant data must flow from Borgata's multiple property systems into Guestrev," which "works hand-in-glove with Borgata's PMS [Property Management System] to recommend rates." *Id*. ¶ 185.

GuestREV is also designed to enforce consistent and continuous acceptance of its recommendations. Users "must *specifically override* the GuestREV pricing recommendations" if they do not want to use them—

something Rainmaker emphasizes should be limited to "times of need and extreme circumstances." *Id.* ¶ 138. GuestREV also includes features like "recommendation process summary reports," "recommendation reports," and an "action index" to identify revenue loss when the rates are not accepted. *Id.* ¶ 139. These reports track whether price outputs were "automatically approved . . . and transmitted to the PMS" and the "revenue impact of the difference between [a user's] current control settings and recommended settings." *Id.* Rainmaker emphasizes the importance of this "action index," as dates with higher scores represent lost revenue under the customer's current settings. *Id.* A key factor in calculating the index is whether the current room rate results from a user overriding GuestREV's price recommendation or accepting the price output by the system. *Id.*

GroupREV works similarly to GuestREV but applies to room rates reserved for larger groups, "like blocks of individuals attending conferences, conventions, and trade shows." *Id.* ¶¶ 151–58. Rainmaker touts that it "improve[s] Group Room Revenue by up to 8.4% or more." *Id.* ¶ 158.

REVCaster, the last addition to the platform, which was discontinued soon after the class period began, was a "price comparison tool" that, according to Rainmaker, "monitor[ed] rate parity" and "solve[d] for competitive rate shopping" by guests. *Id.* ¶¶ 159, 163.[5]

Plaintiffs allege facts showing that all Casino-Hotel Defendants but one began using GuestREV and GroupREV at approximately the same time.[6] They further allege that Defendants also regularly communicated on pricing and supply, including: during industry events; via a private, invitation-only online forum for casino-hotel managers to "collaborate together" and "communicate freely" on pricing decisions; and during bilateral meetings between Rainmaker and individual Casino-Hotel Defendants. *Id.* ¶¶ 20, 318–56.

---

[5]    Rainmaker discontinued REVCaster in January 2019, as Plaintiffs would allege in an amended pleading if necessary. *See* Arg. § II, *infra.* This undermines Defendants' argument that allegations of confidential data use can be explained away by REVCaster's use of publicly advertised room rates. *See* AR 361–62.

[6]    *See id.* ¶¶ 176–95. The sole exception, HRAC, adopted both in mid-2018, when it entered the market. *Id.* ¶¶ 197–99. Defendants argued below that the adoption of a *different, earlier generation* product in 2004 somehow meant that Casino-Hotel Defendants adopted GuestREV and GroupREV over a 14-year period, beginning in 2004. *See* AR 9. That is incorrect. Neither product had even been released to the market in 2004, as Plaintiffs would clarify if given leave to amend.

Ultimately, the plan worked. Public data included in the CAC shows that Casino-Hotel Defendants charged higher rates during the class period than before, while their occupancy levels dropped. *Id.* ¶¶ 245–51. The cited data also shows that their respective room rates and occupancy levels moved in parallel fashion, while room rates and occupancy levels for non-conspirator properties moved dissimilarly from one another. *Id.* And, although economic principles should have compelled Casino-Hotel Defendants to drop rates to compete for more guests and thus raise occupancy rates, as they previously did pursuant to accepted casino-hotel industry economic principles, this did not happen. *Id.* ¶ 250. Accordingly, the CAC alleges that Defendants' scheme has resulted in artificially inflated prices for guest rooms in Atlantic City casino-hotels. *Id.* ¶¶ 243–53. Plaintiffs Karen Cornish-Adebiyi, Monica Blair-Smith, Luis Santiago, and class members like them visited Atlantic City during the class period (June 28, 2018 to the present) and paid those artificially inflated rates. *Id.* ¶¶ 1, 27–35, 385.

<u>Procedural History</u>

Plaintiffs filed their initial complaint in May 2023, and successfully moved to consolidate it with two later-filed actions stating substantially

identical claims against Defendants. *See* AR 41–206.[7] Plaintiffs filed the CAC in January 2024. AR 207–339. Defendants' motion to dismiss was fully briefed on April 5, 2024. AR 611.

In May 2024, the Nevada district court dismissed the complaint in *Gibson II*. Within days of that opinion's publication, both parties filed letters with the district court related to that decision. *See* AR 718–19 (Def's May 13, 2024 Letter); AR 720 (Pl's May 15, 2024 Letter). Plaintiffs specifically expressed their willingness to address *Gibson II*—which they noted "remained distinguishable"—via oral argument on the pending motion, supplemental briefing, or both. *Id.* They reiterated that willingness two months later in a letter filed in July 2024. *See* AR 733. There, again, Plaintiffs underscored that they "remain[ed] available to address any of the issues [raised by Defendants], including via supplemental briefing addressing the recent decision in *Gibson v. Cendyn*, 23-cv-140 (D. Nev.)." AR 735. The district court did not permit supplemental briefing to address *Gibson II*, nor did it hold oral argument on the motion to dismiss.

---

[7]     *See Blair-Smith v. Caesars Entertainment, Inc., et al.*, No. 23-cv-06506 (D.N.J.); *Fabel v. Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City, et al.*, No. 23-cv-06576 (D.N.J.).

Instead, on September 30, 2024, the district court issued an opinion and order granting Defendants' motion to dismiss with prejudice. AR 1–14. The court relied extensively on *Gibson II*, claiming "[i]t can hardly be disputed that the same factual deficiencies identified in [] *Gibson II* are present in the [CAC]." AR 8. But the CAC's factual allegations tell a different story.

For instance, the district court found that the CAC "does not allege" Casino-Hotel Defendants' "proprietary data are pooled or otherwise comingled into a common dataset against which an algorithm runs." *See* AR 3–4; *contra, e.g.,* CAC ¶¶ 6, 137, 147, 148, 185, 224, 358. It reasoned that "the pricing recommendations offered to each Casino-Hotel individually are not based on a pool of confidential competitor data," AR 10, that the CAC's "linguistic equivocation" failed to "unambiguously allege[]" as much, AR 10, and that certain Rainmaker sources from which the CAC quoted "seem to confirm that the pricing recommendations at issue were never based on the confidential, proprietary data of their competitors," AR 10–11. But the CAC contains many factual allegations stating precisely what the court appeared to believe was missing, including the following:

- "Rainmaker's software is installed directly into casino-hotels' on-site room pricing and occupancy data systems, such that *each casino-hotel provides its current, non-public room pricing and occupancy data to the Rainmaker platform on a continuous basis*. In turn, the algorithm continuously processes and analyzes this non-public, real-time information, *along with the same type of non-public, real-time data the client's participating competitors also submit to the platform* . . . and *ultimately* <u>*uses*</u> *this information to generate "optimal' room rates,"* updated multiple times per day, for each client to charge guests." CAC ¶ 6;

- In a Cendyn website post titled "Borgata Hotel Casino & Spa's success with GuestREV," a Borgata executive observed "'*[e]very minute of every day, relevant data must flow from Borgata's multiple property systems into Guestrev*,'" and "'the system *works hand-in-glove with Borgata's PMS system* to recommend rates,'" *id.* ¶ 185;

- Rainmaker "coordinated Casino-Hotel Defendants' knowing shared use of a pricing algorithm that utilized *their real-time pricing and supply data, including sensitive, non-public data*, *to recommend supra-competitive 'optimal' room rates*." *Id.* ¶ 224; and

- "Casino-Hotel Defendants submit their *real-time, non-public pricing and supply data to a common pricing algorithm, or hub, which uses this data* along with other pieces of information to derive true market demand and recommended optimal pricing." *Id.* ¶ 358.

*See also id.* ¶¶ 22, 24, 136, 137, 139, 147–48, 205, 220–21, 225–26, 402.

The court further faulted the period alleged for the conspiracy, finding Casino-Hotel Defendants' alleged adoption of the relevant

Rainmaker products alleged was "not quite 'parallel.'" AR 9. In so doing, it focused on some Casino-Hotel Defendant affiliates' 2004 licensing of a *different*, *earlier* Rainmaker revenue management platform—years before Rainmaker had even released GuestREV and GroupREV. *Id.*

Taken together, the district court reasoned that these two (mis)readings of the CAC's allegations rendered the case indistinguishable from *Gibson II*. Accordingly, it quoted Judge Du's opinion at length, and did not separately address the CAC's "plus factor" allegations—let alone whether, viewed holistically, they permitted the reasonable inference of an anticompetitive scheme. AR 7–13. Likewise, having concluded that no anticompetitive agreement was alleged, the court did not proceed to address whether the CAC pleaded an unreasonable restraint on trade. *Id.*

Finally, in a two-sentence footnote at the end of its opinion, the district court granted the motion to dismiss with prejudice, stating only:

> Following the publication of *Gibson II*, Plaintiffs gave no indication that they wish[ed] to further amend their pleading (ECF No. 114.) As such, the court's dismissal of the Amended Complaint is with prejudice.

AR 14 n.6. The court did not address Plaintiffs' specific request for leave to amend, *see* AR 464; did not address Plaintiffs' repeated indication

following *Gibson II* that they "st[ood] ready" to address that case (which they argued remained distinguishable), *see* AR 720, 735; and did not find, let alone provide any reasoned analysis, that Plaintiffs' requested leave to amend would be either futile or inequitable. *See* AR 7–13. This timely appeal follows.

<u>Legal Standard</u>

This Court exercises "plenary review over a district court's grant of a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim." *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299 (3d Cir. 2020). When deciding whether a complaint alleges sufficient facts to state a plausible claim, "all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." *Id.* at 299-300 (quoting *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009)).

This standard applies equally to complex antitrust class actions. "Although [*Bell Atlantic Corp. v.*] *Twombly*[, 550 U.S. 544 (2007),] acknowledged that discovery in antitrust cases can be expensive, it expressly rejected the notion that a heightened pleading standard

applies in antitrust cases." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). Thus, "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases." *Id.*

## Summary of Argument

The district court's decision should be reversed, and the case remanded for further proceedings, for two independent reasons.

*First*, the district court misapplied the governing legal standard and misread Plaintiff's well-pleaded factual allegations. The CAC plausibly alleges a horizontal hub-and-spoke agreement among Defendants, who knowingly shared their non-public business information with a common intermediary and ceded their pricing strategy and decisionmaking to that intermediary. Instead of applying the proper standard to the actual allegations while guided by binding precedent, the court relied on the flawed analysis of a district court in a different circuit, while eliding dissimilarities between the two complaints, favoring Defendants' disputed interpretation of alleged facts, and faulting Plaintiffs for not pleading facts that they did in fact plead. The court also erected non-existent legal hurdles for Plaintiffs to clear—

such as requiring that Casino-Defendants' knowing delegation of pricing strategy to Rainmaker be accompanied by the exchange of confidential pricing data and that Casino-Defendants' parallel conduct be near-simultaneous—that are at odds with established pleading standards for Section One claims.

*Second*, the district court abused its discretion by denying Plaintiffs the opportunity they requested to amend their pleading after the court's first dismissal. Had they been permitted to do so in the ordinary course, Plaintiffs stood ready to allege additional facts further substantiating their existing claims and to assert additional counts supported by the facts and law. Disregarding this Court's repeated instruction that leave to amend be "freely given" in such circumstances under Federal Rule of Civil Procedure 15(a), the court denied leave to amend without finding— let alone explaining how—amendment would be "futile" or "unfair."

<u>Argument</u>

## I.    Plaintiffs Plausibly Allege a Horizontal Price Fixing Scheme.

Section One of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. A Section One claim requires (1) the existence of

an agreement (2) that unreasonably restrained trade. *See Valspar Corp.*, 873 F.3d at 191.

Some alleged restraints of trade "under § 1 are reviewed for reasonableness, [and] others have no possible competitive virtue and are therefore *per se* illegal." *Id.* at 191. Thus, for conduct deemed illegal *per se*, a plaintiff only must allege the existence of an agreement, while a plaintiff alleging other types of agreements also must sufficiently allege resulting competitive harm. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004) (*per se* illegal "restraints of trade are conclusively presumed to unreasonably restrain competition without elaborate inquiry as to the precise harm [it has] caused or the business excuse for its use") (cleaned up). One category of conduct that is *per se* illegal, and that Plaintiffs allege Defendants' scheme constitutes, is "[h]orizontal price fixing (*i.e.*, price fixing among competitors)." *Valspar Corp.*, 873 F.3d at 191 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940)).

The district court erred in dismissing the CAC because Plaintiffs allege facts plausibly supporting the reasonable inference of an unlawful agreement by Defendants—namely, using the relevant Rainmaker

pricing algorithm products to fix, increase, maintain, or stabilize the prices of casino-hotel rooms in Atlantic City. Plaintiffs further allege this conduct unreasonably restrained trade in the defined relevant market, whether reviewed under the *per se* or rule of reason standards.

## A. Plaintiffs Plausibly Allege an Anticompetitive Agreement.

Antitrust plaintiffs need not point to direct evidence of wrongdoing or proof of a written agreement to fix prices to state a claim. Rather, a complaint's allegations need only contain plausible grounds to infer an unlawful agreement. *See Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010).

In assessing plausibility, courts "examine the entirety of the complaint's factual allegations and determine whether, taken as true, they support a plausible inference of horizontal conspiracy." *Id*. "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co.*, 370 U.S. at 698–99; *see RealPage*, 709 F. Supp. 3d at 510 (rejecting "approach of separately evaluating and dissecting each plus factor" in favor of "assess[ing] plus factors holistically"). This is important "in complex antitrust litigation"

where "motive and intent play leading roles" and "the proof is largely in the hands of the alleged conspirators." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962).

In hub-and-spoke cases, moreover, "an actionable horizontal conspiracy does not require" the pleading (or proving) of "direct communication among the competitors." *Id.* And "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227; *see also Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 688 (1948); *Triangle Conduit & Cable Co. v. Fed. Trade Comm'n*, 168 F.2d 175, 176 (7th Cir. 1948), *aff'd sub nom. Clayton Mark & Co. v. Fed. Trade Comm'n*, 336 U.S. 956 (1949).

The Supreme Court's seminal decision in *Interstate Circuit*—an antitrust hornbook staple—is instructive. There, two theater companies circulated letters to film distributors requesting that restrictions be placed on certain films, such that they could not be shown at discount, second-run theaters. *See* 306 U.S. at 215–21. Those letters noted that the same was being sent to each film distributor. *Id.* at 222. When the distributors imposed the restrictions, they (along with the theater

companies) were found liable for participating in a horizontal conspiracy violating Section One, and the Supreme Court affirmed. *Id*. at 225–27. By adhering to the conspiracy and participating in it, both the theater owners which circulated the letters (the hub) and the distributors (the spokes) had agreed to the anticompetitive restrictions. *Id*. at 226–27. Despite the absence of any direct evidence that the distributors had "entered into any agreement with each other," their common assent to the plan created the reasonable inference of concerted action. *Id*. at 221, 227. "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id*. at 226.

The Court reiterated that instruction in *Masonite*. There, a hardboard manufacturer entered into "agency" agreements with other hardboard manufacturers which specified minimum and maximum prices at which they could resell Masonite's products. 316 U.S. at 269–71. In forming each agreement, Masonite "informed the other party of the existence and terms of each of the agreements [it] had previously made with the others." *Id*. at 268–69. Despite defendants having "acted independently" of each other by "negotiat[ing] only with [Masonite]," the

circumstances of each agency agreement—including that the competitors were "aware" that "its contract was not an isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking" and established concerted action. *Id.* at 275.

Bearing in mind these core antitrust pleading principles, Plaintiffs' factual allegations, considered holistically and taken as true, plausibly suggest Defendants' "unity of purpose" and "common design and understanding" to artificially inflate Atlantic City casino-hotel room prices. *Ins. Brokerage*, 618 F.3d at 331 (quoting *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l*, 602 F.3d 237, 254 (3d Cir. 2010)).

1. *The district court erred by relying on one flawed out-of-Circuit decision while discounting binding precedent.*

In dismissing the CAC, the district court cast aside the Third Circuit's settled framework for analyzing a complaint's sufficiency in antitrust cases, *see* Arg. § I.A.2, *infra*, and instead predominantly relied on the faulty reasoning of the District of Nevada in *Gibson II*. AR 7–13 (citing that decision's rationale on every page—and in nearly every paragraph—of its analysis). It did so even as it failed to contend with the

Supreme Court's long-settled approach to horizontal conspiracy claims. Several overarching errors pervaded that approach.

**First**, the court incorrectly held as a matter of law that confidential data pooling is necessary to sustain Plaintiffs' "unique antitrust theory," and that Plaintiff's failure to allege "how this data is used once it is handed over" somehow renders their claim "factually and legally incomplete." AR 10.

As to the former contention, neither the Supreme Court nor this Court has ever so held. Information sharing is not *necessary* to plead the existence of a horizontal agreement; it is but a single "plus factor" that may raise the inference of one. *See Ins. Brokerage*, 618 F.3d at 326 (confidential information sharing one plus factor that may raise plausible inference of a tacit conspiracy).

Nor, similarly, are Plaintiffs required at the pleading stage to show *how* the Rainmaker algorithms function. The collective delegation of pricing authority to Rainmaker itself is sufficient. *See Socony-Vacuum*, 310 U.S. at 224–26 & n.59 (conspirators may employ any "various formulae" to set prices; the issue is whether their behavior evinces an agreement to fix them). The district court failed to appreciate allegations

that Casino-Hotel Defendants knowingly delegated pricing decisions to "a shared, centralized decisionmaker." CAC ¶ 22. Because this alleged conduct "joins together separate decisionmakers" and "deprives the marketplace of independent centers of decisionmaking," *Am. Needle*, 560 U.S. at 195, it suffices to state a Section One claim, *see Citizen Publ'g Co. v. United States*, 394 U.S. 131, 133-36 (1969) (holding *per se* illegal collective delegation of pricing decisions to common entity).

Recall *Interstate Circuit* and *Masonite*. Both cases plainly lacked evidence that the competitor defendants shared any confidential information with one another. Their delegation of decisionmaking authority to a third party, with knowledge that their competitors were doing the same, sufficed to create the reasonable inference of concerted action. *Interstate Circuit,* 306 U.S. at 226–27; *Masonite*, 316 U.S. at 274–75. That the work of setting prices here is being done by an AI-assisted algorithm makes no difference.[8]

---

[8]    If anything, competitors' delegation of pricing authority to the same algorithm is particularly pernicious. *See* Br. of United States, *Gibson v. Cendyn Grp. LLC*, No. 24-3576 (9th Cir. Oct. 24, 2024), Dkt. 28.1 at 12 ("Modern algorithms can process far more information than humans can—and at much greater speed . . . When competitors use the same algorithms to guide decisions of competitive significance, their doing so

The district court below arrived at its first faulty assumption without ever contending with the key cases Plaintiffs cited, including *Interstate Circuit*, *Masonite*, *American Needle*, and *Continental Ore*. *Compare* AR 436–51 (briefing citing and discussing these cases) *with* AR 7–14 (not contending with or distinguishing any).

**Second**, the district court misread the CAC's allegations. Even though alleging confidential data pooling by Rainmaker was not legally necessary, Plaintiffs plainly did so here. The district court wrongly credited Defendants' arguments disputing the CAC's well-pleaded facts and relied on *distinct* allegations from *Gibson II* not present here. For example, the district court found that the CAC

> does not allege that the Casino-Hotel's proprietary data are pooled or otherwise comingled into a common dataset against which the algorithm runs. Stated differently, the pricing recommendations offered to each Casino-Hotel individually are not based on a pool of confidential competitor data.

AR 10. Based on that reading, the court then adopted *Gibson II* 's rationale for distinguishing the CAC from allegations surviving dismissal in *RealPage*. *See* AR 11–13.

_____

can raise antitrust concerns," as the "technology has the potential to allow competitors to coordinate more effectively[.]").

But <u>unlike</u> the complaint analyzed in *Gibson II*, the CAC <u>does</u> allege confidential data sharing and use in generating recommended prices. It does so repeatedly. *See supra* pp. 20–21 (quoting CAC ¶¶ 6, 185, 224, 358). The reasonable inference drawn from those allegations—and the many, many more like them, *see id.* ¶¶ 22, 24, 136, 137, 139, 147–48, 205, 220–21, 225–26, 402—is that Casino-Hotel Defendants share their private business data with Rainmaker's relevant products, which in turn pool and analyze these and other relevant data to generate "optimal" room price recommendations for each Casino-Hotel Defendant. *Id.* ¶ 6. This inference is squarely at odds with the district court's reading and alone warrants reversal.[9]

***Third***, the district court wrongly found that Plaintiffs failed to allege the sort of prototypically parallel conduct typically found in traditional price-fixing cartels, largely faulting the "timing of the parallel conduct" in the CAC. AR 9. In making that conclusion, it relied on Defendants' argument Plaintiffs were required to, but did not, plead

---

[9]     To the extent Plaintiffs' failure to use the phrase "confidential data pooling" carries any weight in analyzing the strength of Plaintiffs' claim (it should not), they should be allowed to amend to cure this easily fixable issue, because antitrust law "is aimed at substance rather than form." *Am. Needle*, 560 U.S. at 193.

near-simultaneous conduct. The district court then adopted that erroneous view (again relying on *Gibson II*) to find that the timing of Casino-Hotel Defendants' adoption of the Rainmaker products rendered any reasonable inference of the alleged scheme suspect. AR 9–10.

The *RealPage* court's analysis helps show why that holding was in error, as that court weighed—and flatly rejected—the same "timing" argument. 709 F. Supp. 3d at 507. There, plaintiffs sufficiently alleged parallel conduct where each landlord entered into similar vertical agreements with RealPage to use its platform, even though the respective agreements began at various points over a decade. *Id.* at 505–06 & n.11. "Certainly, courts accept allegations of close-in-time agreements as evidence of a horizontal conspiracy," that court reasoned, "[b]ut temporal proximity of the parallel conduct is only one factor[.]." *Id.* at 505. Thus, that court concluded that plaintiffs "need not allege that Defendants simultaneously adopted this new pricing strategy for it to be considered parallel conduct." *Id.* at 507.

And for good reason. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227; *see*

*William Goldman Theaters v. Loew's, Inc.*, 150 F.2d 738, 743 (3d Cir. 1945) (simultaneous action need not be pleaded).[10] Even where allegations show that the "stage for the conspiracy [is] set long before it was alleged to have officially hatched," they may properly support a Section One claim. *In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 565101, at *7 (E.D. Pa. Oct. 31, 2019).

Furthermore, because Plaintiffs allege, *see* CAC ¶¶ 6, 22, 358, 402, that "as the arrangement continued each [conspirator] became familiar with its purpose and scope," *Masonite*, 316 U.S. at 274–75, the CAC states a Section One claim regardless of when each Casino-Hotel Defendant began using the platform. Even if some Casino-Hotel Defendants claim to have initially used Rainmaker products without knowledge of the conspiracy, their continued use of the platform after they became "aware of the fact that its contract was not an isolated transaction but part of a larger arrangement" violates antitrust law. *Id.* at 275.

---

10    *Accord In re Domestic Airline Travel Antitrust Litig.*, 2023 WL 5930973, at *16, *8 (D.D.C. Sept. 12, 2023) (antitrust claim could proceed despite lack of simultaneous action where some defendants engaged in certain conduct 12 years before alleged conspiracy began).

The district court did not properly heed this binding precedent, instead adopting Defendants' misreading of *Burch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011). *See* AR 10. Defendants represented to the lower court that *Burch* set a bright line rule of three months in assessing the plausibility of parallel conduct allegations. *See* AR 375 ("The temporal gaps far exceed the three months that the *Burch* court held was too long to plead parallel conduct.") (emphasis in original); AR 374 ("[A]llegations that defendants took the same action several months apart . . . cannot plead parallel conduct," citing *Burch*); AR 620 (same).

But this Court did no such thing. Rather, it applied the caselaw rejecting such an artificially constrained approach on timing to allegations distinguishable from those here. In particular, *Burch* deemed the parallel conduct allegations in that action implausible not only because of the time gap but also because certain co-conspirators committed only some of the relevant acts while others refrained from doing so entirely. 662 F.3d at 228–29. The Court also found that the plaintiff there, unlike here, failed to "plead any 'plus factors' to suggest that the [defendants] had entered into an agreement." *Id.* at 226–29.

In any event, the district court mistakenly found the CAC alleged Casino-Hotel Defendants began using the relevant Rainmaker products, GuestREV and GroupREV, over a much longer period than Plaintiffs actually allege. Accepting all the well-pleaded facts in the light most favorable to Plaintiffs, the CAC alleges that nearly all Casino-Hotel Defendants began using these products soon after Rainmaker began offering them, around 2010 for GuestREV and 2013 for GroupREV (but obviously not before). *See, e.g.,* CAC ¶¶ 183–86 (alleging Borgata began using Rainmaker product suite in "late 2009" and continued to use "the Rainmaker pricing algorithm platform during the class period, including GuestREV and GrouREV"); *id.* ¶¶ 191–95 (Tropicana did so "around th[e] time" it reopened in "March 2010" and continued to use them during the class period). The sole outlier, HRAC, could not have adopted these Rainmaker products any earlier than mid-2018 because it only opened in mid-2018. *See id.* ¶¶ 11, 196.

Defendants' reading of the CAC to suggest that the Caesars-affiliated Atlantic City properties could have begun using these products

before Rainmaker offered them is, charitably put, misplaced.[11] Defendants improperly and repeatedly prompted the court's confusion about the relevant time period. They represented, for instance, that the "the ***products in this case*** are not new. ***They've been around since the 1990s***." AR 679 (emphasis added). But that representation was false. As Plaintiffs would clarify in any amended pleading. GroupREV did not hit the market until approximately 2013, for instance, and GuestREV appears to have hit the market, judging from public marketing materials, no earlier than 2010. *See* Arg. § II, *infra*. Moreover, and as Plaintiffs would also clarify by explicitly alleging through amendment if needed, "every year each [Casino-Hotel Defendant] renews its license with" Rainmaker, it "re-affirm[s] its commitment to the data-sharing agreement." *RealPage*, 709 F. Supp. 3d at 514.

---

[11]   *See, e.g.*, CAC ¶ 176 ("Around 2004, Caesars Entertainment began using Rainmaker's products . . . according to an August 2004 Supply & Demand Chain Executive article."). This article does not mention GuestREV or GroupREV, but the prior, obsolete "Rainmaker/Manugistics Advanced Hotel Gaming Revenue Management solution." *Revenue Management a Good bet for Caesars Entertainment*, Supply & Demand Chain Executive, (Aug. 3, 2004), https://www.sdcexec.com/sourcing-procurement/news/10354367/revenue -management-a-good-bet-for-caesars-entertainment.

Whether some Casino-Hotel Defendants began using a *different, earlier generation* of Rainmaker revenue management products years earlier is a red herring, and the district court erred in taking the bait. *See* AR 9. Setting aside the impropriety of inordinately focusing on the precise timing of Casino-Hotel Defendants' initial adoptions of Rainmaker products as a threshold question, what the Court should have asked (but did not) was whether Casino-Hotel Defendants used the *relevant, current generation* Rainmaker products in a sufficiently parallel manner.[12] If the Court had done this, it would have answered the question in the affirmative.

2. *The CAC's allegations plausibly support the inference of an anti-competitive agreement under settled precedent.*

When reviewed under this Circuit's proper analytical framework, the CAC plausibly alleges a horizontal price-fixing scheme. An agreement among competitors can be pleaded by alleging (a) parallel conduct, along with (b) at least one "plus factor" allowing courts to

---

[12]   This distinction is significant because the operative Rainmaker pricing algorithm products are powered by innovative and constantly evolving AI that earlier generation products did not and could not have featured. *Cf. id.* ¶ 150.

reasonably infer, pre-discovery, that the conduct at issue may have been concerted rather than independent. *See Twombly*, 50 U.S. at 553, 557. Plaintiffs' well-pleaded facts indicate the existence of parallel conduct and multiple "plus factors." When taken as true and viewed holistically, they plausibly allege that Defendants engaged in a common course of conduct designed to charge supra-competitive room prices.

a. *Parallel Conduct.*

Casino-Hotel Defendants' conscious implementation of the same pricing strategy through their knowing adoption and continued deployment of the Rainmaker platform to set prices constitutes parallel conduct standing alone—and leads to the plausible inference of concerted action without need to assess any "plus factors."

The Supreme Court long has held that an anticompetitive agreement can be inferred from an invitation proposing collective conduct followed by conduct demonstrating acceptance. *See Interstate Cir.*, 306 U.S. at 226–27 ("It was enough that, knowing that concerted action was contemplated and invited, the [competitors] gave their adherence to the scheme and participated in it."); *United States v. Gen. Motors Corp.,* 384 U.S. 127, 142–43 (1966) ("[I]t has long been settled that explicit

agreement is not a necessary part of a Sherman Act conspiracy—certainly not where, as here, joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan.").[13]

This is exactly what Plaintiffs allege. CAC ¶¶12–13, 18, 311–16, 357, 360–61, 402; *see RealPage*, 709 F. Supp. 3d at 506–08 (finding parallel conduct alleged for substantially identical conduct). Therefore, "Plaintiffs have plausibly alleged that Defendants engaged in parallel conduct when they each became [GuestREV and GroupREV] clients and began prioritizing raising rent prices over decreasing vacancy rates." *RealPage*, 709 F. Supp. 3d at 507. In addition, while unnecessary to plead parallel conduct, the CAC's detailed allegations of Casino-Hotel Defendants' synchronous pricing and occupancy rate movement during the class period, *see* CAC ¶¶ 245–50, only underscores the sufficiency of Plaintiffs' allegations on this point.

---

[13] *See also Ins. Brokerage*, 618 F.3d at 332 (determining whether defendants' decisions "presuppose concerted action" pursuant to *Interstate Circuit*); *Viking Theatre Corp. v. Paramount Film Distrib. Corp.,* 320 F.2d 285, 293 (3d Cir. 1963) (applying *Interstate Circuit*'s tacit agreement theory), *aff'd,* 378 U.S. 123 (1964); *Sheldon Pontiac v. Pontiac Motor Div., Gen. Motors Corp.,* 418 F. Supp. 1024, 1029 (D.N.J. 1976) (citing *Interstate Circuit* in stating that "a claimant in a Sherman Act case may prevail without producing an express agreement between the alleged conspirators"), *aff'd,* 566 F.2d 1170 (3d Cir. 1977).

Defendants made two primary arguments to the district court in insisting that the CAC's allegations failed to plead parallel conduct. The first was that the timing of Casino-Hotel Defendants' initial adoptions of Rainmaker software defeated the inference of parallel conduct. As explained above, that was legally wrong and factually incorrect, and at the very least could have been cured by any needed amendment to more precisely allege when GuestREV and GroupREV were first offered. *See* Arg. § II, *infra*.

Defendants also insisted—although the court did not squarely address it—that Plaintiffs must show 100% acceptance of the Rainmaker pricing recommendations to allege parallel conduct. *See* AR 375–76. Not so. Plaintiffs are not obligated to prove—let alone plead—that a conspiracy caused the price of *all* potentially affected transactions to be fixed or impacted. Indeed, in *RealPage*, the court rejected the same argument—that defendants must "accept[] RealPage's price recommendations 100% of the time" for price-fixing to be plausible— reasoning the fact that landlords accepted the recommendations between 80% and 90% of the time was enough. *RealPage*, 709 F. Supp. 3d at 504– 05, 521. The court explained that (1) defendants' payment of fees for the

recommendations, as here, "le[d] to the inference that [they] intended to abide by those recommendations," and (2) that it was "baseless" to assume that when a defendant did "depart[]" from the recommended price, "it adopted a price consistent with ordinary market conditions." *Id.* at 511, 535 & n.26.

That rationale comports with statements of interest federal antitrust enforcers have filed in several pricing algorithm antitrust class actions, including this one. As the enforcers noted, Plaintiffs assert a claim for *per se* illegal price fixing even where "the recommendations generated by Rainmaker's pricing algorithm are not binding" and not always accepted. This is because "the violation is the agreement—not how often it is followed," and because "[a]ny combination which tampers with price structures" "directly interfer[es] with the free play of market forces." AR 563–64, Br. of United States (quoting *Socony-Vacuum*, 310 U.S. at 221); AR 558 (quoting *Flat Glass*, 385 F.3d at 362–63 ("An agreement to fix prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices.")). The CAC alleges that Casino-Hotel Defendants adopted the Rainmaker

recommendations the vast majority of the time, and at a rate similar if not higher than the rate in *RealPage*. *See* CAC ¶ 174.[14]

### b. *Plus Factors*

This Court has clarified that while "[t]here is no finite set of criteria" for what constitutes a factual "plus factor" that makes an inference of an anticompetitive conspiracy reasonable, at least three have been repeatedly identified: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Ins. Brokerage*, 618 F.3d at 322. The CAC alleges each. The district court discussed none. *See* AR 7–13.

**Motive to Conspire**. This factor encapsulates review of (a) structural features of the relevant market (such as high entry barriers, high market concentration, the lack of reasonable substitutes, and product interchangeability) and (b) incentives to collude. *See Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018). Plaintiffs allege facts supporting each.

---

14    Moreover, Plaintiffs allege that the relevant products contained features that fostered and effectively enforced the consistent and continuous acceptance of recommended prices. *See* CAC ¶¶ 138–39.

*Market Structure*: The CAC alleges that the structure of the Atlantic City Casino-Hotel Market[15] contains multiple elements that make it ripe for horizontal collusion. *See* CAC ¶¶ 284–307. Plaintiffs allege a market with high barriers to entry. *Id.* ¶¶ 286–88. They allege it is "highly concentrated," with Casino-Hotel Defendants and their co-conspirators possessing a dominant share of the market, "between 72% and 80% of the total guest rooms available," during the class period). *Id.* ¶¶ 290–91. They allege there are "no reasonable substitutes" available to consumers in the Atlantic City Casino-Hotel Market, thus making demand "relatively inelastic." *Id.* ¶ 292. And they allege that the rooms available within the market are "relatively interchangeable," indicating "product fungibility." *Id.* ¶ 293.

*Incentives to Collude*. Plaintiffs adequately allege that Casino-Hotel Defendants had strong incentive to collude—namely, rebounding from

---

15    Although not relied upon by the district court, Defendants wrongly argued Plaintiffs failed to plead a relevant market. First, any challenge to Plaintiffs' market definition is inapt. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("[I]n most cases, proper market definition can be determined only after a factual inquiry[.]"). Second, Plaintiffs' defined market exceeds the low bar of plausibility; it is supported by New Jersey courts, *see* CAC ¶ 88, gaming regulators and casino-hotel industry participants, *see id.* ¶¶ 82–87, and basic economic principles, *See id.* ¶¶ 71–79.

the severe economic downturn in the Atlantic City Casino-Hotel Market caused by the Great Recession. *See* CAC ¶¶ 294–305. When HRAC opened in mid-2018 and adopted the relevant Rainmaker products— bringing Casino-Hotel Defendants' market share to _80_%—their incentive to jointly use the platform to produce anticompetitive results was particularly pronounced. *Id.* ¶ 303–05.

**Actions Against Interest**. Plaintiffs also plausibly allege that a single Casino-Hotel Defendant would not have independently decided to use the Rainmaker products if no others did so. *See id.* ¶¶ 306–09.

The unique economics of casino-hotels helps explain why: A "typical casino hotel company derives 80% of its total revenues from casino operations and only 7% from room sales." *Id.* ¶ 308 (citing Ryu & Jang, *Journal of Hospitality Financial Management*). Thus, "casino-hotels operating in a normally functioning market have even more incentive than non-casino-hotels to fill their hotels to capacity," so that they do not miss out on significant profits on the casino floor. *Id.* Any strategy to "maximize" hotel room rate revenue does not improve the bottom-line of a casino-hotel's business unless its competitors also do the same thing. Room rates would rise, beds would go unfilled as consumers flock to

lower-priced neighboring venues, and significant revenue would be lost by failing to fill space on the casino floor. But by acting together to adopt Rainmaker's pricing outputs, Casino-Hotel Defendants ensure that they can maximize room rate profits while "avoiding the infamous 'race to the bottom'" from real competition. *Id.* ¶ 18; *see Ins. Brokerage*, 618 F.3d at 332.

**Traditional Conspiracy Evidence**. "Evidence implying a traditional conspiracy" "consists of non-economic evidence that there was an actual, manifest agreement not to compete." *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449 (E.D. Pa. 2018). In the Third Circuit, includes "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Ins. Brokerage*, 618 F.3d at 322. Setting aside the conduct forming the core of Defendants' anticompetitive scheme discussed above, Plaintiffs also allege other forms of traditional conspiracy evidence.

*Change in Business Practices and Common Course of Conduct.* Plaintiffs allege that Casino-Hotel Defendants' coordinated use of a

"single pricing algorithm platform," particularly "after obtaining market power" in 2018, "turned the industry's well-established business model on its head." *Id.* ¶¶ 311–14. This represents a "radical change" from historical industry practices, and a "common course of conduct," given that Casino-Hotel Defendants "all use[] the same pricing algorithm from the same company" while knowing "that the others were doing the same thing as well." *Id.* ¶¶ 315–17.

*Information Exchange.* As addressed above, the CAC alleges that a critical aspect of the Rainmaker products' functionality is the collection and use of real-time, confidential pricing and supply data from all Casino-Hotel Defendants to set recommended "optimal" prices for each one. *Id.* ¶¶ 6, 22, 24, 226–27, 358, 402. This continuous information exchange is enabled by Rainmaker's installation of its software directly into Casino-Hotel Defendant's proprietary databases—fitting "hand-in-glove," as Rainmaker advertised, into the casino-hotel's property management system. *Id.* ¶¶ 136–37, 185.

*Opportunities to Conspire.* The CAC documents numerous opportunities Defendants had to discuss, maintain, and police their anticompetitive scheme. *Id.* ¶¶ 318–56. Those opportunities include

"annual user conferences" sponsored by Rainmaker and attended by Casino-Hotel Defendant executives, *id.* ¶¶ 320–24; annual Gaming & Leisure Roundtable events hosted by Rainmaker executives, *id.* ¶¶ 325–33; "Revenue Optimization Conferences," which included "actionable" presentations by the same Rainmaker executive who oversaw the development of the RealPage algorithm, *id.* ¶¶ 334–44, 229 & n.5; and other industry meetings. *Id.* ¶¶ 345–54. The CAC also alleges Rainmaker and Casino-Hotel Defendants communicated regarding "best practices for maximizing room revenue" using Rainmaker's products. *Id.* ¶¶ 333, 360.

* * *

The bottom line is that when this Court reviews the CAC *de novo* under the governing pleading standards and the proper analytical framework, Plaintiffs have stated a Section One claim. The decision below should therefore be reversed.

### B. Plaintiffs Plausibly Allege an Unreasonable Restraint on Trade.

The district court below found that the motion to dismiss "implicates only the first prong" of a Section One claim—that is, whether an agreement was alleged. AR 5. Accordingly, the court did not determine

whether the scheme imposed an unreasonable restraint on trade. Because this Court may affirm on any basis in the record, Plaintiffs address the plausibility of their allegations with respect to this element. For the reasons that follow, the alleged scheme is unreasonable under both the *per se* illegal and rule of reason analyses.

Courts treat as *per se* unreasonable any conduct that is, by its nature, anticompetitive. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 64-65 (1911) (prescribing *per se* treatment "where the nature and character of the dealing" was proof of anticompetitive effect). The rule of reason applies to all other restraints and requires a balancing test of the anticompetitive effects against any pro-competitive justifications. *Ohio v. Am. Express Co.*, 585 US. 529, 541–42 (2018) ("*Amex*"). This fact-intensive analysis requires "weigh[ing] all the circumstances of a case" to define the relevant markets and show a substantial anticompetitive effect that harms consumers. *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).

As such, it is inapt for consideration at the pleading stage, as courts neither (1) conclusively determine which analysis applies, *see Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 419 F. Supp. 3d 791, 807 (D. Del.

2019) (collecting cases for proposition that court is not obligated to choose between *per se* and rule of reason analysis prior to discovery), nor (2) conduct a comprehensive rule of reason analysis. *See RealPage II*, 709 F. Supp. 3d 478, 521 (M.D. Tenn. 2023).[16] Instead, on a motion to dismiss, a plaintiff simply need allege facts sufficient to raise a plausible inference that defendants' conduct resulted in an unreasonable restraint on trade under either analysis. The CAC clears that bar.

   *1. The alleged conspiracy is* per se *illegal.*

   Plaintiffs have alleged horizontal price-fixing among competitors, the archetypal Section One violation warranting *per se* treatment. *See* CAC ¶¶ 269–281; *Socony-Vacuum*, 310 U.S. at 218, 224 n.59 (horizontal price fixing is "consistently and without deviation" held *per se* unlawful). *Per se* price fixing includes any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *Socony-Vacuum*, 310 U.S. at 223; *see Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 348 (1982). This encompasses

---

16    *See also* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 305 (5th ed. Supp. 2022) ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery."); *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995).

different mechanisms that circumvent fair competition, including the use of shared pricing formulas by competitors. *See Socony-Vacuum*, 310 U.S. at 224-26 n.59; *Amex*, 585 U.S. at 540–41; *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969); *W. Penn Allegheny*, 627 F.3d at 99; *see also* AR 557–58;

Plaintiffs allege that Casino-Hotel Defendants here have agreed to delegate their pricing authority to a common entity. *See, e.g.*, CAC ¶¶ 22, 315–18. This classic antitrust violation does not avoid *per se* treatment simply because an algorithm, and not an individual, fixes prices. *See Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824-26 (S.D.N.Y. 2016) (Rakoff, J.) (applying longstanding antitrust principles where prices are fixed by "algorithm"). It also does not matter that competing Casino-Hotel Defendants organized their conduct through a non-competing intermediary—if "there is a horizontal agreement between [competitors], there is no reason why others joining that conspiracy must be competitors." *United States v. MMR Corp. (LA)*, 907 F.2d 489, 498 (5th Cir. 1990); *accord United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015). And it does not matter if the fixed prices were non-mandatory. *See Flat Glass*, 385 F.3d at 369 ("An agreement to fix list prices is . . . a *per*

*se* violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices.").

The rationale behind the denial of a similar motion to dismiss in *Yardi*, which applied the *per se* standard in sustaining similar claims, illustrates the point. As the *Yardi* court explained, "[f]or over a century, courts have found that horizontal agreements among competitors with regards to pricing structures have predictable and pernicious anticompetitive effects and are therefore a classic example of a *per se* antitrust violation." 2024 WL 4980771 at *7. The purported technological novelty of the alleged scheme, which involves the shared use of a pricing algorithm by competitors in the market for multifamily housing, has no bearing on the analysis—"[w]hen a conspiracy consists of a horizontal price-fixing agreement, no further testing or study is needed." *Id*. at *8.

The same reasoning governs the agreement at issue in this case whether it involves a common pricing algorithm or a "guy named Bob." *See* CAC ¶ 261. Indeed, "[t]he Supreme Court has expressly held that 'the machinery employed by a combination for price-fixing is immaterial' and the Sherman Act declares all such horizontal agreements to tamper with

price structures unlawful." *Yardi*, 2024 WL 4980771 at *8 (quoting *Socony-Vacuum*, 310 U.S. at 223).

This analysis echoes that of the DOJ, which has repeatedly advocated for application of the *per se* standard to pricing algorithm cases including this one under traditional antitrust principles. *See RealPage*, Dkt. 628 at 15; *Yardi*, Dkt. 149 at 6; AR 555–58; DOJ Amicus Br., *Gibson v. Cendyn Grp. LLC*, No. 24-3576 (9th Cir. Oct. 24, 2024), Dkt. 28.1, at 14-15; CAC ¶¶ 269–81.

### 2. The alleged conspiracy unreasonably restrains trade under the rule of reason.

Plaintiffs can satisfy the unreasonable restraint element of a rule of reason claim by pleading either that (1) the conspiracy had "'actual detrimental effects on competition, such as reduced output or increased prices,'" or (2) the defendants "have 'market power, plus some evidence that the challenged restraint harms competition.'" *Lifewatch*, 902 F.3d at 336 (quoting *Amex*, 585 U.S. at 542) (cleaned up). Although either approach suffices, the CAC does both.

*First*, the CAC alleges facts permitting the plausible inference that the conspiracy caused higher room prices than would have existed in a competitive market. CAC ¶¶ 235–36, 242–48. For example, the CAC

alleges that, in 2017-18, room revenue increased even as occupancy decreased, *id.* ¶¶ 235–36, and, in 2022, casino-hotels rented 5% fewer rooms but charged 25% more than they had in 2019, *id.* ¶ 242. It also includes data from New Jersey's gaming regulators showing significant increases in average room rates even as occupancy decreased. *Id.* ¶¶ 243–45. Increased prices and reduced output are classic examples of "actual detrimental effects" on competition that satisfy the unreasonable restraint element. *See Amex*, 585 U.S. at 542 (listing "reduced output" and "increased prices" as "actual detrimental effects" on competition); *Lifewatch*, 902 F.3d at 336 (same); *W. Penn Allegheny*, 627 F.3d at 100 ("At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets.").

*Second*, the CAC's allegations that the Casino-Hotel Defendants had 72-80% market share, and other key market features, during the class period plausibly allege market power. *See* CAC ¶¶ 3, 98, 291, 304; *accord Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 371 (3d Cir. 2020) ("A court can infer market power from a market share significantly greater than 55 percent."). When coupled with the CAC's allegations of

reduced output and increased prices, Plaintiffs have plausibly pleaded market power and evidence that the conspiracy harms competition.

Accordingly, under either approach, the CAC plausibly alleges that the conspiracy unreasonably restrained trade and is anticompetitive. Tellingly, Defendants did not offer any competing procompetitive justification. *See AbbVie*, 976 F.3d at 356.[17]

## II. The District Court Improperly Denied Leave to Amend.

Remand is also independently warranted given the district court's improper and unreasoned denial of leave to amend. The denial of Plaintiffs' requested opportunity to amend their pleadings—on a first dismissal, and without any determination that amendment would be in "futile," "inequitable," or "unduly prejudicial"—constitutes an abuse of discretion under settled Third Circuit precedent. *See, e.g., Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (Alito, J.). Consistent with a long line of cases that favor granting leave following a first dismissal, this Court should remand with instructions that Plaintiffs be permitted to

---

[17] Defendants also wrongly argued below that Plaintiffs' claims are partially time-barred. As Plaintiffs explained to the district court below, their claims are equitably tolled by Defendants' fraudulent concealment. *See* AR 462–64.

amend the CAC, as they expressly sought to do, if it does not outright reverse the district court's ruling. If permitted (and necessary), Plaintiffs will allege additional facts addressing the district court's stated concerns and add additional causes of action under Section One that further bolster Plaintiffs' claims' plausibility.

Leave to amend must be "freely given," Fed. R. Civ. P. 15(a), and this Court has held that the presumption for amendment applies with particular force in the event of a first dismissal. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (same).

The permissible reasons for denying leave are few and specific. "[A]bsent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004). "If a proposed amendment is not clearly futile, then denial

of leave to amend is improper." 6 Wright, Miller & Kane, *Federal Practice & Procedure* § 1487 (2d ed. 1990).

In sum, "[a]lthough 'the grant or denial of an opportunity to amend is within the discretion of the District Court, outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules.'" *Shane*, 213 F.3d at 115 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). So too, "[i]f a district court concludes that an amendment is futile based upon its erroneous view of the law, it abuses its discretion." *Abbott v. Latshaw*, 164 F.3d 141, 149 (3d Cir. 1998).[18]

Here, Plaintiffs specifically sought leave to amend in opposing the motion to dismiss while citing governing Third Circuit caselaw. *See* AR

---

[18] This precedent applies even though the Consolidated Amended Complaint merged multiple pending cases asserting substantially identical claims. *See, e.g., In re NAHC, Inc. Securities Litig.*, 306 F.3d 1314, 1321 (3d Cir. 2002) (leave granted, where plaintiffs previously filed a consolidated amended complaint to join several previously filed complaints); *Salud Servs., Inc. v. Caterpillar, Inc.*, 67 F. Supp. 3d 663, 665 (D.N.J. 2014); *In re Party City Securities Litig.*, 147 F. Supp. 2d 282, 288 (D.N.J. 2001); *In re New Jersey Title Ins. Litig.*, 2009 WL 3233529, at *4 (D.N.J. Oct. 5, 2009). Common sense explains why: the decision below was the first opportunity Plaintiffs had to learn of the district court's concerns with their allegations.

464 ("If the Court grants any part of the Motion, it should do so without prejudice so Plaintiffs can amend to cure any identified deficiencies." (citing *Phillips*, 515 F.3d at 245)). At any rate, the Third Circuit has held that district courts "must provide" leave to amend "even if the plaintiff does not seek [it]." *Phillips*, 515 F.3d at 245.

Although Plaintiffs expressly sought leave to amend, the district court did not find that amendment would be futile or inequitable. Instead, it dismissed the CAC "with prejudice" for the simple, and immaterial, reason that "Plaintiffs gave no indication that they wish[ed] to further amend their pleading" after the erroneous *Gibson II* ruling issued. AR 14. This decision alone constitutes reversible error. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 103 (3d Cir. 2002).

That legally irrelevant and factually inaccurate justification does not withstand scrutiny. This Court has repeatedly held that "even when a plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless a district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time." *Phillips*, 515 F.3d at 245; *Grayson*, 293 F.3d at 108. Plaintiffs already sought such

leave, *see* AR 464, and need not repeat that request simply because a different court wrongly decided a different case after Plaintiffs submitted their opposition brief. *Cf. Krantz v. Prudential Invs. Fund Mgmt., LL*, 305 F.3d 140, 145 (3d Cir. 2002) (when "developing case law" is published <u>before</u> an opposition to a motion to dismiss is filed may a plaintiff be found to be "on notice" of that ruling). To find otherwise would upend this Circuit's settled precedent and nullify the meaning and purpose of Rule 15(a)'s instruction, and ultimately would effectively require Plaintiffs to file successive letters with the court repeating easily identifiable requests to amend already raised in their briefing each time any court anywhere decided an arguably related case. Such a practice would make little sense.

In any event, Plaintiffs *did* make their willingness to further distinguish *Gibson II* clear before the court dismissed their claims with prejudice. Their inability to do so is attributable solely to the court's silence when faced with the parties' requests for supplemental briefing. As discussed *supra*, the motion to dismiss was fully briefed (April 5, 2024) <u>before</u> *Gibson II* was issued (May 8, 2024). *See* AR 36, 736. Consistent with the district court's individual rules, because supplemental briefing

had not been permitted, both Defendants and Plaintiffs filed letters addressing *Gibson II* <u>within days</u> of its publication. *See* AR 718–19 (Def's May 13, 2024 Letter); AR 720 (Pl's May 15, 2024 Letter). In their letter, Plaintiffs stated:

> Plaintiffs stand ready to explain—through supplemental briefing, during any motion to dismiss oral argument, or both—why *Gibson* is still distinguishable in critical respects from this case, and why this case remains analogous to the *RealPage* case. See *In re RealPage, Inc., Rental Software Antitrust Litig.*, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023).

AR 720. That message was reiterated two months later, in a joint letter filed about requests for discovery while the motion to dismiss remained pending. *See* AR 733 (Joint Letter, July 26, 2024). There, again, Plaintiffs highlighted that they "remain[ed] available to address any of the issues [raised by Defendants], including via supplemental briefing addressing the recent decision in *Gibson v. Cendyn*, 23-cv-140 (D. Nev.)." AR 735.

But the district court never permitted supplemental briefing, nor did it schedule oral argument on the motion to dismiss, as Plaintiffs requested. Nor did the district court ever respond to Plaintiffs' letter to determine whether the already-pending request for leave to amend was in any way altered (if at all) by the decision in *Gibson II*—precisely the justification it offered to deny leave.

Instead, the district court extensively relied on *Gibson II* in dismissing this action. And its single footnote justifying that dismissal with prejudice made no mention of any "futility" of further amendment. Yet, Plaintiffs specifically sought multiple opportunities to address and distinguish the Nevada court's decision; they were not given one.

The denial of leave here made a practical difference and prejudiced Plaintiffs, who discovered after the motion to dismiss was fully briefed additional relevant facts they are prepared to allege if necessary that further substantiate their claims. For example:

**(1)** Plaintiffs can now point to specific terms contained in a class period-era Cendyn Master Services Access Agreement that plausibly demonstrate GuestREV and GroupREV collect, pool, and use Casino-Hotel Defendants' internal, confidential data to generate recommended prices.

**(2)** Plaintiffs can now highlight an article published in a prominent industry publication that post-dates the dismissal briefing and notes the relevant Rainmaker pricing algorithm products "take proprietary data from" clients like Casino-Hotel Defendants and other relevant market data to generate price recommendations for those clients.

**(3)** As described *supra* at 37–39, Plaintiffs can now allege that all Casino-Hotel Defendants but one began using GuestREV around 2010 and GroupREV around 2013, when those products respectively hit the market. This alone undermines the district court's first described concern and would be grounds for revaluation on the merits. *See* AR 9.

**(4)** Plaintiffs have identified additional information in Rainmaker press releases and articles supporting their claims, including by employing archived retrieval of The Rainmaker Group's website.

Plaintiffs are also prepared to plead **(5)** additional causes of action under Section One not previously asserted but which are supported by ample factual allegations and legal precedent. Specifically, Plaintiffs intend to add a count asserting that Defendants' conduct constitutes an illegal information exchange, and a count asserting that Defendants engaged in a series of anticompetitive vertical agreements.

Both additional counts are justified under existing precedent, and amendment to include them would not be futile. Confidential data collection and sharing of the kind alleged for GuestREV, for instance, would support a stand-alone count for the use and facilitation of an illegal information exchange. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773,

782–83 (1975); *Flat Glass*, 385 F.3d at 369 (claim sufficient where "a finder of fact could reasonably infer that [defendants] used the information to implement collusive price increases"); *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001).

A cause of action that Defendants engaged in anticompetitive vertical agreements would fit neatly with both existing caselaw and the court's findings below. *See Am. Express*, 585 U.S. at 541–42; *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988). Notably, the district court conceded that Casino-Hotel Defendants formed the very vertical relationships with Rainmaker relevant to this count. *See* AR 13. And the federal government has brought these causes of action in its analogous action against RealPage and various landlords. *See United States v. RealPage, Inc.*, 24-cv-710 (LCB) (M.D.N.C. Jan. 7, 2025).

Finally, "Defendants have not established that they will suffer any prejudice from the amendment of the Complaint." *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 234 (E.D. Pa. 2012). Indeed, Defendants did not even argue below that prejudice would exist from amendment—nor could they. Under these circumstances, remand with instructions that Plaintiffs be given leave to amend would be appropriate if necessary.

## Conclusion

The decision of the district court should be reversed, and the case remanded for further proceedings. In the alternative, this Court should remand with instructions that Plaintiffs be permitted leave to amend their pleadings on a first dismissal.

Dated: January 21, 2025

MINDEE J. REUBEN
LITE DEPALMA GREENBERG
  & AFANADOR, LLC
1515 Market Street, Suite 1200
Philadelphia, Pennsylvania 19102
(215) 854-4060

JOSEPH J. DEPALMA
CATHERINE B. DERENZE
LITE DEPALMA GREENBERG
  & AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

WILLIAM G. CALDES
ICEE N. ETHERIDGE
JEFFREY L. SPECTOR
SPECTOR ROSEMAN
  & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
(215) 496-0300

By \s\ Christopher J. Cormier
CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW,
  Suite 200
Washington, DC 20016
(202) 577-3977

ZACH FIELDS
SUSMAN GODFREY LLP
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
(212) 336-8330

SHAWN RAYMOND
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 653-7817

*Attorneys for Plaintiffs-Appellants*

STANLEY O. KING
KING & KING
231 S. Broad Street
Woodbury, NJ 08096
(856) 845-3001

*Attorney for Plaintiff-Appellant
Monica Blair-Smith,
individually and on behalf of
all others similarly situated*

## CERTIFICATION OF ADMISSION TO BAR

I, <u>Christopher J. Cormier</u>, hereby certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

<u>By  \s\ Christopher J. Cormier</u>
CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW,
  Suite 200
Washington, DC 20016
(202) 577-3977

## CERTIFICATION OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,999 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 point Century Schoolbook font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and a virus detection program the Vipre Virus Protection, version 3.1 was run on the file containing the electronic version of this brief and no viruses have been detected.

By \s\ Christopher J. Cormier
CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW,
  Suite 200
Washington, DC 20016
(202) 577-3977

## CERTIFICATE OF FILING AND SERVICE

I, Melissa Pickett, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

January 21, 2025 the foregoing was filed through the CM/ECF system. I certify

that all participants in the case are registered CM/ECF users and that service will

be accomplished by the appellate CM/ECF system. The required copies have been

sent to the court on the same date as above.


/s/ Melissa Pickett
Melissa Pickett
Counsel Press

# Appendix – Volume 1

# TABLE OF CONTENTS

**Page**

Volume 1:

Opinion, dated September 30, 2024 (Doc 139) ...................................... A-1

Order, dated September 30, 2024 (Doc 140) ......................................... A-15

Notice of Appeal, dated October 25, 2024 (Doc 141) ........................... A-17

Volume 2:

Docket Sheet ......................................................................... A-19

Plaintiffs' Unopposed Motion to Consolidate, dated August 28, 2023,
    with Exhibits 1-2 (Doc 57) ............................................. A-41

Motion to Appoint Interim Co-Lead Class Counsel, Liaison Counsel,
    and Executive Committee Counsel for Plaintiffs, dated
    October 18, 2023 (Doc 75) ............................................ A-167

Plaintiffs' Motion to Appoint Interim Co-Lead Class Counsel, Liaison
    Counsel, and Executive Committee Counsel, and Supporting
    Memorandum of Law, dated October 18, 2023 (Doc 75-1) ......... A-173

Order, dated January 16, 2024 (Doc76) ................................... A-205

Consolidated Amended Class Action Complaint, dated
    January 29, 2024 (Doc 80) ............................................. A-207

Notice of Joint Motion to Dismiss the Consolidated Amended Class
    Action Complaint, dated February 20, 2024 (Doc 89) ............... A-340

Memorandum of Law in Support of Defendants' Motion to Dismiss
    the Consolidated Amended Class Action Complaint, dated
    February 20, 2024 (Doc 89-1) ........................................ A-348

Certification of Tansy Woan in Support of Joint Motion to Dismiss
    the Consolidated Amended Class Action Complaint, dated
    February 20, 2024 (Doc 89-2) ........................................ A-400

Exhibit A -
Compendium of Annual Reports from New Jersey Division of
Gaming Enforcement (Doc 89-3).................................................. A-403

Volume 3:

Plaintiffs' Opposition to Defendants' Motion to Dismiss the
Consolidated Amended Class Action Complaint, dated
March 21, 2024 (Doc 92) ............................................................. A-419

Declaration of Joseph J. DePalma, dated March 21, 2024, with
Exhibits 1-2 (Doc 92-1).................................................. A-470

Statement of Interest of the United States, dated March 28, 2024
(Doc 96) .......................................................................... A-552

Statement of Interest of the United States in *In re RealPage, Inc.,
Rental Software Antitrust Litig.*, No. 3:23-MD- 3071 (M.D.
Tenn. Nov. 15, 2023), dated November 15, 2023 (Doc 96-1) ..... A-566

Memorandum of Law in Support of the Statement of Interest of the
United States in *In re RealPage, Inc., Rental Software Antitrust
Litig.*, No. 3:23-MD- 3071 (M.D. Tenn. Nov. 15, 2023), dated
November 15, 2023 (Doc 96-2)...................................................... A-570

Statement of Interest of the United States of America in *Duffy v.
Yardi*, No. 2:23-cv-01391 (W.D. Wa. March 1, 2024), dated
March 1, 2024 (Doc 96-3) ............................................................. A-603

Reply Memorandum of Law in Further Support of Defendants'
Motion to Dismiss the Consolidated Amended Class Action
Complaint, dated April 5, 2024 (Doc 101)................................... A-611

Letter from Harry H. Rimm to the Honorable Elizabeth A. Pascal,
dated April 16, 2024 (Doc 103)...................................................... A-636

Letter from Joseph J. DePalma to the Honorable Elizabeth A. Pascal,
dated April 16, 2024 (Doc 104)...................................................... A-638

Text Order, dated April 18, 2024 (Doc 106) ......................................... A-642

Joint Proposed Discovery Plan, dated April 19, 2024 (Doc 107)........... A-644

Transcript of Scheduling Conference, dated April 22, 2024 ................. A-667

Letter from Tansy Woan to the Honorable Karen M. Williams, dated
     May 13, 2024 (Doc 113) ............................................... A-718

Letter from Mindee J. Reuben to the Honorable Karen M. Williams,
     dated May 15, 2024 (Doc 114) ....................................... A-720

Order Appointing Interim Class Counsel, Liaison Counsel, and
     Executive Committee Counsel, dated May 20, 2024 (Doc 115).. A-721

Plaintiffs' Renewed Motion to Appoint Executive Committee
     Counsel, dated June 26, 2024 (Doc 120) ....................................... A-725

Plaintiffs' Memorandum in Support of Renewed Motion to Appoint
     Executive Committee Counsel, dated June 26, 2024
     (Doc 120-1) ....................................................... A-728

Letter from Mindee J. Reuben to the Honorable Elizabeth A. Pascal,
     dated July 26, 2024, with Exhibits A-B (Docs 129 & 130) ......... A-733

Transcript of Status & Discovery Dispute Conference, dated
     July 29, 2024 ................................................... A-751

Letter from Mindee J. Reuben to the Honorable Karen M. Williams,
     dated September 30, 2024 (Doc 138) ........................................... A-776

Order re: Ruling on Submitted Matter filed by Yardi Systems, Inc.,
     dated August 19, 2024 (Doc 138-1) ............................................. A-777

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| CORNISH-ADEBIYI, *et al.*, | HONORABLE KAREN M. WILLIAMS |
| Plaintiffs, | |
| v. | Civil Action<br>No. 1:23-CV-02536-KMW-EAP |
| CAESARS ENTERTAINMENT, INC., *et al.*, | |
| Defendants. | **OPINION** |

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Plaintiffs Karen Cornish-Adebiyi, Luis Santiago, Monica Blair-Smith, and Jacob Fabel (together, "Plaintiffs") bring this putative class action against the owners and operators of various casino-hotels, as well as a software company (together, "Defendants"), alleging that they have unlawfully conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1]  Before the Court is Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' Motion is granted.

## II.    FACTUAL BACKGROUND

This case concerns the prices of hotel rooms at various Atlantic City casino-hotels, specifically those at Hard Rock Atlantic City, Borgata Hotel Casino & Spa, and three Caesars-

---

[1] Defendants in this case are Caesars Entertainment, Inc. ("Caesars"); Boardwalk Regency LLC; Harrah's Atlantic City Operating Company, LLC; Tropicana Atlantic City Corporation; MGM Resorts International; Marina District Development Company, LLC; Cendyn Group, LLC; Hard Rock International Inc.; Seminole Hard Rock Support Services, LLC; Boardwalk 1000, LLC.

A-1

affiliated properties—Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City (together, the "Casino-Hotels").[2] *See* Am. Compl. ¶¶ 37, 48, 55. In their Amended Complaint, Plaintiffs allege that the Casino-Hotels have unlawfully conspired to inflate and fix the price of their hotel rooms. *See id.* ¶ 1. That conspiracy, Plaintiffs maintain, has been achieved through pricing software sold and marketed by the same company, defendant Cendyn Group, LLC ("Cendyn"). *See id.*

The relevant software at issue was first developed and sold by The Rainmaker Group ("Rainmaker") in the late 1990s, until it was acquired by Cendyn in 2019. *See id.* ¶¶ 5, 113, 121, 126. Cendyn, and previously Rainmaker before its acquisition, offers two products licensed and used by all the Casino Hotels—GuestREV and GroupREV—both of which use one or more pricing algorithms to offer individualized recommendations to each Casino-Hotel as to how it should optimally price its hotel rooms. *See id.* ¶¶ 7, 11, 134, 153. GuestREV is used to price individual rooms, and GroupREV for group reservations (*e.g.*, blocks for conferences). *See id.* ¶¶ 151–58. Beginning in 2015, both products incorporated a feature called REVCaster, a "price comparison tool" that collects publicly available room prices from competing hotels. *See id.* ¶ 160.[3]

The Casino-Hotels began using the Rainmaker products "at various points in time" over a fourteen-year period, starting with a Caesars-affiliated Hotel using GuestREV around 2004 and

---

[2] For purposes of this Opinion, the Court also uses "Casino-Hotels" to refer to their affiliates who have been named as defendants in this case.

[3] Paragraph 160 of the Amended Complaint purports to quote an uncited source, but alleges in between those quotes that REVCaster collects and utilizes "a client's competitors' *non-public, real-time pricing and supply data*." Am. Compl. ¶ 160 (emphasis added). Plaintiffs have since conceded that the source they invoke contradicts what they allege. *See* Pls.' Opp. at 3 n.3. As Defendants' accurately point out, *see* Defs.' Br. at 26–27, that source is an online news article that states REVCaster "collects market-specific hotel price information from hundreds of branded sites and online travel agencies" (*i.e.*, publicly available information). *See* HNN Newswire, *The Rainmaker Group Acquires Revcaster*, May 21, 2015, *available at* https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.13 (2007) (noting that "District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which [ ] truncated quotations were drawn").

A-2

ending with Hard Rock using both GuestREV and GroupREV in 2018. *See id.* ¶¶ 175–76. The others began using some or all of the products at various points in between. *See id.* ¶¶ 178, 184, 193. However, by "no later than June 28, 2018," the Casino-Hotels allegedly entered into a conspiracy by which they would all use Rainmaker's product as part of an "anticompetitive scheme that has caused Plaintiffs and class members to pay supra-competitive prices for guest rooms." *See id.* ¶ 1. In other words, since 2018, the Casino-Hotels started charging higher prices for hotel rooms. *See id.* ¶ 7.

The function of the Rainmaker products is best understood from the perspective of one of the Casino-Hotels subscribed to them. As Plaintiffs describe it, a casino-hotel gives the Rainmaker products continuous access to certain data, at least some of which includes non-public proprietary data related to pricing and occupancy.[4] *See id.* ¶ 6. In turn, an algorithm "processes and analyzes" the input data of that specific casino-hotel—together with "other supply and demand data"—and recommends an "optimal" price for the casino-hotel's rooms, which it may then adopt or reject at its discretion. *Id.* This is how the Rainmaker products function for each of the Casino-Hotels named in this case, and they are alleged to accept those recommendations around 90% of the time. *See id.* ¶ 174.

The Amended Complaint does not allege that the Casino-Hotels' proprietary data are pooled or otherwise comingled into a common dataset against which an algorithm runs and returns

---

[4] In describing the three Rainmaker products at issue, the Amended Complaint describes them collectively as the "Rainmaker platform," but seems to equivocate in its use of the word "platform." The "platform" it describes initially is more akin to a "suite" of discreet but related products. *See, e.g.*, Am. Compl. ¶ 5 ("Rainmaker developed and marketed a platform of pricing algorithm products[.]"). However, it is around the sixth paragraph where the Amended Complaint appears to adopt an entirely different definition of platform, or at least one that implies a single, unified database into which all the Casino-Hotels' confidential pricing and occupancy data are pooled. *See id.* ¶ 6 (stating that "each casino-hotel provides its current, non-public room pricing and occupancy data to the Rainmaker platform"); *see also id.* ¶ 226 (alleging the Casino-Hotels "knowingly submitted their own real-time and non-public pricing and occupancy data to the same third-party algorithm platform to which their co-defendants were submitting their own respective real-time and non-public pricing and occupancy data."). To be clear, Plaintiffs have not pled that the Casino-Hotels' proprietary data were pooled in such a way.

3

A-3

to each Casino-Hotel individually with recommended prices. Even so, Plaintiffs allege that the Casino-Hotels have engaged in a conspiracy to artificially raise and fix the prices of their hotel rooms, and that their conspiracy is achieved through their "knowing and purposeful shared use" of the Rainmaker products. *Id.* ¶¶ 223–24.

### III.    LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is required to accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff, *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008), but need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). A complaint that provides facts "merely consistent with" the defendant's liability "stops short of the line between possibility and plausibility" and will not survive review under Rule 12(b)(6). *Id.* (quoting *Twombly*, 555 U.S. at 557).

A-4

## IV.    DISCUSSION

In their Motion, Defendants seek dismissal of the Amended Complaint, which asserts against each Defendant a single claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### A.    Legal Framework

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Id.* Thus, to successfully make out a Section 1 claim, a plaintiff must plead: (1) that the defendant was a party to a contract, combination, or conspiracy; and (2) that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade. *See Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). Here, Defendants' Motion implicates only the first prong.

The terms "contract," "combination," or "conspiracy" have not been assigned their own unique meanings but have rather been interpreted together "simply to mean an agreement." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 332 (3d Cir. 2018). They thus require "some form of concerted action, . . . a unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (internal citations and quotation marks omitted). In any case, "Section 1 claims always require the existence of an agreement. Unilateral action, regardless of the motivation is not a violation of Section 1." *Burch*, 662 F.3d at 221 (internal citations and quotation marks omitted); *see also West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("To prevail on a [S]ection claim . . . a plaintiff must establish the existence of an agreement.").

The unlawful agreement alleged in this case is that of a hub-and-spoke conspiracy—a type of conspiratorial agreement comprised of a central actor (the "hub") with multiple competitors jetting out vertically therefrom (the "spokes"). The "rim" of this wheel represents the connecting agreements among the horizontal competitors that form the spokes. "In all hub-and-spoke conspiracies, the horizontal agreement among the spokes supports the agreements between the hub and each spoke, and vice versa." *Ins. Brokerage*, 618 F.3d at 347. Thus, the "critical issue" for establishing a hub-and-spoke conspiracy is determining "how the spokes are connected to each other." *Id.* at 327 (internal quotation marks omitted). The specific conspiracy alleged in this case is arranged with Cendyn and its Rainmaker products in the middle as the "hub," and the individual Casino-Hotels are the "spokes." Defendants' Motion here concerns only the "rim," the alleged horizontal agreements among the Casino-Hotels to fix the prices of their hotel rooms.

A plaintiff's pleading burden for demonstrating a horizontal agreement among direct competitors is the same for any unlawful agreement on the Sherman Act—it requires Plaintiffs to plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. A plausible agreement may be shown through "either direct evidence of an agreement or circumstantial evidence." *Burch*, 662 F.3d at 225. A conspiracy based on direct evidence requires allegations of "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). When relying on circumstantial evidence, a plaintiff must plead evidence of "parallel conduct" that is further "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That necessary context may be evinced through allegations of so-called "plus factors" that "serve as proxies for direct evidence of an agreement." *In re Flat Glass Antitrust*

*Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). The Third Circuit has identified at least three such plus factors that "may" indicate the presence of an agreement: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Ins. Brokerage*, 618 F.3d at 322. However, these factors are neither exclusive nor conclusive; determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 664.

## B.    <u>Horizontal Agreement</u>

As previously indicated, Plaintiffs have alleged a price-fixing agreement among the Casino-Hotels. Plaintiffs have offered no allegation that directly evinces an explicit price-fixing agreement, and they thus endeavor to infer a tacit agreement through the Casino-Hotels' parallel conduct, namely their "knowing use of the same Rainmaker software." Pls.' Opp. at 13.[5] The question thus before the Court is whether the Casino-Hotels' common use of the same pricing software is "plausibly suggest[ive of] (not merely consistent with) agreement." *Twombly*, 550 U.S. at 545. In their Motion, Defendants articulate various factual deficiencies plaguing the Amended Complaint, all of which they contend preclude a plausible inference of any alleged agreement.

At the outset, the Court observes that the purported hub-and-spoke conspiracy in this case is nearly identical to that pled in another case that recently concluded in Las Vegas, Nevada. In *Gibson v. MGM Resorts International* ("*Gibson I*"), the plaintiffs brought a putative class action

---

[5] As "direct evidence" of a price-fixing conspiracy, Plaintiffs point to specific portions of a blog post written by a Cendyn executive that broadly discusses the benefits available to hotels when they optimize revenue instead of occupancy. The Court declines to discuss this evidence at length. To conclude that a conspiratorial agreement was reached based on this evidence requires numerous inferential steps, which necessarily means that these statements, by definition, are not direct evidence. *See, e.g.*, *Burtch*, 662 F.3d 212, 225 (3d Cir. 2011) (rejecting proposed "direct evidence" because allegations did not "specify a time or place that any actual agreement . . . occurred" nor "indicate that any particular individuals . . . made such an agreement").

A-7

against Cendyn and various casino-hotels on the Las Vegas strip. *See* No. 2:23-CV-00140, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). There too, the plaintiffs invoked the Sherman Act and alleged that a price-fixing conspiracy was achieved through the casino-hotels' common use of the very same Rainmaker products at issue in this case. On October 24, 2023, the Honorable Miranda M. Du, U.S.D.J., issued a written opinion setting forth a litany of reasons as to why the plaintiffs failed to allege a plausible agreement among the casino-hotels to raise the prices of their hotel rooms. Though the court dismissed the complaint, it initially did so without prejudice and granted plaintiffs leave to submit an amended pleading.

Plaintiffs here acknowledge the factual and theoretical similarities between this case and *Gibson*, but maintain that the Amended Complaint here "satisfies each concern" expressed by Judge Du. Pls.' Opp. at 7. However, while Defendants' Motion to Dismiss was pending in this case, Judge Du had the opportunity to consider the Las Vegas plaintiffs' amended pleading. *See Gibson v. Cendyn Grp., LLC* ("*Gibson II*"), No. 2:23-CV-00140, 2024 WL 2060260 (D. Nev. May 8, 2024). In another detailed, written opinion, Judge Du found that many of the previously identified factual deficiencies persisted, and that the plaintiffs had, once again, failed to plead parallel conduct from which a plausible, horizontal price-fixing conspiracy could be inferred. *See id.* at *8.

It can hardly be disputed that the same factual deficiencies identified in *Gibson I* and *Gibson II* are present in the Amended Complaint here. Indeed, most of the arguments offered in this case have likewise been presented to and considered by Judge Du. Having considered those arguments, this Court also concludes that Plaintiffs have failed to establish a plausible price-fixing conspiracy among the Casino-Hotels in Atlantic City.

A-8

One particular issue with the Amended Complaint here is the timing of the parallel conduct which, as Defendants point out, was not quite "parallel." As previously mentioned, the Casino-Hotels' subscriptions to the Rainmaker product occurred over a fourteen-year period, starting with a Caesars-affiliated hotel in 2004 and ending with Hard Rock in 2018. The Borgata and Harrah's first subscribed in 2009—five years after Caesars, and nine years before Hard Rock. The penultimate was Tropicana, two years before Hard Rock. In their Opposition, Plaintiffs submit that they are not required to demonstrate "simultaneous" parallel conduct, and that "it does not matter if the allegations leave unclear 'at what precise point of time each [Casino-Hotel] became aware' of the unlawful agreement." Pls.' Opp. at 15–16 (quoting *United States v. Masonite Corp.*, 316 U.S. 265, 274–75 (1942)). While it is true that Plaintiffs need not allege parallel conduct that is strictly simultaneous or conclusively identify a conspiratorial "start date," they must nevertheless place the Casino Hotels' software use "in a context that raises a suggestion of a *preceding agreement*." *Twombly*, 550 U.S. at 557 (emphasis added); *see also Baby Food Antitrust Litig.*, 166 F.3d at 117 ("The existence of an agreement is the hallmark of a Section 1 claim."). Judge Du confronted a similar ten-year gap in *Gibson II*:

> [G]iven the allegations in the [amended complaint] . . . that Hotel Defendants began licensing GuestRev and GroupRev at different times over an approximately 10-year period and never agreed to charge the prices GuestRev and GroupRev recommended to them, the only plausible inference that the Court can draw is that the timing does not raise the specter of collusion. Instead, and even drawing all inferences in Plaintiffs' favor, the allegations to the effect that Hotel Defendants agreed to license GuestRev and GroupRev . . . over the course of some 10 years merely suggest that Hotel Defendants had a similar reaction to similar pressures within an interdependent market, or conscious parallelism. This contrasts with the implausible inference of a tacit agreement between Hotel Defendants that Plaintiffs would like the Court to draw. And the allegations about Defendants' parallel use of GuestRev starting in 2015 do not plausibly allow for such an inference either because, as Defendants pointed out, GuestRev and GroupRev merely integrated public competitor prices through RevCaster starting in 2015. That technical change does not speak to any agreement between Hotel Defendants. The Court thus again

A-9

> finds that the gaps in time between when Hotel Defendants agreed to license
> GuestRev and GroupRev suggest a tacit agreement between them is implausible.

2024 WL 2060260, at *4. (citations and quotation marks omitted). This Court likewise finds that even when considering the Amended Complaint as a whole in the light most favorable to Plaintiffs, the fourteen-year gap, coupled with the pricing authority the Casino-Hotels' continued to retain and exercise, makes it quite implausible that they tacitly agreed to anything, much less to fix the prices of their hotel rooms. *See also Burtch*, 662 F.3d at 228 (holding plaintiff failed to plead plausible agreement where individual conduct occurred months apart).

Another significant gap in the Amended Complaint lies in the unique antitrust theory Plaintiffs have proposed. The parallel conduct from which Plaintiffs ask this Court to infer an illegal price-fixing agreement is the Casino-Hotels' "knowing" and "purposeful" use of the Rainmaker products. But how is their mere use of the specific software here suggestive of culpable conspiracy? Plaintiffs repeatedly and emphatically emphasize that the Casino-Hotels "knowingly provided" their "non-public room pricing and occupancy data" to the Rainmaker products. *See* Am. Compl. ¶¶ 6, 9, 22, 24, 136, 139, 160, 205, 220–21, 224–26. As to how this data is used once it is handed over, Plaintiffs do not say. But that is precisely what appears to be missing. Without it, their antitrust theory is factually and legally incomplete.

The Court reiterates that the Amended Complaint does not allege that the Casino-Hotels' proprietary data are pooled or otherwise comingled into a common dataset against which the algorithm runs. Stated differently, the pricing recommendations offered to each Casino-Hotel individually are not based on a pool of confidential competitor data. The Amended Complaint goes to rather extraordinary lengths to dance around that allegation with linguistic equivocation in an obvious attempt to imply it, but it never unambiguously alleges as much. What is more, the specific sources quoted by the Amended Complaint seem to confirm that the pricing recommendations at

issue were never based on the confidential, proprietary data of their competitors. And the Casino-Hotels' "supply and demand data" to which Plaintiffs allude appears to be publicly available information.

In their Motion, Defendants highlight the Amended Complaint's ambiguity on this issue. And as they have correctly pointed out, Plaintiffs do not allege that the Casino-Hotels receive or directly benefit from the non-public pricing and occupancy data they individually place into the Rainmaker products. Plaintiffs appear to concede that their particular antitrust theory depends on some improper exchange or use of that data. Yet, their Opposition claims that "this is <u>precisely</u> what Plaintiffs allege." Pls.' Br. at 2 (emphasis in original). That is simply not true. What is more, Judge Du confronted these same tactics in *Gibson I*:

> Plaintiffs [ ] allege a hub and spoke conspiracy in their Complaint, but their allegations do not support such a theory because **Plaintiffs never quite allege (though they suggest by implication) that Hotel Operators get nonpublic information from other Hotel Operators by virtue of using insufficiently specified algorithmic pricing software**. Indeed, as [FTC] Commissioner Ohlhausen described it, a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm. And as Defendants' counsel argued at the Hearing, **Plaintiffs attempt to create an inference of the exchange of nonpublic information in their Complaint without actually alleging such an exchange.**
> . . . .
> Plaintiffs do not allege that . . . Hotel Operators exchange nonpublic information with each other through their use of that same software. Accordingly, Plaintiffs have not sufficiently alleged a hub and spoke theory in their Complaint consistent with the theory described[.]

2023 WL 7025996, at *6 (emphasis added) (citations and quotation marks omitted). The same is true of the Amended Complaint here.

Undeterred, Plaintiffs insist that their allegations are "closely analogous" to those successfully alleged in *In re RealPage, Inc.* ("*RealPage*")—a multidistrict litigation involving another algorithm-software provider (RealPage) in the apartment-rentals industry. *See* 709 F.

A-11

Supp. 3d 478 (M.D. Tenn. 2023). As described by the Honorable Waverly D. Crenshaw, Jr.,

U.S.D.J., the antitrust claims in *RealPage* involved allegations that

> RealPage and RMS Client Defendants [ ] formed an illegal price-fixing cartel by jointly using RealPage's RMS software. As the cartel leader or the "hub" of the conspiracy, RealPage serves as an intermediary between horizontal competitors in the multifamily and student housing markets. **It takes its clients commercially sensitive pricing and supply data, runs its RMS algorithm against that collective data pool, and then spits out rental pricing recommendations for each of its clients' properties. RMS Client Defendants agree to set prices based on a pool of their horizontal competitors' proprietary data and reasonably believe that their competitors are using the same data and methods to price their properties**.

*Id.* at 494 (emphasis added) (citations omitted). Critically, Judge Crenshaw rejected the very

analogy Plaintiffs attempt to draw here:

> <u>Gibson</u> concerned a revenue management system that the plaintiffs alleged was used by hotels on the Las Vegas Strip to increase nightly room rates. **On their face, these allegations appear to offer a close analogy to this case, but the devil is in the details**. In granting the defendant hotels' motion to dismiss, the court found that "it is unclear whether the pricing recommendations generated to Hotel Operators include [competitors'] confidential information fed in; perhaps they only get their own confidential information back, mixed with public information from other sources." **Here, the Multifamily Complaint unequivocally alleges that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data[.]** . . . **This critical difference between the** <u>Gibson</u> **complaint and the Multifamily Complaint destroys the analogy**. As the <u>Gibson</u> court acknowledged, "a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm." That is what the Multifamily Plaintiffs have alleged here.

*Id.* at 512 (citations omitted).

Notwithstanding the obvious factual dissimilarities, Plaintiffs state that "Defendants cannot

seriously dispute that Plaintiffs' allegations are substantially identical to those held sufficient in

*RealPage*." Pls.' Opp. at 18. But even that suggestion was offered by the plaintiffs in *Gibson II*

and was swiftly rejected:

A-12

> Plaintiffs state that "Defendants make no serious attempt to distinguish this case from *RealPage*[,]" and hold that case up as an analogue the Court should consider[.] [B]ut the *RealPage* court distinguished that case from this one precisely because the complaint in that case included allegations of the exchange of otherwise confidential information between competitors through the algorithm, while this case did not.

2024 WL 2060260, at *4. Lest there by any doubt, Judge Du further noted:

> To the extent it is not obvious, the Court distinguishes *RealPage* . . . for the same reason that the *RealPage* court distinguished this case. This case does not involve allegations of competitors pooling their confidential or proprietary information in the dataset that the pertinent algorithm runs on, while that case did.

*Id.* at *4 n.7. Here, Plaintiffs' "failure to plausibly allege the exchange of confidential information from one of the spokes to the other through the hub's algorithms is another fatal defect . . . [and] it too compels the conclusion that there is no rim." *Id.* at *4.

Like the Las Vegas plaintiffs, Plaintiffs here have premised their case on a rather novel antitrust theory that is simply "in search of factual allegations that could support it." *Id.* *3. The Court cannot infer a plausible price-fixing agreement between the Casino-Hotels from the mere fact that they all use the same pricing software. Simply stated, the hub-and-spoke conspiracy they articulate lacks a rim. Plaintiffs have not pled any facts that places that behavior in "a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. Without such context, the Casino-Hotels' use of the same pricing software evinces "nothing more than a series of vertical relationships." *Ins. Brokerage*, 618 F.3d at 327. "*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *Id.* Both considerations warrant dismissal of the Amended Complaint here. The Court accordingly holds that Plaintiffs have failed to state a claim under Section 1 of the Sherman Act.

13

A-13

V.    **CONCLUSION**

For all of the reasons set forth above, Defendants' Motion to Dismiss the Amended Complaint is granted.[6]


Dated: September 30, 2024

                                              /s/ Karen M. Williams
                                              KAREN M. WILLIAMS
                                              U.S. DISTRICT COURT JUDGE

---

[6] Following the publication of *Gibson II*, Plaintiffs gave no indication that they wish to further amend their pleading (ECF No. 114.) As such, the Court's dismissal of the Amended Complaint is with prejudice.

A-14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| CORNISH-ADEBIYI, *et al.*, | HONORABLE KAREN M. WILLIAMS |
| Plaintiffs, |  |
| v. | Civil Action<br>No. 1:23-CV-02536-KMW-EAP |
| CAESARS ENTERTAINMENT, INC., *et al.*, |  |
| Defendants. | **ORDER** |

**THIS MATTER**[1] having come before the Court by way of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6); the Court having considered Defendants' Motion (ECF No. 89); Plaintiffs' Opposition thereto (ECF No. 92); and Defendants' Reply (ECF No. 101); for the reasons set forth in the accompanying Opinion of even date; and for good cause shown;

**IT IS** this **30th** day of **September 2024** hereby

**ORDERED** as follows:

A) Defendants' Motion to Dismiss (ECF No. 89) is **GRANTED**.

B) The Consolidated Amended Class Action Complaint (ECF No. 80) is **DISMISSED WITH PREJUDICE**.

C) All pending motions are **DENIED AS MOOT**.

---

[1] "Plaintiffs" refers to Karen Cornish-Adebiyi, Luis Santiago, Monica Blair-Smith, and Jacob Fabel. "Defendants" refers to Caesars Entertainment, Inc.; Boardwalk Regency LLC; Harrah's Atlantic City Operating Company, LLC; Tropicana Atlantic City Corporation; MGM Resorts International; Marina District Development Company, LLC; Cendyn Group, LLC; Hard Rock International Inc.; Seminole Hard Rock Support Services, LLC; Boardwalk 1000, LLC.

1

A-15

**D)**  The Clerk of Court shall mark this matter as **CLOSED**.


/s/ Karen M. Williams
KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE

A-16

**LITE DEPALMA GREENBERG & AFANANDOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Liaison Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KAREN CORNISH-ADEBIYI, LUIS SANTIAGO, and MONICA-BLAIR SMITH, *individually and on behalf of all others similarly situated*,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>CAESARS ENTERTAINMENT, INC., BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO, HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO, TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY, MGM RESORTS INTERNATIONAL, MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA, HARD ROCK INTERNATIONAL INC., SEMINOLE HARD ROCK SUPPORT SERVICES, LLC, BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY, and CENDYN GROUP, LLC,<br><br>     *Defendants*. | No. 1:23-CV-02536-KMW-EAP<br><br> <br><br><u>**NOTICE OF APPEAL**</u> |

      **NOTICE IS HEREBY GIVEN** that Plaintiffs and prospective class representatives Karen Cornish-Adebiyi, Luis Santiago, and Monica Blair-Smith appeal, pursuant to 28 U.S.C. § 1291, to the United States Court of Appeals for the Third Circuit from the Opinion of the United States District Court for the District of New Jersey, entered on September 30, 2024, granting Defendants'

A-17

motion to dismiss with prejudice, *see* Dkt. 139, and made final by the Order entered on September 30, 2024, *see* Dkt. 140.

Respectfully submitted,

Dated:   October 25, 2024

**LITE DEPALMA GREENBERG & AFANADOR LLC**

By:  */s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

Mindee J. Reuben
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060
mreuben@litedepalma.com

*Liaison Attorneys for Plaintiffs and the Prospective Class*

12832606v1/017866

A-18