No. 24-3006

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

CORNISH-ADEBIYI ET AL.,
*Plaintiffs-Appellants*,

*v.*

CAESARS ENTERTAINMENT, INC. ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey, No. 1:23-CV-2536

**BRIEF OF ANTITRUST LAW AND ECONOMICS
PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND REVERSAL**

Isaac Park
*Counsel of Record*
NEW YORK UNIVERSITY
  SCHOOL OF LAW
40 Washington Sq. South
New York, NY 10012
(901) 831-7177
isaac.park@nyu.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................ii

INTEREST OF *AMICUS CURIAE*.............................................. 1

INTRODUCTION ......................................................................... 2

ARGUMENT .................................................................................. 5

    I.    Plaintiffs Have Pleaded an "Agreement" to Fix Prices by Alleging that Hotel Defendants Use a Shared Price Algorithm to Set Room Rates. .................................. 7

        A.    As alleged, Hotel Defendants have raised their room rates "in parallel" since 2018. .............................. 8

        B.    As alleged, Hotel Defendants jointly use a price algorithm to set room rates, which is strong circumstantial evidence of "agreement." ...................... 9

                1.    The price algorithm is an exchange of nonpublic price information between Hotel Defendants. ......................................................... 11

                2.    Exchanging price information is against each Hotel Defendants' individual interest. .............. 16

                3.    Exchanging price information facilitates collusion between Hotel Defendants................... 18

        C.    The existence of a clear-cut remedy further weighs in favor of inferring an "agreement." ........................... 22

    II.    Hotel Defendants' Agreement to Fix the Prices of Hotel Rooms is "Unreasonable.".................................................... 25

CONCLUSION.............................................................................. 26

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) .......................................................................11, 14

*Am. Column & Lumber Co. v. United States,*
  257 U.S. 377 (1921) ................................................................................15

*In re Baby Food Antitrust Litig.,*
  166 F.3d 112 (3d Cir. 1999) ....................................................................8

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..........................................................................5, 11

*Broadcast Music, Inc. v. CBS,*
  441 U.S. 1 (1979) .................................................................................26

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.,*
  851 F.2d 478 (1st Cir. 1988) .................................................................23

*Cornish-Adebiyi v. Caesars Enter., Inc.*, No. 1:23-CV-2536,
  2024 WL 4356188 (D.N.J. Sept. 30, 2024) ......................................11, 24

*Duffy v. Yardi Sys., Inc.*, No. 2:23-CV-1391,
  2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ...............................17, 25

*In re Chocolate Confectionary Antitrust Litig.,*
  801 F.3d 383 (3d Cir. 2015) .................................................................23

*In re Flat Glass Antitrust Litig.,*
  385 F.3d 350 (3d Cir. 2004) ..........................................................6, 7, 14

*In re Petroleum Prods. Antitrust Litig.,*
  906 F.2d 432 (9th Cir. 1990)........................................................ passim

*In re Text Messaging Antitrust Litig.,*
  782 F.3d 867 (7th Cir. 2015).........................................................23, 24

*In re Travel Agent Comm'n Antitrust Litig.,*
  583 F.3d 896 (6th Cir. 2009) ..................................................................8

*Interstate Circuit v. United States,*
  306 U.S. 208 (1939) ................................................................. 8

*Nat'l Rifle Ass'n v. Vullo,*
  602 U.S. 175 (2024) ........................................................... 10, 11

*Anderson News, LLC v. Am. Media, Inc.,*
  899 F.3d 87 (2d Cir. 2018) ...................................................... 8

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,*
  998 F.2d 1224 (3d Cir. 1993) ................................................. 8

*In re RealPage,*
  709 F. Supp. 3d 478 (M.D. Tenn. 2023) ............................... 17

*Ross v. Am. Exp. Co.,*
  35 F. Supp. 3d 407 (S.D.N.Y. 2016) ................................... 8, 9

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015) ................................................. 8

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001) ......................................... passim

*United States v. Container Corp. of Am.,*
  393 U.S. 333 (1969) .............................................................. 20

*United States v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940) ....................................................... 25, 26

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978) .............................................................. 18

*Valspar Corp. v E.I. Du Pont De Nemours & Co.,*
  873 F.3d 185 (3d Cir. 2017) ................................................. 22

## Other Authorities

PHILLIP E. AREEDA & HERBERT HOVENKAMP,
  ANTITRUST LAW (4th ed. 2024) ...................................... passim

2A PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW,
  ANTITRUST LAW (1995) .......................................................... 19

Peter C. Carstensen & Annkathrin Marschall, *Pooling and Exchanging Competitively Sensitive Information Among Rivals: Absolutely Illegal Not Just Unreasonable*,
92 U. CINN. L. REV. 335 (2023)...................................................... passim

Ariel Ezrachi & Maurice E. Stucke, *Artificial Intelligence & Collusion: When Computers Inhibit Competition*,
2017 U. ILL. L. REV. 1775 (2017) ...................................................... 12, 21

Ariel Ezrachi & Maurice E. Stucke, *The Role of Secondary Algorithmic Tacit Collusion in Achieving Market Alignment*,
26 VAND. J. ENT. & TECH. L. 461 (2024) ........................................ passim

Miguel A. Fonseca & Hans-Theo Normann, *Endogenous Cartel Formation: Experimental Evidence*,
125 ECONS. LETTERS 223 (2014)............................................................. 21

Miguel A. Fonseca & Hans-Theo Normann, *Explicit vs. Tacit Collusion—The Impact of Communication in Oligopoly Experiments,*
56 EUR. ECON. REV. 1759 (2012) ........................................................... 21

Francisco Gomez-Martinez et al., *Firm-Specific Information and Explicit Collusion in Experimental Oligopolies*,
82 EUR. ECON. REV. 132 (2015) ............................................................. 21

Joseph E. Harrington, Jr. & Christopher R. Leslie, *Horizontal Price Exchanges*,
44 CARDOZO L. REV. 2301 (2023)..................................................... passim

Georg Kirchsteiger et al., *Endogenizing Market Institutions: An Experimental Approach*,
49 EUR. ECON. REV. 1827 (2005) ........................................................... 21

William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law*,
110 MICH. L. REV. 393, 424 (2011) ............................................ 15, 16, 19

Christopher R. Leslie, *The Decline and Fall of Circumstantial Evidence in Antitrust Law*,
69 AM. U. L. REV. 1713 (2020)............................................................... 20

Alexander MacKay & Samuel N. Weinstein, *Dynamic Pricing Algorithms, Consumer Harm, and Regulatory Response*, 100 WASH. U. L. REV. 111 (2022) ........................................................ 4, 11

Maureen K. Ohlhausen, Acting Chairman, U.S. Fed. Trade Comm'n, *Should We Fear the Things that Go Beep in the Night?  Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing* (May 23, 2017) ..................................................... 12, 13

RICHARD POSNER, ANTITRUST LAW (1976) ........................................................... 11

George J. Stigler, *A Theory of Oligopoly*, 72 J. POL. ECON. 44 (1964) ...................................................... 2

## INTEREST OF *AMICUS CURIAE*[1]

*Amici curiae* are professors of law and of economics who specialize in antitrust law and who have previously published on, or are interested in, the issue of antitrust liability for algorithmic pricing and, more broadly, the proper construction of the antitrust laws in cases involving algorithmic pricing.

*Amici curiae* are:

- Christine Bartholomew, Professor of Law, University at Buffalo School of Law

- Peter C. Carstensen, Fred W. & Vi Miller Chair in Law Emeritus, University of Wisconsin Law School

- Robert H. Lande, Venable Professor of Law Emeritus, University of Baltimore School of Law

- Dr. John L. Solow, White-Xander Professor of Economics, University of Central Florida; Emeritus Professor in Economics, University of Iowa

---

[1] All parties consent to the filing of this brief. No counsel for any party authored this brief in whole or in part. Apart from *amici curiae*, no person contributed money intended to fund preparing or submitting this brief.

The institutional affiliation of *amici curiae* and of undersigned counsel are provided solely for identification purposes. None of the identified institutions are a signatory to this brief. The views expressed in this brief are solely those of *amici curiae*.

# INTRODUCTION

Economic theory, as well as common sense, teaches us that price fixing isn't always easy.  Even for oligopolists with significant market power, a successful price fixing scheme is unlikely to arise when "other market circumstances are uncongenial."  PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1435a (4th ed. 2024).  The pervasive problem faced by the would-be price fixer is that of uncertainty.  *See* George J. Stigler, *A Theory of Oligopoly*, 72 J. POL. ECON. 44, 44 (1964).  As various market conditions tend to make it hard for an oligopolist to "predict[] or monitor[] rivals' present or future behavior," the resulting "uncertainty stands in the way of oligopolists' achieving cartel-like results."  *Id.*

Antitrust law has traditionally responded by seeking to preserve those conditions that tend to make price fixing difficult.  In particular, current doctrine instructs reviewing courts to take a hard look at certain "facilitating" practices by oligopolists—for example, regular exchange of information about each other's pricing practices—that tend to reduce uncertainty and therefore make collusive agreement easier and more likely to occur.  Under the current approach, the use of such a

facilitating practice by competitor firms, if those firms have otherwise acted in parallel, is typically treated as evidence of a *per se* unlawful price fixing agreement. *See* AREEDA & HOVENKAMP ¶ 1435. (Furthermore, even if there is no independent evidence of parallel conduct—if the existence of the facilitating practice is all that can be alleged or proved—such an arrangement still receives antitrust scrutiny under the rule of reason.[2])

In recent years, a powerful new tool for exchanging information and facilitating agreement has emerged: the price algorithm. Powered by artificial intelligence and machine learning, these algorithms take in an enormous amount of raw information—about supply, demand, and competitor pricing, among other things—and generate an estimate for the profit-maximizing price for each product. These algorithms have

---

[2] In recent years, various antitrust scholars—some of whom are *amici* here—have persuasively argued for the presumptive or *per se* illegality of such information exchanges in and of themselves. *See, e.g.*, Peter C. Carstensen & Annkathrin Marschall, *Pooling and Exchanging Competitively Sensitive Information Among Rivals: Absolutely Illegal Not Just Unreasonable*, 92 U. CINN. L. REV. 335 (2023); Joseph E. Harrington, Jr. & Christopher R. Leslie, *Horizontal Price Exchanges*, 44 CARDOZO L. REV. 2301 (2023).

To the extent that Plaintiffs have pressed such a rule of reason claim, *see, e.g.*, Compl. ¶ 358, AR 322, the district court's failure to consider this separate basis for liability is another reason to reverse.

become a ubiquitous feature of many modern markets, from

ride-sharing apps, to airlines, to Amazon.  Yet only recently have these

algorithms been the focus of sustained antitrust scrutiny.

Here, we are concerned with algorithmic pricing in its "simplest"

form: where the "competitors all use the same algorithm or software to

determine their pricing strategy."  Ariel Ezrachi & Maurice E.

Stucke, *The Role of Secondary Algorithmic Tacit Collusion in Achieving*

*Market Alignment*, 26 VAND. J. ENT. & TECH. L. 461, 473 (2024).

Economic theory tells us that parallel use of a shared pricing algorithm

should be treated with skepticism, given the dangerous risk of

coordinated behavior that is necessarily entailed.  Indeed, "a scholarly

consensus has emerged that pricing algorithms can facilitate price-

fixing and other forms of express collusion."  Alexander MacKay &

Samuel N. Weinstein, *Dynamic Pricing Algorithms, Consumer Harm,*

*and Regulatory Response*, 100 WASH. U. L. REV. 111, 129 (2022).

But in the proceedings below, the district court entirely overlooked

the antitrust risks posed by algorithmic pricing.  Plaintiffs in this case

have pleaded that a set of oligopolist casino hotels in Atlantic City have

all begun using the same price algorithm to set their room rates.

Plaintiffs have also pleaded that the hotels have acted in parallel to set room rates. These two allegations, paired together, are strongly suggestive of the existence of a horizontal price-fixing conspiracy and, thus, should have easily survived a motion to dismiss. The district court's contrary ruling flies in the face of established doctrine and basic economic theory. This Court should reverse.

## ARGUMENT

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy in restraint of trade." 15 U.S.C. § 1. In a Section 1 case, the "crucial question" at the pleading stage is whether the plaintiff has plausibly alleged an "agreement," either "tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotation marks omitted). Well pleaded allegations about an express agreement would, of course, do the trick. *See id.* But "smoking gun" evidence is hard to come by. For most antitrust plaintiffs, the existence of an agreement must instead "be inferred" from the defendants' "parallel[] . . . conduct," accompanied by circumstantial evidence" (often called a "plus" factor) that suggests the existence of an agreement. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.).

A textbook example of such circumstantial evidence—relevant to this case—is an allegation that defendants have engaged in a "facilitating practic[e]" like an "[i]nformation exchange." *Id.* As this Court has instructed, "exchanges of confidential price information" between supposed competitors strongly suggest the existence of an agreement because the behavior "cannot simply be explained as a result of oligopolistic interdependence." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 n.12 (3d Cir. 2004); *see In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 446–47 (9th Cir. 1990) (inferring an agreement from "parallel" price changes, plus acts of "announcing [price] information" to each other). Information exchange is, in short, a very strong "plus" factor.

Here, Plaintiffs have adequately pleaded both that Hotel Defendants have acted "in parallel" in raising the price of their rooms, *see infra* Section I.A, and that they have used a price algorithm to exchange nonpublic price information with each other, *see infra* Section I.B.1. Such use of a price algorithm—like any information exchange—is strong circumstantial evidence of an illicit agreement. The exchange of price information is against each Hotel Defendant's individual

self-interest.  *See infra* Section I.B.2.  And exchange of such information makes it much easier for the Hotel Defendants to begin and to maintain a collusive agreement.  *See infra* Section I.B.3.  For those reasons, among others, the district court should have held that Plaintiffs had adequately pleaded an agreement.

The court below did not reach the rest of the Section 1 analysis. But for reasons of judicial economy, this Court may wish to address it, as the analysis is rather straightforward: Hotel Defendants are alleged to be engaging in a horizontal price-fixing agreement, which is *per se* illegal.  *See infra* Part II.

## I.    Plaintiffs Have Pleaded an "Agreement" to Fix Prices by Alleging that Hotel Defendants Use a Shared Price Algorithm to Set Room Rates.

Here, both "parallel conduct" and "information exchange" are adequately pleaded.  According to Plaintiffs, Hotel Defendants have engaged in "parallel" pricing during the class period.  And according to Plaintiffs, Hotel Defendants have also used the algorithm to "exchange" nonpublic information.  Plaintiffs have therefore adequately pleaded the existence of an agreement.  *See Flat Glass*, 385 F.3d at 361 n.12.

**A.  As alleged, Hotel Defendants have raised their room rates "in parallel" since 2018.**

To allege "parallel conduct," an antitrust plaintiff need only plead that the defendants "acted similarly," *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993), with respect to a type of "business conduct," *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009).  To be "parallel," the conduct need not be "uniform." *Baby Food*, 166 F.3d at 132.  Rather, it need only fall "within an agreed upon range," *id.*, and occur "within a time period suggestive of prearrangement," *Anderson News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018).

As these quotations might suggestion, the requirement of "parallel conduct" is not particularly demanding.  *See, e.g.*, *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015) (conduct was parallel even though "to say that . . . defendants did not move in any way close to perfect tandem" would be "an understatement"); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d

407, 439 (S.D.N.Y. 2016) ("[N]ot all conspiracies require swift, simultaneous parallelism.").

Here, it is alleged that Hotel Defendants moved in parallel to raise prices during the relevant class period. As pleaded, "total average room rates . . . significantly increased when Casino-Hotel Defendants collectively used the same pricing algorithm platform to set room rates" beginning "no later than 3rd Quarter 2018." Compl. ¶ 244, AR 286–87. And "[d]uring the class period . . . Casino-Hotel Defendants' room rates trended upward and in similar proportion" for all years except one, while "the occupancy rates . . . meaningfully decreased" for all Hotel Defendants except two. Compl. ¶ 249, AR 291. These allegations easily make out "parallel" conduct.

### B. As alleged, Hotel Defendants jointly use a price algorithm to set room rates, which is strong circumstantial evidence of "agreement."

"Information exchange is an example of [circumstantial evidence] that can help support an inference of a price-fixing agreement." *Todd*, 275 F.3d at 198. Here, Plaintiffs have adequately pleaded that Hotel Defendants' use of the pricing algorithm was a form of "information

exchange," which is strongly suggestive of the existence of an "agreement."

Start with the consolidated amended class complaint—and with its allegations about Defendant Rainmaker's price algorithm. In the complaint, Plaintiffs repeatedly allege that the Rainmaker algorithm generated its recommended room rates for each Hotel Defendant on the basis of (among other things) the nonpublic data of the other Hotel Defendants. Consider, to take just one example, the allegations in paragraph 358 of the operative complaint:

> Casino-Hotel Defendants submit their real-time, non-public pricing and supply data to a common pricing algorithm . . . which uses this data along with other pieces of information to derive true market demand and [to] recommend optimal pricing to each Casino-Hotel Defendant in that market. This conduct, at minimum, constitutes improper information sharing . . . .

Compl. ¶ 358, AR 322; *see also* Compl. ¶¶ 6, 205, AR 211, 264.

These are well pleaded, nonconclusory factual allegations, and (along with all reasonable inferences) must be taken as true on a motion to dismiss. *See Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 191 (2024);

*Twombly*, 550 U.S. at 570.  This brief therefore proceeds on the premise that Plaintiffs have sufficiently pleaded this feature of the algorithm.[3]

### 1. The price algorithm is an exchange of nonpublic price information between Hotel Defendants.

"[P]ricing algorithms all function in the same general manner: they automatically apply a computerized rule to set prices based on various inputs."  MacKay & Weinstein, 100 WASH. U. L. REV. at 124–25. (Relevant inputs include "competitors' prices, supply and demand conditions, day of the week," and "personal characteristics" of buyers. *Id.* at 113.)  Perhaps the biggest difference between algorithmic pricing and old-fashioned pricing is time.  Whereas previously "[p]ricing decisions took weeks—if not months—to implement," nowadays

---

[3] Below, the court reached the opposite conclusion—on the confused theory that Plaintiffs faced an obligation to allege that Hotel Defendants' price information was "pooled or otherwise comingled into a common dataset" before it was fed to the algorithm.  *Cornish-Adebiyi v. Caesars Enter., Inc.*, No. 1:23-CV-2536, 2024 WL 4356188, at *2 (D.N.J. Sept. 30, 2024).  But whether the information was, in fact, "pooled"—or whether it was presented to the algorithm *in seriatim*—should make not a whit of difference.  The district court's analysis smacks of the kind of "formalis[m]" that the Supreme Court has long "eschew[ed]" in the context of the Sherman Act.  *Am. Needle*, 560 U.S. at 191; *see also Petroleum Prods.*, 906 F.2d at 447 ("[T]he *form* of the exchange . . . should not be determinative of its legality." (quoting RICHARD POSNER, ANTITRUST LAW 146 (1976)).

"computers can assess and adjust prices . . . within milliseconds." Ariel Ezrachi & Maurice E. Stucke, *Artificial Intelligence & Collusion: When Computers Inhibit Competition*, 2017 U. ILL. L. REV. 1775, 1780 (2017).

Most importantly for our purposes, rival firms sometimes adopt the *same* pricing algorithm to set their prices. In such an arrangement, each competitor "electronically sends their [pricing] data to a third party," who then relies on all available data to "suggest[] (or set[]) the profit-maximizing price" for each participating firm. *Id.* at 1788. This particular arrangement is premised on the availability of up-to-date data "from each subscribing rival about their operations" so that the algorithm may "update [its] dynamic pricing." Ezrachi & Stucke, 26 VAND. J. ENT. & TECH. L. at 498.

Because (as pleaded by Plaintiffs) the price algorithm draws on all available nonpublic price data to calculate its price recommendations, it functions as a textbook example of an "information exchange." *Todd*, 275 F.3d at 198. According to Maureen Ohlhausen, former chair of the Federal Trade Commission, if a third-party algorithm is used as "a clearing house for confidential price information"—if, say, the various competitor firms "themselves don't directly share" pricing data with

each other, but instead relay their data "to a common, outside agent that provides algorithmic pricing strategies"—such an arrangement should be treated the same as a "direct[]" "exchange [of] competitively sensitive information." Ohlhausen offers the following common-sense observation:

> Everywhere the word 'algorithm' appears, please just insert the words 'a guy named Bob.' Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price?

And her conclusion, too, is common sense: "if it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either."[4]

Under this logic, an "exchange" of price data has occurred even if the information has traveled only "in one direction," from the participating firms to the shared algorithm. Ezrachi & Stucke, 26 VAND. J. ENT. & TECH. L. at 499. The presence or absence of a shared "hub" is what matters. As each firm's price data is fed into the central algorithmic hub, that firm's data becomes usable and useful data for

---

[4] Maureen K. Ohlhausen, Acting Chairman, U.S. Fed. Trade Comm'n, *Should We Fear the Things that Go Beep in the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing* (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf.

each of its rivals. Thus, as long as the algorithm is able to draw on "each rival's nonpublic, confidential data" whenever it calculates an optimal price for each individual competitor firm, the algorithm has effected an "exchange" of price data. *Id.* Even though competitors have "only" "share[d] their data with the [algorithm]," without the algorithm "reshar[ing] the rivals' information with other [rivals]," such an arrangement entails all of the problems that an information exchange augurs. *Id.*

Indeed, to require more—to require Plaintiffs to plead that the algorithm "recirculate[s] each rival's nonpublic, confidential data back to the rivals"—would be a needless formalism. *Id.* Strictly speaking, such recirculation of data is not required for the anticompetitive problems that attend information exchange to arise. And as the Supreme Court has admonished, the Sherman Act "eschew[s] . . . formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010).

14

On this point, the Court's decision in *American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921), is particularly instructive. There, rival lumber firms had agreed to "submit the details of their business to the analysis of an expert, jointly employed, and obtain from him a 'harmonized' estimate of the market." *Id.* at 410. The expert's projection of future prices served as an "attractive basis" for "harmony" of action by the lumber firms "with respect to future prices." *Id.* at 398; *see also id.* at 411. In ruling that this arrangement violated the Sherman Act, the Court viewed two things as "paramount": first, that "the rivals shared their commercially sensitive data with a hub," who "analyzed the data to insistently recommend harmony of act" by all rival firms; and second, that "the rivals complied with the . . . recommendations, thereby inflating lumber prices." Ezrachi & Stucke, 26 VAND. J. ENT. & TECH. L. at 500.

So, too, for the price algorithm in this case—which (as pleaded) is best understood to effect an exchange of nonpublic price information between the various Hotel Defendants.

### 2.    Exchanging price information is against each Hotel Defendants' individual interest.

Parallel conduct, plus horizontal sharing of nonpublic price information, "yield[s] a strong inference of explicit collusion." William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 424 (2011) (identifying it as a "super plus factor"). That is because "exchanges of confidential price information[] cannot simply be explained as a result" of self-interested dealing. *Flat Glass*, 385 F.3d at 361 n.12. "Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process." *Kovacic*, 110 MICH. L. REV. at 424. This means for any given firm, its rivals are likely interested in learning this information. But this also means that the firm in question faces no incentive whatsoever to volunteer this information, either to its rivals or to the world at large. "No rational firm would want to endow its rivals with this kind of information" absent an agreement to collude. Carstensen & Marshall, 92 U. CINN. L. REV. at 340.

Here, it is alleged that each Defendant agreed to submit continuously its nonpublic price and supply data to the algorithm on the understanding that such data would provide the basis for calculating

optimal room rates for its rival firms. *See, e.g.*, Compl. ¶ 358, AR 322.

There is no reasonable explanation for this behavior other than

collusive agreement. Indeed, in other algorithmic price fixing cases,

district courts have deemed the presence of similarly "irrational"

behavior to be the "most persuasive evidence of horizontal agreement."

*In re RealPage*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023); *see Duffy v.*

*Yardi Sys., Inc.*, No. 2:23-CV-1391, 2024 WL 4980771, at *4 (W.D.

Wash. Dec. 4, 2024) ("It is only in the presence of a prior

understanding . . . that such conduct appears rational.").

What's more, this case involves a particularly dubious form of

information exchange, the exchange of *current* price information

between rival firms. According to the economics literature, a rational,

self-interested firm would never willingly provide its competitors with

this particular datum. Indeed, per scholarly consensus, it would

"make[] no sense" for a firm "to share this information in a competitive

market," not least because it would "increase[] the likelihood of the

information provider *losing* the sale." Harrington & Leslie, 44 CARDOZO

L. REV. at 2320. Thus, a "plausible" rationale for "sharing current

prices" would exist "only if the recipient was not going to undercut those

prices as it sought to compete"—presumably because of a collusive agreement.  Carstensen & Marschall, 92 U. CINN. L. REV. at 340.

For these reasons, the Supreme Court in *U.S. Gypsum* identified exchanges involving current price data as having the "greatest potential for generating anticompetitive effects," and observed that such arrangements have "consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978).

### 3.   Exchanging price information facilitates collusion between Hotel Defendants.

Separately, parallel conduct, plus horizontal exchange of price information, gives rise to a strong inference of agreement because such exchange of information is unusually likely to have facilitated collusive agreement.

Not all oligopoly markets lend themselves to collusive price fixing. "Uncertainty is the most general impediment to cartel-like results in oligopoly." AREEDA & HOVENKAMP ¶ 1407e.  Even if other market conditions are conducive to oligopolistic competition, oligopolists "may have difficulty settling upon a . . . supracompetitive price" if there is "great peril in charging [such a] price" and if they are "uncertain about [their] rivals' prospective responses," AREEDA & HOVENKAMP ¶ 1430.

Relatedly, the maintenance of oligopoly requires some means of communication between the various firms. Direct communication is ideal, but not always possible; if forced to rely on "nonverbal" cues, oligopolists are forced to speak "much less precisely," raising the risk of miscommunication. *Id.*

A second impediment to successful oligopolistic pricing is a lack of "transparency" in the market. To sustain a cartel, each member must have some "confidence that rivals will refrain from price cutting," and such confidence is "greatest when each firm can effectively monitor its rivals and discipline their price cutting." *Id.* ¶ 404c. If a firm's "cheating" cannot be detected without substantial time or effort, there will be no way to impose sufficient market discipline, and the market will drift ever closer to a competitive equilibrium.

Price exchange between rival firms goes a long way toward ameliorating all of these obstacles to price fixing. *See* 2A PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW ¶ 404c8 (1995). First, the process of exchanging price information "promote[s] trust and shared goals, which are two pillars supporting effective communication." Harrington & Leslie, 44 CARDOZO L. REV. at

2324.  Second, "the act of exchanging prices . . . allow[s] firms to discuss and agree on prices through either express or tacit communication."  *Id.*  Third, price exchange "facilitate[s] tacit collusion using price signaling by creating more common information about firms' prices."  *Id.*  And fourth, price exchange "serves to monitor firms for compliance with agreed-upon prices."  *Id.*  Overall, the effect of horizontal price exchange is a reduction in the uncertainty faced by each rival firm, and an increase in overall market transparency.  *See United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("The exchange of price data tends toward price uniformity.").  And the predictable result is an increase in price fixing.

These theoretical observations find robust support in the experimental economic literature.  According to one set of studies, when rival firms were provided "extensive market information" but were not permitted "any communication," the result was "improved competitive performance."  By contrast, when rival firms were given both "extensive market information" and the ability to communicate, the result was a "nearly perfect" approximation of "monopoly profits [for] the firms."

Carstensen & Marschall, 92 U. CINN. L. REV. at 353.[5]  In another

experiment, sellers were given the ability to inform competitors of the

price at which they were selling.  Generally, sellers opted not to, but

when they did, it was "when they set a relatively high price"—

suggesting "collusive intentions."  Harrington & Leslie, 44 CARDOZO L.

REV. at 2336–37.  The author of the study observed: "It is as if sellers

wanted to send a message to keep prices at a high level by informing

each other about their high price quotes."[6]  And in a third study, a

Danish company sought to measure the effect of offering the same

pricing algorithm to gas stations across Rotterdam.  The algorithm had

distinctly anticompetitive effects, "transform[ing] a market previously

characterized by 'fierce competition and high volatility' into one with

"softened competition" and "across-the-board upward pressure on price."

Ezrachi & Stucke, 26 VAND. J. ENT. & TECH. L. at 475–76.

---

[5] *See* Miguel A. Fonseca & Hans-Theo Normann, *Explicit vs. Tacit Collusion—The Impact of Communication in Oligopoly Experiments,* 56 EUR. ECON. REV. 1759 (2012); Miguel A. Fonseca & Hans-Theo Normann, *Endogenous Cartel Formation: Experimental Evidence*, 125 ECONS. LETTERS 223 (2014); Francisco Gomez-Martinez et al., *Firm-Specific Information and Explicit Collusion in Experimental Oligopolies*, 82 EUR. ECON. REV. 132 (2015).

[6] Georg Kirchsteiger et al., *Endogenizing Market Institutions: An Experimental Approach*, 49 EUR. ECON. REV. 1827, 1829 (2005).

Thus, both theory and practice point to the same conclusion: the exchange of price data between rival firms is a particularly dangerous form of information exchange.

## C. The existence of a clear-cut remedy further weighs in favor of inferring an "agreement."

Section 1's requirement of an "agreement" has always reflected a particular theory of the judicial role. The reason that "[e]xpress collusion violates antitrust law" while "tacit collusion does not," *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015), is because "courts have no effective remedy for the [latter] problem." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397–98 (3d Cir. 2015); *see also Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.).

Judges have no good options in a situation where rational individual behavior and collusive behavior cannot be distinguished. The classic example is oligopolistic competition. "[I]n an oligopolistic market, parallel behavior "can be a necessary fact of life." *Valspar Corp. v E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017). "[H]ow does [an oligopolist] decide what price to charge? If [it does] the rational thing," and "its 'competitors' do as well," the result

will often be parallel conduct.  But that means the oligopolist "is in trouble."  *Text Messaging*, 782 F.3d at 874.  To avoid antitrust scrutiny, it must make *irrational* choices about pricing.  Or else a reviewing court is placed in the unenviable position of "judg[ing] what constitutes a 'fair' price."  *Petroleum Prods.*, 906 F.2d at 445.  "The federal courts generally are unsuited to act as rate-setting commissions."  *Id.*; *see Text Messaging*, 782 F.3d at 874 ("Such a requirement would convert antitrust law into a scheme resembling public utility price regulation, now largely abolished.")  For these reasons, the federal ourts have been extremely careful to infer the existence of an illegal "agreement" merely from parallel conduct.

But the problem of judicial remedy does not arise when competing firms have relied on a "facilitating practice" like horizontal price exchange to attain an anticompetitive result.  As many scholars have observed, the information exchange itself provides a useful focal point for judicial action.  There is no doubt that a firm may plausibly "be prohibited" by a reviewing court "from sharing confidential information with [a central algorithm]" or from "signaling price movements to each other [privately]."  Ezrachi & Stucke, 26 Vand. J. Ent. & Tech. L. at

496. The facilitating practice "can be enjoined directly," without resort to "price control" or "wholesale reorganization of the economy." AREEDA & HOVENKAMP ¶ 1436. This sort of judicial remedy is quite familiar, and would seem to pose no threat whatsoever to our basic system of private enterprise.

Ultimately, then, the question is whether "permitting an inference of conspiracy from the fact of [collusive algorithmic pricing] would significantly deter important legitimate conduct." *Petroleum Prods.*, 906 F.2d at 448. And because there is "[n]o procompetitive redeeming virtues in permitting such a practice," the answer is "no." AREEDA & HOVENKAMP ¶ 1407e. Thus, inferring "agreement" in such circumstances poses no risk of judicial overreach.

\* \* \*

Below, the district court dismissed the complaint for failing to plead a plausible "agreement." *Cornish-Adebiyi*, 2024 WL 4356188, at *7. Because an agreement can be readily inferred from the allegations of Defendants' parallel conduct, plus their exchange of nonpublic price information via algorithmic pricing, this Court should reverse.

## II.   Hotel Defendants' Agreement to Fix the Prices of Hotel Rooms is "Unreasonable."

For reasons of judicial economy, this Court may wish to address the rest of the Section 1 analysis, which is rather straightforward.

The Supreme Court has recognized that certain horizontal agreements are *per se* illegal because they "always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20 (1979).  The classic example is an agreement to fix prices.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 216 (1940).  (Price fixing, as the Supreme Court has held, not only includes "an agreement to pay or charge rigid, uniform prices," but also "fixed pricing ranges, fixed pricing levels of ascending or descending scales, or prices that are fixed through a formula." *Id.* at 222.)

Here, Plaintiffs have alleged a horizontal agreement between the Hotel Defendants to fix the prices of their hotel rooms using a price algorithm.  Such a price fixing agreement is *per se* illegal.  *See, e.g.*, *Duffy*, 2024 WL 4980771, at *8 (holding that an "adequately alleged horizontal price-fixing agreement" is a "*per se* violation of § 1 of the Sherman Act").

## CONCLUSION

For the foregoing reasons, the district court's decision should be reversed.

February 11, 2025                    Respectfully submitted,

                                     */s/ Isaac Park*
                                     Isaac Park
                                     NEW YORK UNIVERSITY
                                        SCHOOL OF LAW
                                     40 Washington Sq. South
                                     New York, NY 10012
                                     (901) 831-7177
                                     isaac.park@nyu.edu

                                     *Counsel for Amici Curiae*

# COMBINED CERTIFICATIONS

I, Isaac Park, hereby certify the following:

1.  I have submitted a properly completed application for admission to the bar of this Court.

2.  The brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,757 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

4.  Pursuant to Local App. R. 31.1(c), the PDF file and the text of the paper version of the brief are identical.  The electronic version of the brief has been scanned for viruses by VirusTotal (version 3.0) and no viruses were found.

5.  On February 11, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/EFCF users and service will be accomplished by the appellate CM/ECF system.


February 11, 2025                    /s/ Isaac Park
                                     Isaac Park