# United States Court of Appeals

*for the*

# Third Circuit

Case No. 24-3006

KAREN CORNISH-ADEBIYI; LUIS SANTIAGO; MONICA BLAIR-SMITH,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

CAESARS ENTERTAINMENT, INC.; BOARDWALK REGENCY LLC,
d/b/a Caesars Atlantic City Hotel & Casino; HARRAHS ATLANTIC CITY
OPERATING COMPANY, LLC, d/b/a Harrahs Resort Atlantic City Hotel &
Casino; TROPICANA ATLANTIC CITY CORPORATION, d/b/a Tropicana
Casino and Resort Atlantic City; MGM RESORTS INTERNATIONAL;
MARINA DISTRICT DEVELOPMENT COMPANY, LLC, d/b/a Borgata
Hotel Casino & Spa; HARD ROCK INTERNATIONAL INC.; SEMINOLE
HARD ROCK SUPPORT SERVICES, LLC; BOARDWALK 1000, LLC,
d/b/a Hard Rock Hotel & Casino Atlantic City; CENDYN GROUP, LLC,

*Defendants-Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY IN NO. 1-23-CV-02536,
HONORABLE KAREN M. WILLIAMS, DISTRICT JUDGE

## DEFENDANTS-APPELLEES' JOINT RESPONSE BRIEF

SADIK HUSENY
BRENDAN MCSHANE
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
– and –
MELISSA ARBUS SHERRY
ANNA M. RATHBUN
LAWRENCE E. BUTERMAN
CHRISTOPHER J. BROWN
GRAHAM HAVILAND
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004
*Attorneys for Defendant-Appellee
Cendyn Group, LLC*

BORIS BERSHTEYN
*Counsel of Record*
KEN SCHWARTZ
MICHAEL MENITOVE
SAM AULD
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
boris.bershteyn@skadden.com
ken.schwartz@skadden.com
michael.menitove@skadden.com
sam.auld@skadden.com
*Attorneys for Defendants-Appellees
Caesars Entertainment, Inc.,
Boardwalk Regency LLC, Harrah's
Atlantic City Operating Company,
LLC, and Tropicana Atlantic City
Corporation*

*(For Continuation of Appearances See Inside Cover)*

DAVID C. KIERNAN
MATTHEW SILVEIRA
JONES DAY
555 California Street, 26th Floor
San Francisco, California 94104
dkiernan@jonesday.com
msilveira@jonesday.com

– and –

JENNIFER L. DEL MEDICO
LAURA W. SAWYER
JONES DAY
250 Vesey Street, 34th Floor
New York, New York 10281
(212) 326-3658
jdelmedico@jonesday.com
lwsawyer@jonesday.com

*Attorneys for Defendants-Appellees
Hard Rock International Inc. and
Seminole Hard Rock Support
Services, LLC*


CRAIG CARPENITO
DAVID S. LESSER
KING & SPALDING LLP
1185 Avenue of the Americas,
34th Floor
New York, New York 10036
ccarpenito@kslaw.com
dlesser@kslaw.com

*Attorneys for Defendant-Appellee
Boardwalk 1000, LLC d/b/a Hard
Rock Hotel & Casino Atlantic City*

BETHANY W. KRISTOVICH
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9100
bethany.kristovich@mto.com

– and –

JUSTIN P. RAPHAEL
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
justin.raphael@mto.com

*Attorneys for Defendants-Appellees
MGM Resorts International and
Marina District Development
Company, LLC d/b/a Borgata Hotel
Casino & Spa.*

# DISCLOSURE STATEMENTS

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and</u>**
**<u>Statement of Financial Interest</u>**

No. <u>24-3006</u>

Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest.  This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings.  If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list.  LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first.  A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed.  Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, **Caesars Entertainment, Inc.**

makes the following disclosure:

(Name of Party)

     1) For non-governmental corporate parties please list all parent corporations: Caesars Entertainment, Inc. is a publicly traded company that has no parent corporation.

     2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

N/A

     3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

     4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

**s/ Boris Bershteyn**

(Signature of Counsel or Party)

Dated: 11/12/2024

**rev: 09/2014**                    (Page 2 of 2)

**United States Court of Appeals for the Third Circuit**

## Corporate Disclosure Statement and
## Statement of Financial Interest

No. <u>24-3006</u>

Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

   Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

   Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

   In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

   The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

   The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

   If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

**Boardwalk Regency LLC**
_(Name of Party)_

    1) For non-governmental corporate parties please list all parent corporations: Caesars New Jersey LLC, Caesars World LLC, CEOC LLC, Caesars Resort Collection LLC, Caesars Growth Partners LLC, Caesars Holdings, Inc., Caesars Entertainment, Inc.

    2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

N/A

    3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

    4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

**s/ Boris Bershteyn**
_(Signature of Counsel or Party)_

Dated: 11/12/2024

**rev: 09/2014**                    (Page 2 of 2)

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and
Statement of Financial Interest**

No. <u>24-3006</u>

Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Harrah's Atlantic City Operating Company, LLC
_____
(Name of Party)

     1) For non-governmental corporate parties please list all parent corporations: Caesars Resort Collection LLC, Caesars Growth Partners LLC, Caesars Holdings, Inc., Caesars Entertainment, Inc.

     2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:
N/A

     3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:
N/A

     4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.
N/A

s/ Boris Bershteyn
_____
(Signature of Counsel or Party)

Dated: 11/12/2024
_____

**rev: 09/2014**         (Page 2 of 2)

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and
Statement of Financial Interest**

No. <u>24-3006</u>

Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Tropicana Atlantic City Corporation
_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations: Tropicana Entertainment, Inc., Caesars Entertainment, Inc.

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:
N/A

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:
N/A

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.
N/A

s/ Boris Bershteyn
_____
(Signature of Counsel or Party)

Dated: 11/12/2024
_____

**rev: 09/2014**            (Page 2 of 2)

## United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and
## Statement of Financial Interest

No. <u>24-3006</u>
<u>      </u>

KAREN CORNISH-ADEBIYI; LUIS SANTIAGO; MONICA
BLAIR-SMITH, individually and on behalf of all others
similarly situated

v.

CAESARS ENTERTAINMENT, INC.; BOARDWALK REGENCY LLC, d/b/a Caesars Atlantic City Hotel & Casino;
HARRAHS ATLANTIC CITY OPERATING COMPANY, LLC, d/b/a Harrahs Resort Atlantic City Hotel & Casino;
TROPICANA ATLANTIC CITY CORPORATION, d/b/a Tropicana Casino and Resort Atlantic City; MGM RESORTS
INTERNATIONAL; MARINA DISTRICT DEVELOPMENT COMPANY, LLC, d/b/a Borgata Hotel Casino & Spa; HARD
ROCK INTERNATIONAL INC.; SEMINOLE HARD ROCK SUPPORT SERVICES, LLC; BOARDWALK 1000, LLC, d/b/a
Hard Rock Hotel & Casino Atlantic City; CENDYN GROUP, LLC

## Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, <u>Cendyn Group, LLC</u>
makes the following disclosure:                    (Name of Party)

      1) For non-governmental corporate parties please list all parent
corporations: Cendyn Group, LLC is 100% owned by Cendyn Parent, Inc.  Cendyn Parent, Inc. is
              100% owned by Cendyn Group Holdings LLC, a portfolio company of Accel-KKR.

      2) For non-governmental corporate parties please list all publicly held
companies that hold 10% or more of the party's stock:
No publicly held corporation holds 10% or more of Cendyn Group, LLC's stock.

      3) If there is a publicly held corporation which is not a party to the
proceeding before this Court but which has as a financial interest in the outcome of the
proceeding, please identify all such parties and specify the nature of the financial
interest or interests:
N/A

      4) In all bankruptcy appeals counsel for the debtor or trustee of the
bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the
members of the creditors' committee or the top 20 unsecured creditors; and, 3) any
entity not named in the caption which is active participant in the bankruptcy proceeding.
If the debtor or trustee is not participating in the appeal, this information must be
provided by appellant.
N/A

/s/ Sadik Huseny
_____          Dated: 11/12/2024
(Signature of Counsel or Party)         _____

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and</u>**
**<u>Statement of Financial Interest</u>**

No. <u>24-3006</u>

Karen Cornish-Adebiyi, et al

v.

Caesars Entertainment, Inc., et al

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Hard Rock International (USA) Inc.
_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations:  Seminole Hard Rock Entertainment, Inc.

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Jennifer L. Del Medico
_____
(Signature of Counsel or Party)

Dated: 11/13/2024
_____

**rev: 09/2014**          (Page 2 of 2)

## United States Court of Appeals for the Third Circuit

### Corporate Disclosure Statement and
### Statement of Financial Interest

No. <u>24-3006</u>

Karen Cornish-Adebiyi, et al

v.

Caesars Entertainment, Inc., et al

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Seminole Hard Rock Support Services, LLC
_____
(Name of Party)

       1) For non-governmental corporate parties please list all parent corporations: None

       2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

       3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

       4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Jennifer L. Del Medico
_____
(Signature of Counsel or Party)

Dated: 11/13/2024
_____

**rev: 09/2014**         (Page 2 of 2)

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and
Statement of Financial Interest**

No. <u>24-3006</u>

Karen Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

BOARDWALK 1000, LLC, d/b/a Hard Rock Hotel & Casino Atlantic City
_____
(Name of Party)

       1) For non-governmental corporate parties please list all parent corporations: Hard Rock Tristate AC, LLC

       2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

No publicly held corporation holds 10% or more of Boardwalk 1000, LLC stock.

       3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

       4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/Craig Carpenito
_____
(Signature of Counsel or Party)

Dated: 12/16/2024
_____

**rev: 09/2014**                    (Page 2 of 2)

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and</u>**
**<u>Statement of Financial Interest</u>**

No. <u>24-3006</u>

Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

      Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

      Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest.  This information need be provided only if a party has something to report under that section of the LAR.

      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings.  If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list.  LAR 26.1(c).

      The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

      The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first.  A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed.  Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

      If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Marina District Development Company LLC d/b/a Borgata Hotel Casino & Spa
(Name of Party)

1) For non-governmental corporate parties please list all parent corporations: The party is a limited liability corporation whose membership interests are wholly owned by Marina District Development Holding Co., LLC.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Marina District Development Holding Co., LLC, interests are owned 50.51% by MAC, Corp., and 49.49% by MGM Resorts International.  MAC, Corp., is a wholly owned subsidiary of Mirage Resorts LLC, which is a wholly owned subsidiary of MGM Resorts International.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Bethany Kristovich
(Signature of Counsel or Party)

Dated: 11/15/2024

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and</u>**
**<u>Statement of Financial Interest</u>**

No. <u>24-3006</u>

Cornish-Adebiyi, et al.

v.

Caesars Entertainment, Inc., et al.

<u>Instructions</u>

    Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

    Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

    The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

    The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

    If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, **MGM Resorts International**
makes the following disclosure:

(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations: N/A

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

IAC Holdings, Inc.

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Bethany Kristovich

(Signature of Counsel or Party)

Dated: 11/15/2024

rev: 09/2014             (Page 2 of 2)

## TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS ........................................................................ i

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION ............................................................................................1

STATEMENT OF THE ISSUES.......................................................................5

STANDARD OF REVIEW...............................................................................6

STATEMENT OF RELATED CASES .............................................................6

STATEMENT OF THE CASE .........................................................................7

      A.     Factual Allegations .........................................................................7

            1.     Cendyn's Revenue Management Products .........................7

            2.     The Revenue Management Products' recommended prices were not based on competitors' non-public data ..............9

            3.     Casino-Hotels subscribe to Rainmaker's revenue management software up to 14 years apart ......................10

            4.     Most Casino-Hotels lowered their room rates during the alleged conspiracy ................................................................12

      B.     Procedural History.......................................................................14

SUMMARY OF ARGUMENT .......................................................................17

ARGUMENT ..................................................................................................22

I.     THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' AMENDED COMPLAINT BECAUSE THEY FAIL TO PLAUSIBLY ALLEGE AN AGREEMENT AMONG CASINO-HOTELS.................22

      A.     Plaintiffs Fail to Plead Parallel Conduct and Plus Factors.........23

# TABLE OF CONTENTS
## (continued)

Page

    1.    Casino-Hotels' conduct is far less parallel than the conduct in *Burtch* ..............................................................24

    2.    Plaintiffs' "plus factors" are weaker than the plus factors this Court has rejected ..........................................32

B.    Plaintiffs' Attempt to Plead an Agreement Without Parallel Conduct Also Fails..............................................................45

    1.    Plaintiffs fail to plead any "knowing delegation," and it would be insufficient even if they did ...............................45

    2.    Plaintiffs cannot satisfy *Interstate Circuit*, and *Masonite* and *American Needle* are inapplicable .........................................49

II.    THE DISTRICT COURT PROPERLY DISMISSED WITH PREJUDICE....................................................................52

A.    The Court Could Not Have Abused Its Discretion Because Plaintiffs Never Properly Sought Leave to Amend....................53

B.    Even If Plaintiffs Properly Sought Leave, the District Court Was Well Within Its Discretion to Deny It .................................59

C.    Plaintiffs' Belated Attempt to Identify New Facts Is Too Late and Too Little ........................................................................61

CONCLUSION...............................................................................65

CERTIFICATE OF COMPLIANCE .................................................68

CERTIFICATE OF SERVICE..........................................................74

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Acquaire v. Canada Dry Bottling Co. of New York*,
    24 F.3d 401 (2d Cir. 1994) ........................................................52

*In re Adams Golf, Inc. Securities Litigation*,
    381 F.3d 267 (3d Cir. 2004) ............................................. 62-63

*In re Allergan ERISA Litigation*,
    975 F.3d 348 (3d Cir. 2020) ............................................. 54-55

*American Needle, Inc. v. National Football League*,
    560 U.S. 183 (2010)..........................................................49, 51-52

*In re Baby Food Antitrust Litigation*,
    166 F.3d 112 (3d Cir. 1999) ....................................................42

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................24, 27-28, 40

*Burch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ............................................passim

*City of Pontiac Police & Fire Retirement System v. BNP
    Paribas Securities Corp.*,
    92 F.4th 381 (2d Cir. 2024) ...............................................33, 46

*Concord Associates, L.P. v. Entertainment Properties Trust*,
    817 F.3d 46 (2d Cir. 2016) ............................................... 43-44

*Davis v. Abington Memorial Hospital*,
    765 F.3d 236 (3d Cir. 2014) ....................................................61

*In re Domestic Airline Travel Antitrust Litigation*,
    691 F. Supp. 3d 175 (D.D.C. 2023) ......................................30

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Duffy v. Yardi Systems*,
  No. 23-CV-01391, 2024 WL 4980771
  (W.D. Wash. Dec. 4, 2024) ................................................................. 36-37

*Eichorn v. AT & T Corp.*,
  248 F.3d 131 (3d Cir. 2001) ......................................................................44

*Erie County, Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ....................................................................24

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
  482 F.3d 247 (3d Cir. 2007) ...............................................................passim

*Gibson v. Cendyn Group*,
  No. 23-CV-00140, 2024 WL 2060260
  (D. Nev. May 8, 2024) ..................................... 4-5, 15-16, 45-46, 60-61, 63

*Gibson v. MGM Resorts International*,
  No. 23-CV-00140, 2023 WL 7025996
  (D. Nev. Oct. 24, 2023) ...........................................................14-15, 37, 60

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
  602 F.3d 237 (3d Cir. 2010) .............................................................22, 47

*In re Insurance Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010) ...............................................................passim

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939)............................................................................20, 49

*Kemezis v. Matthews*,
  394 F. App'x 956 (3d Cir. 2010) .............................................................59

*Kerwin v. Casino*,
  802 F. App'x 723 (3d Cir. 2020) .............................................................25

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Krantz v. Prudential Investments Fund Management LLC,*
    305 F.3d 140 (3d Cir. 2002) ................................................................ 59-60

*LabMD Inc. v. Boback,*
    47 F.4th 164 (3d Cir. 2022) ......................................5, 21, 53-54, 55, 58-59

*Lake v. Arnold,*
    232 F.3d 360 (3d Cir. 2000) .......................................................................54

*Lisowski v. Walmart Stores, Inc.,*
    No. 21-2501, 2022 WL 2763698 (3d Cir. July 15, 2022) .........................59

*Lungu v. Antares Pharma Inc.,*
    No. 21-1624, 2022 WL 212309 (3d Cir. Jan. 25, 2022) ..................... 40-41

*In re Musical Instruments & Equipment Antitrust Litigation,*
    798 F.3d 1186 (9th Cir. 2015) ...................................................................28

*In re Nexium (Esomeprazole) Antitrust Litigation,*
    842 F.3d 34 (1st Cir. 2016) ........................................................... 20, 50, 51

*Park Irmat Drug Corp. v. Express Scripts Holding Co.,*
    911 F.3d 505 (8th Cir. 2018) ............................................................. 32-23

*In re Passenger Vehicle Replacement Tires Antitrust Litigation,*
    No. 24-MD-3107, 2025 WL 606533
    (N.D. Ohio Feb. 25, 2025).........................................................................48

*Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,*
    836 F.2d 173 (3d Cir. 1988) .....................................................................29

*In re Processed Egg Products Antitrust Litigation,*
    No. 08-MD-2002, 2019 WL 5656101
    (E.D. Pa. Oct. 31, 2019).............................................................................30

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997) .............................................................43, 44

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ramsgate Court Townhome Ass'n v. West Chester Borough*,
    313 F.3d 157 (3d Cir. 2002) ...........................................................6, 53, 56

*Ranke v. Sanofi-Synthelabo Inc.*,
    436 F.3d 197 (3d Cir. 2006) ............................................................... 56-57

*Real Estate Exchange Inc. v. Zillow Group, Inc.*,
    No. 24-685, 2025 WL 670967 (9th Cir. Mar. 3, 2025) ...........................52

*In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023) ....................................... 36, 37, 44

*Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*,
    401 F.3d 123 (3d Cir. 2005) ........................................................................52

*Tri-M Group, LLC v. Sharp*,
    638 F.3d 406 (3d Cir. 2011) ............................................................... 29-30

*U.S. ex rel. Schumann v. AstraZeneca Pharmaceuticals L.P.*,
    769 F.3d 837 (3d Cir. 2014) ......................................................................60

*U.S. ex rel. Zizic v. Q2Administrators, LLC*,
    728 F.3d 228 (3d Cir. 2013) ..............................................................54, 56

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942).......................................................................20, 50-51

*Zanetich v. Wal-Mart Stores East, Inc.*,
    123 F.4th 128 (3d Cir. 2024) .....................................................................57

## RULES

D.N.J. Local Civ. R. 7.1(d)(6) ...............................................................................57

D.N.J. Local Civ. R. 15.1 .......................................................................................54

Fed. R. Civ. P. 15(a) .......................................................................................... 54-56

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

6 Areeda & Hovenkamp, *Antitrust Law* ¶ 1427 (5th ed. 2023)......................51

**INTRODUCTION**

Plaintiffs ask this Court to reverse the district court's well-reasoned opinion based on legal theories this Court has rejected, facts plaintiffs never pleaded, arguments plaintiffs never made, and leave to amend plaintiffs never properly sought. What's more, plaintiffs repeatedly mischaracterize their pleadings and this Court's precedents to sow confusion. Shorn of this misdirection, the only substantive issue before this Court is straightforward: whether the district court correctly determined that plaintiffs failed to plausibly allege an agreement among Casino-Hotels to adopt prices suggested by Rainmaker's revenue management software.[1] The answer is yes.

The district court applied settled antitrust authority to conclude plaintiffs failed to state a claim under Section 1 of the Sherman Act. It distinguished plaintiffs' factual allegations from their conclusory and misleading characterizations to identify what plaintiffs have—and have not— pleaded:

---

[1] Casino-Hotels are: Hard Rock Atlantic City, Borgata Hotel Casino & Spa, and three properties affiliated with Caesars Entertainment, Inc.: Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City. Unless noted, all internal quotation marks, citations, and alterations are omitted, and all emphases are added.

- 1 -

- Plaintiffs <u>do not</u> plead that Casino-Hotels coordinated their decision to license Rainmaker's software or ever discussed it. Instead, plaintiffs allege these decisions happened <u>14 years</u> apart.

- Plaintiffs <u>do not</u> plead that there is anything suspicious about Casino-Hotels subscribing to Rainmaker's software. Instead, plaintiffs allege that thousands of non-defendant hotels also subscribed to this software.

- Plaintiffs — and the sources their amended complaint expressly relies on — allege that Rainmaker's software bases pricing recommendations to a Casino-Hotel only on that property's own information and on <u>publicly available</u> competitor information.

- Plaintiffs <u>do not</u> plead the frequency with which any Casino-Hotel agreed to accept Rainmaker's software's recommendations. Instead, plaintiffs rely exclusively on marketing statements about the collective adoption rate of Rainmaker's entire subscriber base.

To fill these gaps, plaintiffs seek an unprecedented expansion of antitrust law that would infer a horizontal agreement among businesses just because they separately subscribed to the same software. But "an inference of horizontal conspiracy" does not "arise from the fact" that a defendant "knows which of its competitors have purchased" a service from the same vendor. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 330-31 (3d Cir. 2010). This Court should apply its settled authority to affirm.

<u>First</u>, the district court correctly dismissed plaintiffs' sole claim under Section 1 of the Sherman Act. Guided by *Burtch v. Milberg Factors, Inc.*, 662

F.3d 212 (3d Cir. 2011), *Brokerage Antitrust*, and two district court opinions (that dismissed claims based on the same software), the court correctly concluded that plaintiffs fail to allege a hub-and-spoke conspiracy in which the alleged spokes (Casino-Hotels) agreed with each other to adopt room rates recommended by the alleged hub (Rainmaker software).  As in those cases, plaintiffs fail to allege an agreement among Casino-Hotels through parallel conduct and "plus factors."

Casino-Hotels' alleged parallelism displays all the deficiencies that caused this Court to conclude that the *Burtch* plaintiffs fell "far short of demonstrating parallel behavior."  *Burtch*, 662 F.3d at 228.  *Burtch* held that alleging the defendants acted three months apart and acted in opposite directions does not plead parallel conduct.  Plaintiffs allege defendants' conduct was much less parallel here: Casino-Hotels separately licensed Rainmaker's software up to 14 years apart and some Casino-Hotels' room rates increased while other Casino-Hotels' room rates decreased.

Plaintiffs' failure to plead parallel conduct renders their alleged "plus factors" irrelevant.  But even if the Court considered them, they are weaker than those this Court rejected in *Burtch* and *Brokerage Antitrust*.  In fact, rather than allege Casino-Hotels would not have subscribed to Rainmaker's

software unless they were conspiring, plaintiffs allege that Rainmaker's software offers its subscribers many efficiencies, thousands of non-defendant hotels license that software, and defendant Caesars began licensing it a decade before the purported conspiracy.  While plaintiffs also insist they do not have to plead that pricing recommendations Rainmaker provided to a Casino-Hotel were based on other Casino-Hotels' confidential information, the lower court cases they rely on hold those allegations are a necessary—but insufficient—ingredient.

Plaintiffs also gain nothing by repeatedly arguing that Casino-Hotels "delegated" pricing to Rainmaker's software while "knowing" the other Casino-Hotels were doing the same.  Far from pleading any such "delegation," plaintiffs allege that each Casino-Hotel "continued to retain and exercise" its "pricing authority," A10, because they were free to reject every recommended price.  At any rate, "allegations that each [defendant] knew about" competitors' pricing before adopting the same pricing "manifestly do not describe a horizontal conspiracy."  *Brokerage Antitrust*, 618 F.3d at 331.

Finally, plaintiffs fault the district court for "extensively relying" on *Gibson v. Cendyn Group*, 2024 WL 2060260 (D. Nev. May 8, 2024) ("*Gibson II*"). But *Gibson II* dismissed a "nearly identical" claim—alleging that casino-

hotels conspired to use Rainmaker's software to inflate room rates in Las Vegas—by applying well-settled antitrust principles that apply equally here. A7. While plaintiffs argue that *Gibson II* is "flawed" and "now on appeal," Br. 4, *Gibson II* was so plainly correct that the plaintiffs in that case "abandon[ed] their appeal of the dismissal" of any horizontal claim—the only claim pleaded in this case, *Gibson v. Cendyn Grp.*, 24-3576, ECF No. 61 at 32 (9th Cir. filed Feb. 7, 2025).

<u>Second</u>, plaintiffs' assertion that the district court abused its discretion in dismissing with prejudice is also foreclosed by this Court's settled precedent. Indeed, the district court could not have abused its discretion because plaintiffs never properly asked for leave to amend. "[P]roperly request[ing] leave to amend" requires the plaintiff to move for leave "and submit[] a draft of the amended complaint." *LabMD Inc. v. Boback*, 47 F.4th 164, 192 (3d Cir. 2022). Plaintiffs did neither. And they "can hardly fault the Court for not granting relief [they] never requested." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007).

## STATEMENT OF THE ISSUES

I.    Whether the district court correctly concluded that plaintiffs failed to allege a hub-and-spoke conspiracy to fix prices through Casino-

Hotels' licensing of revenue management software when Casino-Hotels (a) started licensing the software at varying times up to 14 years apart, (b) had room rates that moved in opposite directions, (c) are among thousands of hotels that license the same software, and (d) did not receive price recommendations based on each other's confidential information.

II.    Whether the district court abused its discretion by dismissing plaintiffs' amended complaint with prejudice when plaintiffs never (a) moved for leave to amend, (b) submitted a proposed amended pleading, or (c) identified facts that would cure deficiencies exposed by defendants' motion to dismiss.

## STANDARD OF REVIEW

This Court reviews a decision dismissing a complaint de novo.  *Ramsgate Ct. Townhome Ass'n v. W. Chester Borough*, 313 F.3d 157, 158 (3d Cir. 2002). This Court reviews a district court's decision dismissing a complaint with prejudice for abuse of discretion.  *Id.* at 161.

## STATEMENT OF RELATED CASES

Plaintiffs' case focuses on Atlantic City hotels, but tracks an earlier-filed case alleging that casino-hotels in Las Vegas violated the Sherman Act by entering into: (1) a hub-and-spoke conspiracy to license the same

Rainmaker software plaintiffs challenge here and (2) separate individual vertical software licenses with Rainmaker. *Gibson v. Cendyn Grp.*, 23-CV-00140 (D. Nev.). The *Gibson* court dismissed those plaintiffs' claims twice, and they appealed to the Ninth Circuit. Briefing on that appeal, captioned *Gibson v. Cendyn Group, LLC*, 24-03576 (9th Cir.), was completed on February 7, 2025. On reply, the *Gibson* plaintiffs "abandon[ed] their appeal of the dismissal of their hub-and-spoke claim." ECF No. 61 at 32. The claim that the *Gibson* plaintiffs abandoned before the Ninth Circuit is the only claim on appeal here.

## STATEMENT OF THE CASE

### A.    Factual Allegations

### 1.    Cendyn's Revenue Management Products

Before revenue management tools, many casino-hotels lacked "the real-time data to back up . . . decisions" about how to forecast demand and what room rates to charge guests who are likely to generate additional revenue during their stay, like gaming and dining. A236 ¶ 115.[2]

---

[2] Defendants accept plaintiffs' allegations as true only for purposes of this appeal because it follows from a dismissal under Rule 12(b)(6).

Hoping to develop software that helps hotels understand the whole picture of their revenue, Rainmaker Group (later acquired by Cendyn) developed revenue management software in the "late 1990s." A236, A238-39 ¶¶ 113, 121, 126. At an unspecified time, Rainmaker's software eventually included "three separate . . . products: GuestREV, GroupREV, and REVCaster" (the "Revenue Management Products"). A240 ¶ 131. The Revenue Management Products offer a suite of customizable solutions that enable a subscriber to harness and optimize its own "complex data" at the individual property level, A240-41 ¶ 132, taking into account a guest's total value based on all available revenue streams (including gaming, room revenue, and food), to help subscribers forecast "the most accurate valuation of [guests'] true revenue potential," A244, A252 ¶¶ 145, 171.

The Revenue Management Products offer many functionalities:

- "[F]orecast[ing] demand more accurately." A245 ¶ 148.

- Generating "recommended room rates" based on the data that the subscriber uploads to the product's platform. A271 ¶ 226.

- Using a subscriber's "customer data" to "help" that subscriber "curate highly personalized . . . discounts." A245-46 ¶ 149.

- Providing "booking curves." A242-43 ¶ 140.

Cendyn advertised that these functionalities "enable[d]" subscribers to manage revenue "more efficiently," A245 ¶ 148, and boosted unidentified hotels' revenues by "up to 15%," A251 ¶ 169. "[T]ens of thousands of hotels across the globe" found the Revenue Management Products' functionalities attractive and subscribed. A224, A236-37 ¶¶ 62, 116. Most subscribers are not defendants in this case and are not alleged to have been part of any conspiracy. A259 ¶ 194.

### 2. The Revenue Management Products' recommended prices were not based on competitors' non-public data

Plaintiffs' amended complaint does not plausibly allege that the Revenue Management Products' pricing recommendations for any hotel were based on any other hotel's non-public information. Instead, sources plaintiffs quote in their amended complaint specify that the Revenue Management Products—through the "REVCaster tool," A270 ¶ 224—collect only publicly available room rates from "hundreds of branded sites and online travel agencies." *See* A248-49 ¶¶ 159-60.[3] And plaintiffs allege that a

---

[3] *The Rainmaker Group Acquires Revcaster*, CoStar (May 21, 2015) (quoted in A249 ¶¶ 160, 162), https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster ("Revcaster's application collects market-specific hotel price information from hundreds of branded sites and online travel agencies and provides easy-to-use reports and data downloads.").

subscriber can choose whether that public information informs the room rates suggested to it by GuestREV.  A245 ¶ 146.  Cendyn touted its products' ability to provide a subscriber with competitors' publicly available room prices as a way to "ensur[e] [the subscriber's] pricing is as competitive as possible when the hotel needs to capture more market share to boost occupancy."[4]

### 3.    Casino-Hotels subscribe to Rainmaker's revenue management software up to 14 years apart

Only "five . . . out of nine casino-hotels" in Atlantic City are defendants.  A303 ¶ 291.  Three of those defendants are affiliated with Caesars (Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City), A220 ¶ 37, one defendant is affiliated with MGM Resorts International (Borgata), A222 ¶ 49, and the other defendant is affiliated with Hard Rock International, Inc. (Hard Rock Atlantic City), A224 ¶ 58.  Non-defendants operate the four other casino-hotels in Atlantic City: Bally's, the Golden Nugget, Ocean Resort, and Resorts Casino Hotel.  A288-89 ¶ 246.  Besides competing with the four non-defendant casino-hotels in Atlantic City,

---

[4] *Examining Trends in Rate and Revenue Management*, Hotelier (Jan. 30, 2020) (quoted in A245 ¶ 146), https://www.hoteliermagazine.com/examining-trends-in-rate-and-revenue-management/?cn-reloaded=1.

Casino-Hotels "compete directly with other casino[s] . . . in the . . . surrounding areas."  A228 ¶ 82.

"Casino-Hotel[s] . . . started using the Rainmaker pricing algorithm platform products at various times" between 2004 and 2018, A212 ¶ 8:

- "Around <u>2004</u>, <u>Caesars Entertainment</u>" began using "Rainmaker's revenue management system."  A253 ¶¶ 176-78.

- "In late <u>2009</u>, <u>Borgata</u> began using Rainmaker's products."  A255 ¶ 184.

- "Around . . . Fall <u>2015</u>," <u>Tropicana Atlantic City</u> "began using Rainmaker products."  A258-59 ¶¶ 193, 195.

- Upon opening in "<u>June 2018</u>, <u>Hard Rock Atlantic City</u> started using the Rainmaker pricing algorithm product platform."  A259 ¶ 196.

Casino-Hotels purportedly used various features of those Products other than suggested prices.  Casino-Hotels affiliated with Caesars used "booking curves" to forecast demand, A242-43, A253-54 ¶¶ 140, 179, while an employee at the Borgata allegedly "use[d] GuestREV to validate her pricing recommendations to management," A280 ¶ 229(j).  Cendyn's marketing materials note that when one considers the "thousands of hotels across the globe" subscribing to Rainmaker's software, A224 ¶ 62, the average adoption of rate recommendations is 90%, A214 ¶ 15.  Plaintiffs do not allege that: any Casino-Hotel was required to accept any recommended rate; how often

Casino-Hotels adopted Rainmaker's recommendations; or even a single instance when a Casino-Hotel adopted a price recommended by a Revenue Management Product.

Instead, plaintiffs allege that subscribers' users have "permission" to "override" any recommended price.  A241 ¶ 138.  Although plaintiffs quote an "industry website" as stating that subscribers "should be able to override both forecast and price recommendations" "[i]n times of need and extreme circumstances," *id.*, plaintiffs do not allege that subscribers overrode recommendations only in those circumstances.

### 4.    Most Casino-Hotels lowered their room rates during the alleged conspiracy

Plaintiffs assert that starting "no later than" June 28, 2018, when Hard Rock Atlantic City opened (but nearly 14 years after Caesars began licensing Rainmaker's revenue management software), defendants "agree[d] to knowingly and collectively use the Rainmaker pricing algorithm platform . . . to fix . . . the price" of their hotel rooms in Atlantic City.  A332 ¶¶ 399-400.  Plaintiffs do not identify when the supposed agreement was formed, which employees reached it, or how it could be enforced when Casino-Hotels did not communicate with each other and no Casino-Hotel was

required to accept the prices suggested by the Revenue Management Products. Nor do plaintiffs allege how a conspiracy sprang into existence just because Hard Rock Atlantic City opened.

Plaintiffs rely on room pricing and occupancy rate statistics from 2018 through 2022, years after several Casino-Hotels began subscribing to the Revenue Management Products. A285-90 ¶¶ 243-47. Plaintiffs' statistics show that the Casino-Hotels affiliated with Caesars increased their average room rates from the start of the alleged conspiracy in 2018 to the last year for which plaintiffs provide data (2022), while the Casino-Hotels affiliated with the other two defendants—Hard Rock and Borgata—<u>decreased</u> their average room rates over this same time:



A378.  Plaintiffs' statistics also show that Ocean Resort and Golden Nugget, two <u>non-defendants</u>, had the <u>highest</u> daily room prices and <u>lowest</u> occupancy rates, respectively, in virtually every year of the alleged conspiracy. A288-89 ¶ 246.  By contrast, defendant Hard Rock Atlantic City ended this period with a higher occupancy rate than it started.  A287-88 ¶ 245.

### B.    Procedural History

On January 25, 2023, the *Gibson* plaintiffs filed suit, asserting that casino-hotels in Las Vegas violated the Sherman Act by agreeing to "use" the Revenue Management Products.  *See* No. 23-CV-00140, ECF No. 1.  After the *Gibson* defendants moved to dismiss, plaintiffs filed this case, alleging essentially the same conspiracy in Atlantic City.  A24.  Plaintiffs "acknowledge[d] the factual . . . similarities between this case and *Gibson*," A8, and that they coordinated their research into the Revenue Management Products with their *Gibson* counterparts, A183.

Plaintiffs in this case amended on August 21, 2023.  A31, ECF No. 53. A few months later, Chief Judge Du of the District of Nevada dismissed the *Gibson* complaint, identifying three "fatal" defects that included the plaintiffs' failures to allege that: (1) casino-hotels "began using particular pricing software at or around the same time"; (2) the pricing "recommendations

generated to [one hotel subscriber] include . . . confidential information fed in" from other hotel subscribers; and (3) casino-hotels "are required to accept the prices that the . . . software recommends."  2023 WL 7025996, at *2-5 (D. Nev. Oct. 24, 2023) ("*Gibson I*").  After *Gibson I,* on January 29, 2024, plaintiffs in this case amended for a second time.  A34.

Defendants moved to dismiss by demonstrating that the amended complaint failed to plead a horizontal agreement among Casino-Hotels. A400.  On March 21, 2024, plaintiffs opposed defendants' motion and concluded their brief: "[i]f the Court grants any part of the Motion, it should do so without prejudice so Plaintiffs can amend to cure any identified deficiencies."  A464.

On May 8, 2024, in *Gibson II*, Chief Judge Du dismissed the amended complaint with prejudice.  The court held that the same "three key deficiencies" from *Gibson I* "persist" in the amended complaint and were "alternative . . . reasons why [p]laintiffs have not plausibly alleged a[n] . . . agreement" among casino-hotels.  2024 WL 2060260, at *3.  Even though it "can hardly be disputed that the same factual deficiencies identified in *Gibson* . . . are present in the Amended Complaint," plaintiffs here "gave no indication that they wish[ed] to further amend their pleading" after

*Gibson II*.  A8, A14 n.6.  Plaintiffs said that they could "explain . . . why *Gibson* is still distinguishable," A720, but never sought leave to file supplemental briefing in the four months between *Gibson II* and the district court's decision.

On September 30, 2024, the court dismissed plaintiffs' complaint with prejudice by applying this Court's decision in *Brokerage Antitrust* to hold that "the hub-and-spoke conspiracy [plaintiffs] articulate lacks a rim" among Casino-Hotels.  A13.  "One particular issue" in plaintiffs' failure to allege a rim is that Casino-Hotels' "subscriptions to the Rainmaker product occurred over a fourteen-year period."  A9.  Applying this Court's ruling in *Burtch*, the court held that "the fourteen-year gap . . . makes it quite implausible that [Casino-Hotels] agreed to anything, much less to fix the prices of their hotel rooms."  A10.

The district court also rejected plaintiffs' attempt to allege a conspiracy by asserting that Casino-Hotels delegated their pricing to the Revenue Management Products.  Instead, the court recognized that "the pricing authority the Casino-Hotels' continued to retain and exercise" showed that plaintiffs' claims about pricing delegation were conclusory.  *Id.*

- 16 -

Finally, the court reasoned that plaintiffs' "antitrust theory is factually and legally incomplete" because they "do[] not allege that . . . the pricing recommendations offered to each Casino-Hotel individually are . . . based on a pool of confidential competitor data." *Id.*  The court observed that the "Amended Complaint goes to rather extraordinary lengths to dance around" this subject "with linguistic equivocation in an obvious attempt to imply it, but [the amended complaint] never unambiguously alleges as much." *Id.*  Instead, "specific sources quoted by the Amended Complaint seem to confirm that the pricing recommendations at issue were never based on the confidential . . . data of their competitors."  A10-11.

## SUMMARY OF ARGUMENT

**I.**    The district court correctly dismissed plaintiffs' amended complaint because plaintiffs plead no facts plausibly suggesting Casino-Hotels agreed with each other to adopt prices suggested by the Revenue Management Products.

**A.**    Plaintiffs fail to plead an agreement under this Court's precedents.  This Court's opinions in *Brokerage Antitrust* and *Burtch* provide the benchmark for pleading a horizontal agreement through circumstantial

evidence.  Plaintiffs try to satisfy those benchmarks by pleading parallel conduct and "plus factors," but plausibly allege neither.

1.    Plaintiffs do not plead parallel conduct because they allege Casino-Hotels licensed the Revenue Management Products 14 years apart, which is much less parallel than the conduct *Burtch* declared insufficient. Plaintiffs try to narrow the 14-year gap by asserting new facts and arguments on appeal, but plaintiffs forfeited them by failing to assert them below.  And they would not change the analysis even if they were considered.

Plaintiffs also assert that Casino-Hotels' pricing and occupancy rates were "synchronous."  Br. 43.  But that is not what the amended complaint alleges.  It instead shows that two of the three Casino-Hotel brands <u>lowered</u> room prices across the alleged conspiracy.  Like *Burtch*, defendants' opposite actions are fatal to plaintiffs' attempt to plead parallel conduct.

2.    While plaintiffs' "plus factors" are irrelevant without parallel conduct, they also lend no support because they are weaker than the "plus factors" rejected by *Burtch* and *Brokerage Antitrust*.  Plaintiffs acknowledge many reasons why hotels—including thousands of non-defendant hotels—decided it was in their self-interest to license the Revenue Management Products.    Plaintiffs  also  do  not  plausibly  allege  that  the  Revenue

Management Products suggest room rates to one Hotel Defendant based on another Casino-Hotel's confidential information.

Instead, plaintiffs mischaracterize their allegations and make vague new assertions about the Revenue Management Products' use of confidential data that are absent from the amended complaint. Not only have plaintiffs waived these arguments, their attempt to cure their pleading failures is also futile because *Burtch* held that conclusorily alleging that defendants "regularly and unlawfully shared highly confidential information . . . does not plausibly state a Section 1 claim." 662 F.3d at 224, 233.

**B.**    Unable to satisfy *Burtch* and *Brokerage Antitrust*, plaintiffs contend this Court can infer an agreement because Casino-Hotels "knowingly delegated" their pricing authority to Rainmaker. But that conclusory refrain fails on the facts and law.

**1.**    Plaintiffs fail to allege that any Casino-Hotel delegated its pricing authority to Rainmaker. Casino-Hotels could—and did—override any price suggested by the Revenue Management Products. And even if plaintiffs had alleged <u>vertical</u> "delegations" of pricing authority to Rainmaker, those allegations "manifestly do not describe a <u>horizontal </u>conspiracy to unreasonably restrain trade." *Brokerage Antitrust*, 618 F.3d at 331.

**2.**    Plaintiffs incorrectly argue a horizontal agreement among Casino-Hotels is plausible under *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), and *United States v. Masonite Corp.*, 316 U.S. 265 (1942). The "[k]ey to *Interstate Circuit*'s conspiracy finding" is missing because plaintiffs cannot allege that it would be "self-defeating" for a Casino-Hotel to independently subscribe to the Revenue Management Products. *Brokerage Antitrust*, 618 F.3d at 331. To the contrary, plaintiffs allege many reasons why a Casino-Hotel would—and did—subscribe to Revenue Management Products even if rivals did not. *Masonite* is even less applicable because "*Masonite* makes no holding on horizontal conspiracy." *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 57 (1st Cir. 2016).

**II.**    The district court abused no discretion in dismissing with prejudice.

**A.**    Plaintiffs are wrong that "the district court abused its discretion under binding precedent" by not offering them another chance to amend. Br. 5. This Court's "long[]-standing rule [is] that, to request leave to amend a complaint, the plaintiff must" move for leave and "submit a draft amended complaint to the court." *Fletcher-Harlee*, 482 F.3d at 252. Yet plaintiffs never moved for leave, never submitted a draft amended complaint, and never

even identified any new facts they would plead.  Plaintiffs also misstate this Court's precedents in arguing that the district court "must" grant leave "even if the plaintiff" does not properly request it.  Br. 61.  Where, as here, the case "is not a civil rights case . . . the District Court was not obligated to grant leave to amend of its own accord."  *LabMD*, 47 F.4th at 192.

**B.**    Even if plaintiffs had properly requested leave, the district court would have been well within its discretion to deny it because plaintiffs had notice that their amended complaint had many fatal defects.  Indeed, when plaintiffs amended their complaint, *Gibson I* had already dismissed very similar claims for essentially the same reasons as the district court here.

**C.**    Plaintiffs' attempt to identify new facts and claims for the first time on appeal is improper and futile.  Plaintiffs waived any argument or claim based on these facts by not presenting them below, and plaintiffs cannot argue that they could not have obtained this information or asserted these claims earlier.  At any rate, the "new" facts plaintiffs identify are too vague to make an agreement among Casino-Hotels plausible.

## ARGUMENT

## I.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' AMENDED COMPLAINT BECAUSE THEY FAIL TO PLAUSIBLY ALLEGE AN AGREEMENT AMONG CASINO-HOTELS

This Court should affirm the decision below because plaintiffs fail to plead any facts plausibly suggesting an agreement among Casino-Hotels. "Section 1 claims . . . always require the existence of an agreement," *Howard Hess Dental Lab'ys. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010), "which [is] define[d] as unity of purpose . . . and . . . a meeting of minds or a conscious commitment to a common scheme," *Burtch*, 662 F.3d at 221.

"To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence." *Id.* at 225.  Plaintiffs must allege facts "show[ing]" an agreement "[b]ecause . . . conclusory averments" that defendants "agreed" with each other or that "every [defendant] knew that every other [defendant] agreed" "cannot carry plaintiffs' pleading burden." *Brokerage Antitrust*, 618 F.3d at 326.  Nor can plaintiffs satisfy their burden if "common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *Id.*

- 22 -

This Court's decision in *Brokerage Antitrust* provides the framework for adequately pleading an agreement where, as here, the plaintiff seeks to plead that defendants agreed to a "hub-and-spoke conspiracy" through circumstantial evidence. A270 ¶ 223. "The critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other." *Brokerage Antitrust*, 618 F.3d at 327. In other words, plaintiffs must plead enough circumstantial evidence to "adequately allege[] the existence of a . . . rim . . . connecting the . . . spokes." *Id.* "Plaintiffs relying on circumstantial evidence . . . must make a showing . . . with well-pled allegations . . . of . . . parallel behavior" and "plus factors." *Id.* at 322-23.

Here, like in *Brokerage Antitrust*, plaintiffs fail to plead parallel conduct coupled with plus factors plausibly suggesting an agreement among Casino-Hotels. Plaintiffs instead argue it is "unnecessary to plead parallel conduct" because Casino-Hotels "delegated" their pricing to Rainmaker. Br. 43. But plaintiffs fail to allege any Casino-Hotel delegated its pricing, and their theory is foreclosed by this Court's precedent.

## A.    Plaintiffs Fail to Plead Parallel Conduct and Plus Factors

The district court correctly held that plaintiffs failed to plead an agreement though parallel conduct and plus factors. While plaintiffs argue that

defendants' conduct was "synchronous," Br. 43, their amended complaint shows that defendants' conduct was less parallel than the conduct held insufficient in *Burtch*.  Because plaintiffs fail to plead parallel conduct, the Court can ignore plaintiffs' "plus factors."  But even if the Court considers them, they are weaker than those this Court has already rejected.

### 1.    Casino-Hotels' conduct is far less parallel than the conduct in *Burtch*

Pleading parallel conduct requires plaintiffs to identify conduct that "raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Brokerage Antitrust*, 618 F.3d at 322.  "Parallel conduct is . . . setting prices at the same level," *id.* at 321, and "'conduct that indicates the sort of restricted freedom of action . . . that one generally associates with agreement,'" *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007)).

In *Burtch*, the plaintiff claimed that the defendants conspired to refuse it credit.  662 F.3d at 216.  The plaintiff alleged that the defendants "regularly . . . shared highly confidential information" and then "declined and limited credit to [the plaintiff] at approximately the same time."  *Id*. at 224.

The plaintiff identified "27 alleged telephone conversations between . . . [d]efendants" and instances when the defendants declined credit to the plaintiff between "April 23, 2003" and "July 22, 2003." *Id.* at 225, 228.

This Court affirmed dismissal, holding that the plaintiff's allegations fell "far short of demonstrating parallel behavior" for two reasons. *Id.* at 228. First, the plaintiff alleged that the defendants began the alleged conduct at "different time[s]": one defendant began refusing to extend credit on "April 23, 2003," and another began doing so on "July 22, 2003." *Id.* Second, the plaintiff alleged that one defendant acted contrary to the alleged conspiracy by "increas[ing] credit" to the plaintiff. *Id.*; *see also Kerwin v. Casino*, 802 F. App'x 723, 727 (3d Cir. 2020) ("That Sands Casino allowed Kerwin to promote two events during the alleged boycott undermines his assertion that [casinos conspired to boycott Kerwin].").

Plaintiffs try to plead parallel conduct by relying on (1) when Casino-Hotels allegedly subscribed to the Revenue Management Products, Br. 39-41, and (2) "Casino-Hotel[s'] . . . synchronous pricing and occupancy rate movement" beginning in 2018, *id.* at 43. But the same flaws that doomed the *Burtch* complaint are fatal to plaintiffs' attempt to plead parallel conduct

here: Casino-Hotels subscribed to the Products at far different times, and their prices and occupancy moved in different directions.

**Subscription to Revenue Management Products**.  Plaintiffs fail to allege parallel conduct because, like the *Burch* defendants that acted at "different time periods," 662 F.3d at 228, Casino-Hotels allegedly began subscribing to the Revenue Management Products at "various times in . . . Atlantic City" across more than a decade, A212 ¶ 8:



A364.  Indeed, plaintiffs concede there is a <u>14-year gap</u> between when a Caesars-owned hotel began subscribing to "the Rainmaker pricing algorithm platform . . . [a]round 2004," A253 ¶ 175-76, and when Hard Rock Atlantic City did so in "<u>June 2018</u>," A259 ¶ 196.  Plaintiffs' allegations about the other defendant—the MGM-affiliated Borgata property—do not bridge that 14-

year gap because the Borgata allegedly began subscribing to a Revenue Management Product <u>five years after</u> Caesars and <u>nine years before</u> Hard Rock Atlantic City.  A225 ¶ 184.  Thus, the temporal gaps in defendants' subscriptions far exceed the <u>three-month</u> gap in the *Burtch* defendants' conduct that "f[e]ll far short of demonstrating parallel [conduct]."  662 F.3d at 228.  These gaps render plaintiffs' claim implausible.

Plaintiffs incorrectly argue that the gap in Casino-Hotels' subscriptions is not fatal because (a) "*Burtch* [did not] set a bright line rule of three months," and (b) "the district court mistakenly found . . . Casino-Hotel[s] began using the relevant Rainmaker products . . . over a much longer period than Plaintiffs . . . allege."  Br. 38-39.  Plaintiffs get the law wrong, while raising new facts and arguments they waived and that make no difference anyway.

First, the district court did not hold that *Burtch* established a "bright line rule" that a three-month gap defeats parallel conduct.  Nor did it need to: the 14-year gap in Casino-Hotels' subscriptions was <u>over 50 times longer</u> than the three-month gap in *Burtch*.  Instead, the district court applied black-letter law in holding that the long time gaps do not "suggest[] . . . a preceding agreement" among Casino-Hotels to subscribe to the Revenue Management

Products.  A9 (quoting *Twombly*, 550 U.S. at 557); *see also In re Musical Instru-*

*ments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015)

("[D]efendants adopt[ing] the [same pricing] policies over a period of sev-

eral years . . . does not raise the specter of collusion.").  The district court also

did not rely only on the time gap, holding that the "gap, <u>coupled</u> with the

pricing authority the Casino-Hotels' continued to retain and exercise, makes

it quite implausible that they tacitly agreed to anything."  A10.

While plaintiffs argue that defendants' conduct can be parallel because

Casino-Hotels continued to subscribe to Revenue Management Products in

2018, Br. 40, that hardly distinguishes *Burtch* from this case.  In *Burtch*, the

plaintiffs alleged that all defendants <u>eventually</u> refused to extend credit to

plaintiff, but this Court held that the "different time periods" at which they

<u>started</u> doing so was fatal.  662 F.3d at 228.  Thus, the key deficiency under

*Burtch* is that plaintiffs allege Casino-Hotels <u>started</u> subscribing 14 years

apart.  And by alleging that some Casino-Hotels did not subscribe to the

Revenue Management Products for years while others did, plaintiffs "fall

short of demonstrating parallel behavior."  *Id*.

Second, plaintiffs improperly fault the district court for "mistakenly"

elongating the time gap over which defendants subscribed to the Revenue

Management Products because Caesars' subscription in 2004 was to an "earlier generation of Rainmaker revenue management products." Br. 41. For starters, plaintiffs' newfound theory about some unspecified "earlier generation" software cannot be considered now (and could not have been considered by the district court) because it is absent from their amended complaint. *Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[T]he legal theories set forth in Pennsylvania's brief are helpful only to the extent that they find support in the allegations . . . in the complaint.").

Contrary to plaintiffs' attempt to rewrite their amended complaint on appeal, all that their amended complaint alleges is that Caesars began subscribing to Rainmaker's revenue management software in 2004. A253 ¶¶ 175-76. Plaintiffs <u>never</u> alleged that: (1) there is any other relevant date for Caesars' subscription; (2) there was an "earlier generation" of Rainmaker's software in 2004; (3) a new version of the software was released in 2010; or (4) there are any differences between the 2004 and 2010 versions of Rainmaker's software. Instead, plaintiffs admit that they did not "explicitly alleg[e]" these missing "facts." Br. 40.

Nor can plaintiffs escape their failure to plead these facts by casting them as legal arguments because plaintiffs never made them below. "It is

axiomatic that arguments asserted for the first time on appeal are deemed to be waived." *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011). Plaintiffs blame the district court for not "ask[ing] . . . whether Casino-Hotel[s] used the . . . current generation Rainmaker products in a sufficiently parallel manner," Br. 41, but the court had no reason to ask because plaintiffs were silent on this issue.

Even if plaintiffs had not forfeited these arguments, their new allegations would not help them because there would still be an <u>eight-year</u> gap in Casino-Hotels' subscriptions to the Revenue Management Products. Br. 39. That gap is still 30 times longer than the gap this Court held was too long in *Burtch*.[5]

**Casino-Hotels' Room and Occupancy Rates Were Far From Parallel**.

Plaintiffs' pricing and occupancy allegations likewise suffer from the same flaw that doomed the parallel conduct in *Burtch*. In fact, while plaintiffs

---

[5] Plaintiffs argue two district court cases held that parallel conduct may be inferred when the defendants acted "years" before the conspiracy, Br. 37, but neither decision holds that. *See In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 202 (D.D.C. 2023) (defendants' "strategy . . . differed from past practice"); *In re Processed Egg Prods. Antitrust Litig.*, 2019 WL 5656101, at *1 (E.D. Pa. Oct. 31, 2019) (motion *in limine* decision that does not discuss parallel conduct).

assert that "Casino-Hotel[s] charged higher rates during the class period than before, while their occupancy levels dropped [and] their respective room rates and occupancy levels moved in parallel fashion," Br. 19, their alleged facts are to the contrary.  Like the defendants that were extending credit while others refused credit in *Burtch*, plaintiffs allege that <u>two out of three</u> Casino-Hotel brands (Hard Rock Atlantic City and the Borgata) <u>decreased</u> room rates over the class period, while average rates at Casino-Hotels affiliated with Caesars <u>increased</u>.  *Compare* A287-88 ¶ 245, *with Burtch*, 662 F.3d at 228 ("Wells Fargo was allegedly declining [credit], while GMAC and CIT were extending . . . credit.").

To illustrate just how much plaintiffs' arguments about supposed parallel pricing and occupancy contradict their allegations, plaintiffs allege that Hard Rock Atlantic City "<u>increased</u> its occupancy," A291 ¶ 251, by over <u>27%</u> during the alleged conspiracy, while occupancy at the Borgata <u>decreased</u> by about <u>15%</u> and occupancy at Caesars Atlantic City <u>decreased</u> by about <u>4%</u>, A287-88 ¶ 245.  And contrary to their argument that "Casino-Hotel[s] charged higher rates during the class period than before," Br. 19, plaintiffs allege that when the class period began in 2018, defendant Hard Rock

Atlantic City's average room rates were $160.73, and that its average room rates <u>decreased</u> to $158.11 in 2022. A288 ¶ 245.

Plaintiffs also contradict their amended complaint by arguing that the Court can infer parallel conduct because "non-conspirator" casino-hotels' room and occupancy rates "moved dissimilarly." Br. 19. Far from being "dissimilar," plaintiffs allege that all non-defendant casino-hotels increased their room rates throughout the alleged conspiracy. Indeed, the amended complaint alleges non-conspirator Ocean Resort increased room rates more than any Casino-Hotel during the class period. A289 ¶ 246.

In sum, like *Burtch*, plaintiffs "fall far short of demonstrating parallel behavior." 662 F.3d at 228. Casino-Hotels subscribed to the Revenue Management Products at different times, and their room prices and occupancy rates moved in different directions.

### 2.    Plaintiffs' "plus factors" are weaker than the plus factors this Court has rejected

Plaintiffs' "plus factors" fail to plausibly suggest a conspiracy because they are (1) irrelevant and (2) weaker than the plus factors this Court has rejected. To begin, "no discussion of any 'plus factors' is necessary" when the plaintiff "fails to plausibly plead parallel conduct." *Park Irmat Drug Corp.*

*v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018); *see also City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 401 (2d Cir. 2024) ("Because Plaintiffs fail to allege parallel conduct . . . they cannot demonstrate an agreement . . . irrespective of their plus factors."). Plaintiffs' "plus factors" thus add nothing to their claim because plaintiffs fail to plead parallel conduct.

In any case, plaintiffs' alleged plus factors are insufficient. This Court "ha[s] identified . . . three types of . . . plus factors": "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Burtch*, 662 F.3d at 227. The amended complaint alleges no plus factors adequately.

**No Motive to Conspire**. Plaintiffs argue that Casino-Hotels had an "incentive" to collude after "the severe economic downturn . . . caused by the Great Recession." Br. 47-48. But those allegations are "precisely the legally insufficient facts [this Court] ha[s] cautioned against using as circumstantial evidence of an agreement" because "all entrepreneurs have a legitimate . . . motive to increase profits." *Burtch*, 662 F.3d at 229.

**No Acts Against Self-Interest**. Plaintiffs assert no "Casino-Hotel . . . would . . . have independently" subscribed to the Revenue Management Products because consumers would have "flock[ed]" to non-subscribing hotels with lower room rates. Br. 48-49. That argument contradicts plaintiffs' amended complaint, which provides several "obvious alternative explanations for" why a Casino-Hotel would—and did—independently subscribe. *Brokerage Antitrust*, 618 F.3d at 322-23.

Like plaintiffs here, the *Brokerage Antitrust* plaintiffs alleged a conspiracy between insurance brokers (the hub) and insurers (the spokes) in which insurers would pay commissions to brokers for the brokers allocating some of their clients' business to the insurer. The plaintiffs argued it was against the insurers' interests to pay the brokers' contingent commissions absent a conspiracy because they would lose business: contingent commissions would have increased consumers' premiums, and those consumers would have sought a competing insurer to avoid higher premiums. *Id*. at 308. This Court held that plaintiffs failed to plausibly allege an agreement among the insurer spokes because "the obvious alternative explanation . . . is that each member of the industry believes its profits would suffer without the

practice," and "each insurer found that the benefits [of contingent commissions] justified the costs" due to efficiencies. *Id*. at 328.

Plaintiffs' allegations support the same holding here. Plaintiffs allege many reasons why hotels would decide it was in their independent interests to license the Revenue Management Products, including because the software products "forecast demand more accurately, [to enable subscribers] to manage their business more efficiently," A245 ¶ 148, and help "curate highly personalized . . . discounts" for customers, A245-46 ¶ 149. *See Brokerage Antitrust*, 618 F.3d at 327 (conspiracy implausible because commissions could "improve efficiency").

Plaintiffs also undercut any inference that Casino-Hotels would subscribe to the Revenue Management Products only if there were a conspiracy to do so because they allege that "thousands of hotels across the globe" decided it was in their self-interests to subscribe, A224 ¶ 62, and Caesars began subscribing years before the alleged conspiracy, *supra* 11.

**No Evidence Implying a Traditional Conspiracy**. "[E]vidence implying a traditional conspiracy[] consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common

action." *Brokerage Antitrust*, 618 F.3d at 322.  There are no allegations showing a traditional conspiracy here because plaintiffs "do[] not allege assurances of common action between" Casino-Hotels.  *Burtch*, 662 F.3d at 230.  Indeed, plaintiffs do not allege that any Casino-Hotel ever communicated with any another Casino-Hotel, much less exchanged assurances to adopt prices suggested by the Revenue Management Products.

**No Information Sharing**.  Plaintiffs and their amici assert that plaintiffs need not allege that the Revenue Management Products used any Casino-Hotel's "confidential information" to recommend prices to other Casino-Hotels.  Br. 32-33; *see also* Professors Br. 13-14, COSAL Br. 5-6; AAI Br. 21; OMI Br. 9-10.  But plaintiffs themselves suggest that an allegation necessary to their theory is that Casino-Hotels used the algorithm as "an intermediary to facilitate the exchange of confidential business information." A294 ¶ 261.  The cases that plaintiffs and their amici rely on also hold that a necessary (though insufficient) ingredient is to "unequivocally allege[]" that the algorithm "pooled" competitor data to suggest prices.  *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 512 (M.D. Tenn. 2023); *see also Duffy v. Yardi Sys., Inc.*, 2024 WL 4980771, at *4 (W.D. Wash.

Dec. 4, 2024) (inferring conspiracy because Yardi's software "use[d] all of [defendants'] data to recommend rental prices").

Plaintiffs alternatively argue that even if "alleging confidential data pooling" is "necessary," the "district court misread" their allegations. Br. 34. But rather than "unequivocally alleging" that the Revenue Management Products "spit[] out price recommendations based on [pooled] competitor data," *RealPage*, 709 F. Supp. 3d at 512, plaintiffs identify allegations that fail to plead that the Revenue Management Products used confidential information submitted by one Casino-Hotel to recommend prices to other Casino-Hotels.

Instead, plaintiffs cite allegations that each Casino-Hotel "submit[s] their real-time, non-public [room] pricing and [occupancy] data" to the Revenue Management Products, "which use[] this data along with <u>other pieces of information to</u> . . . recommend optimal pricing to each Casino-Hotel." A322 ¶ 358. But as the court below and *Gibson* concluded, the flaw with plaintiffs' allegations is that they suggest that "confidential information is fed in[to]" the Revenue Management Products, but do "not quite say that nonpublic information from one hotel" is used to recommend prices to a different hotel. *Gibson I*, 2023 WL 7025996, at *5. Every allegation plaintiffs

identify uses the same conspicuously vague formula: each subscriber "provides . . . non-public . . . data to . . . Rainmaker," Rainmaker then "processes and analyzes this . . .  information . . . and other relevant supply and demand-related data . . . to generate optimal room rates," A211-12 ¶ 6.

But plaintiffs never allege that their vague allusions to "this information" that the Revenue Management Products use to generate pricing recommendations includes commingled non-public subscriber data.  Nor do plaintiffs allege that the Revenue Management Products commingle any Casino-Hotel confidential data submitted to Rainmaker.  To the contrary, the only "pieces of information," A322 ¶ 358, and "other . . . data," A211-12 ¶ 6, that plaintiffs allege the Revenue Management Products commingle with a Casino-Hotel's confidential information to recommend prices is competitor rates collected by REVCaster from public sources.  A270 ¶ 224; *see also supra* note 3.

Despite using the same "linguistic equivocation" as *Gibson II*, A10, plaintiffs fault the district court for relying on *Gibson II*, Br. 4.  But *Gibson II*

got the law so right that the plaintiffs recently "abandon[ed]" their appeal of their hub-and-spoke claim. *Gibson v. Cendyn Grp.*, 24-3576, ECF No. 61 at 32.[6]

Plaintiffs are also wrong that their vague allegations are supported by "Defendants' publicly-available admissions about the relevant Rainmaker pricing algorithm[s]," Br. 4-5, because the record shows the opposite. In fact, plaintiffs never identify these "admissions," and the district court correctly concluded that "the specific sources quoted by the Amended Complaint . . . confirm that the pricing recommendations . . . were never based on the confidential, proprietary data of their competitors." A10-11. The district court's conclusion was well-founded: the amended complaint quotes a document stating that information a Revenue Management Product provides to a subscriber about its competitors is obtained from public sources, yet plaintiffs deceptively deleted that critical fact and inserted the words "non-public" to make it appear that the source had the opposite meaning:

---

[6] Plaintiffs assert that the Department of Justice argued in *Gibson* that the court incorrectly dismissed the plaintiffs' hub-and-spoke claim. Br. 4. But DOJ did "not take a position on the sufficiency of the complaint's allegations of horizontal agreement," and instead weighed in on the plaintiffs' challenge to the vertical licenses between Rainmaker and each casino-hotel. *Gibson*, 24-3576, ECF No. 28 at 37. Plaintiffs do not bring that claim here and DOJ chose not to file an amicus brief in this appeal.

| Plaintiffs' source (*The Rainmaker Group Acquires Revcaster,* CoStar (May 21, 2015) (quoted in A249 ¶¶ 160, 162), [https://www.co-star.com/article/448134080/the-rainmaker-group-acquires-revcaster](https://www.co-star.com/article/448134080/the-rainmaker-group-acquires-revcaster)): | Plaintiffs' changes to that source (A249 ¶ 160): |
|---|---|
| "Developed by hoteliers for hotel operators, Revcaster's application collects market-specific hotel price information **from hundreds of branded sites and online travel agencies** and provides easy-to-use reports and data downloads that increase revenue for clients." | "'Developed by hoteliers for hotel operators,' the tool 'collects market-specific hotel price information' from ~~hundreds of branded sites and online travel agencies~~ **a client's competitors' non-public, real-time pricing and supply data** and 'provides easy-to-use reports and data downloads that increase revenue for clients.'" |

Plaintiffs do not challenge the district court's conclusion. Instead, they effectively concede that those underlying documents trump their vague allegations because they confessed to manipulating the documents on which their amended complaint relies.  A427 n.3; *see also Twombly*, 550 U.S. at 568 n.13 ("The complaint quoted a reported statement of [defendant's CEO], to suggest that [defendants] declined to compete," but that was "only part of what he reportedly said . . . and the District Court was entitled to take notice of the full contents of the published articles . . . ."); *Lungu v. Antares Pharma Inc.*, No. 21-1624, 2022 WL 212309, at *5 n.14 (3d Cir. Jan. 25, 2022) ("When an allegation in the complaint is contradicted by a document incorporated

in it by reference, the document controls and the allegation is not accepted as true.")[7]

Finally, even if plaintiffs had somehow alleged that the Revenue Management Products pool competitors' data to suggest prices, plaintiffs still fail to allege an agreement among Casino-Hotels. For starters, alleging that the Revenue Management Products use "non-public data," A241, A269, A270-71 ¶¶ 136, 221, 224-25, is conclusory because plaintiffs never specify what information is non-public or what makes it confidential, *see Burtch*, 662 F.3d at 224-25 (alleging that defendants "regularly and unlawfully shared highly confidential information relating to . . . clients . . . is not entitled to assumptions of truth . . . [i]n light of the conclusory nature of these allegations").

In fact, this Court has rejected plaintiffs' theory by holding that a hub disclosing information provided by one spoke to another spoke is not enough to support an inference of a conspiracy among the spokes:

> Just as a manufacturer's practice of informing each of its distrib-
> utors of the identities of its other distributors — as well as the

---

[7] While plaintiffs admit that they manipulated their sources and that the Revenue Management Products "use[] publicly advertised room rates," they argue that the use of public rates was limited to REVCaster and "Rainmaker discontinued REVCaster in January 2019." Br. 18 n.5. But the Court can ignore these arguments: plaintiffs concede they failed to allege supporting facts. *Id.*

> prices they paid and the volume of product they received—
> would not plausibly imply a horizontal agreement among the
> distributors, the disclosure of information alleged here fails to
> plausibly suggest a conspiracy among the insurers [because] . . .
> it is at least equally consistent with unconcerted action.

*Brokerage Antitrust*, 618 F.3d at 329-30; *see also In re Baby Food Antitrust Litig.*,

166 F.3d 112, 126 (3d Cir. 1999) ("[C]ommunications between competitors do

not [alone] permit an inference of an agreement to fix prices" because

"[g]athering competitors' price information can be consistent with inde-

pendent competitor behavior.").

**No "Radical Change" in Conduct**. Plaintiffs' argument that subscrib-

ing to Revenue Management Products was a "radical change" from past

practices is also unsupported. Br. 50. That "radical" change by Casino-Ho-

tels allegedly spanned 14 years, and they are among "thousands" of non-

defendant hotels that also allegedly subscribe with no whiff of conspiracy.

*See supra* 35. Moreover, the *Brokerage Antitrust* plaintiffs alleged the same

thing—that adopting contingent commissions was "a dramatic change from

prior practice"—and this Court gave it no weight because it was in defend-

ants' self-interest, 618 F.3d at 312. Plaintiffs allege the same here in spades.

*See supra* 35.

**No Plausibly Defined Market**.  Plaintiffs assert that Casino-Hotels' 72% share of the "Atlantic City Casino-Hotel Market" make it "ripe for horizontal collusion," Br. 47, but plaintiffs fail to allege that Atlantic City is a plausible market.  "Plaintiffs have the burden of defining the relevant market."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  Courts "measure a market's geographic scope . . . by determining the areas . . . where consumers can turn . . . for supply of the relevant product."  *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).

*Concord* shows that plaintiffs' attempt to limit the market to casino-hotels in Atlantic City is implausible.  There, the plaintiffs alleged that the defendants conspired to obstruct the plaintiffs' racino in the Catskills.  *Id.* at 49-51.  The plaintiffs defined their geographic market as the "gaming market in the Catskills region."  *Id.* at 53.  The Second Circuit affirmed dismissal, holding that this geographic market definition was "too narrow and inherently implausible" because "the resort's potential customers would . . . view Atlantic City and Connecticut as reasonably interchangeable substitutes for a Catskills racino."  *Id.* at 53-54.

Like the failed market definition in *Concord,* plaintiffs' market definition is implausible because it excludes casino-hotels in New York and

Connecticut.  As the Second Circuit reasoned in *Concord*, consumers view casino-hotels in New York and Connecticut as "reasonably interchangeable substitutes" for casino-hotels in Atlantic City, because they are "tourist destinations, where tourists could gamble and have access to natural resources and other related activities." *Id.* at 54.  Indeed, even plaintiffs concede that Casino-Hotels "compete directly with other casino[s] . . . in the . . . surrounding areas."  A228 ¶ 82.

Plaintiffs' failure to plead a plausible relevant market—along with their admissions that two defendants lowered their room prices across the purported conspiracy—dooms their amended complaint because properly pleaded market definition and anticompetitive effects are "essential elements" of a "rule of reason" claim.  *Queen City*, 124 F.3d at 436.  Plaintiffs are wrong that they need not define a relevant market because the alleged conduct is "per se" unlawful.  Br. 53.  The "per se rule" applies to a narrow sliver of anticompetitive behavior and does not apply to novel "factual circumstances." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001).  Indeed, the case plaintiffs allege as "analogous," A297 ¶ 270, held that the "per se standard is not appropriate" for analyzing an alleged agreement to use revenue management software, *RealPage*, 709 F. Supp. 3d at 521.

**Alleged Opportunities to Conspire Are Insufficient**.  Plaintiffs argue

that the purported conspiracy is plausible because defendants had "oppor-

tunities to conspire" at industry events.  Br. 50.  But plaintiffs never allege

Casino-Hotels ever discussed anything at these events.  And mere "[p]roof

of opportunity to conspire . . . will not sustain an inference that a conspiracy

has taken place."  *Brokerage Antitrust*, 618 F.3d at 349.

## B.    Plaintiffs' Attempt to Plead an Agreement Without Parallel Conduct Also Fails

Having failed to allege parallel conduct and plus factors, plaintiffs can-

not salvage their claim by arguing that they "allege that [d]efendants took

concerted action . . . by knowingly delegating pricing authority to . . . Rain-

maker."  Br. 13.  Plaintiffs do not allege that any Casino-Hotel delegated its

pricing authority, let alone that any Casino-Hotel knew any other Casino-

Hotel delegated its pricing authority.  And this Court has rejected plaintiffs'

theory as insufficient to infer an agreement.

### 1.    Plaintiffs fail to plead any "knowing delegation," and it would be insufficient even if they did

To begin, "[p]laintiffs have not actually alleged . . . a delegation" to

Revenue Management Products because they "have not alleged that [Ca-

sino-Hotels] have given Cendyn authority to . . . set prices."  *Gibson II*, 2024

WL 2060260, at *6.  Instead, plaintiffs admit that each Casino-Hotel retained its pricing discretion because it could—and did—freely reject prices suggested by Revenue Management Products.  A252 ¶ 174.  In fact, plaintiffs do not allege Casino-Hotels were required to adopt any price suggested by the Revenue Management Products and identify no instance when a Casino-Hotel actually adopted a suggested price.  Plaintiffs rely on the generic allegation that "Rainmaker itself publicly boast[ed] a 90% acceptance rate" across its thousands of subscribers, Br. 7, but that says nothing about how often rates were adopted by Casino-Hotels (which are a minuscule fraction of Rainmaker's subscribers), much less that they each delegated their independent pricing authority.  *See BNP*, 92 F.4th at 399 ("Plaintiffs' statistics are fundamentally flawed because they do not focus on the ten Auction Defendants.  Instead, the data concern all the twenty-plus primary dealers.").

Plaintiffs try to paper over this non-delegation by arguing that only a "select few managers are allowed" to override the Revenue Management Products' recommendations in "extreme circumstances."  Br. 7.  But that is not what plaintiffs allege in their amended complaint.  Rather, the amended complaint alleges that all "GuestREV users" at an individual hotel can have permissions to override "GuestREV pricing recommendations."  A241 ¶ 138.

While plaintiffs argue that "Rainmaker emphasizes [overrides] should be limited to times of need and extreme circumstances," Br. 16-17, they again mischaracterize their own allegations. The amended complaint quotes an "industry website"—not Rainmaker—as stating that subscribers "should be able to override . . . price recommendations" "[i]n times of need and extreme circumstances," A241-42 ¶ 138. Plaintiffs do not allege that subscribers overrode recommendations in only those circumstances or were constrained from overriding recommendations in other circumstances.

Second, even if plaintiffs alleged that Casino-Hotels delegated pricing, they fail to allege any Casino-Hotel did so because it knew others had done so. Plaintiffs claim that each Casino-Hotel knew that every other Casino-Hotel adopted the prices recommended by a Revenue Management Product because "marketing materials" identified certain Casino-Hotels as clients. A309 ¶ 316. But plaintiffs identify nothing in those marketing materials suggesting that each Casino-Hotel adopted the Revenue Management Products' pricing recommendations. *See Hess*, 602 F.3d at 255 ("[I]t does not suffice to simply say that the defendants had knowledge; there must be factual allegations to plausibly suggest as much.").

Plaintiffs' other allegations undercut any inference that Casino-Hotels subscribed to Revenue Management Products because they knew that others were doing so.  If anything, their allegations suggest the opposite; after all, Caesars subscribed years before any other Casino-Hotel.  *See supra* 11.  And as the district court correctly held, one "cannot infer a plausible price-fixing agreement between the Casino-Hotels from the mere fact that they all use the same pricing software."  A13; *see also In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 2025 WL 606533, at *19 (N.D. Ohio Feb. 25, 2025) (adopting this reasoning, and concluding that the holdings of the district court and *Gibson II* are "persuasive").

Third, even if plaintiffs had adequately alleged a "knowing delegation," this Court has held that these allegations do not suffice.  In *Brokerage Antitrust*, the plaintiffs tried to infer a conspiracy among the insurer spoke defendants to adopt contingent commissions as competitive protections because they each knew the other insurer defendants had adopted contingent commissions.  618 F.3d at 330.  But "[c]ontrary to plaintiffs' contentions, the allegations that each insurer knew about the 'competitive protections' purchased by the other insurer-partners manifestly do not describe a horizontal

conspiracy to unreasonably restrain trade." *Id*. at 331. Because plaintiffs assert the same theory here, the Court should reject it.

### 2. Plaintiffs cannot satisfy *Interstate Circuit*, and *Masonite* and *American Needle* are inapplicable

Plaintiffs also find no support in *Interstate Circuit, Masonite*, and *American Needle, Inc. v. National Football League*, 560 U.S. 183, 192 (2010). Br. 29-31. Plaintiffs cannot satisfy *Interstate Circuit* because they allege hotels would—and did—subscribe to the Revenue Management Products without a conspiracy. In *Interstate Circuit*, a first-run theater wrote to eight movie distributors at the same time asking them to restrict distributing movies to second-run theaters. 306 U.S. at 217. The distributors complied by imposing these identical restrictions. *Id*. The Supreme Court inferred an agreement among the movie distributors because each distributor "was aware" that "without substantially unanimous action . . . there was risk of a substantial loss of the business." *Id*. at 222. Thus, as this Court has made clear, the "[k]ey to *Interstate Circuit*'s conspiracy finding" was that each distributor's decision to accede to Interstate's demands "would have been economically self-defeating unless the other distributors did the same." *Brokerage Antitrust*, 618 F.3d at 331.

Plaintiffs cannot satisfy *Interstate Circuit* because they cannot allege that subscribing to the Revenue Management Products "would have been economically self-defeating unless the other [Casino-Hotels] did the same." *Id.* Instead, plaintiffs allege Caesars subscribed to the Revenue Management Products <u>years</u> before any other Casino-Hotel, and that "thousands" of non-defendant hotels also unilaterally subscribed to the Revenue Management Products. *See supra* 11, 35.

Plaintiffs and their amici incorrectly argue that *Masonite* eliminated *Interstate Circuit's* "self-defeating" requirement because the Court inferred a horizontal agreement where the spoke defendants negotiated agreements with the hub "independently of each other." Br. 30-31. But "contrary to the plaintiffs' argument, *Masonite* makes no holding on horizontal conspiracy." *Nexium*, 842 F.3d at 57. Masonite had patents for material called hardboard. *Masonite*, 316 U.S. at 267-68. When competitors started making hardboard, Masonite sued, but eventually settled with them on identical terms, including a term allowing the competitors to act as "agents" to distribute Masonite's hardboard. *Id.* at 269-73.

The Court held that the <u>vertical</u> contracts between Masonite and its "agents" restrained trade, but did "not broaden the *Interstate Circuit*

formula" because the decision "does not rest on any horizontal conspiracy holding." 6 Areeda & Hovenkamp, *Antitrust Law* ¶ 1427 (5th ed. 2023). In fact, the First Circuit and the nation's leading antitrust treatise warned "unwary reader[s]" against "believ[ing] that the Court found a horizontal conspiracy among the agents." *Id.*; *see also Nexium*, 842 F.3d at 57. Reading—as plaintiffs and their amici do here—"*Masonite* as having found a[] . . . horizontal conspiracy would be 'nonsensical' because 'an essential conspiracy element [wa]s missing—namely, a motive for joint action or interdependence.'" *Nexium*, 842 F.3d at 57 (quoting Areeda ¶ 1427d).

Finally, *American Needle* has no relevance to the only substantive issue before this Court. The defendant NFL teams in *American Needle* conceded they agreed among themselves but argued that their agreement fell outside Section 1 under the "single enterprise doctrine." *Am. Needle*, 560 U.S. at 196. The Supreme Court held that the NFL teams were "capable of conspiring under § 1" because their "agreement joins together independent centers of decisionmaking." *Id*. That holding is irrelevant here because defendants do not challenge whether they are "capable of conspiring under § 1." Instead, the issue here is whether plaintiffs pleaded sufficient facts to plausibly infer

an agreement among Casino-Hotels. *American Needle* has nothing to say on that question because the existence of an agreement was undisputed there.

Even if *American Needle* were relevant, plaintiffs fail to allege that subscribing to the Revenue Management Products "joins together separate decisionmakers." Br. 33. Instead, plaintiffs admit that subscribers are free to reject every price suggested by those Products. *See supra* 12. And "optional" rules and obligations do not "join[] together separate decisionmakers." *Real Est. Exch. Inc. v. Zillow Grp., Inc.*, 2025 WL 670967, at *1 (9th Cir. Mar. 3, 2025); *see also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132-33 (3d Cir. 2005) (affirming dismissal of antitrust claim because there was no "restraint in [defendants'] alleged activity" since the parties "remain[ed] free" to sell their products); *Acquaire v. Canada Dry Bottling Co. of N.Y.*, 24 F.3d 401, 410 (2d Cir. 1994) ("Evidence of pricing suggestions . . . is not sufficient to . . . transgress § 1 of the Sherman Act" when the party receiving them is not "require[d]" to accept them.).

## II.    THE DISTRICT COURT PROPERLY DISMISSED WITH PREJUDICE

Plaintiffs' argument that "the district court abused its discretion under binding precedent" in dismissing with prejudice, Br. 5, is wrong for at least

three reasons.  First, plaintiffs never properly requested leave to amend, and the court below had no duty to invite them to do so.  Second, the court also correctly rejected plaintiffs' cursory request for leave to amend in their opposition to defendants' motion to dismiss, as plaintiffs had notice that their pleadings had many defects, yet made no effort to fix them.  Third, plaintiffs' belated attempt to fix those defects in appellate briefing explains why they never moved for leave: they have nothing to plead that plausibly suggests an agreement among Casino-Hotels.

### A.    The Court Could Not Have Abused Its Discretion Because Plaintiffs Never Properly Sought Leave to Amend

The district court did not abuse its discretion in dismissing with prejudice because plaintiffs never properly asked to amend.  "[I]n ordinary civil litigation it is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint."  *Fletcher-Harlee*, 482 F.3d at 253; *accord, e.g.*, *Ramsgate*, 313 F.3d at 161.  So, a "district court need not worry about amendment when the plaintiff does not properly request it."  *LabMD*, 47 F.4th at 192.

This Court has identified three steps for properly requesting leave to amend. First, a "plaintiff properly requests amendment by asking the district court for leave to amend" by filing "a motion to amend." *Id.*; *see also U.S. ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 242-43 (3d Cir. 2013) ("Zizic's request for leave to amend his complaint [in his brief] was improper" because he "could have amended his complaint only with the District Court's leave [under] Rule 15(a)(2).").

Second, the "settled rule is that properly requesting leave to amend a complaint requires submitting a draft amended complaint." *Fletcher-Harlee*, 482 F.3d at 253; *see also In re Allergan ERISA Litig.*, 975 F.3d 348, 358 (3d Cir. 2020) ("[A] district court does not abuse its discretion by denying leave to amend when the party seeking leave does not attach a draft amended complaint to its request."). The District of New Jersey's rules reinforce this Court's precedent by "requir[ing] that a plaintiff give a District Court a draft amended complaint." *Lake v. Arnold*, 232 F.3d 360, 373-74 (3d Cir. 2000).[8]

Third, a plaintiff seeking leave must identify the new facts it intends to plead because this Court does "not ask district courts to be mind readers."

---

[8] *Accord* District of New Jersey, Local Civil Rule 15.1.

*Allergan*, 975 F.3d at 358.  Failing to provide a draft amended complaint and identify new facts "is fatal to a request for leave to amend."  *Fletcher-Harlee*, 482 F.3d at 252; *see also Allergan*, 975 F.3d at 357 ("[W]e cannot say the District Court abused its discretion" because "the plaintiffs had failed to identify what modifications they proposed to make to their complaint.").

Plaintiffs committed fatal errors by taking no step to properly request leave.  Because plaintiffs exhausted their ability to amend as-of-right, they would have had to seek leave under Federal Rule of Civil Procedure 15(a)(2). Yet plaintiffs "never filed a motion to amend, and [they] never submitted a draft amended complaint."  *LabMD*, 47 F.4th at 192.  Indeed, "plaintiffs here not only failed to include a draft complaint . . . they failed to say anything at all about how they intended to amend their pleading."  *Allergan*, 975 F.3d at 358.  Thus, having committed fatal errors by not taking the steps this Court has required for requesting leave to amend, plaintiffs "can hardly complain about the entry of final judgment."  *Fletcher-Harlee*, 482 F.3d at 253.

Rather than demonstrate they properly requested amendment, plaintiffs characterize the district court's decision as error by arguing that (1) seeking "leave to amend in opposing the motion to dismiss" was sufficient, and (2) "the Third Circuit has held that district courts must provide

leave to amend even if the plaintiff does not seek it." Br. 60-61. Both arguments are foreclosed by this Court's precedent.

**Requesting leave in an opposition brief is insufficient.** Plaintiffs' first argument fails because a "bare request in an opposition to a motion to dismiss . . . does not constitute a motion within the contemplation of Rule 15(a)." *Q2Administrators*, 728 F.3d at 243. This Court has "addressed that issue directly" by holding that "such a conclusory remark" at the end of an opposition brief is "not a motion to amend." *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 206 (3d Cir. 2006); *see also Q2Administrators*, 728 F.3d at 234 (district court did not abuse its discretion in dismissing first pleading with prejudice because plaintiffs requested leave only in opposition brief); *Ramsgate*, 313 F.3d at 161 ("Plaintiff's single sentence . . . dangling at the end of her memorandum, did not rise to the level of a motion for leave to amend.").

Plaintiffs fell far short of requesting leave because they mentioned it only in a "single sentence . . . dangling at the end of" their opposition to defendants' motion to dismiss. *Id.* Indeed, plaintiffs' conclusory request mirrors the requests this Court has repeatedly rejected. *Compare* A464 ("If the Court grants any part of the Motion, it should do so without prejudice so Plaintiffs can amend."), *with Ranke*, 436 F.3d at 206 ("[I]n the event that

the Court concludes that the Complaint fails to state claims . . . [p]laintiffs . . . request . . . leave to amend.").

Plaintiffs also incorrectly argue that their note to the court saying that they "stand ready to explain—through supplemental briefing [or] during . . . oral argument . . . why *Gibson* is still distinguishable" somehow requested leave to amend.  Br. 63.  Plaintiffs did not mention amending and instead showed they would stand on their existing pleading.  Although plaintiffs argue "[t]he district court did not permit supplemental briefing to address *Gibson II*," Br. 20, they only have themselves to blame because they failed to ask for any such supplemental brief, *see* District of New Jersey, Local Civil Rule 7.1(d)(6) (supplemental briefs may be filed with leave of the Court).

**The district court had no duty to offer plaintiffs leave sua sponte.**
Plaintiffs are incorrect when arguing that "settled Third Circuit precedent" required the district court to "permit a curative amendment" "even if the plaintiff does not seek [it.]"  Br. 58-60.  What that "settled precedent" shows is that "this Court's willingness to permit an opportunity for curative amendment is limited to cases involving federally recognized civil rights." *Zanetich v. Wal-Mart Stores E., Inc.*, 123 F.4th 128, 149 (3d Cir. 2024).

*Fletcher-Harlee* identified two rules this Court applies when assessing whether the district court needed to offer leave to amend when the plaintiff failed to properly request it. The Court observed that the "sua sponte" rule requires that "in civil rights cases district courts must offer amendment — irrespective of whether it is requested," while the "longer-standing" "amendment rule" requires plaintiffs to "submit a draft amended complaint to the court." 482 F.3d at 251-52. *Fletcher-Harlee* resolved the "tension" between these two rules by holding that the sua sponte rule does not apply "outside of . . . civil rights case[s]." *Id*. at 252.

Like plaintiffs here, many other <u>non</u>-civil rights plaintiffs have tried to excuse their failure to seek leave to amend by blaming the district court for not offering it sua sponte, and this Court has re-affirmed *Fletcher-Harlee* at every turn:

> This is not a civil rights case, so the District Court was not obligated to grant leave to amend of its own accord. LabMD never filed a motion to amend, and it never submitted a draft amended complaint. Thus, the District Court did not have any reason to believe that amendment would cure the identified defects, and it had nothing upon which to exercise its discretion.

*LabMD*, 47 F.4th at 192-93.[9]  Indeed, every case that plaintiffs cite to support

their assertion that "the Third Circuit has held that district courts 'must pro-

vide' leave to amend" is a civil rights case that has no applicability here.  Br.

59-61 (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 103 (3d Cir. 2002);

*Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *Phillips v. Cnty. of Allegheny*,

515 F.3d 224, 245 (3d Cir. 2008); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir.

2000); *Abbott v. Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998)).  Basic shepardizing

would have shown plaintiffs that this Court has expressly limited those

opinions to civil rights cases.  *See Fletcher-Harlee*, 482 F.3d at 252 (*Grayson*,

*Alston*, *Shane*, and *Abbott* do not apply "in ordinary civil litigation").[10]

## B.    Even If Plaintiffs Properly Sought Leave, the District Court Was Well Within Its Discretion to Deny It

The court also correctly dismissed with prejudice because plaintiffs

had notice that their attempt to plead an agreement has fatal defects, but

failed to fix them.  "A District Court has discretion to deny a plaintiff leave

---

[9] *See also Kemezis v. Matthews*, 394 F. App'x 956, 959 (3d Cir. 2010) (antitrust and unfair trade practices claims are "ordinary civil litigation").

[10] *See also Lisowski v. Walmart Stores, Inc.*, 2022 WL 2763698, at *4 n.4 (3d Cir. July 15, 2022) ("Lisowski cites *Phillips v. Cnty. of Allegheny* for the proposition that 'a district court must permit a curative amendment' . . . [but w]e have limited this proposition to civil rights cases, so it does not apply here.").

to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them." *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002). A plaintiff receives notice of "problems with the allegations in his Complaint" from (1) "developing case law," *id.*, and (2) defendants' motion to dismiss, *U.S. ex rel. Schumann v. AstraZeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) ("Schumann was on notice of the deficiencies . . . after BMS moved to dismiss.").

*Gibson I* and *II* and defendants' motions to dismiss gave plaintiffs notice their pleadings had many defects, but plaintiffs did not fix them:



Thus, plaintiffs were "not caught unaware by the Court's entry of judgment, as [they] had notice of [defendants'] motion and every

opportunity to amend [their] complaint beforehand." *Fletcher-Harlee*, 482 F.3d at 253; *see also Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 244 (3d Cir. 2014) (no abuse of discretion because plaintiffs knew about "deficiencies identified by . . . other district courts that had dismissed similar complaints").[11]  Indeed, plaintiffs amended after *Gibson I*, yet failed to cure the three flaws identified by that court.  And plaintiffs failed to seek leave to amend after *Gibson II* held that "the three key deficiencies that the Court . . . identified in [*Gibson I*] and persist . . . [are] determinative reasons why Plaintiffs have not plausibly alleged a tacit agreement."  2024 WL 2060260, at *3.

## C.    Plaintiffs' Belated Attempt to Identify New Facts Is Too Late and Too Little

Plaintiffs assert they are "prepared to allege" "additional" facts and claims, Br. 64, but plaintiffs never mentioned them below, and the district court would have been well within its discretion to deny leave if they did.

---

[11] Plaintiffs argue that *Krantz*'s notice standard is inapplicable because *Gibson II* was decided after they filed their opposition.  Br. 62.  But plaintiffs knew about the flaws highlighted by *Gibson II* long before they opposed defendants' motion to dismiss on March 21, 2024, because *Gibson I* highlighted the same flaws on October 23, 2023.  *See supra* 14-15.

First, plaintiffs needed to identify to the district court the facts they would plead in an amended complaint because "issues not raised before the district court are waived on appeal." *Fletcher-Harlee*, 482 F.3d at 253.  Plaintiffs here waived their right to allege "additional facts" and claims because they never presented them below.

Second, plaintiffs acted with undue delay by failing to identify these issues in the district court.  Courts have broad discretion to deny leave to amend if the plaintiff engages in "undue delay." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004).  "The concept of 'undue delay' includes consideration of whether new information came to light or was available . . . to the moving party . . . before the Court granted the motion to dismiss." *Id*.  Plaintiffs do not argue that the information they identify for the first time on appeal was unavailable below.  Nor could they.  For example, plaintiffs argue they can "highlight an . . . industry publication that post-dates the dismissal briefing" that supposedly notes that Revenue Management Products "'take proprietary data from' clients.'"  Br. 64 (quoting Skift, *DOJ and FTC Weigh in on Hotel Price Collusion Case* (Mar. 29, 2024), https://skift.com/2024/03/29/doj-and-ftc-weigh-in-on-hotel-price-collusion-case/).  But the article was published six months <u>before</u> the district

court dismissed their amended complaint and weeks <u>before</u> defendants finished briefing their motion to dismiss.  *See Adams Golf*, 381 F.3d at 280 (undue delay because plaintiffs "could have introduced the allegations . . . long before the Court granted the motion to dismiss").

Nor can plaintiffs claim they did not know about the "additional causes of action under Section One" until after the court dismissed their amended complaint.  Br. 65.  Instead, plaintiffs seek to assert the same challenge to the "vertical agreements" between Cendyn and each Casino-Hotel, *id.*, that were asserted and dismissed in *Gibson II*.  2024 WL 2060260, at *9 ("It . . . cannot be that the vertical agreements between Cendyn and Hotel Defendants . . . restrain trade.").  And they had ample opportunities to assert information-sharing claims, yet still identify no factual support.

Third, even if the Court entertained plaintiffs' tardy attempt to identify how they would further amend, the facts and claims they identify cannot plead an agreement among Casino-Hotels.  Indeed, "[e]ven on appeal [plaintiffs are] vague about what facts [they] might allege that would allow [them] to state a claim," *Fletcher-Harlee*, 482 F.3d at 253 n.7, obliquely referring to "terms contained in a class period-era Cendyn Master Services Access Agreement," the industry article discussed above, "information in

Rainmaker press releases," and information about when GuestREV was developed, Br. 64-65.

Plaintiffs, however, do not assert that any Casino-Hotel was party to that unidentified Cendyn Master Services Access Agreement or identify <u>any</u> terms suggesting that the Revenue Management Products recommend prices to a Casino-Hotel based on confidential information submitted by other Casino-Hotels. *See Fletcher-Harlee*, 482 F.3d at 253 n.7 (rejecting new allegations on appeal because plaintiffs "reference[] allegations concerning meetings . . . without elaborating on the content of those meetings"). Nor do plaintiffs identify the "additional information in Rainmaker press releases" that would somehow make their claims more plausible.

Plaintiffs also misrepresent the contents of the material they do identify. Far from specifying that the Revenue Management Products use confidential data from a subscriber's competitors to recommend prices as plaintiffs claim, the article plaintiffs cite merely reports <u>on this case</u> and recycles plaintiffs' own ambiguity: "companies . . . have increasingly relied on third-party software to inform their prices. These algorithmic pricing systems take proprietary data from companies and demand signals <u>from other sources</u> to suggest whether to raise or drop prices." Skift, *supra* 62.

Finally, even if plaintiffs "c[ould] now allege that all Casino-Hotel Defendants but one began using GuestREV around 2010" or that Cendyn's software facilitates the exchange of confidential data among subscribers, Br. 64-65, plaintiffs would still come up short in pleading an agreement among Casino-Hotels. In fact, plaintiffs concede that there is still an eight-year gap in defendants' subscriptions. And this Court has held that "parallel conduct alone is not enough," and "exchang[ing] . . . information without any direct or circumstantial evidence of an agreement does not plausibly state a Section 1 claim." *Burtch*, 662 F.3d at 233.

## CONCLUSION

For these reasons, the Court should affirm the dismissal of plaintiffs' complaint for failure to state a claim.

Respectfully submitted,

/s/ Sadik Huseny
Sadik Huseny
Brendan McShane
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Melissa Arbus Sherry
Anna M. Rathbun
Lawrence E. Buterman
Christopher J. Brown
Graham Haviland
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004

*Counsel for Defendant-Appellee
Cendyn Group, LLC*

/s/ Jennifer L. Del Medico
David C. Kiernan
Matthew Silveira
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
dkiernan@jonesday.com
msilveira@jonesday.com

Jennifer L. Del Medico
Laura W. Sawyer
JONES DAY
250 Vesey Street, 34th Floor
New York, NY 10281
Telephone: 212-326-3658
jdelmedico@jonesday.com

/s/ Boris Bershteyn
Boris Bershteyn
*Counsel of Record*
Ken Schwartz
Michael Menitove
Sam Auld
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Ken.Schwartz@skadden.com
Michael.Menitove@skadden.com
Sam.Auld@skadden.com

*Attorneys for Defendants
Caesars Entertainment, Inc., Boardwalk
Regency LLC, Harrah's Atlantic City
Operating Company, LLC, and Tropi-
cana Atlantic City Corporation*

/s/ Bethany W. Kristovich
Bethany W. Kristovich
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100
Bethany.Kristovich@mto.com

Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Justin.Raphael@mto.com

lwsawyer@jonesday.com

*Attorneys for Hard Rock International
Inc. and Seminole Hard Rock Support
Services, LLC*

/s/ Craig Carpenito
Craig Carpenito
David S. Lesser
KING & SPALDING LLP
1185 Avenue of the Americas, 34th
Floor
New York, NY 10036
ccarpenito@kslaw.com
dlesser@kslaw.com

*Attorneys for Boardwalk 1000, LLC
d/b/a Hard Rock Hotel & Casino At-
lantic City*

*Attorneys for MGM Resorts Interna-
tional and Marina District Development
Company, LLC d/b/a Borgata Hotel Ca-
sino & Spa.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 31.1(c) because it contains 12,999 words (including 12,829 words counted by Microsoft Word and 170 words manually counted in demonstrative charts), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); (2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6), and with Local Rule 32.1(c), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in a 14-point Book Antiqua font; (3) this brief complies with Local Rule 31.1(c) because the text of the hard copies of this brief filed with this Court and the electronic brief are identical, and because Microsoft Defender Antimalware Client Version 4.18.23110.3 Antivirus Version 1.403.2426.0 was run on this electronic brief and no virus was detected; and (4) pursuant to Local Rules 28.3(d) and 46.1(e), I am a member of the bar of this Court.

Dated: March 24, 2025

/s/ Boris Bershteyn

Boris Bershteyn
Ken Schwartz
Michael Menitove
Sam Auld
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
Boris.Bershteyn@skadden.com
Ken.Schwartz@skadden.com
Michael.Menitove@skadden.com
Sam.Auld@skadden.com

*Attorneys for Defendants*
*Caesars Entertainment, Inc., Boardwalk*
*Regency LLC, Harrah's Atlantic City Op-*
*erating Company, LLC, and Tropicana*
*Atlantic City Corporation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Local Rules 28.3(d) and 46.1(e), I am

a member of the bar of this Court.

Dated: March 24, 2025             */s/ Sadik Huseny*
                                  Sadik Huseny
                                  Brendan McShane
                                  LATHAM & WATKINS LLP
                                  505 Montgomery Street, Suite 2000
                                  San Francisco, CA 94111

                                  Melissa Arbus Sherry
                                  Anna M. Rathbun
                                  Lawrence E. Buterman
                                  Christopher J. Brown
                                  Graham Haviland
                                  LATHAM & WATKINS LLP
                                  555 Eleventh Street, NW Suite 1000
                                  Washington, DC 20004

                                  *Counsel for Defendant-Appellee*
                                  *Cendyn Group, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Local Rules 28.3(d) and 46.1(e), I am

a member of the bar of this Court.


Dated: March 24, 2025                    */s/ Jennifer L. Del Medico*
                                         David C. Kiernan
                                         Matthew Silveira
                                         JONES DAY
                                         555 California Street, 26th Floor
                                         San Francisco, CA 94104
                                         dkiernan@jonesday.com
                                         msilveira@jonesday.com

                                         Jennifer L. Del Medico
                                         Laura W. Sawyer
                                         JONES DAY
                                         250 Vesey Street, 34th Floor
                                         New York, NY 10281
                                         Telephone: 212-326-3658
                                         jdelmedico@jonesday.com
                                         lwsawyer@jonesday.com

                                         *Attorneys for Hard Rock International Inc.*
                                         *and Seminole Hard Rock Support Services,*
                                         *LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Local Rules 28.3(d) and 46.1(e), I am

a member of the bar of this Court.

Dated: March 24, 2025

*/s/ Craig Carpenito*
Craig Carpenito
David S. Lesser
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
ccarpenito@kslaw.com
dlesser@kslaw.com

*Attorneys for Boardwalk 1000, LLC d/b/a*
*Hard Rock Hotel & Casino Atlantic City*

# CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Local Rules 28.3(d) and 46.1(e), I am

a member of the bar of this Court.

Dated: March 24, 2025          */s/ Bethany W. Kristovich*
                               Bethany W. Kristovich
                               MUNGER, TOLLES & OLSON LLP
                               350 South Grand Avenue, 50th Floor
                               Los Angeles, CA 90071-3426
                               Telephone: 213-683-9100
                               Bethany.Kristovich@mto.com

                               Justin P. Raphael
                               MUNGER, TOLLES & OLSON LLP
                               560 Mission Street, 27th Floor
                               San Francisco, CA 94105-2907
                               Justin.Raphael@mto.com

                               *Attorneys for MGM Resorts International
                               and Marina District Development Company,
                               LLC d/b/a Borgata Hotel Casino & Spa.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: March 24, 2025           */s/ Boris Bershteyn*
                                 Boris Bershteyn
                                 Ken Schwartz
                                 Michael Menitove
                                 Sam Auld
                                 SKADDEN, ARPS, SLATE,
                                   MEAGHER & FLOM LLP
                                 One Manhattan West
                                 New York, New York 10001
                                 (212) 735-3000
                                 Boris.Bershteyn@skadden.com
                                 Ken.Schwartz@skadden.com
                                 Michael.Menitove@skadden.com
                                 Sam.Auld@skadden.com

                                 *Attorneys for Defendants*
                                 *Caesars Entertainment, Inc., Boardwalk*
                                 *Regency LLC, Harrah's Atlantic City Op-*
                                 *erating Company, LLC, and Tropicana*
                                 *Atlantic City Corporation*