# United States Court of Appeals
*for the*
# Third Circuit

---

Case No. 24-3006

KAREN CORNISH-ADEBIYI; LUIS SANTIAGO; MONICA BLAIR-SMITH,
individually and on behalf of all others similarly situated,

*Appellants,*

– v. –

CAESARS ENTERTAINMENT, INC.; BOARDWALK REGENCY LLC,
d/b/a Caesars Atlantic City Hotel & Casino; HARRAHS ATLANTIC CITY
OPERATING COMPANY, LLC, d/b/a Harrahs Resort Atlantic City Hotel &
Casino; TROPICANA ATLANTIC CITY CORPORATION, d/b/a Tropicana
Casino and Resort Atlantic City; MGM RESORTS INTERNATIONAL;
MARINA DISTRICT DEVELOPMENT COMPANY, LLC, d/b/a Borgata Hotel
Casino & Spa; HARD ROCK INTERNATIONAL INC.; SEMINOLE HARD
ROCK SUPPORT SERVICES, LLC; BOARDWALK 1000, LLC, d/b/a Hard
Rock Hotel & Casino Atlantic City; CENDYN GROUP, LLC.

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY IN
NO. 1-23-CV-02536, HONORABLE KAREN M. WILLIAMS, DISTRICT JUDGE

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

ZACH FIELDS
SUSMAN GODFREY LLP
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
(212) 336-8330

SHAWN RAYMOND
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 653-7817

CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
(202) 577-3977

*Attorney for Plaintiffs-Appellants*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (380968)

WILLIAM G. CALDES
ICEE N. ETHERIDGE
JEFFREY L. SPECTOR
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
(215) 496-0300

STANLEY O. KING
KING & KING
231 South Broad Street
Woodbury, New Jersey 08096
(856) 845-3001

*Attorney for Plaintiff-Appellant
   Monica Blair-Smith, individually
   and on behalf of all others similarly
   situated*

JOSEPH J. DEPALMA
CATHERINE B. DERENZE
LITE DEPALMA GREENBERG
   & AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

*Attorney for Plaintiffs-Appellants*

# Table of Contents

**Page**

Table of Authorities ..................................................................iii

Introduction ........................................................................ 1

Argument ........................................................................... 7

   I.    By alleging that Defendants agreed to use the same
pricing algorithm, Plaintiffs state a per se claim ................... 7

       A.    Plaintiffs' liability theory rests on well-
established antitrust principles ..................................... 7

       B.    The district court and Defendants err in
ignoring these antitrust principles and the
allegations ................................................................ 10

   II.    Plaintiffs also have pleaded parallel conduct and plus
factors ........................................................................ 15

       A.    Plaintiffs pleaded parallel conduct .............................. 15

           1.    Plaintiffs allege that all Casino-Hotel
Defendants used the same Rainmaker
pricing algorithm platform at the same
time .................................................................. 15

           2.    Defendants and their amicus
mischaracterize the CAC's pricing and
occupancy allegations ......................................... 19

       B.    Plaintiffs have sufficiently pleaded plus factors ......... 25

  III.    The District Court Improperly Denied Leave to
Amend ....................................................................... 28

       A.    Plaintiffs requested leave to amend ............................ 28

       B.    Plaintiffs lacked notice of the CAC's purported
deficiencies .............................................................. 30

C.    Plaintiffs timely identified new factual allegations showing that amendment would not be futile ..............................................................31

Conclusion ................................................................................34

# Table of Authorities

**Page(s)**

**Cases:**

*Am. Needle, Inc. v. Nat'l Football League,*
560 U.S. 183 (2010) .......................................................... 7, 13

*Arizona v. Maricopa Cnty. Med. Soc'y,*
457 U.S. 332 (1982) ................................................................ 14

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ................................................................ 13

*Ball v. Paramount Pictures,*
169 F.2d 317 (3d Cir. 1948) ..................................................... 2

*Bechtel v. Robinson,*
886 F.2d 644 (3d Cir. 1989) ................................................... 34

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..................................................... 4, 18, 31

*Burch v. Milberg Factors, Inc.,*
662 F.3d 212 (3d Cir. 2011) .......................... 16, 18, 19, 24

*City of Atl. City v. Ace Gaming, LLC,*
23 N.J. Tax 70 (N.J. Tax Ct. 2006) ...................................... 28

*Concord Assocs., L.P. v. Ent. Props. Tr.,*
817 F.3d 46 (2d Cir. 2016) ..................................................... 28

*Contra Lefco v. United States,*
74 F. 2d 66 (3d Cir. 1934) ....................................................... 3

*Copperweld Corp. v. Indep. Tube Corp.,*
467 U.S. 752 (1984) .................................................................. 7

*Dole v. Arco Chem. Co.,*
921 F.2d 484 (3d Cir. 1990) ................................................... 33

*Duffy v. Yardi Sys., Inc.,*
No. 2:23cv1391,
2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ......................... 14, 26, 27

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
    482 F.3d 247 (3d Cir. 2007) ........................................................ 28, 29, 30

*Gibson v. Cendyn Grp., LLC, et al.*,
    24-03576 (9th Cir.) Dkt. 67 (Apr. 21, 2025) ..................................... 5, 26

*Gibson v. Cendyn Grp., LLC*,
    2:23-cv-00140 (MMD), 2024 WL 2060260
    (D. Nev. May 8, 2024) .................................................................. 5, 30-31

*Guirguis v. Movers Specialty Servs., Inc.*,
    346 F. App'x 774 (3d Cir. 2009) ........................................................ 30

*Hill v. Burgeon Legal Grp., Ltd.*,
    No. 19-cv-12783, 2020 WL 114008 (D.N.J. Jan. 10, 2020) ................. 29

*In re Cathode Ray Tube(CRT) Antitrust Litig.*,
    MDL No. 1917, 2016 WL 6246736 (N.D. Cal. Oct. 26, 2016) ............. 24

*In re Chocolate Confectionary Antitrust Litig.*,
    999 F. Supp. 2d 777 (E.D. Pa. 2014) .................................................. 20

*In re Domestic Airline Travel Antitrust Litig.*,
    691 F. Supp. 3d 175 (D.D.C. Sept. 12, 2023) ...................................... 16

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ............................................................ 4, 20

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ............................................................... 4

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ..................................................... 17

*In re Processed Egg Prods. Antitrust Litig.*,
    No. 08-md-2002, 2019 WL 5656101 (E.D. Pa. Oct. 31, 2019) ............. 17

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023) ..................................... *passim*

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ........................................................ 11, 12

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939) ............................................................... *passim*

*Krantz v. Prudential Invs. Fund Mgmt., LLC,*
    305 F.3d 140 (3d Cir. 2002) ............................................. 32, 33

*LabMD Inc. v. Boback,*
    47 F.4th 164 (3d Cir. 2022) ................................................ 30

*Lefco v. United States,*
    74 F. 2d 66 (3d Cir. 1934) ............................................... 3, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ............................................................ 24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997) .............................................. 28

*Snyder v. Baxter Healthcare, Inc.,*
    393 F. App'x 905 (3d Cir. 2010) ...................................... 30

*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.,*
    967 F.3d 295 (3d Cir. 2020) .............................................. 24

*Sun Oil Co. v. F. T. C.,*
    350 F.2d 624 (7th Cir. 1965) ......................................... 12-13

*United States ex rel. Customs Fraud Investigations, LLC. v.*
    *Victaulic Co.,*
    839 F.3d 242 (3d. Cir. 2016) ........................................ 30, 31

*United States v. Container Corp. of Am.,*
    393 U.S. 333 (1969) ...................................................... 9, 22

*United States v. Masonite Corp.,*
    316 U.S. 265 (1942) ............................................ 9, 12, 13, 19

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ....................................................... 1, 13

*Viking Theatre Corp. v. Paramount Film Distrib. Corp.,*
    320 F.2d 285 (3d Cir. 1963) ................................................. 2

*William Goldman Theaters v. Loew's, Inc.,*
    150 F.2d 738 (3d Cir. 1945) ............................................... 16

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.,*
    No. 15-6480, 2021 WL 409982 (E.D. Pa. Feb. 5, 2021) ........................ 17

*Zavolta v. Lord, Abbett & Co.*,
No. 2:08-cv-4546, 2010 WL 686546 (D.N.J. Feb. 24, 2010) ................29

**Statutes & Other Authorities:**

Statement of Interest of the United States,
*In re MultiPlan Health Ins. Provider Litig.*,
No. 1:24cv6795 (N.D. Ill. Mar. 27, 2025),
ECF No. 382 ("*MultiPlan* SOI")....................................................*passim*

6 Wright & Miller § 1487 (2d ed. 1990) ...................................................33

Alexander MacKay & Samuel N. Weinstein, *Dynamic Pricing
Algorithms, Consumer Harm, and Regulatory Response*,
100 Wash. U. L. Rev. 111 (2022)............................................................9

Fed. R. Civ. P. 8(a)(2) ...............................................................................31

Fed. R. Civ. P. 8(d)(1) ...............................................................................31

## Introduction

Defendants fail to address the fundamental basis for this appeal: the district court departed from settled antitrust precedent, and its decision, left standing, effectively immunizes the coordinated use of algorithmic software by competitors to fix prices. To prop up this errant ruling, Defendants misconstrue the law and misstate the record. Their arguments fail for at least three reasons.[1]

*First*, Plaintiffs properly plead a *per se* violation of the antitrust laws. As the Supreme Court has explained, any "combination formed for the purpose and with the effect of raising … or stabilizing" prices, including an agreement on "the formula underlying pricing policies," qualifies as concerted action under the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 224 n.59 (1940). Accordingly, simply "using a common pricing algorithm can … qualify as concerted action under Section 1 of the Sherman Act … even if competitors do not always use the algorithm in the same way."[2] The CAC satisfies this

---

[1] Plaintiffs use the same defined terms as in the Opening Brief. Unless otherwise stated, all emphasis is added and internal citations, quotations, and alterations omitted.

[2] Statement of Interest of the United States, *In re MultiPlan Health Ins.*

pleading standard by alleging Casino-Hotel Defendants agreed to use the same Rainmaker pricing algorithm, CAC ¶¶ 13, 17, 204, 221, 223–24, 226–27, 229, 402, even if Casino-Hotel Defendants used the algorithm differently or deviated from its suggested prices.

Plaintiffs' cause of action therefore does not depend on alleging parallel conduct and plus factors because "allegations and evidence of parallel conduct and so-called 'plus factors' … are not always required to show the existence of concerted action." AR 556. Instead, "a tacit agreement can be inferred from an invitation proposing collective action followed by a course of conduct showing acceptance." *Id.* (citing *Interstate Circuit v. United States*, 306 U.S. 208, 226–27 (1939)); *see also MultiPlan* SOI at 3 n.3. Allegations thus suffice where, "knowing that concerted action was contemplated and invited," conspirators "gave their adherence to the scheme and participated in it." *Interstate Circuit*, 306 U.S. at 226; *Viking Theatre Corp. v. Paramount Film Distrib. Corp.,* 320 F.2d 285, 293 (3d Cir. 1963), *aff'd,* 378 U.S. 123 (1964); *Ball v. Paramount Pictures,* 169 F.2d 317, 319 (3d Cir. 1948). Plaintiffs plainly make those allegations

*Provider Litig.*, No. 1:24cv6795 (N.D. Ill. Mar. 27, 2025), ECF No. 382 ("*MultiPlan* SOI") at 4; *see also* AR 605.

here. *See, e.g.*, CAC ¶¶ 11–15, 17, 18, 175–219, 220–24, 226–27, 229, 357, 402.

*Second,* Plaintiffs **have** pleaded parallel conduct and plus factors which reasonably evince an unlawful conspiracy to fix prices. The CAC alleges parallel conduct in that, every day "during the class period," "Casino-Hotel Defendants **all used the same pricing algorithm platform** from the same company to set their room rates" and "knew that the others were doing the same thing"—quintessential parallel conduct. CAC ¶¶ 315–16; *see also* ¶¶ 11–13, 222, 313, 402.

In arguing otherwise, Defendants wrongly assert that the unlawful agreement should be read to start **before** the Rainmaker products at issue **were even available for purchase**. *See* Resp. 29 (asserting conspiracy clock must begin in 2004). So too, Defendants wrongly argue that the timing of Hard Rock's entrance into the conspiracy when it first opened its casino doors should somehow immunize the conspiratorial conduct which came before. *Contra Lefco v. United States*, 74 F. 2d 66, 68 (3d Cir. 1934) (late joining conspirators "become parties [to the conspiracy] and assume responsibility for **all done before**").

In addition, the Casino-Hotel Defendants' argument that "prices

and occupancy moved in different directions," Resp. 26, wrongly requires the Court to read the complaint in the light most favorable to Defendants—not Plaintiffs. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And it falls into the "trap" of "failing to distinguish between the existence of a conspiracy and its efficacy." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002); *see In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004). Regardless, Plaintiffs allege that Defendants' conspiracy ***did*** increase prices. CAC ¶¶ 234–53.

Plaintiffs also alleged plus factors. Although Casino-Hotel Defendants claim that they would have subscribed to the Rainmaker pricing algorithm platform if no conspiracy existed, Resp. 34–35, Plaintiffs expressly allege the opposite, CAC ¶ 307. This fact dispute cannot be resolved on the pleadings alone. Plus, Casino-Hotel Defendants cannot explain how "contribution of sensitive pricing and supply data for use" by Rainmaker to recommend prices for competitors is in their "economic self-interest," unless they "know they are receiving in return the benefit of their competitors' data in pricing their own units." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d

478, 510 (M.D. Tenn. 2023); CAC ¶¶ 220, 226–27.

What's more, Defendants—like the district court—ignore allegations which expressly differentiate this case from *Gibson*.[3] But there they are—over and over again. *See, e.g.,* CAC ¶¶ 6, 22, 147, 185, 224, 358, 402. Defendants' "quotation" of the CAC, Resp. 38, bears little resemblance to what Plaintiffs actually allege, manufacturing ambiguity where none exists. Consider the red text below, all of which was ***omitted*** from Defendants' quotation and misleadingly replaced by ellipses:

> "[E]ach casino-hotel client provides its current, non-public room pricing and occupancy data to the Rainmaker platform on a continuous basis. In turn, the algorithm continuously processes and analyzes this **non-public, real-time** information, **along with the same type of non-public, real-time data the client's participating competitors also submit to the platform,** and other relevant supply and demand-related data. . . . The algorithm ultimately uses this information to generate 'optimal' room rates, uploaded multiple times per day, for each client to

---

[3] Defendants' red-herring that the *Gibson* plaintiffs somehow *must* have abandoned their horizontal claim on appeal in that separate action because "*Gibson II* was so plainly correct," Resp. 5, ignores the myriad decisions made by *different* counsel, for *different* litigants, with *different* allegations. Notably, the DOJ recently moved for argument time on Plaintiffs' behalf in that appeal, *see Gibson v. Cendyn Grp., LLC, et al.*, 24-03576 (9th Cir.), Dkt. 67 (Apr. 21, 2025), demonstrating the importance and unlawfulness of the scheme alleged in the federal government's view—***across*** administrations, at that.

charge guests."

CAC ¶ 6.

*Finally*, Defendants fault Plaintiffs for not formally moving for leave to amend their CAC. But Defendants do not defend the district court's stated reason for dismissing with prejudice, its failure to determine the futility of amending the CAC, or whether it would have been inequitable to give Plaintiffs that opportunity. Nor could they, given the allegations and theories that Plaintiffs stand ready to add, if necessary, and the significant issues at stake.

\*      \*      \*

"Judicial treatment of the use of algorithms in price fixing has tremendous practical importance." AR 553. "Competitors' use of algorithmic technologies to coordinate their decision-making poses a growing threat to the free market competition on which our economic system is premised." *MultiPlan* SOI at 1. "Longstanding legal principles apply with equal force to this new machinery," and this Court must faithfully apply those principles to ensure that "[a]ntitrust law does not become obsolete simply because conspirators find new ways to act in concert." AR 579. Because the district court did not do so here, this Court

should reverse.

Argument

## I. By alleging that Defendants agreed to use the same pricing algorithm, Plaintiffs state a *per se* claim.

Plaintiffs allege that Casino-Hotel Defendants agreed to use the Rainmaker platform—at Rainmaker's invitation—as the centerpiece of their pricing strategies. CAC ¶¶ 11–14, 17–18, 220–21, 223–24, 226–27, 229, 357, 402. This constitutes concerted action under Section One per *Interstate Circuit*—period. *See* 306 U.S. at 226–27; *MultiPlan* SOI at 2–4 & n.3 (applying same to shared pricing algorithm). The concerted action alleged here is therefore unreasonable *per se*.

### A. Plaintiffs' liability theory rests on well-established antitrust principles.

The Sherman Act prohibits "concerted action" that "'deprives the marketplace of independent centers of decisionmaking.'" *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)). "[C]oncerted action may be inferred from evidence of an invitation for collective action followed by conduct showing acceptance," *MultiPlan* SOI at 2–3; *see also Interstate Circuit*, 306 U.S. at 226–27. Because Plaintiffs plausibly allege

7

precisely such concerted action, that is where this appeal begins and ends.

Specifically, Plaintiffs allege:

- Casino-Hotel Defendants compete in the Atlantic City market for guest stays at casino-hotels, CAC ¶¶ 71–112;

- they each use the same Rainmaker "pricing algorithm platform," after Rainmaker "conveyed that uniform adoption would … generate significantly higher prices for each Casino-Hotel Defendant than if each one did so independently without use of that platform," *id.* ¶ 220; *see also id.* ¶¶ 11–14, 18, 174–219, 224, 357;

- they did so knowing—indeed, ***because***—their competitors were using the same software, *id.* ¶¶ 204–20;

- they provide their "non-public room pricing and occupancy data to the Rainmaker platform on a continuous basis" (and Rainmaker's "participating competitors" provide "the same type of non-public, real-time data"), *id.* ¶ 6; *see also id.* ¶¶ 22, 147, 185, 224, 358, 402;

- Rainmaker uses this "non-public room pricing and occupancy data" to "generate 'optimal' room rates, updated multiple times per day, for each client to charge guests," *id.* ¶ 6; *see also id.* ¶¶ 22, 147, 185, 224, 358, 402;

- all Casino-Hotel Defendants use the pricing algorithm platform for their pricing strategy, and automatically ingest pricing recommendations into their pricing management systems, *id.* ¶¶ 11, 137, 150; and

- they adopt Rainmaker's price "recommendations" 90% of the

time, *id.* ¶¶ 15, 142, 174.[4]

This conduct violates the antitrust laws. *Interstate Circuit*, 306 U.S. at 226–27; *United States v. Masonite Corp.*, 316 U.S. 265, 274–75 (1942); *see also* ECF No. 56 ("OMI Br.") 11–13; ECF No. 61 ("COSAL Br.") 13–16, 19–21.

Rainmaker's invitation to Casino-Hotel Defendants to use the pricing algorithm to achieve supracompetitive profits, and their collective acceptance of that invitation, constitutes "concerted action." *See United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969). The Sherman Act prohibits such a transparent attempt to curtail free market decision making's benefits by thwarting price competition. ECF No. 75 ("Prof. Br.") 9–22. AI-powered algorithmic software's role in the scheme does not immunize Defendants from liability. If anything, it makes the conduct more troubling. *See, e.g., id.* 4, 21; Alexander MacKay & Samuel N. Weinstein, *Dynamic Pricing Algorithms, Consumer Harm, and*

---

[4] Defendants suggest that this 90% figure is somehow categorically deficient because it includes all Rainmaker's clients rather than only Casino-Hotel Defendants. *See* Resp. 46, AR 375–76. But Casino-Hotel Defendants offer no basis to believe that this statistic inaccurately reflects their own acceptance rate. Moreover, 100% acceptance is not required. *See RealPage*, 709 F. Supp. 3d at 504–05.

*Regulatory Response*, 100 WASH. U. L. REV. 111, 129 (2022) ("[A] scholarly consensus has emerged that pricing algorithms can facilitate price fixing and other forms of express collusion.").

### B. The district court and Defendants err in ignoring these antitrust principles and the allegations.

Defendants' insistence that Plaintiffs have not alleged an agreement requires ignoring the CAC's allegations and the bedrock antitrust principles upon which Plaintiffs' claim rests.

For instance, Defendants claim that the CAC fails to allege that Rainmaker had the authority to set prices for Casino-Hotel Defendants. But Plaintiffs need not allege this to state a claim. AR 605 (*per se* price fixing "includes agreements to use the same pricing formula—analogous to agreements to use the same pricing algorithm," and remains unlawful even if the conspirators "retain some authority to deviate from the algorithm's recommendations").

Besides, the CAC alleges that Casino-Hotel Defendants adopt Rainmaker's pricing recommendations 90% of the time, CAC ¶¶ 15, 142, exceeding the 80–90% range found sufficient in *RealPage*, 709 F. Supp. 3d at 504–05, 534. Plaintiffs further allege that:

- clients' revenue managers must receive special permission to override GuestREV recommendations "in times of need and extreme circumstances," CAC ¶ 138,

- Rainmaker "scores" its users on their adherence to the pricing "recommendations," *id.* ¶139, Br. 7,

- GuestREV constantly reminds users that anything but "automatically" approving algorithmic recommendations decreases revenue, CAC ¶ 139,

- GuestREV can run "largely on autopilot … with little need for human judgment," *id.* ¶ 150, and

- Casino-Hotel Defendants' employees describe Rainmaker products as "indispensable," admitting that they "generally" allow "GuestREV to perform its mathematical magic," CAC ¶ 185. There's little need for intervention when the rates tick higher as Rainmaker does the hard part, CAC ¶¶ 142–43.

As for knowledge, Plaintiffs allege far more than Casino-Hotel Defendants' mere use of "the same pricing software." Resp. 48. The CAC showcases how, when they agreed to use the Rainmaker pricing algorithm, Casino-Hotel Defendants knew (a) who else was using it, *see* CAC ¶¶ 12, 180–81, 184, 186, 188, 190, 193–94, 197, 201–02, 204, 206, 207–08, 220, 223–28, 316, and (b) that the software used competitor data to set prices, *see id.* ¶¶ 6, 205–06, 210–16, 220, 317. This is sufficient knowledge. *See RealPage*, 709 F. Supp. 3d at 512, 518.

Defendants also sidestep binding precedent to argue that conspiracies like this are somehow immunized from antitrust scrutiny.

For instance, Defendants draw an inapt analogy to *Insurance Brokerage*, comparing Casino-Hotel Defendants' shared reliance on pricing software—knowing their co-conspirators are doing the same—to a contingent commission system among insurers. Resp. 48. But the portion of *Insurance Brokerage* they quote simply means that awareness of ***the specific terms of*** competitors' <u>separate</u> contractual arrangements is not "knowledge" of a conspiracy. *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010). The case is further distinguishable because the plaintiffs' pleadings were deliberately narrow and, crucially, ***lacked the joint adoption of a*** <u>***common pricing mechanism***</u> as alleged here. *See* ECF No. 60 ("AAI Br.") 25–26 (describing pleading errors of *Insurance Brokerage* plaintiffs).

Defendants' drive-by treatment of *Masonite*, meanwhile, uses a single out-of-Circuit decision that collides with Supreme Court instructions. Plaintiffs—like the *RealPage* court, *see* 709 F. Supp. 3d at 508, and federal antitrust enforcers, *see MultiPlan* SOI at 6—cite *Masonite* to argue that a price-fixing agreement can be inferred when each spoke of the conspiracy knew about and assented to the general scheme, even if they interacted only with the hub. *See* Br. 30–31; *see also* COSAL Br. 14. That principle's applicability here holds regardless of

whether the *Masonite* arrangement itself is described as "horizontal" or "vertical." *See* COSAL Br. 23–28; *Sun Oil Co. v. F. T. C.*, 350 F.2d 624, 634 (7th Cir. 1965) (describing "the horizontal conspiracy in *Masonite*"); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 356 (1990) (Stevens, J., dissenting) (vertical relationships in *Masonite* did not disrupt "the horizontal character of the agreement").

Next, attempting to distance themselves from *American Needle*, Defendants insist that Rainmaker's pricing recommendations are nominally optional and therefore cannot support an antitrust violation. Resp. 52. But that argument misrepresents the CAC and "is inconsistent with Section 1 precedent," AR 563–64, for reasons already described. Caselaw makes clear that the Casino-Hotel Defendants' collective use of Rainmaker's recommended prices as the starting point for their pricing strategies is the violation—not how often those recommended prices are followed or whether they are based on confidential information. *See Socony-Vacuum*, 310 U.S. at 221. And Plaintiffs allege repeatedly that Casino-Hotel Defendants' agreement to adopt the Rainmaker algorithm as part of their pricing strategies impermissibly "join[ed] together separate decisionmakers"—especially when they almost always accepted the Rainmaker pricing suggestions. *See, e.g.*, CAC ¶¶ 22, 315–18; COSAL

Br. 8, 20–21.

Defendants' effort to avoid *Interstate Circuit* also fails. Resp. 49–50. They misidentify the alleged illegal behavior in question as merely "subscribing" to Rainmaker. Not so. As the American Antitrust Institute rightly argues, Casino-Hotel Defendants "gave Cendyn **real-time access** to their back-end vacancy and booking operations." AAI Br. 21. "Absent an agreement to collude, it is against the self-interest of an individual firm to provide such data to a firm it knows will provide recommendations to its rivals." *Id.*; *RealPage*, 709 F. Supp. 3d at 510. Plaintiffs have alleged precisely that.

Indeed, Defendants barely push back on Plaintiffs' argument that they pleaded a *per se* violation. Their only counter is that *per se* analysis must be cabined to its previous uses and is inapplicable to "novel factual circumstances." Resp. 44. But there is nothing "novel" about competitors coordinating to fix prices. *See* COSAL Br. 15–16 (*per se* treatment "is no different" here). Whatever the machinery of price fixing, when "a conspiracy consists of a horizontal price-fixing agreement, no further testing or study is needed." *Duffy v. Yardi Sys., Inc.*, No. 2:23cv1391, 2024 WL 4980771, at *8 (W.D. Wash. Dec. 4, 2024); *see also Arizona v.*

*Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348–51 (1982); OMI Br. 13.

*Per se* analysis in this case begins and ends with the existence of price fixing conspiracy, which the CAC adequately alleges. *See* AAI Br. 6 (describing role of *per se* analysis in antitrust cases).

## II. Plaintiffs also have pleaded parallel conduct and plus factors.

Because Plaintiffs have alleged a *per se* violation, they need not plead parallel conduct and plus factors leading to the inference of an unlawful conspiracy. AR 556. Nevertheless, they do so.

### A. Plaintiffs pleaded parallel conduct.

#### 1. *Plaintiffs allege that all Casino-Hotel Defendants used the same Rainmaker pricing algorithm platform at the same time.*

Defendants base much of their argument about the CAC's purported failure to plead parallel conduct on the timing of Casino-Hotel Defendants' adoption of the Rainmaker products. *See* Resp. 11, 26–30. Along the way, they erroneously: (1) misstate long-settled law; (2) assert that a new market entrant—Hard Rock—immediately agreeing to the scheme somehow immunizes the conspirators' preceding conduct; (3) attempt to gloss over their misrepresentations to the district court about when Rainmaker first released the products at issue (it wasn't 2004); and

(4) rely almost exclusively on distinguishable facts and reasoning in *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011)—replicating their misrepresentations about that case.

*First*, Defendants suggest that a rote 'number-of-years' (or months) cutoff governs parallel conduct, after which antitrust claims may never proceed. Nonsense. "It is elementary that an unlawful conspiracy may be and often is formed **without simultaneous action or agreement** on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227; *see William Goldman Theaters v. Loew's, Inc.*, 150 F.2d 738, 743 (3d Cir. 1945); *RealPage*, 709 F. Supp. 3d at 505–08 & n.11 (rejecting "timing" argument when conspirators entered agreements over a decade).[5]

*Second*, Hard Rock Atlantic City joining the conspiracy last does not immunize preceding conduct. Plaintiffs allege that Hard Rock opened its casino doors in <u>2018</u>—and **simultaneously** joined the conspiracy by agreeing to use Rainmaker's pricing algorithm platform as part of its pricing strategy. CAC ¶¶ 11, 196. But a "co-conspirator is liable for all

---

[5] *See also In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 189–90, 200–01 (D.D.C. Sept. 12, 2023) (claim stated where defendants engaged in activity **12 years** before conspiracy began); AAI Br. 7–8; COSAL Br. 13–15; Prof. Br. 8–9.

acts committed in furtherance of the conspiracy, ***regardless of when it entered the conspiracy***." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538–39 (D.N.J. 2004); *Lefco*, 74 F. 2d at 68 (conspirators "who come on later and co-operate in the common effort … become parties thereto and assume responsibility for ***all done before***"). Despite being late to the conspiratorial party, Hard Rock shares liability for the entire conspiracy period. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2021 WL 409982, at *3 (E.D. Pa. Feb. 5, 2021).

Defendants would have this Court rule that a plausible inference of conspiracy is defeated when a conspiracy ***grows*** years into its operation. That cannot possibly be the law. Holding as much would immunize all antitrust defendants whenever a participant signs up to fix prices when it enters what should be a competitive marketplace. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2019 WL 5656101, at *7 (E.D. Pa. Oct. 31, 2019) (conspiracy set "long before it was alleged to have officially hatched"); *see also* Prof. Br. 8–9 (collecting cases).

*Third*, taking one lines from the 125-plus page CAC out of context, Defendants contend that the conspiracy ***must*** have started in 2004. *See* Resp. 29. The problem? For one, the CAC contains express allegations to

the contrary, putting the conspiracy's start on June 28, 2018. *See* CAC ¶¶ 1, 387. For another, Plaintiffs' allegations involve three **specific** Rainmaker products—GuestREV, GroupREV, and REVCaster—which **were not yet on the market in 2004**. Yet, the same Defendants who develop and sell those products wrongly asserted below that they had been in use for decades. *See* AR 679 (counsel falsely representing "the products at issue **in this case** are not new. **They've been around since the 1990s**.").

Courts historically have recognized that the proof of conspiracy in antitrust contexts is often in the defendants' hands. That's why, if plaintiffs state "allegations plausibly suggesting" an agreement, they must proceed to discovery. *Twombly*, 550 U.S. at 557. That standard is met here.

*Fourth*, Defendants cite *Burtch* as their North Star; but it is not to the contrary and is distinguishable. In *Burtch*, this Court found conspiracy allegations insufficient not simply because of the time gap in the conspiracy's adoption, but because: (1) certain co-conspirators **did not even allegedly engage** in the conspiratorial conduct, and (2) the plaintiffs failed to "plead **_any_ 'plus factors'** to suggest that the

[defendants] had entered into an agreement." 662 F.3d at 228–29. Defendants misstated this case's holding in their briefing below— repeatedly asserting that this Court set a bright line timing rule to assess parallel conduct's plausibility. *See, e.g.,* AR 375 ("[T]he *Burtch* court ***held***" that three months "***was too long*** to plead parallel conduct"); AR 620 (arguing same). The district court's opinion credited that misreading. *See* AR 10.

*Finally*, because Plaintiffs' allegations show that "as the arrangement continued each [conspirator] became familiar with its purpose and scope," *Masonite* 316 U.S. at 275, the CAC states a claim regardless of when each Casino-Hotel Defendant began using the platform, *see* CAC ¶¶ 6, 22, 200, 358, and 402. That is, Plaintiffs plausibly allege that as Casino-Hotel Defendants used the Rainmaker products, they became "aware of the fact" that their contracts were "not an isolated transaction but part of a larger arrangement." *Masonite*, 316 U.S. at 275. This, too, pleads parallel conduct and Defendants do not even attempt to address this argument.

### 2. *Defendants and their amicus mischaracterize the CAC's pricing and occupancy allegations.*

The CAC's pricing and occupancy allegations also plausibly suggest

19

parallel conduct. CAC ¶¶ 234–53.

In *Flat Glass*, 385 F.3d at 362, this Court "squarely addressed, and rejected, [Defendants'] theory" that Plaintiffs must plead uniform price increases to allege parallel conduct. *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 788 (E.D. Pa. 2014). A conspiracy that stabilizes prices or prevents them from dropping further—even if effectuated unevenly across defendants—violates the Sherman Act no less than one that raises prices uniformly. *See id.*; *Flat Glass*, 385 F.3d at 362 (contention that declining prices during conspiracy preclude liability is "***simply wrong***").

Regardless, Plaintiffs do **<u>not</u>** "allege that two out of three" Casino-Hotel Defendants lowered room prices during the conspiracy. *Contra* Resp. 31–32; ECF No. 80 ("ICLE Br.") 10–11. Defendants improperly treat four separate hotels which each raised prices—Harrah's, Tropicana, Caesars, and Bally's—as one economic actor to skew the numbers in their favor. *Compare* CAC ¶ 245, *with* Resp. 31 (comparing prices among "Casino-Hotel ***brands***," not individual Casino-Hotels). They also compare 2018 to 2022 prices, Resp. 31–32, instead of accounting for the difference between the pre- and post-conspiracy world by comparing the

last full year of **pre**-conspiracy prices (2017) to 2022 prices. Correcting this error alone shows Borgata's prices rose during the conspiracy—as Plaintiffs allege. CAC ¶ 244–45.



CAC ¶ 245.

Moreover, Hard Rock's 1.6% average price decrease (amounting to $2.62) from the year it opened (2018) to 2022 does not prove that it acted independently or charged competitive prices. Indeed, at this stage, this Court may plausibly infer that such price stability supports Plaintiffs'

allegations that all conspirators, including Hard Rock, charged supracompetitive prices. *See Container Corp.*, 393 U.S. at 337 ("Stabilizing prices as well as raising them is within the ban of § 1 of the Sherman Act."). Also, Hard Rock joined a fully formed conspiracy, allowing it to charge supracompetitive prices from the start. In other words, unlike the other conspirators, Hard Rock never had a pre-conspiracy price to which Plaintiffs can compare. Plaintiffs, therefore, have plausibly alleged average price increases by five of six Casino-Hotel Defendants and supracompetitive pricing by all six.

Defendants (and their amicus) similarly mischaracterize Plaintiffs' occupancy allegations. At base, Defendants claim they could not have conspired because Hard Rock's occupancy increased during the class period. Resp. 31. But it makes sense that Rainmaker's optimal pricing strategy would involve new market entrant Hard Rock filling its rooms at higher levels than its more established conspirators because, again, it had no pre-conspiracy occupancy benchmark from which to depart and would also have less initial popularity than more proven brands. CAC ¶ 251. Besides, Hard Rock's increased occupancy levels despite high prices "should have compelled at least some Casino-Hotel Defendants to

drop room rates in order to compete" with Hard Rock. CAC ¶ 250; *see also* ICLE Br. 11–12 ("Basic economic theory predicts that hotels will choose to undercut when doing so would be profitable."). "But, this did not happen," which Plaintiffs plausibly allege suggests that Casino-Hotel Defendants acted in concert, using Rainmaker to "exercise[] 'discipline' and avert[] the 'inevitable race to the bottom' on price that would likely occur in a competitive market." CAC ¶¶ 250–51.



CAC ¶ 247.

Similarly, **non**-conspirators' rising prices during the conspiracy period **supports**, not undermines, Plaintiffs' allegations. "Successful cartels increase the *market* price for a price-fixed good, not just their own price." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 6246736, at *6 (N.D. Cal. Oct. 26, 2016) (emphasis in original). Conspirators' competitors thus often "stand to gain from any conspiracy to raise the market price"—particularly where, as here, the conspirators jointly have a dominant market share. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986). And it stands to reason that the new, higher-end product, Ocean Casino, commands higher prices <u>and</u> higher occupancy. In any event, all these pricing and occupancy fact disputes should not be resolved on a motion to dismiss. *See St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299–300 (3d Cir. 2020).

Finally, in *Burtch*, the plaintiff failed to allege that the defendants "acted in concert by declining or limiting" credit to a factory because he alleged that some defendants "increase[d] credit" to the factory during the relevant time. 662 F.3d at 228. In other words, the allegations failed because the plaintiff **did not allege** that all defendants engaged in the

24

behavior that underpinned the conspiracy—not because the conspiracy had uneven market effects. Not so here. *See* CAC ¶¶ 234–53.

## B. Plaintiffs have sufficiently pleaded plus factors.

Although Casino-Hotel Defendants' acceptance of Rainmaker's invitation to collectively adopt the Rainmaker pricing algorithm platform as part of their pricing strategy independently suffices to state a *per se* Section One claim, an unlawful conspiracy may reasonably be inferred from the CAC even if the Court looks to "plus factors." These plus factors also serve as non-economic evidence of a traditional conspiracy.

**Confidential Data Pooling.** Defendants continue to argue that Plaintiffs make only "vague allusions" to confidential data sharing. Resp. 38; ICLE Br. 8, 16–17. They assert that Plaintiffs "***never*** allege" that (1) Rainmaker products use confidential, non-public information "to **generate** pricing recommendations," (2) or "that the Revenue Management Products **commingle** any Casino-Hotel confidential data submitted to Rainmaker." Resp. 38. Flatly wrong. The CAC expressly alleges ***both***-hard to miss unless you're trying. *See supra* 5–6 (citing CAC ¶ 6); *see also* CAC ¶¶ 22, 24, 136, 137, 139, 147–48, 185, 205, 220–21, 224–26, 358, 402. Just like before the district court, Defendants ignore

the CAC's specific allegations—and reasonable inferences drawn therefrom—to instead litigate against *Gibson*'s different (and weaker) allegations. *See*, *e.g.*, AR 428–31 (table demonstrating differences).[6] On *de novo* review, this Court should correct the district court's misreading of Plaintiffs' confidential data pooling allegations—which bolster the inference of an unlawful horizontal conspiracy. *See* AR 3–4.

**Actions Against Interest**. Defendants' focus on hypothetical legitimate uses of the Rainmaker platform products leads them to ignore allegations which must be accepted as true. The decision in the closely analogous algorithmic price fixing case *Duffy v. Yardi Systems, Inc.*, is instructive. There, the court accepted Plaintiffs' allegations that "raising

---

[6] Defendants' misplaced swipe that Plaintiffs "manipulated" Rainmaker's sources, *see* Resp. 39–40, involves one source, about one product, referenced in the 407-paragraph CAC. That source also concerns marketing material concerning an older version of REVCaster. Defendants cannot refute the many Rainmaker sources regarding confidential data collection and use.

Regardless, plaintiffs identified the error to the district court and explained that countless other allegations in the CAC—including Defendants' own statements—established that the Rainmaker products (including GuestREV and GroupREV) collect and use non-public data. *See* AR 427 n.3. Plaintiffs did not rely on the erroneous quotation in their briefing before either the district court or this Court, and, if given leave to amend, would correct it.

rental prices regardless of occupancy and/or competitiveness would, in a competitive market … work against each lessor defendant's economic self-interest." *Yardi*, 2024 WL 4980771, at *4. Plaintiffs make similar allegations. *See* CAC ¶¶ 250–51.

Here, Casino-Hotel Defendants gave "non-public room pricing and occupancy data to the Rainmaker platform on a continuous basis." CAC ¶ 6. It would cut against their interest to provide such confidential information—let alone on a real-time, ongoing basis. *RealPage*, 709 F. Supp. 3d at 510. Nor would strategies to maximize room rate revenue improve a casino-hotel's bottom line without a horizontal conspiracy preventing a "race to the bottom" from competition. *See* CAC ¶¶ 18, 251, 308 (room sales are only 7% of casino-hotels' revenues).

**Opportunities to Conspire**. Contrary to Defendants' reading, the CAC has numerous allegations documenting specific opportunities Defendants had to effect, maintain, and police the horizontal conspiracy. CAC ¶¶ 318–56. Many of these meetings concerned Casino-Hotel Defendants' use of Rainmaker products and featured hands-on assistance concerning the platform's operation. *Id.* ¶¶ 321, 341. Plaintiffs even allege that Casino-Hotel Defendants' pricing managers could

directly communicate on invitation-only fora, to "collaborate" with the comfort that participants would "not share content from this group in any other manner." *Id.* ¶ 333.

**Clearly Defined Market**. Plaintiffs' definition of the Atlantic City Casino-Hotel Market meets the low bar of plausibility at the pleading stage. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). New Jersey courts have specifically endorsed it. *See City of Atl. City v. Ace Gaming, LLC*, 23 N.J. Tax 70, 88–91 (N.J. Tax Ct. 2006). And Defendants' ***very own case*** acknowledges it. *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016) (noting the Atlantic City casino market has "been implicitly recognized as [a] valid market definition[ ] in antitrust suits").

## III. The District Court Improperly Denied Leave to Amend.

This Court should reject all three arguments that Defendants advance to justify the district court's denial of Plaintiffs' request to amend their pleadings.

### A. Plaintiffs requested leave to amend.

Defendants fault Plaintiffs for not requesting leave to amend using the heightened procedures from *Fletcher-Harlee Corp. v. Pote Concrete*

*Contractors, Inc.*, 482 F.3d 247, 252–53 (3d Cir. 2007). But, when a plaintiff has already explicitly requested leave to amend, as Plaintiffs did, AR 464, courts have found *Fletcher-Harlee* inapplicable. *See, e.g., Zavolta v. Lord, Abbett & Co.*, No. 2:08-cv-4546, 2010 WL 686546, at *13 n.18 (D.N.J. Feb. 24, 2010). Moreover, applying *Fletcher-Harlee* here would work undue prejudice in a case with "tremendous practical importance" for the American economy. AR 553.

   *Zavolta* shows how the district court should have proceeded. There, the court granted a motion to dismiss in a prospective securities class action but gave the plaintiff 30 days to file "a motion to amend the Complaint, with a draft amended complaint," because she "had requested an opportunity to amend"—albeit not by formal motion. 2010 WL 686546, at *13–14 & n.18. In arriving at this decision, the court found that *Fletcher-Harlee* did not apply because it only "discusses whether it is error for a district court to fail to offer a plaintiff an opportunity to amend *sua sponte*, i.e., where **no** request to amend was made to the trial court." *Id.* at *13 n.18.

   The district court could have followed that sensible path here. *See also Hill v. Burgeon Legal Grp., Ltd.*, No. 19-cv-12783, 2020 WL 114008,

at *4 (D.N.J. Jan. 10, 2020). Indeed, as this Court explained, "we have rarely upheld a dismissal with prejudice of a complaint when the plaintiff has been given no opportunity to amend." *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 250 (3d. Cir. 2016). And *Fletcher Harlee*'s application to non-Section 1983 cases is not something this Court has consistently recognized. To the contrary, two panels of this Court questioned that view after *Fletcher Harlee* was decided. *See Snyder v. Baxter Healthcare, Inc.*, 393 F. App'x 905, 910 (3d Cir. 2010) ("The reach of [the *Phillips*] rule outside of the Section 1983 context, and extent to which a district court must *sua sponte* offer leave to amend remains unresolved."); *Guirguis v. Movers Specialty Servs., Inc.*, 346 F. App'x 774, 777 (3d Cir. 2009) (same). *But see LabMD Inc. v. Boback*, 47 F.4th 164, 192–93 (3d Cir. 2022).

## B. Plaintiffs lacked notice of the CAC's purported deficiencies.

Despite Defendants' claim to the contrary, neither developing caselaw nor Defendants' motion to dismiss gave Plaintiffs notice of the CAC's purported deficiencies. Rather, developing caselaw and the federal government's statement of interest in this case only ***affirmed*** the CAC's sufficiency when the parties fully briefed the motion to dismiss. And

*Gibson v. Cendyn Grp., LLC*, 2:23-cv-00140 (MMD), 2024 WL 2060260 (D. Nev. May 8, 2024) ("*Gibson II*"), upon which the district court relied extensively, did not issue until ***after*** the motion was fully briefed. Plaintiffs thereafter repeatedly offered to distinguish *Gibson II. See* AR 720 (May 2024 Letter); AR 733, 735 (July 2024 Letter). They were met with silence—until the district court's order on September 30.

Moreover, "the mere fact that a defendant files a motion to dismiss is not necessarily sufficient to put a plaintiff on notice that the court will find his complaint to be deficient." *Victaulic*, 839 F.3d at 249. "[I]n the context of a typical Rule 12(b)(6) motion, a plaintiff is unlikely to know whether his complaint is actually deficient—and in need of revision—until ***after*** the District Court has ruled." *Id.* at 250.

### C. Plaintiffs timely identified new factual allegations showing that amendment would not be futile.

Defendants' attempt to cast Plaintiffs' proposed new factual allegations as untimely and irrelevant falls flat.

*First*, the pre-dismissal availability of certain proposed factual allegations does not show undue delay by Plaintiffs; nothing requires a plaintiff to plead every (or even most) facts bolstering a claim. *See Twombly*, 550 U.S. at 555; Fed. R. Civ. P. 8(a)(2), (d)(1); *Victaulic*, 839 F.3d at 249, 252 (no undue delay where plaintiff "was 'waiting to see what

the court said' before filing its motion to amend its complaint because [it] had 'thought the court was going to deny the motion to dismiss'"); *Krantz v. Prudential Invs. Fund Mgmt., LLC*, 305 F.3d 140, 145 (3d Cir. 2002) (only when "developing case law" predates a motion to dismiss opposition are plaintiffs "on notice" of the case).

*Second*, Defendants' attempt to minimize Plaintiffs' proposed new factual allegations' significance lacks merit. For instance, the industry article Plaintiffs cite does not only discuss this case or rely on the CAC's allegations for the statement Plaintiffs highlighted as Defendants' claim. Resp. 64.

Tellingly, Defendants never directly discuss the Cendyn Master Services Access Agreement's ("MSA") contents, even though they know how to access it (Cendyn's own website), who posted it (Rainmaker Defendants), and what it says (all Defendants subscribe to Cendyn products and cannot credibly disclaim knowledge of the MSA's contents). This refusal to meaningfully engage with the MSA speaks volumes, particularly because Defendants have read other publicly available sources cited in the CAC so they could argue that those sources, viewed in isolation, help them. *See* Resp. 10 n.4.

Defendants' cursory treatment of the MSA is unsurprising. The

July 2020 MSA confirms that Cendyn receives "live reservation data" from GroupREV customers' property management systems and "live data" from GuestREV customers' "sales and catering system." MSA at 4. Nowhere does the MSA purport to segregate that data (to prevent "**commingling**") or disavow using it to suggest other customers' recommended rates (to avoid "**generating**" price outputs). Instead, it explicitly gives Cendyn a license to incorporate that data "into other similar data and information available, derived or obtained from other clients, customers, licensees or users." *Id.* at 8.[7]

*Third*, in denying leave, the district court did not determine the amendment would have been futile or inequitable. *See* AR 14; 6 Wright & Miller § 1487 (2d ed. 1990) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper."). Nor could it have done so. Defendants have not established that they will suffer ***any*** prejudice from Plaintiffs' requested amendment, even though ***they*** bear that burden. *See Dole v. Arco Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990);

---

[7] The district court found that the motion to dismiss implicated "only the first prong" of a Section One claim, AR 5, and did not perform any restraint-of-trade analysis. Because this Court may affirm on any basis the record supports, Plaintiffs refer to their Opening Brief's restraint-of-trade argument. *See* Br. 51–58.

*Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (prejudice to non-movant is "the touchstone" for denying request for leave to amend).

Conclusion

This Court should reverse the district court's judgment and remand for further proceedings. In the alternative, it should remand with instructions that the district court grant Plaintiffs' requested leave to amend.

Dated: April 28, 2025

JOSEPH J. DEPALMA
CATHERINE B. DERENZE
LITE DEPALMA GREENBERG
  & AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

WILLIAM G. CALDES
ICEE N. ETHERIDGE
JEFFREY L. SPECTOR
SPECTOR ROSEMAN
  & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
(215) 496-0300

By \s\ Christopher J. Cormier
CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW,
  Suite 200
Washington, DC 20016
(202) 577-3977

ZACH FIELDS
SUSMAN GODFREY LLP
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
(212) 336-8330

SHAWN RAYMOND
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 653-7817

*Attorneys for Plaintiffs-Appellants*

STANLEY O. KING
KING & KING
231 S. Broad Street
Woodbury, NJ 08096
(856) 845-3001

*Attorney for Plaintiff-Appellant*
  *Monica Blair-Smith,*
  *individually and on behalf of*
  *all others similarly situated*

## CERTIFICATION OF ADMISSION TO BAR

I, <u>Christopher J. Cormier</u>, hereby certify as follows:

1.      I am a member in good standing of the bar of the United States Court

of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that

the foregoing is true and correct.

<u>By  \s\ Christopher J. Cormier</u>
CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW,
  Suite 200
Washington, DC 20016
(202) 577-3977

## CERTIFICATION OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 6,497 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 point Century Schoolbook font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and a virus detection program the Vipre Virus Protection, version 3.1 was run on the file containing the electronic version of this brief and no viruses have been detected.

By \s\ Christopher J. Cormier
CHRISTOPHER J. CORMIER
MATT STRAUSER
BURNS CHAREST LLP
4725 Wisconsin Avenue NW,
  Suite 200
Washington, DC 20016
(202) 577-3977

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I, Melissa Pickett, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

April 28, 2025 the foregoing was filed through the CM/ECF system. I certify that

all participants in the case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system. The required copies have been

sent to the court on the same date as above.


<u>/s/ Melissa Pickett</u>
Melissa Pickett
Counsel Press