```
 1
 2   UNITED STATES COURT OF APPEALS
 3   EASTERN DISTRICT OF PENNSYLVANIA
 4   - - - - - - - - - - - - - - - - - - - -x
 5   In the Matter of:
 6   KAREN CORNISH-ADEBIYI; LUIS SANTIAGO;      Main Case No.
 7   MONICA BLAIR-SMITH, individually           24-3006
 8   and on behalf of all others similarly situated,
 9                  Appellants,
10   V.
11   CAESARS ENTERTAINMENT, INC; BOARDWALK REGENCY LLC,
12   d/b/a Caesars Atlantic City Hotel & Casino, et al.
13
14   - - - - - - - - - - - - - - - - - - - -x
15            United States Third Circuit Court of Appeals
16            September 17, 2025
17            1:00 PM
18
19   B E F O R E:
20   CIRCUIT JUDGE L. FELIPE RESTREPO
21   CIRCUIT JUDGE THEODORE A. MCKEE
22   CIRCUIT JUDGE D. BROOKS SMITH
23   U.S. THIRD CIRCUIT COURT OF APPEALS
24
25
```

1

2   Transcribed by:  Lindsey Carlson

3   eScribers, LLC

4   7227 North 16th Street, Suite #207

5   Phoenix, AZ 85020

6   (800) 257-0885

7   operations@escribers.net

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2  A P P E A R A N C E S:

3  FOR THE APPELLANTS:

4  SUSMAN GODFREY

5       Attorneys for Karen Cornish-Adebiyi; Luis Santiago;

6          Monica Blair-Smith

7       One Manhattan West

8       395 9th Avenue, 50th Floor

9       New York, NY 10001

10  BY:   JOSEPH Z. FIELDS, ESQ.

11

12  BERGER MONTAGUE

13       Attorneys for American Antitrust Institute

14       505 Montgomery Street

15       Suite 625

16       San Francisco, CA 94111

17  BY:   MATTHEW I. SUMMERS, ESQ.

18

19  FOR THE APPELLEES:

20  SKADDEN ARPS SLATE MEAGHER & FLOM

21       Attorneys for Caesars Entertainment, Inc.; Boardwalk

22          Regency LLC

23       One Manhattan West

24       New York, NY 10001

25  BY:   BORIS BERSHTEYN, ESQ.

1

2                    P R O C E E D I N G S

3          THE COURT:  So we will call 24-3006, Cornish, Santiago

4    Blair v. Caesars.

5          Mr. Fields, whenever you're ready, sir.

6          MR. FIELDS:  Thank you, Your Honor.

7          So good afternoon.  Zach Fields from Susman Godfrey on

8    behalf of the plaintiffs and prospective class.  We have

9    alleged that the casino hotels here each use Rainmaker to set

10   the prices that they overwhelmingly adopt to charge guests.

11         JUDGE MCKEE:  You say overwhelmingly, this percentage

12   in the complaint?

13         MR. FIELDS:  Your Honor, we allege that nationwide or

14   I should say globally, ninety percent of the pricing

15   recommendations from Rainmaker are accepted.  That was found

16   sufficient in the RealPage case, which I think really is the

17   best analog.

18         JUDGE MCKEE:  In terms of trying to get a handle on

19   this thing.  And I think you'd agree that if it was 50/50, if

20   half the time the recommendations were accepted, half the time

21   they weren't, you wouldn't have enough for -- to show an

22   agreement.  It certainly wouldn't be a per se violation.  And

23   it wouldn't be the rule of reason, would it?

24         MR. FIELDS:  Your Honor, I think that the Supreme

25   Court's decision in Socony-Vacuum Oil would help to answer that

Page 5

1    question.  There, the Court said that even a starting formula

2    that you use to set prices could be sufficient to state a

3    claim.  You really have to take -- the acceptance rate is but

4    one of many factors and ultimately what the District Court --

5              JUDGE MCKEE:  But it has to be collusion.

6              MR. FIELDS:  That's correct, Your Honor.  There has to

7    at least be some tacit --

8              JUDGE MCKEE:  If they're rejecting the recommendation,

9    say, as often as they're accepting it, is that sufficient to

10   show collusion?

11             MR. FIELDS:  Your Honor, I think you would have to

12   take in totality this Court in Burtch, for instance, outlined a

13   number of plus factors.  It's applied those consistently since

14   and Judge Smith's opinion in West Penn Allegheny made quite

15   clear that in antitrust contexts, plausibility doesn't get some

16   sort of extra bite.  You apply the same Twombly standard.  So

17   look all at one, you know, all together, all of these factors,

18   if perhaps the rates were being rejected fifty percent of the

19   time, but you still have evidence of confidential data sharing,

20   or you still have evidence of policing mechanisms to ensure

21   that the casinos were accepting those prices at least half of

22   the time, you know, with eighty percent market power, that may

23   still be sufficient to state a claim.  Of course, that's not

24   our case here, Your Honor.

25             THE COURT 1:  It's eighty and I posited fifty --

Page 6

1          MR. FIELDS:  Well what --

2          JUDGE MCKEE:  -- percent of what you said.

3          MR. FIELDS:  Eighty percent market power, to be clear,

4    Your Honor.  So even accepting the rates half of the time, if

5    you own eighty percent of the market, I think it probably would

6    be sufficient to state a claim.

7          The market is Atlantic City Casino Hotels.  And we

8    think that that's a perfectly acceptable market definition that

9    New Jersey Courts have credited.  You know, in the Gibson case,

10   which obviously the Ninth Circuit just decided, there was never

11   any real question about whether casino hotels on the Vegas

12   Strip satisfied a market.  I think Atlantic City for the same

13   reason.

14         THE COURT:  (Audio interference).

15         MR. FIELDS:  It's Atlantic City Casino Hotels.  So

16   really, you're looking at eight different properties, Your

17   Honor.  The only three that are nondefendant casino hotels are

18   the Golden Nugget, Resorts, and Ocean.  And if any of you all

19   like blackjack and have been to Atlantic City like I have, you

20   know that Oceans sort of sits as a luxury product on the

21   market.  And that Resorts Casino and Golden Nugget sort of sit

22   as discount properties.  So this is -- it's really every other

23   casino hotel in Atlantic City.

24         THE COURT:  (Audio interference).

25         MR. FIELDS:  We're talking about five different

Page 7

1   properties, I should say.

2         THE COURT:  (Audio interference).

3         MR. FIELDS:  That's correct, Your Honor.  Until the

4   until the sale of Bally's.  Yeah.  So I should say it's five

5   casino hotel defendants.  There are more casinos under each of

6   those defendants.  That's correct.

7         So we've alleged, again, that you have this

8   overwhelming adoption of Rainmaker's prices.  We've alleged

9   that the casino hotels adopt those prices knowing that and

10  indeed because their competitors are doing the same thing.

11        JUDGE RESTREPO:  Does it matter that they opted into

12  the system at different times?

13        MR. FIELDS:  Your Honor, I'm glad that you asked the

14  timing question.  I'll give you one answer as a matter of law

15  and one as a matter of fact.  So as a matter of law, I think

16  that the Supreme Court in Interstate Circuit was quite clear

17  that you can state an antitrust conspiracy without simultaneous

18  agreement.  And in fact, in the West Penn Allegheny case, you

19  had conduct that took place over the course of nine years.  In

20  RealPage you had conduct that took place over a decade.

21  Domestic Airline, that was twelve years.  So as a matter of

22  law, I don't think it matters, Your Honor.

23        But as a matter of fact, I mean, if you look at our

24  complaint, we really do allege that each of them, other than

25  Hard Rock, adopted this technology around 2010.  We know now

Page 8

1    that GuestREV hit the market, we think 2009 or 2010, and one

2    chart in defendant's brief that I want to touch on is they show

3    Tropicana as somehow adopting in 2015.  That's just not

4    consistent with our complaint.  If you look at paragraphs 192

5    and 193, you'll see that we allege that they started using it

6    around 2011.  So again, I think you're really looking at

7    everybody within a two year period at most.  And you have Hard

8    Rock come later.  But Your Honors, it can't be the case as a

9    matter of law, that if an antitrust conspiracy grows years into

10   its operation, that somehow that means that plaintiffs wouldn't

11   state a claim.  Otherwise, defendants would have every

12   incentive to just ask someone else a decade later to join the

13   conspiratorial party.  So I don't think that that would be

14   consistent with this Court's precedent.

15        And Your Honors, critically, I think we have alleged

16   that the casino hotels here each provide their confidential

17   data to Rainmaker on a real time, continuous basis, which it

18   then uses to set the prices that are automatically uploaded

19   into the casino hotels' systems.

20        THE COURT:  (Audio interference).

21        MR. FIELDS:  Certainly, Your Honor, I think the four

22   best paragraphs, paragraphs 226, 227, 6, and 358.  I think

23   those allegations we make quite clear that the Casino Hotel

24   defendants understood that the recommended room rates they were

25   receiving were based on real time, nonpublic pricing and

Page 9

1   occupancy data that they and their co-defendants all were

2   providing to the platform.  And Your Honor, I'm glad that I

3   have the opportunity to address confidential information,

4   because I think it's key to seeing how our complaint was not

5   the same as the complaint in Gibson.  If you look at A.R. 3 to

6   4, it's basically the very end of the District Court's fact

7   discussion.  There, the District Court said that we never

8   allege confidential data pooling or co-mingling.  And she then

9   relies on that assumption to say that our case is the same as

10  Gibson.  But if you look at Gibson, Judge Du, there focused on

11  paragraphs 264 and 265 of the complaint.

12          JUDGE RESTREPO:  If I understand your theory correctly

13  based on your complaint, each hotel gave this company

14  proprietary information?

15          MR. FIELDS:  That's correct, Your Honor.

16          JUDGE RESTREPO:  And the other hotels knew that their

17  colleagues, so to speak, were giving them proprietary

18  information?

19          MR. FIELDS:  Absolutely, Your Honor.

20          THE COURT:  All that was baked into the algorithm?

21          MR. FIELDS:  Absolutely, Your Honor.

22          THE COURT:  At bottom, that's your theory?

23          MR. FIELDS:  That is essentially our theory.  Now, you

24  know, as a matter of law, I don't think that this Court or the

25  Supreme Court has ever said that you must show confidential

1    information sharing to state a claim.  I think that we have --

2              THE COURT:  That's what you've pled.

3              MR. FIELDS:  We have pleaded it that way in part, Your

4    Honor, because, you know, as other federal district courts are

5    considering these theories, I think the RealPage case really is

6    the best analog.  And you can see, you know, Judge Bea's

7    opinion in the Ninth Circuit, it's quite careful.  Footnotes 8,

8    10, 11, he points to RealPage essentially, and says, if you

9    allege that they all knew that their competitors were using the

10   same pricing information or that they were providing

11   confidential information to get the prices back, then that

12   would be a sufficient hub-and-spoke conspiracy.  Of course, the

13   plaintiffs there abandoned the theory, so the Ninth Circuit

14   expressly doesn't reach the question before you today.

15             JUDGE MCKEE:  Would it make a difference if it was

16   only public information that was being pooled?

17             MR. FIELDS:  Your Honor, I think that if it were

18   purely public information and you had no enforcement

19   mechanisms, then you likely would not have an antitrust

20   conspiracy.  But where you have, instead, competitors with

21   market power who are essentially tying their hands, they're

22   saying that this --

23             JUDGE MCKEE:  The enforcement mechanisms, is there an

24   allegation of an enforcement mechanism here, other than kind of

25   the prisoner's dilemma that's mentioned that each person knows

1    as to their -- each entity understands it's their best interest

2    to go along with the recommended rates.  Other than that, is

3    there any mechanism?

4          MR. FIELDS:  Yes, Judge McKee, there are several.  So

5    first, the system actually plugs directly into the Casino

6    Hotels' property management systems.  It automatically uploads

7    the price.  You actually have to seek override permissions to

8    turn it off in times of need and extreme circumstance; that's

9    in our complaint.  And here I think it gets back to the sort of

10   actions against interest plus factor.  You have to ask

11   yourselves why Caesars or Borgata revenue management executives

12   would ever tie their own hands and say, you know, I don't want

13   the opportunity to set prices for my property.  I'm going to

14   have to seek overrides from this system.  So yes, I do think

15   that we have those policing mechanisms alleged here.  So

16   certainly sufficient at the pleading stage to raise fact

17   questions to advance the discovery.

18         THE COURT:  (Audio interference).

19         MR. FIELDS:  Your Honor, I think sort of two answers

20   to that question.  The first is, again, you had eighty percent

21   of the market adopting this tool.  So it's only natural that

22   you're going to publicly see raised prices.  And that is

23   eventually what we see to some degree, you don't see the same

24   degree of parallel conduct.  But second, I'd point this Court

25   to the AbbVie decision, you know, 976 F.3d at 356.  This Court

1   said if a plaintiff plausibly alleges that the anticompetitive

2   effects outweigh its pro-competitive virtues, then the District

3   Court must accept the allegation and allow the plaintiff to

4   take discovery.

5           So at most, Your Honor, I think you would have a fact

6   question.  You know, we have an economist who obviously will

7   testify as an expert.  I'm sure defendants will have several.

8   And you know, there may be difficult fact questions ahead at

9   summary judgment, but that's not the case that you have before

10  you today.  And really, all that we are asking is that this

11  Court read our allegations with the inferences drawn in the

12  plaintiffs' favor.  That's been the consistent rule of this

13  Court and the Supreme Court since Twombly.  And that's

14  unfortunately not what the District Court did below.

15          JUDGE MCKEE:  And I couldn't figure this out looking

16  at the charts, which graphically appear very dramatic, but it

17  includes within the years here, the COVID pandemic, and that

18  had to have had an impact on occupancy and rates charged for

19  rooms.  And I guess also, casino profitability.  And to what

20  extent should that factor in or at this stage, is that totally

21  irrelevant?

22          MR. FIELDS:  Your Honor, I think if you look at those

23  charts, what you'll see is that we've sort of grayed out the

24  COVID period.  I think we acknowledge that that obviously was

25  an exceptional circumstance.  Our class period starts in June

1   2018.  So I think the key fact question when you're looking at

2   price and occupancy movement is the last pre-class period, so

3   2017, to during the class period.  And what you see there,

4   we've got some of these numbers jotted down, is you see changes

5   Caesars raised room rates by thirty-six percent.  This is again

6   long before COVID.  Harrah's by ten percent, Tropicana fifty-

7   five percent, Borgata thirty-five percent.  At minimum, Your

8   Honor, I think at the pleading stage, we have raised fact

9   questions and I guess I should raise that if this Court had

10  difficulty with any of the particular price and occupancy

11  movement, that wasn't a question even addressed by the District

12  Court below.  So we would seek at least remand to answer that

13  step two question.  For the reasons --

14        JUDGE MCKEE:  The Tropicana went from $90 to $140?

15        MR. FIELDS:  $90 to 140.24, that's right.  Fifty-five

16  percent increase.

17        JUDGE MCKEE:  But with a decrease in occupancy?

18        MR. FIELDS:  Correct.  Which again, when you see that

19  decrease in supply with an increase in price, I mean, that's

20  classic antitrust conspiracy evidence.  That's the kind of

21  thing that regularly advances at least to discovery.

22        One case, Your Honors, that unfortunately didn't

23  receive sufficient attention in our brief, if I may briefly

24  just touch on it, was the American Column and Lumber case.  And

25  that's a case where basically you had a number of hardwood

Page 14

1    manufacturers who each used the same outside expert, and they

2    gave that expert, you know, this is this is what we've been

3    able to supply this month.  This is what we've been able to

4    charge.  And the expert then would tell them all, you know, via

5    a regular distributed pamphlet, this is what you should do

6    moving forward.  The Supreme Court had no difficulty saying

7    that's a per se price fixing conspiracy.  And you know, even if

8    you look at Judge Bork's Antitrust Paradox, Chapter 13, he

9    acknowledges this is classic antitrust conspiracy.  This really

10   is the same case.  It's just dressed up in new clothes.

11   Instead of an expert, instead of a guy named Bob, you have an

12   algorithm.  And we would submit that as a matter of law, the

13   fact that this price fixing is being done by an algorithm

14   should not make a difference.

15           THE COURT:  (Audio Interference).

16           MR. FIELDS:  Certainly, Your Honor.  I think

17   ultimately what you're looking for, and I'm sure that

18   defendants will touch on this, is do you have enough to infer

19   the existence of a tacit agreement?  And yes, you're looking

20   for human inputs, outputs, I think here inputs.  They all are

21   adopting this algorithm, knowing that their competitors are

22   doing the same thing.  They're getting this letter that shows,

23   hey, Caesars signed up and is charging higher prices, and then

24   they're tying their hands, again, policing mechanisms.  They

25   are taking away their own opportunity to set prices and instead

Page 15

1   sacrificing that opportunity to Rainmaker as the hub.

2        JUDGE RESTREPO:  Is part of the human experience here

3   providing this proprietary information?

4        MR. FIELDS:  Absolutely.  Your Honor.  You know, we

5   don't think that this Court needs to set some sort of a firm

6   rule that you always need confidential information sharing, but

7   when you have alleged it, it's certainly a strong plus factor

8   to suggest the existence of an anti-competitive agreement.

9        Your Honors, I'm happy to save remaining time for

10  rebuttal.  Or if I could just very briefly touch on our request

11  for leave to amend in the alternative.

12       JUDGE MCKEE:  Yeah, I was concerned about that.  There

13  wasn't really a request for leave to amend, and there was no

14  sample complaint that would be filed if that was granted, as is

15  required by Rule 15.  So what do we do with that?

16       MR. FIELDS:  Your Honor, I think here, this was,

17  again, the first opportunity that we had to hear the District

18  Court's potential issues with our claims.  We filed our

19  complaint back in January of 2024.  It was before we had the

20  Gibson two decision.  Courts weren't circling around this

21  confidential information sharing as sort of a key piece.  We

22  requested leave to amend in our opposition to the motion to

23  dismiss.  And then, you know, subsequently in letters,

24  indicated that we wanted to address Gibson and would be happy

25  to amend --

                                                        Page 16

1          JUDGE MCKEE:  Right.  Letters were filed.  No motion

2    was filed and no sample complaint was (indiscernible).

3          MR. FIELDS:  That's correct, Your Honor.  And I think

4    that the realities of litigation here, you know, we didn't

5    know -- we thought our allegations were sufficient as they were

6    and in fact, still believe that today.

7          JUDGE MCKEE:  But my guess is, everybody who's ever

8    filed a complaint, assuming it wasn't a frivolous lawsuit,

9    thought that the allegations in the complaint were sufficient.

10         MR. FIELDS:  That certainly tends to be the case.  I

11   guess what I'll say, Your Honor, is that in Fletcher-Harlee

12   this Court was concerned with civil rights plaintiffs.  So you

13   know, if you have a situation where there are broader policy

14   concerns, then perhaps you should give plaintiffs that extra

15   shot.  And here, you know, there are scores of absent class

16   members.  And I don't want that fact to be lost here.

17   Subsequently, we have found the contract that Cendyn enters

18   into with Casino Hotel defendants, and at pages 3 and 4 the

19   District Court said we never alleged data commingling.  We now

20   know that in their contract, they actually had a defined term

21   for it.  They called it aggregated data.  We take confidential

22   information from all of these different sources.

23         JUDGE MCKEE:  But now you're filing the complaint you

24   never moved to file.

25         MR. FIELDS:  Well, Your Honor, I think the reason that

Page 17

1   I raised that is because this Court is, of course, always

2   concerned with the equities at play.  And there would be many,

3   you know, thousands of absent class members who would never

4   have the opportunity to make their case in this antitrust

5   conspiracy if we were denied even leave to amend.  So --

6           THE COURT:  (Audio interference).

7           MR. FIELDS:   And Your Honor, I think that the timing

8   here makes quite a big difference.  When we finished briefing

9   the motion to dismiss long after the complaint was filed, there

10  was no decision from the Gibson District Court in Gibson II.

11  If you look at the District Court's opinion here, every page of

12  the analysis focuses quite a bit on Gibson.  I mean, it's

13  nearly every paragraph.

14          JUDGE MCKEE:  Well that doesn't help you because in

15  your letter you basically said that you would like an

16  opportunity --

17          MR. FIELDS:  Correct, Your Honor.

18          JUDGE MCKEE:  -- to respond Gibson.  Didn't file a

19  motion asking leave to amend to file the attached complaint

20  responding to Gibson, which is totally contrary to Rule 15.

21          MR. FIELDS:  Correct, Your Honor.  You know, we did

22  not file a redlined, amended complaint.  And obviously, if we

23  could go back in time, we wish that we would.  You know, I

24  continue to believe today that our complaint, as is alleged,

25  already in the record, is quite different from Gibson.  I was

Page 18

1    just making a suggestion, Your Honor, that to the extent that

2    this Court finds that it is not sufficiently distinct, that we

3    really have found facts subsequently, which would, I think,

4    answer each and every one of the District Court's concerns.

5    And it -- without any analysis of futility, the District Court

6    didn't say we could never state a claim.  She said there was

7    linguistic equivocation and that we didn't on our pleading.  We

8    could directly answer each of the District Court's concerns if

9    given the opportunity to replead.  I don't think that that's

10   necessary.  I think we've done enough to survive to discovery

11   for the reasons this Court said in West Penn Allegheny.

12           But Your Honor, certainly it is true that we wish that

13   we had filed a red lined amended complaint at the time before

14   we even knew what the District Court was thinking.

15           So with that, Your Honors, unless you have any

16   additional questions, I'll reserve time for rebuttal.

17           THE COURT:  We'll hear from Mr. Summers.  Good

18   afternoon, Mr. Summers.

19           MR. SUMMERS:  Good afternoon.  Matt Summers for the

20   American Antitrust Institute.

21           Algorithmic collusion poses a grave threat to

22   consumers.  Yet instead of applying a century of longstanding

23   antitrust law, the District Court effectively adopted a rule of

24   per se legality.  It laid out a playbook for companies that

25   want to price fix with their rivals.  All they have to do is

Page 19

1   join the conspiracy at different times and not share their

2   confidential information.  And if they do that, they can get

3   off scot free, and consumers have no recourse.

4        JUDGE MCKEE:  What we hear, you say and not share

5   their confidential information.  It seems to me, and I'll ask

6   your colleagues on the side about it, seems to me the key thing

7   that plaintiffs have going for them is that confidential

8   information was shared.  So I'm not sure I know what you mean

9   by the road map to not share confidential information.

10        MR. SUMMERS:  So I completely agree, Your Honor, that

11   in this case, we have sort of dozens of paragraphs of

12   allegations of nonpublic, confidential, real time --

13        JUDGE MCKEE:  (Indiscernible)  if there are dozens.

14   But go ahead.

15        MR. SUMMERS:  -- information, the confidential

16   information that's being shared.  So I think the allegations

17   here are sufficient.  I think in addition to that, the legal

18   requirement that the notion that confidential information is a

19   requirement, I don't think holds under antitrust law for a

20   couple of reasons.  But I agree that it's not necessary to

21   resolve this case.  I think it's an additional reason why the

22   District Court erred.  Because even if it was just public

23   information, I think the right way to think about it is that

24   there's sort of two directions.  There's inputs to the

25   algorithm and there's outputs.  On the input side, there's

Page 20

1   confidential information.  And Container Corp., I think is

2   crystal clear on this, a three page Supreme Court decision that

3   says that, of course, if you're sharing current prices, that

4   suffices to show a combination or conspiracy.  So if you've got

5   it on the input, that's fine.  But even if you didn't, I think

6   the critical dimension here is the output, where you've got

7   recommended prices coming from a third-party that, as the

8   Supreme Court in American Column and Lumber suggested, if

9   you're outsourcing your pricing, you're essentially delegating

10  it to a third-party, and those prices are being recommended,

11  and then with some frequency accepted by the parties, by the

12  different supposed competitors, that would also be a violation.

13          JUDGE MCKEE:  Sharing prices, that is an interesting

14  concept here, because I can go on the internet right now and

15  tell you the price of all the rooms -- of certain rooms in each

16  of these casinos.

17          MR. SUMMERS:  But I'll tell you what you can't find,

18  Your Honor.  You can't find the occupancy rate.  You might find

19  if it's vacant or no vacancy, but you won't find the exact

20  percentage of rooms that are available or are occupied at the

21  hotel.  You also won't find the individualized prices.  You

22  might go on Google and find the prices that are being offered

23  to you, but if there are thousands of different prices being

24  personalized to specific consumers, you can't, as like an

25  individual member of the public or a competitor, find that out.

Page 21

1    And yet that's the kind of information that was being shared.

2    You've got direct plug-in to the sort of mainframe of these

3    casino hotels getting the real time occupancy and this kind of

4    even the nonpublic sort of pricing information is coming out,

5    going into an algorithm that's able to use sort of a single

6    algorithm to recommend prices to many different players in the

7    industry.  That's exactly the kind of conduct that the

8    antitrust laws find to be sufficient to show that there was,

9    one, likely an agreement, two, that there was an

10   anticompetitive nature underlying this, because price is the

11   most sensitive feature of any of any market.  And I see my time

12   is up, I'll wrap up.  I see that -- and I think finally, it

13   suggests that there is -- if this decision below is affirmed,

14   it would show that contrary to the Supreme Court in Union

15   Pacific Railroad, that the advancement of technological -- of

16   technological means for the orchestration of large scale price

17   fixing conspiracies need not leave the antitrust laws behind.

18   I think that's what the District Court opinion does here.  And

19   I think a reversal would correct that record.

20           THE COURT:  Thank you.

21           MR. SUMMERS:  Thank you.

22           THE COURT:  Mr. Bershteyn, am I pronouncing that

23   right?

24           MR. BERSHTEYN:  It's [Ber-sh-tine], but I'm really not

25   persnickety about it at all.

Page 22

1          Good afternoon, Your Honors.  I'm Boris Bershteyn, I

2     represent the Caesars defendants.  And I'll be here speaking

3     for the defendant-appellees.

4          Your Honor plaintiffs' claims here, in essence, is

5     that multiple rival hotels, if they -- each license Cendyn

6     software, that's all it takes to plead a violation of antitrust

7     laws.

8          JUDGE RESTREPO:  So a little more than that.  Why

9     don't you address the confidentiality piece and the sharing of

10    proprietary information?

11         MR. BERSHTEYN:  Absolutely.  So there are two layers

12    of answers on confidentiality.  I'm just going to skip between

13    them.  The second answer, which I'll preview for you, is that

14    it's crystal clear under this Court's law in both insurance

15    brokerage and in a Burtch case that that doesn't cut it.

16    Exchange of information does not make -- even if they pleaded

17    exchange of information, that would not do it.  I'm going to

18    come back to that because I don't want to be -- I don't want to

19    seem defensive about the issue that is about whether they were

20    whether they in fact alleged exchange of information, which, as

21    I said, is not enough.

22         And so this is an issue that every court that's looked

23    at this -- Judge Du in Las Vegas, Judge Williams here in New

24    Jersey grappled with.  And so let me just go through what

25    happens with this algorithm in some detail.  And so Cendyn has

1   a lot of clients.  And what the clients do is give their

2   information to Cendyn and say help us.  Help us display this

3   information in a useful way.

4           JUDGE MCKEE:  Their information --

5           MR. BERSHTEYN:  Yes.

6           JUDGE MCKEE:  -- what's in that?

7           MR. BERSHTEYN:  Yeah.  So my client, Caesars, gives

8   Caesars' information to Cendyn.

9           JUDGE MCKEE:  What information?

10          MR. BERSHTEYN:  So for example, how many rooms do we

11  have available for October -- or for next October?  And you

12  know, at this point last October, how many rooms did we book a

13  year out?  Are we ahead of last year or behind last year?

14          JUDGE RESTREPO:  It is proprietary to Caesars?

15          MR. BERSHTEYN:  It's our -- yes.  It is proprietary to

16  Caesars.

17          JUDGE MCKEE:  (Indiscernible).

18          MR. BERSHTEYN:  I'm sorry?

19          JUDGE MCKEE:  I know you're getting there, but I have

20  to ask it before I forget it.  What legitimate business

21  interest does Caesars have in giving a competitor that kind of

22  proprietary information?

23          MR. BERSHTEYN:  And there is the rub, Judge McKee, it

24  is not giving it to the competitor.  It is giving it --

25          JUDGE MCKEE:  Woah, let's back up.

1          MR. BERSHTEYN:  -- to Cendyn.

2          JUDGE MCKEE:  You're giving it to a -- say it's Bob,

3     you're giving it to Bob as is used in these materials.

4          MR. BERSHTEYN:  Right.

5          JUDGE MCKEE:  No, you're giving it to an entity,

6     Bob --

7          MR. BERSHTEYN:  Yes.

8          JUDGE MCKEE:  -- whatever.  Knowing that competitors

9     will have the benefit of that information, even if they don't

10    get the chapter and verse of the information, competitors will

11    have the benefit of that information and be able to adjust

12    their prices based upon that information.

13         MR. BERSHTEYN:  You skipped ahead, though.  That is

14    the piece that's not alleged.  The piece of the information

15    goes to anybody else.  That's the essential piece.  It's kind

16    of like saying, look, I might represent Coca-Cola and Pepsi as

17    a lawyer, and I might get information from both, that --

18         JUDGE RESTREPO:  Well, the complaint says such, that

19    each casino hotel client provides its current nonpublic room

20    pricing and occupancy data to Rainmaker.

21         MR. BERSHTEYN:  It does.  So I provide it to --

22    Caesars provides it to Rainmaker and gets information -- gets

23    back these charts and curves about --

24         JUDGE RESTREPO:  So do the --

25         MR. BERSHTEYN:  -- Caesars.

1          JUDGE RESTREPO:   -- other hotels.

2          MR. BERSHTEYN:   And Borgata provides it and gives

3    Borgata information back.   That's the key.   So now you're

4    getting right to the key.   And this is what Judge Du ultimately

5    focused on and what Judge Williams focused on here.   The

6    allegation that plaintiffs don't quite make, and this is the

7    key, is that that information is pooled together and the

8    algorithm is run on that information.   They come close to

9    beating around the bush.   This is the dancing that Judge

10   Williams was referring to.   But in fact, everything they say is

11   consistent with the casino -- Caesars giving its own

12   information, and getting back various nonprice related stuff

13   like these charts that help us plan.   And also recommendations

14   for pricing based on our proprietary information and public

15   information.

16         JUDGE MCKEE:   And other people's proprietary --

17         MR. BERSHTEYN:   No.

18         JUDGE MCKEE:   -- information?

19         MR. BERSHTEYN:   No.   That's the thing.

20         JUDGE MCKEE:   Then what good is the algorithm?

21         JUDGE RESTREPO:   And they do allege it.

22         MR. BERSHTEYN:   Let's look at it.   Show me where?

23         JUDGE RESTREPO:   205.

24         MR. BERSHTEYN:   205.

25         JUDGE RESTREPO:   And knew that their main competitors

1    were contributing their respective nonpublic pricing and

2    supplied data for the same pricing algorithm.

3         MR. BERSHTEYN:  So I'm sorry, what paragraph 205?

4         JUDGE RESTREPO:  Yeah.  A264.

5         MR. BERSHTEYN:  All right.  Hold on.  Let me just get

6    there.  Okay.  Casino hotels knew that their main competitors

7    were contributing their respective nonpricing related -- okay.

8    They were contributing it.  Okay.  And used this data, this

9    data, to generate optimal guest room rates.  Okay.  So the

10   question is --

11        JUDGE RESTREPO:  Well they knew that --

12        MR. BERSHTEYN:  -- what is this data?

13        JUDGE RESTREPO:  -- their main competitors were doing

14   the same thing.

15        MR. BERSHTEYN:  Yes.  But that doesn't get you an

16   exchange of information.  Sure.  Caesars might be contributing

17   this information and getting back output based on Caesars

18   information.

19        JUDGE RESTREPO:  Exchanging it with Bob, right?

20        MR. BERSHTEYN:  No.  Well again think about it like

21   just outside this context.  So I'm an antitrust lawyer, I might

22   advise Coke, I might advise Pepsi.  I get proprietary

23   information from Coke, I get proprietary information from

24   Pepsi.  Does that mean that Coke is getting advice based on

25   proprietary --

Page 27

1        JUDGE MCKEE:  Depends on what you do with the

2    information.

3        MR. BERSHTEYN:  Yes.  Yes.  You're 100 percent right,

4    Judge McKee.  So what the RealPage -- so there's like these

5    RealPage cases and there's cases based on Rainmaker, which is a

6    software here.  And the line that Judge Crenshaw in RealPage

7    and Judge Du in case about this software drew is that isn't

8    happening here.  And what they are careful not to allege is

9    that the information is ever pooled together.  That is that

10   when they give us recommendations, they give us recommendations

11   based on the pool of information.  And so these words are --

12   these are --

13        JUDGE RESTREPO:  Look at 225.

14        MR. BERSHTEYN:  Okay.

15        JUDGE RESTREPO:  In agreeing with Rainmaker later send

16   to use their platform and to submit nonpublic pricing and

17   occupancy.  Each casino hotel understood that all the other

18   casino hotel defendants had agreed to do the same.

19        MR. BERSHTEYN:  Okay.  But where does that say the

20   information is pooled?  That's the thing, this is all very

21   coordinated --

22        JUDGE MCKEE:  Coordinate the supra competitive prices

23   to be set based on the submitted nonpublic data.  That's also

24   paragraph 25.

25        MR. BERSHTEYN:  Where does it say that?

Page 28

1          JUDGE MCKEE:  That they would coordinate the super

2   competitive prices to be set based on the submitted nonpublic

3   data.  Now, you maybe said rather than say coordinate, they

4   agreed to, it's the same thing.

5          MR. BERSHTEYN:  And this is exactly what Judge

6   Williams stumbled on.  See, these are -- each of these is

7   carefully parsed to avoid saying that Cendyn ever combines

8   information from Cendyn -- to -- or even from Cendyn to Borgata

9   or I'm sorry, from Caesars and Borgata.  And there's a reason

10  for that because I think plaintiffs are rightly concerned about

11  Rule 11 if that happens.  And let me give you an illustration.

12  These are all various formulations of the same words.  There's

13  one time, only one time in the complaint that plaintiff's side

14  actually some source about exchange of information.  And --

15         JUDGE MCKEE:  All they need is one.

16         MR. BERSHTEYN:  There's only one.

17         JUDGE MCKEE:  That's all they need, isn't it?

18         MR. BERSHTEYN:  Yes.  And so if you look at page 40 of

19  our brief --

20         JUDGE RESTREPO:  Let's take a look at the complaint

21  again.  Look at the last paragraph, bullet point on page A 270.

22  They share casino hotel defendants respective competitively

23  sensitive information.  That's not enough?

24         MR. BERSHTEYN:  Wait, I'm -- hang on one second.

25         JUDGE MCKEE:  Before the complaint.

1          MR. BERSHTEYN:  Paragraph?

2          JUDGE RESTREPO:  That's bullet point A 270, page 61 of

3     the complaint.

4          MR. BERSHTEYN:  All right.  Last bullet?

5          JUDGE RESTREPO:  Yeah.  They shared.

6          MR. BERSHTEYN:  They understood that their co-

7     defendants also knew that a recommended room rates they were

8     receiving from the platform were based on real time, nonpublic

9     pricing and occupancy.  Yes.  Our Caesars --

10         JUDGE RESTREPO:  I'm reading from --

11         MR. BERSHTEYN:  Yeah.

12         JUDGE RESTREPO:  -- page 61 of the complaint.

13         MR. BERSHTEYN:  Yes.  Oh, 61 of the complaint.

14         JUDGE RESTREPO:  They shared casino hotel defendants

15    respective competitively sensitive information concerning

16    pricing and occupancy with each other; isn't that enough?

17         JUDGE MCKEE:  It was during their meetings which is

18    more direct than I had (indiscernible).

19         MR. BERSHTEYN:  I'm sorry.  What did you --

20         JUDGE MCKEE:  I said it was during meetings, which is

21    more direct.  So it's more than just you spit it into the

22    software, but it's actually shared during meetings.

23         MR. BERSHTEYN:  Oh, so this is nothing -- this has

24    nothing to do with the software.  This is some sort of -- this

25    is about some sort of undefined meetings, I guess.

1     JUDGE MCKEE:  You're saying there was another

2  conspiracy the plaintiffs don't know about?

3     MR. BERSHTEYN:  No, no, no.  And so if I can just turn

4  to the sources for a second.   So there's this one source in

5  the complaint for this whole exchange of information idea.  And

6  if you turn to page 40 of our brief, we basically analyze what

7  that source says.  It cites to a website.  Right.  And what

8  plaintiffs allege in the complaint is that this website says

9  that the tool collects market specific hotel information from

10  clients, competitors, nonpublic real-time pricing and supply

11  data.  That sounds very ominous.  And they cite a source for

12  that.  What that source actually says is that this information

13  is collected not from other competitors, but from hundreds of

14  public website -- branded websites and online trading and

15  travel agencies like Priceline, Expedia and when we call them

16  out on that, in a motion to dismiss, plaintiffs conceded that

17  they misquoted that source.  That is the only actual

18  information pointed to in the complaint about the information

19  exchange.

20     Now, you heard my friend, Mr. Fields, say oh, but we

21  found more.  We found an actual contract, an agreement where

22  there is reference to aggregated data.  Right?  If you recall.

23  So we asked -- and this this wasn't alleged in the complaint.

24  This is what they wanted to allege in their amended complaint

25  if they were let.  And this this finally proves our case.  So

Page 31

1    we asked Mr. Fields, what is this contract?  Where did you find

2    it?  And he kindly sent it to us.  And you know, I hate to take

3    the Court down the road of something that wasn't a complaint,

4    but it was just brought up in the argument.  And so we looked

5    at the provision that says what plaintiffs say it says.  That

6    is it combines -- the Cendyn is allowed to combine data derived

7    from clients.  Right?  And we give them an opportunity --

8    permission to do that.  And then it says in part that

9    plaintiffs don't quote that Cendyn is allowed to do that,

10   quote, for internal statistical or performance analysis only by

11   Cendyn.  So if Cendyn wants to use our proprietary data,

12   Caesars' proprietary data, and combine it in any way with

13   anybody else's proprietary data, they can only do it for,

14   quote, internal statistical or performance analysis.  This is a

15   document that they say proves their case.  And then it goes on

16   to say -- and I'm again, I'm reading, Cendyn represents and

17   warrants to us that the scope of the use of the aggregated data

18   will be limited to the terms of this section.  So the very

19   contract that plaintiffs say proves that the data is pooled and

20   that's what recommendations are based on, that's what this

21   Court is most concerned about.  That actual document says no,

22   no, no.  The only way that Cendyn can pull our proprietary data

23   with anybody else's proprietary data is for its own performance

24   purposes, and it warrants that it won't do it under any other

25   circumstances.  And that's what all this language, all this

Page 32

1   kind of ambiguous language about, well, they base it on

2   competitively sensitive information, but they don't say that

3   it's our own competitively sensitive information is what Judge

4   Williams called dancing around the issue.

5           JUDGE MCKEE:  But Judge Williams didn't have that

6   document though.

7           MR. BERSHTEYN:  She didn't have the -- she didn't have

8   that document, but what she had is a complaint that doesn't

9   ever clearly say what they want her to imply.  And that's what

10  I think made clear to her as eventually became clear to Judge

11  Du, that the plaintiffs here are actually trying to get the

12  Court to read something into the complaint that, as a matter of

13  fact, they are unable to say because they know it's not true.

14  So that's the -- I wanted to cover that because I know the

15  Court is concerned about information sharing as just a matter

16  of fact.  But let me talk about information sharing as a matter

17  of law.

18          As I previewed in the beginning, information sharing

19  is not going to get plaintiffs there, even if they had alleged

20  it, because this Court had clear and unambiguous evidence of

21  information sharing in a hub-and-spoke conspiracy in the

22  insurance brokerage case and in a Burtch case.  So let me just

23  talk about the facts of those.  In the insurance brokerage case

24  the conspiracies were between a broker and the insurers, and

25  the conspiracy was to pay contingent commissions.  That was the

1  misconduct.  The Court found that it was clearly alleged that

2  the insurers all knew that the other insurers were paying

3  contingent commissions, that they all knew the level of

4  contingent commissions, that is, they knew what the other guys

5  were paying.  They even knew what benefits they were getting --

6  their competitors were getting from the broker.  And this Court

7  still said that's not enough.

8         JUDGE MCKEE:  It's also in Burtch, anyhow, no

9  allegation of parallel conduct or parallel behavior.  And Judge

10 Greenway was pretty explicit in saying that the complaint

11 failed to allege that.

12        MR. BERSHTEYN:  So I'm glad you asked that that, Judge

13 McKee, because I wanted to make sure that we cover the

14 allegations of parallel behavior here.  So my friend, Mr.

15 Fields, uses parallel behavior kind of as a shield and a sword.

16 So let me just make -- what is parallel question -- what is

17 parallel behavior question about?  Plaintiffs have to plead in

18 order to get off the ground in a Section I conspiracy case,

19 that the defendants behaved in a suspiciously parallel way, so

20 suspicious that it must have been because of the conspiracy.

21 So that's what they -- that's what their evidence has to show.

22 And when we say no, no, no, it doesn't show -- your allegations

23 don't show that at all.  They say, oh no, no, no this is --

24 we're going to put on some experts, this is too facty.  Well,

25 if it -- it's they who have to show that their facts, if those

Page 34

1   facts were true, would actually show suspiciously parallel

2   behavior.  So there's two things that are supposedly parallel

3   here, but neither of them, even on the face of it meets a

4   parallel conduct standard.

5        One is the timing of the casino defendants adoption of

6   licenses.  So Caesars started using Cendyn products, they

7   allege, in 2004.  And then additional hotels started doing that

8   five years later.  And then they say conspiracy eventually

9   began when Hard Rock started using it in 2018.  So fourteen

10  years passed between the time Caesars started using it, and

11  then additional hotels started using it, and the conspiracy

12  began.  How is that parallel conduct?  According to plaintiff's

13  brief that is near simultaneous adoption.  It's only near

14  simultaneous on geological time.  And it surely doesn't

15  prove --

16        JUDGE MCKEE:  Geological time?  I like that.

17        MR. BERSHTEYN:  I mean, it surely isn't behavior that

18  is so suspiciously parallel that it suggests a conspiracy.  If

19  this whole thing was a conspiracy, why would Caesars start

20  using it five hours before -- five years before anybody else?

21  If the only reason to use it was to be in conspiracy, it

22  doesn't even make any sense.  Their second sort of allegations

23  of parallelism is the is the movements of -- the movements of

24  price and occupancy.  So we have a chart in our brief, which

25  you might remember.  It's on page 13 of our brief.  It shows

1  movements in price during the class period.  Right?  So there

2  are three defendants.  There's a Caesars Hotels, there's

3  Borgata Hotels, there's Hard Rock, and then plaintiffs allege

4  data for nondefendants.  So if you look at that chart, page 13

5  of our brief, it shows, I think in blue, the Caesars prices,

6  and in orange the nondefendant prices.  And they're moving

7  exactly the same way.  So how does that show a conspiracy

8  involving Caesars.  Caesars is doing exactly the same thing

9  that the non-conspirators are doing.  And what about the other

10  conspirators, the non Caesars?  Well, their prices are going

11  down.  So how is this evidence of a suspicious conspiracy to

12  raise prices up if two of the three defendants are driving

13  prices down and the third is doing what non-conspirators are

14  doing.  The only rational inference from the evidence

15  plaintiffs plead here is that there is no conspiracy.

16         So now plaintiffs have an answer to this in their

17  reply brief, and it didn't quite come up in their argument, but

18  it might come up in their reply.  So I want to make sure I

19  address it.  They say, well, 2018 isn't the right year.  You

20  should really look at 2017 to 2022.  So the year before the

21  conspiracy.  Okay, let's do that.  So because they don't have

22  data for a few of these hotels for 2017, we can only look at --

23  we can only look at a few.  So there are Caesars, Borgata, and

24  there's two of the nondefendants.  Okay?  So remember this is a

25  conspiracy to increase -- or to decrease occupancy.  Right?  So

Page 36

1    there's more available rooms and prices go up.  Okay?  So of

2    the four hotels for which we have data, which plaintiffs allege

3    data 2017 to 2022, which have the steepest drops in occupancy?

4    Drop in occupancy is bad.  That's sign of conspiracy, you would

5    think that that would be the conspirators.  But actually the

6    two non-conspirators have bigger drops in occupancy according

7    to their own allegations.  2017 to 2022, the years they just

8    picked, than the conspirators do.  So how is that evidence of

9    behavior that is so suspicious that we can infer a conspiracy

10   to reduce occupancy?  And if you --

11        JUDGE MCKEE:  Aren't we now beyond the 12(b)(6)

12   dismissal?  This was -- the complaint was dismissed under

13   failure to state a claim.  And you're really making a factual

14   argument as to the proof that would be admitted.

15        MR. BERSHTEYN:  Respectfully, Judge McKee, I strongly

16   disagree with that because this is how this is -- it is the

17   whole teaching of Twombly.  All right?  The whole teaching of

18   it is that it is on the plaintiffs' pleading to come up with

19   allegations that, if true, prove something that is so

20   suspicious that it -- there is a plausible inference it must

21   have been a conspiracy.  So let's just remember what happened

22   in Twombly, right?  So Twombly was about Telecom companies and

23   the plaintiffs alleged, you know, Telecom companies, they were

24   deregulated a long time ago.  They used to be regional Ma Bell

25   companies, and we all remember that.  And weirdly, they don't

1    invade each other's territory, they just stick to their own.

2    It must be a conspiracy, that was one of the allegations.  And

3    the Supreme Court, in an opinion by Justice Souter, said, well,

4    that's one reading of it, but that doesn't pass the test of

5    plausibility.  Why?  Because there is a perfectly rational

6    explanation for why they were doing what they were doing.  You

7    know, as the Court said, everyone knows the adage about a

8    person who lives by the sword, dies by the sword.  And so maybe

9    that's why they were doing what they were doing.  If the Court

10   followed the well, they say something that sounds a little bit

11   like maybe there's some possibility there's something going on

12   here, we should just let it -- we should just roll the dice and

13   see if something comes up in discovery.  That case would have

14   come out differently.  And that, and really all the case law

15   after Twombly follows.  Let me, unless the Court has questions

16   about any of these subjects, turn to the acceptance rate.

17          So Judge McKee, you started the questioning with Mr.

18   Fields there.  So there isn't -- there's one allegation about

19   how often these rates are accepted.  That is across the

20   population of all clients that Cendyn has, of which they're

21   alleged to be tens of thousands.  That's --

22          JUDGE MCKEE:  You're saying -- I think this is where

23   you're going.  The ninety percent is the acceptance rate for

24   the universe of clients, not these hotels.  Is that what you're

25   saying?

```
 1              MR. BERSHTEYN:  That's -- well, I have really two

 2    things to say about that.  One is, yes, that's classic group

 3    pleading because it's true of everybody, it must be true of

 4    defendants.  So I just looked -- I just googled while I was

 5    listening to the copyright argument.  It turns out that the

 6    average height of a male in the United States is five foot

 7    nine, so I guess that makes, Mr. Fields and me five foot nine,

 8    which probably means we're both winners today.  That doesn't

 9    stand to reason.  That's just classic improper group pleading.

10              The second point I would make is let's go with the

11    plaintiffs on this --

12              JUDGE MCKEE:  I'm not sure I follow that, nor am I

13    sure I want to.  I use that statistic all the time.  Elevator

14    shoes.

15              MR. BERSHTEYN:  So but let's just assume, let's assume

16    for the argument that the allegation that everybody, tens of

17    thousands of users of Cendyn adopt their recommendations ninety

18    percent of the time.  And that means that every individual one

19    does as well.  So each of the three hotel defendants did the

20    same.  What would that show?  That would show that each of the

21    three hotel defendants behaved in exactly the same way that

22    tens of thousands of users of this product that are not alleged

23    to be in a conspiracy are doing, right?  So how could that

24    possibly be evidence of conspiracy if what you're doing,

25    allegedly, is exactly the same thing that non-conspirators are
```

1   doing?

2       And then let me just touch on one concept before

3   you -- unless the Court has other questions, which is that this

4   is a kind of a case that's basically like, did you do this

5   knowing that your competitors were doing it?  And does that put

6   you in agreement?  That's basically the legal framework.  And

7   this Court was very, very precise in the insurance brokerage

8   case about what the legal test -- what is it that plaintiffs

9   have to plead to essentially proceed with the case of this

10  type?  And the words this Court used is plaintiffs have to

11  plead that it would be economically self-defeating to do this,

12  economically self-defeating, that's the phrase this Court used,

13  if it weren't for a conspiracy.

14      JUDGE MCKEE:  Which is why I asked you my initial

15  question.

16      MR. BERSHTEYN:  Yes.  And we -- there's nothing in

17  this complaint that shows why it would be economically self-

18  defeating.  But there's plenty of allegations in this complaint

19  that show why it's not economically self-defeating to use

20  Cendyn.  So I'll give you examples.  They allege that tens of

21  thousands of hotels use Cendyn, that are -- all but three of

22  them are not in a conspiracy.  So how could it be economically

23  self-defeating to use this service if it wasn't for a

24  conspiracy if nearly everyone who uses it is not alleged to be

25  a conspiracy?  So that's point one.

1           Point two, they allege that Caesars started using

2    these products years and years and years before everyone else,

3    before it's alleged to be a conspiracy.  He's got no one to

4    conspire with.  The other defendants weren't --

5           JUDGE MCKEE:  See that argument, though, I find

6    underwhelming because no conspiracy has to simultaneously begin

7    with all of the members of the conspiracy at exactly the same

8    instant.  People can come, people can leave.

9           MR. BERSHTEYN:  And that's exactly the argument we

10   heard from Mr. Fields.  But --

11          THE COURT:  (Audio interference).

12          MR. BERSHTEYN:  Yes, but it goes to a completely

13   different point because -- so take 2004, was there a conspiracy

14   then?  Who did Caesars conspire with?  The other defendants

15   weren't using -- they weren't using Cendyn.  There was no

16   agreement.  There's no allegation that in 2024, the hotels

17   agreed that they're going to take turns using Cendyn.  Hard

18   Rock, one of the defendants hadn't even been opened yet.

19          JUDGE MCKEE:  Did Rainmaker even exist in 2004?

20          MR. BERSHTEYN:  Yes.

21          JUDGE MCKEE:  It did.

22          MR. BERSHTEYN:  In early -- allegedly, we'll stick to

23   allegations, and it was launched in early 90s.

24          JUDGE MCKEE:  Uh-huh.

25          MR. BERSHTEYN:  So in 2004, Caesars adopted it.  Then

Page 41

1   other hotels started adopting.  So if at the time when Caesars

2   adopted it, no coconspirators were -- nobody in conspiracy was

3   using it.  How could you say there would be economically self-

4   defeating to use it if it wasn't for conspiracy?

5          And then finally, the complaint is replete with

6   allegations which, you know, I think are true about all the

7   other nonprice recommendation related features that this suite

8   of software has.  I mentioned these curves, which is how

9   allegedly -- and I think, in fact, how Caesars uses it, that's

10  just our own information being displayed to us.  The complaint

11  alleges that this software, for example, it can distinguish

12  between legitimate group requests like, we want to hold your

13  conference in the hotel and kind of spam ones.  It can flag

14  really high value ones.  There's all these things this software

15  does have nothing to do with room recommendations.  So how

16  could it -- allegedly -- so how could it be economically self-

17  defeating to use it if it wasn't for a conspiracy about room

18  recommendations?

19         Unless the Court has any other questions, I think I

20  may have exhausted your patience.

21         THE COURT:  Thank you very much.

22         MR. FIELDS:  I am five-seven on a good day.  So

23  there's a lot to get to here.  Let me just start, I'm actually

24  surprised that Mr. Bershteyn went there.  So let me start with

25  the contract, because --

Page 42

1          JUDGE RESTREPO:  That's not part of this case.

2          MR. FIELDS:  Okay.  Of course, Your Honor.

3          JUDGE RESTREPO:  Unless you (audio interference).

4          JUDGE MCKEE:  I was going to ask, actually, whether or

5     not contract (indiscernible).

6          THE COURT:  We don't need to go through that.

7          MR. FIELDS:  Of course, Your Honor.  I'll just say

8     minimally, there would be a fact question there, but I think

9     that it was misread.

10          Second, Your Honor, I want to go to his analogy.  So

11     Mr. Bershteyn says perhaps I represent Coke and Pepsi.  If Mr.

12     Bershteyn represented eighty percent of the relevant market,

13     learned confidential information, and then told those clients

14     what to charge, that absolutely would be an antitrust

15     conspiracy.  I mean, that's a guy named Bob, that's American

16     Column and Lumber.  Mr. Bershteyn, of course, would never do

17     something like that.  But I think that it helps to explain why

18     the analogy doesn't quite work.  It's also key to recognize

19     that in his analogy, Mr. Bershteyn would -- he's an attorney,

20     he has heightened ethical and fiduciary responsibilities.

21     Rainmaker here is holding itself as providing prices.  It's not

22     offering a service to provide generalized legal advice to

23     competitors in the marketplace.  Its main offering is we'll

24     tell you what to charge to optimize your revenue.  So I don't

25     think it works for a number of reasons.

1          Third, I think Your Honors hit on some great

2     paragraphs from our complaint.  I just want to make sure that

3     four are in the minds of your of your chambers, you know,

4     paragraph 6, I think we get right to that confidential data use

5     226 and 227, we say that they were knowingly sharing

6     competitively sensitive information.  358, they submit their

7     real time nonpublic pricing and supply data, which uses this

8     data.  I think, over and over again, we really did make

9     precisely the allegation that Mr. Bershteyn said that we did

10    not.

11         One thing that didn't come up at the top is the

12    additional allegations we have of a traditional conspiracy, and

13    this Court has often looked to that as another plus factor.  If

14    you look at paragraph 229 and footnote 5 of our complaint, we

15    make clear that the very same individuals who developed,

16    marketed, and sold the algorithm that is at issue in RealPage

17    developed, marketed, and sold the precursor to GuestREV and

18    GroupREV, which are really the heart of the claims in this

19    case.  And the Department of Justice opened an investigation

20    there, twelve state attorneys generals have brought actions

21    over those same individuals.  So I think we at least have

22    alleged, you know, traditional evidence of a conspiracy.

23         Mr. Bershteyn says, well, you know, every --

24         JUDGE MCKEE:  And now that it's been mentioned, I

25    don't know which way this cuts, but there was a the Supreme

1  Court case, and I just remember the NFL case.  I can't remember

2  the full name of the case where the Court was cognizant to

3  state that we must be aware of the fact that in developing

4  antitrust law, it must be a developing law.  It can't be

5  stagnant --

6         MR. FIELDS:  Correct, Your Honor.

7         JUDGE MCKEE:  -- and it has to take into consideration

8  various changes in competition and in technology.  This --

9         MR. FIELDS:  Absolutely.

10         JUDGE MCKEE:  -- is the epidemy case for that, it

11  seems to me.

12         MR. FIELDS:  I think that's right, Your Honor.  I'm

13  glad you asked the question, Judge McKee.  I think you're

14  thinking of American Needle.

15         JUDGE MCKEE:  Yeah.

16         MR. FIELDS:  And what the Supreme Court goes on to say

17  there is, ultimately the Sherman Act is concerned with

18  independent centers of economic decision making.  We want a

19  competitive market where casino hotels in Atlantic City are

20  each competing with each other to charge consumers the lowest

21  price.  And instead, what we have here is eighty percent of the

22  market tying their hands, saying, tell us the price to charge

23  and we'll overwhelmingly adopt it.  In fact, we need override

24  permissions to even get out of the system.  They advertise

25  themselves as using that feature to each of the competitors.

Page 45

1   So I think that you're precisely right, Your Honor.  I don't

2   think that this case raises novel questions.  And in many ways,

3   I think that the more aggressive move here would be to affirm

4   the District Court's ruling below, to just sort of rubber stamp

5   it, because then what you have, you have the Rainmaker factors

6   moving forward.  Defendants know, don't put this in a contract.

7   Don't say that you're going to have enforcement mechanisms,

8   don't collect confidential information, or at least don't say

9   it.  And plaintiffs would not be able to get under the

10  proprietary hood of these black boxes to know how they're

11  working.  You could have staged discovery.  I mean, there are a

12  number of different ways the courts could deal with this.  I

13  think the way that the RealPage court has chosen to deal with

14  it, look at inputs, look at outputs, makes lots of sense.

15  Here, we have alleged competitive data is pooled, co-mingled,

16  it's used by this algorithm to generate its pricing outputs.

17  Mr. Bershteyn mentions insurance brokerage.  I'm not sure why

18  that case, he thinks, helps defendants.  I mean, there, without

19  a formal sort of red line complaint, the plaintiffs had three

20  different opportunities, three times to amend their pleading

21  before the District Court finally dismissed it.  This Court

22  actually sent one of those claims back.  You didn't have any

23  policing mechanisms.  And ultimately, that resulted in a

24  quarter billion dollar settlement in favor of the class in that

25  case.  So I'm not I'm not sure how that case quite gets them

Page 46

1    there.

2          JUDGE MCKEE:  The policing mechanism here, is it just

3    the prisoner's dilemma, the shared interest, the commonality of

4    interest or is it something more?

5          MR. FIELDS:  No, Your Honor.  So Rainmaker actually

6    scores casino hotels on a daily basis based on the rate at

7    which they accept the pricing output.  So they're scoring them

8    every day.  You have to have these override permissions.

9    Again, you know, if you're using the system --

10         JUDGE MCKEE:  That scoring is for, I'm assuming,

11   internal hotels or for Rainmaker's benefit.  I'm assuming

12   public doesn't (indiscernible).

13         MR. FIELDS:  Your Honor, that's going to be one of the

14   first questions I would like to ask in a 30(b)(6) deposition.

15   How are those scores used?  Are they then giving discounts, for

16   instance, based on the scores?  Did they publish the scores?

17   We haven't been able to identify them publicly, but I think it

18   gets to a key sort of fact about the posture of this case.

19   Everything in our complaint, we alleged without a single

20   document obtained in discovery, without a single question asked

21   at a deposition.  And at this stage you don't take well, Mr.

22   Bershteyn says you could potentially see something in

23   defendant's favor.  That's again, you know West Penn Allegheny,

24   antitrust plaintiffs, you don't have some extra bite under Rule

25   8.  If you have alleged sufficient facts to infer the existence

Page 47

1    of a conspiracy, you get to move forward to discovery.

2         Burtch, Mr. Bershteyn mentions Burtch.  There, this

3    Court was only able to distinguish Container Corp. because of

4    the market power.  There, they said, well, Container Corp, it

5    had close to ninety percent market power.  That's very

6    different than was the thirty some percent in Burtch.  Here

7    we've got eighty percent.  And that's another key difference

8    between our allegations and those in Gibson.  There, you had

9    thirty-five percent of the casino hotels on the Vegas Strip

10   using Rainmaker.  Here we've got eighty.  I think that that is

11   a key distinction.

12        Mr. Bershteyn talks about timing, and he says, well,

13   Caesars adopted the products in 2004.  Candidly, Your Honors, I

14   don't know how he can say that because GuestREV was not

15   available until at least 2009 or 2010.  Predecessor products

16   you know, are not the heart of our claim.  And I think that

17   goes to the paragraph that they point out in their brief,

18   paragraph 160, that involved REVcaster, it's a separate

19   product.  It wasn't really the focus of our briefing on appeal,

20   because we have learned that for the most part, it appears at

21   least, that it was using public data.  Not true of GuestREV and

22   GroupREV, which is why they've really been the heart of our

23   case.

24        Sixth, you know, he sort of goes to, again, the

25   pricing movement.  And this time today he says, well, let's

1   compare 2017 to 2022.  Again, that doesn't quite work as a

2   matter of fact, because you've got to look at the pre

3   conspiracy period to the start of the conspiracy, 2017 to 2018.

4   We do that in our reply brief and I think you can see it there.

5        Overall, Your Honors, I think it's important to

6   recognize that were this Court to affirm.  You really would be

7   setting a heightened standard for plaintiffs to plead in these

8   changing cases, as you pointed out, Judge McKee.  And I think

9   so much of what we've talked about today sounds very fact

10  intensive, because they really are fact questions.  If Mr.

11  Bershteyn is right, they're going to have great arguments at

12  summary judgment.  But that's not the posture of this case.

13  And we would ask that this Court reverse the District Court's

14  opinion below, or minimally send it back with instructions that

15  we receive leave to amend.

16       I'm happy to answer any additional questions.

17  Otherwise, I thank you for your time.

18       JUDGE RESTREPO:  We will ask the parties to speak to

19  Mr. Williams (phonetic) here about ordering the transcript of

20  this argument, and that you'll split the costs.

21       MR. FIELDS:  Of course.

22       MR. BERSHTEYN:  Thank you, Your Honor.

23       JUDGE RESTREPO:  Thank you very much, Counsel, for

24  your arguments and your briefs.

25       (Whereupon these proceedings were concluded.)

Page 49

1

2                    C E R T I F I C A T I O N

3

4   I, Lindsey Carlson, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9   _____

10  Lindsey Carlson

11

12  eScribers

13  7227 North 16th Street, Suite #207

14  Phoenix, AZ 85020

15

16  Date:  September 23, 2025

17

18

19

20

21

22

23

24

25

## &

**&**  1:12 3:20

## 1

**1**  5:25
**10**  10:8
**100**  27:3
**10001**  3:9,24
**11**  10:8 28:11
**12**  36:11
**13**  14:8 34:25
  35:4
**140**  13:14
**140.24**  13:15
**15**  15:15 17:20
**160**  47:18
**16th**  2:4 49:13
**17**  1:16
**192**  8:4
**193**  8:5
**1:00**  1:17

## 2

**2004**  34:7
  40:13,19,25
  47:13
**2009**  8:1 47:15
**2010**  7:25 8:1
  47:15
**2011**  8:6
**2015**  8:3
**2017**  13:3
  35:20,22 36:3
  36:7 48:1,3

**2018**  13:1 34:9
  35:19 48:3
**2022**  35:20
  36:3,7 48:1
**2024**  15:19
  40:16
**2025**  1:16
  49:16
**205**  25:23,24
  26:3
**207**  2:4 49:13
**225**  27:13
**226**  8:22 43:5
**227**  8:22 43:5
**229**  43:14
**23**  49:16
**24-3006**  1:7 4:3
**25**  27:24
**257-0885**  2:6
**264**  9:11
**265**  9:11
**270**  28:21 29:2

## 3

**3**  9:5 16:18
**30**  46:14
**356**  11:25
**358**  8:22 43:6
**395**  3:8

## 4

**4**  9:6 16:18
**40**  28:18 30:6

## 5

**5**  43:14
**50/50**  4:19
**505**  3:14
**50th**  3:8

## 6

**6**  8:22 36:11
  43:4 46:14
**61**  29:2,12,13
**625**  3:15

## 7

**7227**  2:4 49:13

## 8

**8**  10:7 46:25
**800**  2:6
**85020**  2:5
  49:14

## 9

**90**  13:14,15
**90s**  40:23
**94111**  3:16
**976**  11:25
**9th**  3:8

## a

**a.r.**  9:5
**a264**  26:4
**abandoned**
  10:13
**abbvie**  11:25
**able**  14:3,3
  21:5 24:11

45:9 46:17
  47:3
**absent**  16:15
  17:3
**absolutely**  9:19
  9:21 15:4
  22:11 42:14
  44:9
**accept**  12:3
  46:7
**acceptable**  6:8
**acceptance**  5:3
  37:16,23
**accepted**  4:15
  4:20 20:11
  37:19
**accepting**  5:9
  5:21 6:4
**accurate**  49:5
**acknowledge**
  12:24
**acknowledges**
  14:9
**act**  44:17
**actions**  11:10
  43:20
**actual**  30:17,21
  31:21
**actually**  11:5,7
  16:20 28:14
  29:22 30:12
  32:11 34:1
  36:5 41:23
  42:4 45:22

46:5
**adage** 37:7
**addition** 19:17
**additional**
  18:16 19:21
  34:7,11 43:12
  48:16
**address** 9:3
  15:24 22:9
  35:19
**addressed**
  13:11
**adebiyi** 1:6 3:5
**adjust** 24:11
**admitted** 36:14
**adopt** 4:10 7:9
  38:17 44:23
**adopted** 7:25
  18:23 40:25
  41:2 47:13
**adopting** 8:3
  11:21 14:21
  41:1
**adoption** 7:8
  34:5,13
**advance** 11:17
**advancement**
  21:15
**advances** 13:21
**advertise** 44:24
**advice** 26:24
  42:22
**advise** 26:22,22

**affirm** 45:3
  48:6
**affirmed** 21:13
**afternoon** 4:7
  18:18,19 22:1
**agencies** 30:15
**aggregated**
  16:21 30:22
  31:17
**aggressive** 45:3
**ago** 36:24
**agree** 4:19
  19:10,20
**agreed** 27:18
  28:4 40:17
**agreeing** 27:15
**agreement** 4:22
  7:18 14:19
  15:8 21:9
  30:21 39:6
  40:16
**ahead** 12:8
  19:14 23:13
  24:13
**airline** 7:21
**al** 1:12
**algorithm** 9:20
  14:12,13,21
  19:25 21:5,6
  22:25 25:8,20
  26:2 43:16
  45:16
**algorithmic**
  18:21

**allegation**
  10:24 12:3
  25:6 33:9
  37:18 38:16
  40:16 43:9
**allegations**
  8:23 12:11
  16:5,9 19:12
  19:16 33:14,22
  34:22 36:7,19
  37:2 39:18
  40:23 41:6
  43:12 47:8
**allege** 4:13 7:24
  8:5 9:8 10:9
  25:21 27:8
  30:8,24 33:11
  34:7 35:3 36:2
  39:20 40:1
**alleged** 4:9 7:7
  7:8 8:15 11:15
  15:7 16:19
  17:24 22:20
  24:14 30:23
  32:19 33:1
  36:23 37:21
  38:22 39:24
  40:3 43:22
  45:15 46:19,25
**allegedly** 38:25
  40:22 41:9,16
**alleges** 12:1
  41:11

**allegheny** 5:14
  7:18 18:11
  46:23
**allow** 12:3
**allowed** 31:6,9
**alternative**
  15:11
**ambiguous**
  32:1
**amend** 15:11
  15:13,22,25
  17:5,19 45:20
  48:15
**amended** 17:22
  18:13 30:24
**american** 3:13
  13:24 18:20
  20:8 42:15
  44:14
**analog** 4:17
  10:6
**analogy** 42:10
  42:18,19
**analysis** 17:12
  18:5 31:10,14
**analyze** 30:6
**answer** 4:25
  7:14 13:12
  18:4,8 22:13
  35:16 48:16
**answers** 11:19
  22:12
**anti** 15:8

**anticompetitive** 12:1 21:10
**antitrust** 3:13 5:15 7:17 8:9 10:19 13:20 14:8,9 17:4 18:20,23 19:19 21:8,17 22:6 26:21 42:14 44:4 46:24
**anybody** 24:15 31:13,23 34:20
**appeal** 47:19
**appeals** 1:2,15 1:23
**appear** 12:16
**appears** 47:20
**appellants** 1:9 3:3
**appellees** 3:19 22:3
**applied** 5:13
**apply** 5:16
**applying** 18:22
**argument** 31:4 35:17 36:14 38:5,16 40:5,9 48:20
**arguments** 48:11,24
**arps** 3:20
**asked** 7:13 30:23 31:1 33:12 39:14

44:13 46:20
**asking** 12:10 17:19
**assume** 38:15 38:15
**assuming** 16:8 46:10,11
**assumption** 9:9
**atlantic** 1:12 6:7,12,15,19,23 44:19
**attached** 17:19
**attention** 13:23
**attorney** 42:19
**attorneys** 3:5 3:13,21 43:20
**audio** 6:14,24 7:2 8:20 11:18 14:15 17:6 40:11 42:3
**automatically** 8:18 11:6
**available** 20:20 23:11 36:1 47:15
**avenue** 3:8
**average** 38:6
**avoid** 28:7
**aware** 44:3
**az** 2:5 49:14

**b**

**b** 1:12,19 36:11 46:14

**back** 10:11 11:9 15:19 17:23 22:18 23:25 24:23 25:3,12 26:17 45:22 48:14
**bad** 36:4
**baked** 9:20
**bally's** 7:4
**base** 32:1
**based** 8:25 9:13 24:12 25:14 26:17,24 27:5 27:11,23 28:2 29:8 31:20 46:6,16
**basically** 9:6 13:25 17:15 30:6 39:4,6
**basis** 8:17 46:6
**bea's** 10:6
**beating** 25:9
**began** 34:9,12
**beginning** 32:18
**behalf** 1:8 4:8
**behaved** 33:19 38:21
**behavior** 33:9 33:14,15,17 34:2,17 36:9
**believe** 16:6 17:24

**bell** 36:24
**benefit** 24:9,11 46:11
**benefits** 33:5
**ber** 21:24
**berger** 3:12
**bershteyn** 3:25 21:22,24 22:1 22:11 23:5,7 23:10,15,18,23 24:1,4,7,13,21 24:25 25:2,17 25:19,22,24 26:3,5,12,15,20 27:3,14,19,25 28:5,16,18,24 29:1,4,6,11,13 29:19,23 30:3 32:7 33:12 34:17 36:15 38:1,15 39:16 40:9,12,20,22 40:25 41:24 42:11,12,16,19 43:9,23 45:17 46:22 47:2,12 48:11,22
**best** 4:17 8:22 10:6 11:1
**beyond** 36:11
**big** 17:8
**bigger** 36:6
**billion** 45:24

**bit** 17:12 37:10

**bite** 5:16 46:24

**black** 45:10

**blackjack** 6:19

**blair** 1:7 3:6
4:4

**blue** 35:5

**boardwalk**
1:11 3:21

**bob** 14:11 24:2
24:3,6 26:19
42:15

**book** 23:12

**borgata** 11:11
13:7 25:2,3
28:8,9 35:3,23

**boris** 3:25 22:1

**bork's** 14:8

**bottom** 9:22

**boxes** 45:10

**branded** 30:14

**brief** 8:2 13:23
28:19 30:6
34:13,24,25
35:5,17 47:17
48:4

**briefing** 17:8
47:19

**briefly** 13:23
15:10

**briefs** 48:24

**broader** 16:13

**broker** 32:24
33:6

**brokerage**
22:15 32:22,23
39:7 45:17

**brooks** 1:22

**brought** 31:4
43:20

**bullet** 28:21
29:2,4

**burtch** 5:12
22:15 32:22
33:8 47:2,2,6

**bush** 25:9

**business** 23:20

**c**

**c** 3:2 4:2 49:2,2

**ca** 3:16

**caesars** 1:11,12
3:21 4:4 11:11
13:5 14:23
22:2 23:7,8,14
23:16,21 24:22
24:25 25:11
26:16,17 28:9
29:9 31:12
34:6,10,19
35:2,5,8,8,10
35:23 40:1,14
40:25 41:1,9
47:13

**call** 4:3 30:15

**called** 16:21
32:4

**candidly** 47:13

**careful** 10:7
27:8

**carefully** 28:7

**carlson** 2:2
49:4,10

**case** 1:6 4:16
5:24 6:9 7:18
8:8 9:9 10:5
12:9 13:22,24
13:25 14:10
16:10 17:4
19:11,21 22:15
27:7 30:25
31:15 32:22,22
32:23 33:18
37:13,14 39:4
39:8,9 42:1
43:19 44:1,1,2
44:10 45:2,18
45:25,25 46:18
47:23 48:12

**cases** 27:5,5
48:8

**casino** 1:12 4:9
6:7,11,15,17,21
6:23 7:5,9 8:16
8:19,23 11:5
12:19 16:18
21:3 24:19
25:11 26:6
27:17,18 28:22
29:14 34:5
44:19 46:6

47:9

**casinos** 5:21
7:5 20:16

**cendyn** 16:17
22:5,25 23:2,8
24:1 28:7,8,8
31:6,9,11,11,16
31:22 34:6
37:20 38:17
39:20,21 40:15
40:17

**centers** 44:18

**century** 18:22

**certain** 20:15

**certainly** 4:22
8:21 11:16
14:16 15:7
16:10 18:12

**certify** 49:4

**chambers** 43:3

**changes** 13:4
44:8

**changing** 48:8

**chapter** 14:8
24:10

**charge** 4:10
14:4 42:14,24
44:20,22

**charged** 12:18

**charging** 14:23

**chart** 8:2 34:24
35:4

**charts** 12:16,23
24:23 25:13

**chosen** 45:13
**circling** 15:20
**circuit** 1:15,20
  1:21,22,23
  6:10 7:16 10:7
  10:13
**circumstance**
  11:8 12:25
**circumstances**
  31:25
**cite** 30:11
**cites** 30:7
**city** 1:12 6:7,12
  6:15,19,23
  44:19
**civil** 16:12
**claim** 5:3,23
  6:6 8:11 10:1
  18:6 36:13
  47:16
**claims** 15:18
  22:4 43:18
  45:22
**class** 4:8 12:25
  13:2,3 16:15
  17:3 35:1
  45:24
**classic** 13:20
  14:9 38:2,9
**clear** 5:15 6:3
  7:16 8:23 20:2
  22:14 32:10,10
  32:20 43:15

**clearly** 32:9
  33:1
**client** 23:7
  24:19
**clients** 23:1,1
  30:10 31:7
  37:20,24 42:13
**close** 25:8 47:5
**clothes** 14:10
**coca** 24:16
**coconspirators**
  41:2
**cognizant** 44:2
**coke** 26:22,23
  26:24 42:11
**cola** 24:16
**colleagues** 9:17
  19:6
**collect** 45:8
**collected** 30:13
**collects** 30:9
**collusion** 5:5
  5:10 18:21
**column** 13:24
  20:8 42:16
**combination**
  20:4
**combine** 31:6
  31:12
**combines** 28:7
  31:6
**come** 8:8 22:18
  25:8 35:17,18
  36:18 37:14

40:8 43:11
**comes** 37:13
**coming** 20:7
  21:4
**commingling**
  16:19
**commissions**
  32:25 33:3,4
**commonality**
  46:3
**companies**
  18:24 36:22,23
  36:25
**company** 9:13
**compare** 48:1
**competing**
  44:20
**competition**
  44:8
**competitive**
  12:2 15:8
  27:22 28:2
  44:19 45:15
**competitively**
  28:22 29:15
  32:2,3 43:6
**competitor**
  20:25 23:21,24
**competitors**
  7:10 10:9,20
  14:21 20:12
  24:8,10 25:25
  26:6,13 30:10
  30:13 33:6

39:5 42:23
  44:25
**complaint** 4:12
  7:24 8:4 9:4,5
  9:11,13 11:9
  15:14,19 16:2
  16:8,9,23 17:9
  17:19,22,24
  18:13 24:18
  28:13,20,25
  29:3,12,13
  30:5,8,18,23,24
  31:3 32:8,12
  33:10 36:12
  39:17,18 41:5
  41:10 43:2,14
  45:19 46:19
**completely**
  19:10 40:12
**conceded** 30:16
**concept** 20:14
  39:2
**concerned**
  15:12 16:12
  17:2 28:10
  31:21 32:15
  44:17
**concerning**
  29:15
**concerns** 16:14
  18:4,8
**concluded**
  48:25

| | | | |
|---|---|---|---|
| **conduct** 7:19 7:20 11:24 21:7 33:9 34:4 34:12 | 34:18,19,21 35:7,11,15,21 35:25 36:4,9 36:21 37:2 | **contrary** 17:20 21:14 **contributing** 26:1,7,8,16 | 16:12,19 17:1 17:6,10 18:2,5 18:11,14,17,23 19:22 20:2,8 |
| **conference** 41:13 | 38:23,24 39:13 39:22,24,25 | **coordinate** 27:22 28:1,3 | 21:14,18,20,22 22:22 31:3,21 |
| **confidential** 5:19 8:16 9:3,8 9:25 10:11 15:6,21 16:21 19:2,5,7,9,12 19:15,18 20:1 42:13 43:4 45:8 | 40:3,6,7,13 41:2,4,17 42:15 43:12,22 47:1 48:3,3 **conspiratorial** 8:13 **conspirators** 35:9,10,13 36:5,6,8 38:25 | **coordinated** 27:21 **copyright** 38:5 **cornish** 1:6 3:5 4:3 **corp** 20:1 47:3 47:4 **correct** 5:6 7:3 7:6 9:15 13:18 | 32:12,15,20 33:1,6 37:3,7,9 37:15 39:3,7 39:10,12 40:11 41:19,21 42:6 43:13 44:1,2 44:16 45:13,21 45:21 47:3 48:6,13 |
| **confidentiality** 22:9,12 **consideration** 44:7 | **conspire** 40:4 40:14 **consumers** 18:22 19:3 | 16:3 17:17,21 21:19 44:6 **correctly** 9:12 **costs** 48:20 | **court's** 4:25 8:14 9:6 15:18 17:11 18:4,8 22:14 45:4 |
| **considering** 10:5 | 20:24 44:20 **container** 20:1 | **counsel** 48:23 **couple** 19:20 | 48:13 **courts** 6:9 10:4 |
| **consistent** 8:4 8:14 12:12 25:11 | 47:3,4 **context** 26:21 **contexts** 5:15 | **course** 5:23 7:19 10:12 17:1 20:3 42:2 | 15:20 45:12 **cover** 32:14 33:13 |
| **consistently** 5:13 | **contingent** 32:25 33:3,4 | 42:7,16 48:21 **court** 1:2,15,23 | **covid** 12:17,24 13:6 |
| **conspiracies** 21:17 32:24 | **continue** 17:24 **continuous** | 4:3 5:1,4,12,25 6:14,24 7:2,16 | **credited** 6:9 **crenshaw** 27:6 |
| **conspiracy** 7:17 8:9 10:12 10:20 13:20 14:7,9 17:5 19:1 20:4 30:2 32:21,25 33:18 33:20 34:8,11 | 8:17 **contract** 16:17 16:20 30:21 31:1,19 41:25 42:5 45:6 | 8:20 9:7,20,22 9:24,25 10:2 11:18,24,25 12:3,11,13,13 12:14 13:9,12 14:6,15 15:5 | **critical** 20:6 **critically** 8:15 **crystal** 20:2 22:14 **current** 20:3 24:19 |

**curves** 24:23
  41:8
**cut** 22:15
**cuts** 43:25

**d**

**d** 1:12,22 4:2
**daily** 46:6
**dancing** 25:9
  32:4
**data** 5:19 8:17
  9:1,8 16:19,21
  24:20 26:2,8,9
  26:12 27:23
  28:3 30:11,22
  31:6,11,12,13
  31:17,19,22,23
  35:4,22 36:2,3
  43:4,7,8 45:15
  47:21
**date** 49:16
**day** 41:22 46:8
**deal** 45:12,13
**decade** 7:20
  8:12
**decided** 6:10
**decision** 4:25
  11:25 15:20
  17:10 20:2
  21:13 44:18
**decrease** 13:17
  13:19 35:25
**defeating** 39:11
  39:12,18,19,23

41:4,17
**defendant** 22:3
**defendant's** 8:2
  46:23
**defendants** 7:5
  7:6 8:11,24 9:1
  12:7 14:18
  16:18 22:2
  27:18 28:22
  29:7,14 33:19
  34:5 35:2,12
  38:4,19,21
  40:4,14,18
  45:6,18
**defensive** 22:19
**defined** 16:20
**definition** 6:8
**degree** 11:23
  11:24
**delegating** 20:9
**denied** 17:5
**department**
  43:19
**depends** 27:1
**deposition**
  46:14,21
**deregulated**
  36:24
**derived** 31:6
**detail** 22:25
**developed**
  43:15,17
**developing**
  44:3,4

**dice** 37:12
**dies** 37:8
**difference**
  10:15 14:14
  17:8 47:7
**different** 6:16
  6:25 7:12
  16:22 17:25
  19:1 20:12,23
  21:6 40:13
  45:12,20 47:6
**differently**
  37:14
**difficult** 12:8
**difficulty** 13:10
  14:6
**dilemma** 10:25
  46:3
**dimension** 20:6
**direct** 21:2
  29:18,21
**directions**
  19:24
**directly** 11:5
  18:8
**disagree** 36:16
**discount** 6:22
**discounts** 46:15
**discovery**
  11:17 12:4
  13:21 18:10
  37:13 45:11
  46:20 47:1

**discussion** 9:7
**dismiss** 15:23
  17:9 30:16
**dismissal** 36:12
**dismissed**
  36:12 45:21
**display** 23:2
**displayed**
  41:10
**distinct** 18:2
**distinction**
  47:11
**distinguish**
  41:11 47:3
**distributed**
  14:5
**district** 1:3 5:4
  9:6,7 10:4 12:2
  12:14 13:11
  15:17 16:19
  17:10,11 18:4
  18:5,8,14,23
  19:22 21:18
  45:4,21 48:13
**document**
  31:15,21 32:6
  32:8 46:20
**doing** 7:10
  14:22 26:13
  34:7 35:8,9,13
  35:14 37:6,6,9
  37:9 38:23,24
  39:1,5

**[dollar - failure]** Page 8

**dollar** 45:24
**domestic** 7:21
**dozens** 19:11
  19:13
**dramatic** 12:16
**drawn** 12:11
**dressed** 14:10
**drew** 27:7
**driving** 35:12
**drop** 36:4
**drops** 36:3,6
**du** 9:10 22:23
  25:4 27:7
  32:11

**e**

**e** 1:19,19 3:2,2
  4:2,2 49:2
**early** 40:22,23
**eastern** 1:3
**economic** 44:18
**economically**
  39:11,12,17,19
  39:22 41:3,16
**economist** 12:6
**effectively**
  18:23
**effects** 12:2
**eight** 6:16
**eighty** 5:22,25
  6:3,5 11:20
  42:12 44:21
  47:7,10

**elevator** 38:13
**else's** 31:13,23
**enforcement**
  10:18,23,24
  45:7
**ensure** 5:20
**enters** 16:17
**entertainment**
  1:11 3:21
**entity** 11:1 24:5
**epidemy** 44:10
**equities** 17:2
**equivocation**
  18:7
**erred** 19:22
**escribers** 2:3
  49:12
**escribers.net**
  2:7
**esq** 3:10,17,25
**essence** 22:4
**essential** 24:15
**essentially** 9:23
  10:8,21 20:9
  39:9
**et** 1:12
**ethical** 42:20
**eventually**
  11:23 32:10
  34:8
**everybody** 8:7
  16:7 38:3,16
**evidence** 5:19
  5:20 13:20

32:20 33:21
  35:11,14 36:8
  38:24 43:22
**exact** 20:19
**exactly** 21:7
  28:5 35:7,8
  38:21,25 40:7
  40:9
**example** 23:10
  41:11
**examples** 39:20
**exceptional**
  12:25
**exchange** 22:16
  22:17,20 26:16
  28:14 30:5,19
**exchanging**
  26:19
**executives**
  11:11
**exhausted**
  41:20
**exist** 40:19
**existence** 14:19
  15:8 46:25
**expedia** 30:15
**experience** 15:2
**expert** 12:7
  14:1,2,4,11
**experts** 33:24
**explain** 42:17
**explanation**
  37:6

**explicit** 33:10
**expressly** 10:14
**extent** 12:20
  18:1
**extra** 5:16
  16:14 46:24
**extreme** 11:8

**f**

**f** 1:19 49:2
**f.3d** 11:25
**face** 34:3
**fact** 7:15,18,23
  9:6 11:16 12:5
  12:8 13:1,8
  14:13 16:6,16
  22:20 25:10
  32:13,16 41:9
  42:8 44:3,23
  46:18 48:2,9
  48:10
**factor** 11:10
  12:20 15:7
  43:13
**factors** 5:4,13
  5:17 45:5
**facts** 18:3
  32:23 33:25
  34:1 46:25
**factual** 36:13
**facty** 33:24
**failed** 33:11
**failure** 36:13

favor  12:12
  45:24 46:23
feature  21:11
  44:25
features  41:7
federal  10:4
felipe  1:20
fiduciary  42:20
fields  3:10 4:5
  4:6,7,13,24 5:6
  5:11 6:1,3,15
  6:25 7:3,13
  8:21 9:15,19
  9:21,23 10:3
  10:17 11:4,19
  12:22 13:15,18
  14:16 15:4,16
  16:3,10,25
  17:7,17,21
  30:20 31:1
  33:15 37:18
  38:7 40:10
  41:22 42:2,7
  44:6,9,12,16
  46:5,13 48:21
fifty  5:18,25
  13:6,15
figure  12:15
file  16:24 17:18
  17:19,22
filed  15:14,18
  16:1,2,8 17:9
  18:13

filing  16:23
finally  21:12
  30:25 41:5
  45:21
find  20:17,18
  20:18,19,21,22
  20:25 21:8
  31:1 40:5
finds  18:2
fine  20:5
finished  17:8
firm  15:5
first  11:5,20
  15:17 46:14
five  6:25 7:4
  13:7,7,15 34:8
  34:20,20 38:6
  38:7 41:22
  47:9
fix  18:25
fixing  14:7,13
  21:17
flag  41:13
fletcher  16:11
flom  3:20
floor  3:8
focus  47:19
focused  9:10
  25:5,5
focuses  17:12
follow  38:12
followed  37:10
follows  37:15

foot  38:6,7
footnote  43:14
footnotes  10:7
foregoing  49:4
forget  23:20
formal  45:19
formula  5:1
formulations
  28:12
forward  14:6
  45:6 47:1
found  4:15
  16:17 18:3
  30:21,21 33:1
four  8:21 36:2
  43:3
fourteen  34:9
framework
  39:6
francisco  3:16
free  19:3
frequency
  20:11
friend  30:20
  33:14
frivolous  16:8
full  44:2
futility  18:5

**g**

g  4:2
generalized
  42:22

generals  43:20
generate  26:9
  45:16
geological
  34:14,16
getting  14:22
  21:3 23:19
  25:4,12 26:17
  26:24 33:5,6
gibson  6:9 9:5
  9:10,10 15:20
  15:24 17:10,10
  17:12,18,20,25
  47:8
give  7:14 16:14
  23:1 27:10,10
  28:11 31:7
  39:20
given  18:9
gives  23:7 25:2
giving  9:17
  23:21,24,24
  24:2,3,5 25:11
  46:15
glad  7:13 9:2
  33:12 44:13
globally  4:14
go  11:2 17:23
  19:14 20:14,22
  22:24 36:1
  38:10 42:6,10
godfrey  3:4 4:7
goes  24:15
  31:15 40:12

44:16 47:17,24
**going** 11:13,22
  19:7 21:5
  22:12,17 32:19
  33:24 35:10
  37:11,23 40:17
  42:4 45:7
  46:13 48:11
**golden** 6:18,21
**good** 4:7 18:17
  18:19 22:1
  25:20 41:22
**google** 20:22
**googled** 38:4
**granted** 15:14
**graphically**
  12:16
**grappled** 22:24
**grave** 18:21
**grayed** 12:23
**great** 43:1
  48:11
**greenway**
  33:10
**ground** 33:18
**group** 38:2,9
  41:12
**groupprev** 43:18
  47:22
**grows** 8:9
**guess** 12:19
  13:9 16:7,11
  29:25 38:7

**guest** 26:9
**guestrev** 8:1
  43:17 47:14,21
**guests** 4:10
**guy** 14:11
  42:15
**guys** 33:4

### h

**half** 4:20,20
  5:21 6:4
**handle** 4:18
**hands** 10:21
  11:12 14:24
  44:22
**hang** 28:24
**happened**
  36:21
**happening** 27:8
**happens** 22:25
  28:11
**happy** 15:9,24
  48:16
**hard** 7:25 8:7
  34:9 35:3
  40:17
**hardwood**
  13:25
**harlee** 16:11
**harrah's** 13:6
**hate** 31:2
**hear** 15:17
  18:17 19:4

**heard** 30:20
  40:10
**heart** 43:18
  47:16,22
**height** 38:6
**heightened**
  42:20 48:7
**help** 4:25 17:14
  23:2,2 25:13
**helps** 42:17
  45:18
**hey** 14:23
**high** 41:14
**higher** 14:23
**hit** 8:1 43:1
**hold** 26:5 41:12
**holding** 42:21
**holds** 19:19
**honor** 4:6,13
  4:24 5:6,11,24
  6:4,17 7:3,13
  7:22 8:21 9:2
  9:15,19,21
  10:4,17 11:19
  12:5,22 13:8
  14:16 15:4,16
  16:3,11,25
  17:7,17,21
  18:1,12 19:10
  20:18 22:4
  42:2,7,10 44:6
  44:12 45:1
  46:5,13 48:22

**honors** 8:8,15
  13:22 15:9
  18:15 22:1
  43:1 47:13
  48:5
**hood** 45:10
**hotel** 1:12 6:23
  7:5 8:23 9:13
  16:18 20:21
  24:19 27:17,18
  28:22 29:14
  30:9 38:19,21
  41:13
**hotels** 4:9 6:7
  6:11,15,17 7:9
  8:16,19 9:16
  11:6 21:3 22:5
  25:1 26:6 34:7
  34:11 35:2,3
  35:22 36:2
  37:24 39:21
  40:16 41:1
  44:19 46:6,11
  47:9
**hours** 34:20
**hub** 10:12 15:1
  32:21
**huh** 40:24
**human** 14:20
  15:2
**hundreds**
  30:13

| i | | | |
|---|---|---|---|
| **idea** 30:5 | **inference** 35:14 | **instant** 40:8 | **issues** 15:18 |
| **identify** 46:17 | 36:20 | **institute** 3:13 | |
| **ii** 17:10 | **inferences** | 18:20 | **j** |
| **illustration** | 12:11 | **instructions** | **january** 15:19 |
| 28:11 | **information** | 48:14 | **jersey** 6:9 |
| **impact** 12:18 | 9:3,14,18 10:1 | **insurance** | 22:24 |
| **imply** 32:9 | 10:10,11,16,18 | 22:14 32:22,23 | **join** 8:12 19:1 |
| **important** 48:5 | 15:3,6,21 | 39:7 45:17 | **joseph** 3:10 |
| **improper** 38:9 | 16:22 19:2,5,8 | **insurers** 32:24 | **jotted** 13:4 |
| **incentive** 8:12 | 19:9,15,16,18 | 33:2,2 | **judge** 1:20,21 |
| **includes** 12:17 | 19:23 20:1 | **intensive** 48:10 | 1:22 4:11,18 |
| **increase** 13:16 | 21:1,4 22:10 | **interest** 11:1,10 | 5:5,8,14 6:2 |
| 13:19 35:25 | 22:16,17,20 | 23:21 46:3,4 | 7:11 9:10,12 |
| **independent** | 23:2,3,4,8,9,22 | **interesting** | 9:16 10:6,15 |
| 44:18 | 24:9,10,11,12 | 20:13 | 10:23 11:4 |
| **indicated** 15:24 | 24:14,17,22 | **interference** | 12:15 13:14,17 |
| **indiscernible** | 25:3,7,8,12,14 | 6:14,24 7:2 | 14:8 15:2,12 |
| 16:2 19:13 | 25:15,18 26:16 | 8:20 11:18 | 16:1,7,23 |
| 23:17 29:18 | 26:17,18,23,23 | 14:15 17:6 | 17:14,18 19:4 |
| 42:5 46:12 | 27:2,9,11,20 | 40:11 42:3 | 19:13 20:13 |
| **individual** | 28:8,14,23 | **internal** 31:10 | 22:8,23,23 |
| 20:25 38:18 | 29:15 30:5,9 | 31:14 46:11 | 23:4,6,9,14,17 |
| **individualized** | 30:12,18,18 | **internet** 20:14 | 23:19,23,25 |
| 20:21 | 32:2,3,15,16,18 | **interstate** 7:16 | 24:2,5,8,18,24 |
| **individually** | 32:21 41:10 | **invade** 37:1 | 25:1,4,5,9,16 |
| 1:7 | 42:13 43:6 | **investigation** | 25:18,20,21,23 |
| **individuals** | 45:8 | 43:19 | 25:25 26:4,11 |
| 43:15,21 | **initial** 39:14 | **involved** 47:18 | 26:13,19 27:1 |
| **industry** 21:7 | **input** 19:25 | **involving** 35:8 | 27:4,6,7,13,15 |
| **infer** 14:18 | 20:5 | **irrelevant** | 27:22 28:1,5 |
| 36:9 46:25 | **inputs** 14:20,20 | 12:21 | 28:15,17,20,25 |
| | 19:24 45:14 | **issue** 22:19,22 | 29:2,5,10,12,14 |
| | **instance** 5:12 | 32:4 43:16 | 29:17,20 30:1 |
| | 46:16 | | 32:3,5,5,10 |

33:8,9,12
34:16 36:11,15
37:17,22 38:12
39:14 40:5,19
40:21,24 42:1
42:3,4 43:24
44:7,10,13,15
46:2,10 48:8
48:18,23
**judgment** 12:9
48:12
**june** 12:25
**justice** 37:3
43:19

**k**

**karen** 1:6 3:5
**key** 9:4 13:1
15:21 19:6
25:3,4,7 42:18
46:18 47:7,11
**kind** 10:24
13:20 21:1,3,7
23:21 24:15
32:1 33:15
39:4 41:13
**kindly** 31:2
**knew** 9:16 10:9
18:14 25:25
26:6,11 29:7
33:2,3,4,5
**know** 5:17,22
6:9,20 7:25
9:24 10:4,6

11:12,25 12:6
12:8 14:2,4,7
15:4,23 16:4,5
16:13,15,20
17:3,21,23
19:8 23:12,19
30:2 31:2
32:13,14 36:23
37:7 41:6 43:3
43:22,23,25
45:6,10 46:9
46:23 47:14,16
47:24
**knowing** 7:9
14:21 24:8
39:5
**knowingly** 43:5
**knows** 10:25
37:7

**l**

**l** 1:20
**laid** 18:24
**language** 31:25
32:1
**large** 21:16
**las** 22:23
**launched** 40:23
**law** 7:14,15,22
8:9 9:24 14:12
18:23 19:19
22:14 32:17
37:14 44:4,4

**laws** 21:8,17
22:7
**lawsuit** 16:8
**lawyer** 24:17
26:21
**layers** 22:11
**learned** 42:13
47:20
**leave** 15:11,13
15:22 17:5,19
21:17 40:8
48:15
**legal** 19:17
39:6,8 42:22
**legality** 18:24
**legitimate**
23:20 41:12
**letter** 14:22
17:15
**letters** 15:23
16:1
**level** 33:3
**license** 22:5
**licenses** 34:6
**likely** 10:19
21:9
**limited** 31:18
**lindsey** 2:2
49:4,10
**line** 27:6 45:19
**lined** 18:13
**linguistic** 18:7
**listening** 38:5

**litigation** 16:4
**little** 22:8 37:10
**lives** 37:8
**llc** 1:11 2:3
3:22
**long** 13:6 17:9
36:24
**longstanding**
18:22
**look** 5:17 7:23
8:4 9:5,10
12:22 14:8
17:11 24:16
25:22 27:13
28:18,20,21
35:4,20,22,23
43:14 45:14,14
48:2
**looked** 22:22
31:4 38:4
43:13
**looking** 6:16
8:6 12:15 13:1
14:17,19
**lost** 16:16
**lot** 23:1 41:23
**lots** 45:14
**lowest** 44:20
**luis** 1:6 3:5
**lumber** 13:24
20:8 42:16
**luxury** 6:20

| m | | | |
|---|---|---|---|
| **ma** 36:24 | 47:5 | 43:24 44:7,10 | **minimum** 13:7 |
| **made** 5:14 | **marketed** | 44:13,15 46:2 | **misconduct** |
| 32:10 | 43:16,17 | 46:10 48:8 | 33:1 |
| **main** 1:6 25:25 | **marketplace** | **meagher** 3:20 | **misquoted** |
| 26:6,13 42:23 | 42:23 | **mean** 7:23 | 30:17 |
| **mainframe** | **materials** 24:3 | 13:19 17:12 | **misread** 42:9 |
| 21:2 | **matt** 18:19 | 19:8 26:24 | **monica** 1:7 3:6 |
| **make** 8:23 | **matter** 1:5 7:11 | 34:17 42:15 | **montague** 3:12 |
| 10:15 14:14 | 7:14,15,15,21 | 45:11,18 | **montgomery** |
| 17:4 22:16 | 7:23 8:9 9:24 | **means** 8:10 | 3:14 |
| 25:6 33:13,16 | 14:12 32:12,15 | 21:16 38:8,18 | **month** 14:3 |
| 34:22 35:18 | 32:16 48:2 | **mechanism** | **motion** 15:22 |
| 38:10 43:2,8 | **matters** 7:22 | 10:24 11:3 | 16:1 17:9,19 |
| 43:15 | **matthew** 3:17 | 46:2 | 30:16 |
| **makes** 17:8 | **mckee** 1:21 | **mechanisms** | **move** 45:3 47:1 |
| 38:7 45:14 | 4:11,18 5:5,8 | 5:20 10:19,23 | **moved** 16:24 |
| **making** 18:1 | 6:2 10:15,23 | 11:15 14:24 | **movement** 13:2 |
| 36:13 44:18 | 11:4 12:15 | 45:7,23 | 13:11 47:25 |
| **male** 38:6 | 13:14,17 15:12 | **meetings** 29:17 | **movements** |
| **management** | 16:1,7,23 | 29:20,22,25 | 34:23,23 35:1 |
| 11:6,11 | 17:14,18 19:4 | **meets** 34:3 | **moving** 14:6 |
| **manhattan** 3:7 | 19:13 20:13 | **member** 20:25 | 35:6 45:6 |
| 3:23 | 23:4,6,9,17,19 | **members** 16:16 | **multiple** 22:5 |
| **manufacturers** | 23:23,25 24:2 | 17:3 40:7 | n | |
| 14:1 | 24:5,8 25:16 | **mentioned** | **n** 3:2 4:2 49:2 |
| **map** 19:9 | 25:18,20 27:1 | 10:25 41:8 | **name** 44:2 |
| **market** 5:22 | 27:4,22 28:1 | 43:24 | **named** 14:11 |
| 6:3,5,7,8,12,21 | 28:15,17,25 | **mentions** 45:17 | 42:15 |
| 8:1 10:21 | 29:17,20 30:1 | 47:2 | **nationwide** |
| 11:21 21:11 | 32:5 33:8,13 | **minds** 43:3 | 4:13 |
| 30:9 42:12 | 34:16 36:11,15 | **mingled** 45:15 | **natural** 11:21 |
| 44:19,22 47:4 | 37:17,22 38:12 | **mingling** 9:8 | **nature** 21:10 |
| | 39:14 40:5,19 | **minimally** 42:8 | |
| | 40:21,24 42:4 | 48:14 | |

**near** 34:13,13
**nearly** 17:13
   39:24
**necessary**
   18:10 19:20
**need** 11:8 15:6
   21:17 28:15,17
   42:6 44:23
**needle** 44:14
**needs** 15:5
**neither** 34:3
**never** 6:10 9:7
   16:19,24 17:3
   18:6 42:16
**new** 3:9,24 6:9
   14:10 22:23
**nfl** 44:1
**nine** 7:19 38:7
   38:7
**ninety** 4:14
   37:23 38:17
   47:5
**ninth** 6:10 10:7
   10:13
**non** 35:9,10,13
   36:6 38:25
**nondefendant**
   6:17 35:6
**nondefendants**
   35:4,24
**nonprice** 25:12
   41:7
**nonpricing**
   26:7

**nonpublic** 8:25
   19:12 21:4
   24:19 26:1
   27:16,23 28:2
   29:8 30:10
   43:7
**north** 2:4 49:13
**notion** 19:18
**novel** 45:2
**nugget** 6:18,21
**number** 5:13
   13:25 42:25
   45:12
**numbers** 13:4
**ny** 3:9,24

**o**

**o** 1:19 4:2 49:2
**obtained** 46:20
**obviously** 6:10
   12:6,24 17:22
**occupancy** 9:1
   12:18 13:2,10
   13:17 20:18
   21:3 24:20
   27:17 29:9,16
   34:24 35:25
   36:3,4,6,10
**occupied** 20:20
**ocean** 6:18
**oceans** 6:20
**october** 23:11
   23:11,12

**offered** 20:22
**offering** 42:22
   42:23
**oh** 29:13,23
   30:20 33:23
**oil** 4:25
**okay** 26:6,7,8,9
   27:14,19 35:21
   35:24 36:1
   42:2
**ominous** 30:11
**ones** 41:13,14
**online** 30:14
**opened** 40:18
   43:19
**operation** 8:10
**operations** 2:7
**opinion** 5:14
   10:7 17:11
   21:18 37:3
   48:14
**opportunities**
   45:20
**opportunity**
   9:3 11:13
   14:25 15:1,17
   17:4,16 18:9
   31:7
**opposition**
   15:22
**opted** 7:11
**optimal** 26:9
**optimize** 42:24

**orange** 35:6
**orchestration**
   21:16
**order** 33:18
**ordering** 48:19
**outlined** 5:12
**output** 20:6
   26:17 46:7
**outputs** 14:20
   19:25 45:14,16
**outside** 14:1
   26:21
**outsourcing**
   20:9
**outweigh** 12:2
**overall** 48:5
**override** 11:7
   44:23 46:8
**overrides** 11:14
**overwhelming**
   7:8
**overwhelmin...**
   4:10,11 44:23
**own** 6:5 11:12
   14:25 25:11
   31:23 32:3
   36:7 37:1
   41:10

**p**

**p** 3:2,2 4:2
**pacific** 21:15
**page** 17:11
   20:2 28:18,21

29:2,12 30:6
34:25 35:4
**pages** 16:18
**pamphlet** 14:5
**pandemic**
12:17
**paradox** 14:8
**paragraph**
17:13 26:3
27:24 28:21
29:1 43:4,14
47:17,18
**paragraphs** 8:4
8:22,22 9:11
19:11 43:2
**parallel** 11:24
33:9,9,14,15,16
33:17,19 34:1
34:2,4,12,18
**parallelism**
34:23
**parsed** 28:7
**part** 10:3 15:2
31:8 42:1
47:20
**particular**
13:10
**parties** 20:11
48:18
**party** 8:13 20:7
20:10
**pass** 37:4
**passed** 34:10

**patience** 41:20
**pay** 32:25
**paying** 33:2,5
**penn** 5:14 7:18
18:11 46:23
**pennsylvania**
1:3
**people** 40:8,8
**people's** 25:16
**pepsi** 24:16
26:22,24 42:11
**percent** 4:14
5:18,22 6:2,3,5
11:20 13:5,6,7
13:7,16 27:3
37:23 38:18
42:12 44:21
47:5,6,7,9
**percentage**
4:11 20:20
**perfectly** 6:8
37:5
**performance**
31:10,14,23
**period** 8:7
12:24,25 13:2
13:3 35:1 48:3
**permission**
31:8
**permissions**
11:7 44:24
46:8
**persnickety**
21:25

**person** 10:25
37:8
**personalized**
20:24
**phoenix** 2:5
49:14
**phonetic** 48:19
**phrase** 39:12
**picked** 36:8
**piece** 15:21
22:9 24:14,14
24:15
**place** 7:19,20
**plaintiff** 12:1,3
**plaintiff's**
28:13 34:12
**plaintiffs** 4:8
8:10 10:13
12:12 16:12,14
19:7 22:4 25:6
28:10 30:2,8
30:16 31:5,9
31:19 32:11,19
33:17 35:3,15
35:16 36:2,18
36:23 38:11
39:8,10 45:9
45:19 46:24
48:7
**plan** 25:13
**platform** 9:2
27:16 29:8
**plausibility**
5:15 37:5

**plausible** 36:20
**plausibly** 12:1
**play** 17:2
**playbook** 18:24
**players** 21:6
**plead** 22:6
33:17 35:15
39:9,11 48:7
**pleaded** 10:3
22:16
**pleading** 11:16
13:8 18:7
36:18 38:3,9
45:20
**pled** 10:2
**plenty** 39:18
**plug** 21:2
**plugs** 11:5
**plus** 5:13 11:10
15:7 43:13
**pm** 1:17
**point** 11:24
23:12 28:21
29:2 38:10
39:25 40:1,13
47:17
**pointed** 30:18
48:8
**points** 10:8
**policing** 5:20
11:15 14:24
45:23 46:2
**policy** 16:13

**pool** 27:11
**pooled** 10:16
  25:7 27:9,20
  31:19 45:15
**pooling** 9:8
**population**
  37:20
**poses** 18:21
**posited** 5:25
**possibility**
  37:11
**possibly** 38:24
**posture** 46:18
  48:12
**potential** 15:18
**potentially**
  46:22
**power** 5:22 6:3
  10:21 47:4,5
**pre** 13:2 48:2
**precedent** 8:14
**precise** 39:7
**precisely** 43:9
  45:1
**precursor**
  43:17
**predecessor**
  47:15
**pretty** 33:10
**preview** 22:13
**previewed**
  32:18
**price** 11:7 13:2
  13:10,19 14:7

  14:13 18:25
  20:15 21:10,16
  34:24 35:1
  44:21,22
**priceline** 30:15
**prices** 4:10 5:2
  5:21 7:8,9 8:18
  10:11 11:13,22
  14:23,25 20:3
  20:7,10,13,21
  20:22,23 21:6
  24:12 27:22
  28:2 35:5,6,10
  35:12,13 36:1
  42:21
**pricing** 4:14
  8:25 10:10
  20:9 21:4
  24:20 25:14
  26:1,2 27:16
  29:9,16 30:10
  43:7 45:16
  46:7 47:25
**prisoner's**
  10:25 46:3
**pro** 12:2
**probably** 6:5
  38:8
**proceed** 39:9
**proceedings**
  48:25 49:5
**product** 6:20
  38:22 47:19

**products** 34:6
  40:2 47:13,15
**profitability**
  12:19
**pronouncing**
  21:22
**proof** 36:14
**properties** 6:16
  6:22 7:1
**property** 11:6
  11:13
**proprietary**
  9:14,17 15:3
  22:10 23:14,15
  23:22 25:14,16
  26:22,23,25
  31:11,12,13,22
  31:23 45:10
**prospective** 4:8
**prove** 34:15
  36:19
**proves** 30:25
  31:15,19
**provide** 8:16
  24:21 42:22
**provides** 24:19
  24:22 25:2
**providing** 9:2
  10:10 15:3
  42:21
**provision** 31:5
**public** 10:16,18
  19:22 20:25
  25:14 30:14

  46:12 47:21
**publicly** 11:22
  46:17
**publish** 46:16
**pull** 31:22
**purely** 10:18
**purposes** 31:24
**put** 33:24 39:5
  45:6

## q

**quarter** 45:24
**question** 5:1
  6:11 7:14
  10:14 11:20
  12:6 13:1,11
  13:13 26:10
  33:16,17 39:15
  42:8 44:13
  46:20
**questioning**
  37:17
**questions** 11:17
  12:8 13:9
  18:16 37:15
  39:3 41:19
  45:2 46:14
  48:10,16
**quite** 5:14 7:16
  8:23 10:7 17:8
  17:12,25 25:6
  35:17 42:18
  45:25 48:1

**quote** 31:9,10
31:14

**r**

**r** 1:19 3:2 4:2
49:2
**railroad** 21:15
**rainmaker** 4:9
4:15 8:17 15:1
24:20,22 27:5
27:15 40:19
42:21 45:5
46:5 47:10
**rainmaker's**
7:8 46:11
**raise** 11:16
13:9 35:12
**raised** 11:22
13:5,8 17:1
**raises** 45:2
**rate** 5:3 20:18
37:16,23 46:6
**rates** 5:18 6:4
8:24 11:2
12:18 13:5
26:9 29:7
37:19
**rather** 28:3
**rational** 35:14
37:5
**reach** 10:14
**read** 12:11
32:12

**reading** 29:10
31:16 37:4
**ready** 4:5
**real** 6:11 8:17
8:25 19:12
21:3 29:8
30:10 43:7
**realities** 16:4
**really** 4:16 5:3
6:16,22 7:24
8:6 10:5 12:10
14:9 15:13
18:3 21:24
35:20 36:13
37:14 38:1
41:14 43:8,18
47:19,22 48:6
48:10
**realpage** 4:16
7:20 10:5,8
27:4,5,6 43:16
45:13
**reason** 4:23
6:13 16:25
19:21 28:9
34:21 38:9
**reasons** 13:13
18:11 19:20
42:25
**rebuttal** 15:10
18:16
**recall** 30:22
**receive** 13:23
48:15

**receiving** 8:25
29:8
**recognize**
42:18 48:6
**recommend**
21:6
**recommendat...**
5:8 41:7
**recommendat...**
4:15,20 25:13
27:10,10 31:20
38:17 41:15,18
**recommended**
8:24 11:2 20:7
20:10 29:7
**record** 17:25
21:19 49:5
**recourse** 19:3
**red** 18:13 45:19
**redlined** 17:22
**reduce** 36:10
**reference** 30:22
**referring** 25:10
**regency** 1:11
3:22
**regional** 36:24
**regular** 14:5
**regularly** 13:21
**rejected** 5:18
**rejecting** 5:8
**related** 25:12
26:7 41:7
**relevant** 42:12

**relies** 9:9
**remaining** 15:9
**remand** 13:12
**remember**
34:25 35:24
36:21,25 44:1
44:1
**replead** 18:9
**replete** 41:5
**reply** 35:17,18
48:4
**represent** 22:2
24:16 42:11
**represented**
42:12
**represents**
31:16
**request** 15:10
15:13
**requested**
15:22
**requests** 41:12
**required** 15:15
**requirement**
19:18,19
**reserve** 18:16
**resolve** 19:21
**resorts** 6:18,21
**respectfully**
36:15
**respective** 26:1
26:7 28:22
29:15

respond 17:18
responding
17:20
responsibilities
42:20
restrepo 1:20
7:11 9:12,16
15:2 22:8
23:14 24:18,24
25:1,21,23,25
26:4,11,13,19
27:13,15 28:20
29:2,5,10,12,14
42:1,3 48:18
48:23
resulted 45:23
revcaster 47:18
revenue 11:11
42:24
reversal 21:19
reverse 48:13
right 13:15
16:1 19:23
20:14 21:23
24:4 25:4 26:5
26:19 27:3
29:4 30:7,22
31:7 35:1,19
35:25 36:17,22
38:23 43:4
44:12 45:1
48:11
rightly 28:10

rights 16:12
rival 22:5
rivals 18:25
road 19:9 31:3
rock 7:25 8:8
34:9 35:3
40:18
roll 37:12
room 8:24 13:5
24:19 26:9
29:7 41:15,17
rooms 12:19
20:15,15,20
23:10,12 36:1
rub 23:23
rubber 45:4
rule 4:23 12:12
15:6,15 17:20
18:23 28:11
46:24
ruling 45:4
run 25:8

**s**

s 3:2 4:2
sacrificing 15:1
sale 7:4
sample 15:14
16:2
san 3:16
santiago 1:6
3:5 4:3
satisfied 6:12

save 15:9
saying 10:22
14:6 24:16
28:7 30:1
33:10 37:22,25
44:22
says 10:8 20:3
24:18 30:7,8
30:12 31:5,5,8
31:21 42:11
43:23 46:22
47:12,25
scale 21:16
scope 31:17
scores 16:15
46:6,15,16,16
scoring 46:7,10
scot 19:3
se 4:22 14:7
18:24
second 11:24
22:13 28:24
30:4 34:22
38:10 42:10
section 31:18
33:18
see 8:5 10:6
11:22,23,23
12:23 13:3,4
13:18 21:11,12
28:6 37:13
40:5 46:22
48:4

seeing 9:4
seek 11:7,14
13:12
seem 22:19
seems 19:5,6
44:11
self 39:11,12,17
39:19,23 41:3
41:16
send 27:15
48:14
sense 34:22
45:14
sensitive 21:11
28:23 29:15
32:2,3 43:6
sent 31:2 45:22
separate 47:18
september 1:16
49:16
service 39:23
42:22
set 4:9 5:2 8:18
11:13 14:25
15:5 27:23
28:2
setting 48:7
settlement
45:24
seven 41:22
several 11:4
12:7
sh 21:24

**share**  19:1,4,9
  28:22
**shared**  19:8,16
  21:1 29:5,14
  29:22 46:3
**sharing**  5:19
  10:1 15:6,21
  20:3,13 22:9
  32:15,16,18,21
  43:5
**sherman**  44:17
**shield**  33:15
**shoes**  38:14
**shot**  16:15
**show**  4:21 5:10
  8:2 9:25 20:4
  21:8,14 25:22
  33:21,22,23,25
  34:1 35:7
  38:20,20 39:19
**shows**  14:22
  34:25 35:5
  39:17
**side**  19:6,25
  28:13
**sign**  36:4
**signed**  14:23
**similarly**  1:8
**simultaneous**
  7:17 34:13,14
**simultaneously**
  40:6
**single**  21:5
  46:19,20

**sir**  4:5
**sit**  6:21
**sits**  6:20
**situated**  1:8
**situation**  16:13
**six**  13:5
**sixth**  47:24
**skadden**  3:20
**skip**  22:12
**skipped**  24:13
**slate**  3:20
**smith**  1:7,22
  3:6
**smith's**  5:14
**socony**  4:25
**software**  22:6
  27:6,7 29:22
  29:24 41:8,11
  41:14
**sold**  43:16,17
**sorry**  23:18
  26:3 28:9
  29:19
**sort**  5:16 6:20
  6:21 11:9,19
  12:23 15:5,21
  19:11,24 21:2
  21:4,5 29:24
  29:25 34:22
  45:4,19 46:18
  47:24
**sounds**  30:11
  37:10 48:9

**source**  28:14
  30:4,7,11,12,17
**sources**  16:22
  30:4
**souter**  37:3
**spam**  41:13
**speak**  9:17
  48:18
**speaking**  22:2
**specific**  20:24
  30:9
**spit**  29:21
**split**  48:20
**spoke**  10:12
  32:21
**stage**  11:16
  12:20 13:8
  46:21
**staged**  45:11
**stagnant**  44:5
**stamp**  45:4
**stand**  38:9
**standard**  5:16
  34:4 48:7
**start**  34:19
  41:23,24 48:3
**started**  8:5 34:6
  34:7,9,10,11
  37:17 40:1
  41:1
**starting**  5:1
**starts**  12:25
**state**  5:2,23 6:6
  7:17 8:11 10:1

  18:6 36:13
  43:20 44:3
**states**  1:2,15
  38:6
**statistic**  38:13
**statistical**
  31:10,14
**steepest**  36:3
**step**  13:13
**stick**  37:1 40:22
**street**  2:4 3:14
  49:13
**strip**  6:12 47:9
**strong**  15:7
**strongly**  36:15
**stuff**  25:12
**stumbled**  28:6
**subjects**  37:16
**submit**  14:12
  27:16 43:6
**submitted**
  27:23 28:2
**subsequently**
  15:23 16:17
  18:3
**suffices**  20:4
**sufficient**  4:16
  5:2,9,23 6:6
  10:12 11:16
  13:23 16:5,9
  19:17 21:8
  46:25
**sufficiently**
  18:2

suggest 15:8
suggested 20:8
suggestion 18:1
suggests 21:13
  34:18
suite 2:4 3:15
  41:7 49:13
summary 12:9
  48:12
summers 3:17
  18:17,18,19,19
  19:10,15 20:17
  21:21
super 28:1
supplied 26:2
supply 13:19
  14:3 30:10
  43:7
supposed 20:12
supposedly
  34:2
supra 27:22
supreme 4:24
  7:16 9:25
  12:13 14:6
  20:2,8 21:14
  37:3 43:25
  44:16
sure 12:7 14:17
  19:8 26:16
  33:13 35:18
  38:12,13 43:2
  45:17,25

surely 34:14,17
surprised
  41:24
survive 18:10
susman 3:4 4:7
suspicious
  33:20 35:11
  36:9,20
suspiciously
  33:19 34:1,18
sword 33:15
  37:8,8
system 7:12
  11:5,14 44:24
  46:9
systems 8:19
  11:6

**t**

t 49:2,2
tacit 5:7 14:19
take 5:3,12
  12:4 16:21
  28:20 31:2
  40:13,17 44:7
  46:21
takes 22:6
talk 32:16,23
talked 48:9
talking 6:25
talks 47:12
teaching 36:17
  36:17

technological
  21:15,16
technology
  7:25 44:8
telecom 36:22
  36:23
tell 14:4 20:15
  20:17 42:24
  44:22
ten 13:6
tends 16:10
tens 37:21
  38:16,22 39:20
term 16:20
terms 4:18
  31:18
territory 37:1
test 37:4 39:8
testify 12:7
thank 4:6 21:20
  21:21 41:21
  48:17,22,23
theodore 1:21
theories 10:5
theory 9:12,22
  9:23 10:13
thing 4:19 7:10
  13:21 14:22
  19:6 25:19
  26:14 27:20
  28:4 34:19
  35:8 38:25
  43:11

things 34:2
  38:2 41:14
think 4:16,19
  4:24 5:11 6:5,8
  6:12 7:15,22
  8:1,6,13,15,21
  8:22 9:4,24
  10:1,5,17 11:9
  11:14,19 12:5
  12:22,24 13:1
  13:8 14:16,20
  15:5,16 16:3
  16:25 17:7
  18:3,9,10
  19:16,17,19,21
  19:23,23 20:1
  20:5 21:12,18
  21:19 26:20
  28:10 32:10
  35:5 36:5
  37:22 41:6,9
  41:19 42:8,17
  42:25 43:1,4,8
  43:21 44:12,13
  45:1,2,3,13
  46:17 47:10,16
  48:4,5,8
thinking 18:14
  44:14
thinks 45:18
third 1:15,23
  20:7,10 35:13
  43:1

| | | | |
|---|---|---|---|
| **thirty** 13:5,7 47:6,9 | **together** 5:17 25:7 27:9 | **two** 8:7 11:19 13:13 15:20 | **understood** 8:24 27:17 |
| **thought** 16:5,9 | **told** 42:13 | 19:24 21:9 | 29:6 |
| **thousands** 17:3 | **took** 7:19,20 | 22:11 34:2 | **underwhelmi...** |
| 20:23 37:21 | **tool** 11:21 30:9 | 35:12,24 36:6 | 40:6 |
| 38:17,22 39:21 | **top** 43:11 | 38:1 40:1 | **unfortunately** |
| **threat** 18:21 | **totality** 5:12 | **twombly** 5:16 | 12:14 13:22 |
| **three** 6:17 20:2 | **totally** 12:20 | 12:13 36:17,22 | **union** 21:14 |
| 35:2,12 38:19 | 17:20 | 36:22 37:15 | **united** 1:2,15 |
| 38:21 39:21 | **touch** 8:2 13:24 | **tying** 10:21 | 38:6 |
| 45:19,20 | 14:18 15:10 | 14:24 44:22 | **universe** 37:24 |
| **tie** 11:12 | 39:2 | **type** 39:10 | **uploaded** 8:18 |
| **time** 4:20,20 | **trading** 30:14 | | **uploads** 11:6 |
| 5:19,22 6:4 | **traditional** | **u** | **use** 4:9 5:2 21:5 |
| 8:17,25 15:9 | 43:12,22 | **u.s.** 1:23 | 27:16 31:11,17 |
| 17:23 18:13,16 | **transcribed** 2:2 | **uh** 40:24 | 34:21 38:13 |
| 19:12 21:3,11 | **transcript** | **ultimately** 5:4 | 39:19,21,23 |
| 28:13,13 29:8 | 48:19 49:4 | 14:17 25:4 | 41:4,17 43:4 |
| 30:10 34:10,14 | **travel** 30:15 | 44:17 45:23 | **used** 14:1 24:3 |
| 34:16 36:24 | **tropicana** 8:3 | **unable** 32:13 | 26:8 36:24 |
| 38:13,18 41:1 | 13:6,14 | **unambiguous** | 39:10,12 45:16 |
| 43:7 47:25 | **true** 18:12 | 32:20 | 46:15 |
| 48:17 | 32:13 34:1 | **undefined** | **useful** 23:3 |
| **times** 7:12 11:8 | 36:19 38:3,3 | 29:25 | **users** 38:17,22 |
| 19:1 45:20 | 41:6 47:21 | **under** 7:5 | **uses** 8:18 33:15 |
| **timing** 7:14 | 49:5 | 19:19 22:14 | 39:24 41:9 |
| 17:7 34:5 | **trying** 4:18 | 31:24 36:12 | 43:7 |
| 47:12 | 32:11 | 45:9 46:24 | **using** 8:5 10:9 |
| **tine** 21:24 | **turn** 11:8 30:3 | **underlying** | 34:6,9,10,11,20 |
| **today** 10:14 | 30:6 37:16 | 21:10 | 40:1,15,15,17 |
| 12:10 16:6 | **turns** 38:5 | **understand** | 41:3 44:25 |
| 17:24 38:8 | 40:17 | 9:12 | 46:9 47:10,21 |
| 47:25 48:9 | **twelve** 7:21 | **understands** | |
| | 43:20 | 11:1 | |

**[v - zach]**                                                    Page 22

| v | ways 45:2,12 | y |
|---|---|---|

**v**

**v** 1:10 4:4
**vacancy** 20:19
**vacant** 20:19
**vacuum** 4:25
**value** 41:14
**various** 25:12
  28:12 44:8
**vegas** 6:11
  22:23 47:9
**verse** 24:10
**violation** 4:22
  20:12 22:6
**virtues** 12:2

**w**

**wait** 28:24
**want** 8:2 11:12
  16:16 18:25
  22:18,18 32:9
  35:18 38:13
  41:12 42:10
  43:2 44:18
**wanted** 15:24
  30:24 32:14
  33:13
**wants** 31:11
**warrants** 31:17
  31:24
**way** 10:3 19:23
  23:3 31:12,22
  33:19 35:7
  38:21 43:25
  45:13

**ways** 45:2,12
**we've** 7:7,8
  12:23 13:4
  14:2,3 18:10
  47:7,10 48:9
**website** 30:7,8
  30:14
**websites** 30:14
**weirdly** 36:25
**went** 13:14
  41:24
**west** 3:7,23
  5:14 7:18
  18:11 46:23
**williams** 22:23
  25:5,10 28:6
  32:4,5 48:19
**winners** 38:8
**wish** 17:23
  18:12
**woah** 23:25
**words** 27:11
  28:12 39:10
**work** 42:18
  48:1
**working** 45:11
**works** 42:25
**wrap** 21:12

**x**

**x** 1:4,14

**y**

**yeah** 7:4 15:12
  23:7 26:4 29:5
  29:11 44:15
**year** 8:7 23:13
  23:13,13 35:19
  35:20
**years** 7:19,21
  8:9 12:17 34:8
  34:10,20 36:7
  40:2,2,2
**york** 3:9,24

**z**

**z** 3:10
**zach** 4:7

Commonwealth of Pennsylvania Rules of Civil

Procedure

Title 231, Chapter 4000

Depositions and Discovery

Rule 4017

(c) When the testimony is fully transcribed a copy
of the deposition with the original signature page
shall be submitted to the witness for inspection
and signing and shall be read to or by the witness
and shall be signed by the witness, unless the
inspection, reading and signing are waived by the
witness and by all parties who attended the taking
of the deposition, or the witness is ill or cannot
be found or refuses to sign. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the person before
whom it was taken with a statement of the reasons
given by the witness for making the changes. If the
deposition is not signed by the witness within
thirty days of its submission to the witness, the
person before whom the deposition was taken shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the refusal to sign together with the reason, if

any, given therefor; and the deposition may then be used as fully as though signed, unless the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.